REDACTED – PUBLIC VERSION

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| HUMANA INC. | |
| Plaintiff, | Civil Action No. 16-MD-2724 |
| v. | HON. CYNTHIA M. RUFE |
| ACTAVIS ELIZABETH LLC;<br>ACTAVIS HOLDCO US, INC.;<br>ACTAVIS PHARMA, INC.;<br>ALVOGEN, INC.<br>AMNEAL PHARMACEUTICALS, LLC;<br>APOTEX CORP.;<br>ASCEND LABORATORIES, LLC;<br>AUROBINDO PHARMA U.S.A., INC.;<br>BAUSCH HEALTH AMERICAS, INC. F/K/A VALEANT<br>PHARMACEUTICALS INTERNATIONAL, INC.;<br>BAUSCH HEALTH US, LLC F/K/A VALEANT<br>PHARMACEUTICALS NORTH AMERICA LLC;<br>FOUGERA PHARMACEUTICALS INC.;<br>GLENMARK PHARMACEUTICALS INC., USA<br>G&W LABORATORIES, INC.;<br>HIKMA PHARMACEUTICALS USA INC. F/K/A WEST-<br>WARD PHARMACEUTICALS CORP.;<br>IMPAX LABORATORIES, LLC F/K/A IMPAX<br>LABORATORIES, INC.;<br>LANNETT COMPANY, INC.;<br>LUPIN PHARMACEUTICALS, INC.;<br>MYLAN INC.;<br>MYLAN, N.V.;<br>MYLAN PHARMACEUTICALS INC.;<br>NOVARTIS AG;<br>PAR PHARMACEUTICAL, INC.;<br>PAR PHARMACEUTICAL COMPANIES, INC.;<br>PERRIGO COMPANY PLC;<br>PERRIGO NEW YORK, INC.;<br>SANDOZ AG;<br>SANDOZ, INC.;<br>SUN PHARMACEUTICAL INDUSTRIES, INC.;<br>TARO PHARMACEUTICAL INDUSTRIES LTD.;<br>TARO PHARMACEUTICALS USA, INC.;<br>TEVA PHARMACEUTICALS USA, INC.; AND<br>WOCKHARDT USA LLC | Individual Case No. 20-cv-06303<br><br>SUPPLEMENTAL AND<br>AMENDED COMPLAINT<br><br>JURY TRIAL DEMANDED |
| Defendants. | |

REDACTED – PUBLIC VERSION

# TABLE OF CONTENTS

I.    NATURE OF THE CASE ............................................................................................1

II.    THE DRUGS SUBJECT TO THE CONSPIRACY ...............................................5

III.    JURISDICTION AND VENUE...............................................................................8

IV.    THE PARTIES .........................................................................................................9

    A.    Plaintiff.............................................................................................................9

    B.    Defendants .....................................................................................................10

    C.    Co-Conspirators..............................................................................................17

V.    REGULATORY AND ECONOMIC BACKGROUND.........................................29

    A.    Generic Drugs Should Provide Lower-Priced Options for Purchasers.....................29

    B.    The Prescription Drug Market .......................................................................31

    C.    The Prescription Drug Distribution System...................................................32

    D.    The Market for Generic Drugs is Highly Susceptible to Collusion ...........................34

VI.    GOVERNMENT INVESTIGATIONS OF THE CONSPIRACY ........................37

    A.    Congress Launched an Investigation into Generic Price Hikes ...................37

    B.    The DOJ Investigates Criminal Generic Drug Collusion .............................39

    C.    State Attorneys General Launch Their Own Investigation............................45

VII.    THE GENERIC DRUG MARKET........................................................................49

    A.    The Cozy Nature of the Industry and Opportunities for Collusion...........................49

        1.    Trade Association Meetings and Conferences.......................................50

            a.    National Association of Chain Drug Stores.........................52

            b.    Generic Pharmaceutical Association ...................................52

            c.    Healthcare Distribution Management Association ...............54

            d.    Efficient Collaborative Retail Marketing ............................55

            e.    Minnesota Multistate Contracting Pharmacy Alliance.......................56

f.      Healthcare Supply Chain Association ...................................................56

2.      Industry Dinners and Private Meetings...................................................57

3.      Personal Telephone Calls, E-Mails, and Text Message Communications......59

B.    The Overarching Conspiracy Between Generic Drug Manufacturers—Playing Nice in the Sandbox .........................................................................60

C.    Generic Drug Price Spikes Since 2013...................................................68

VIII.    THE CONSPIRACY ...................................................................................69

A.    Topical Drugs Conspiracy.....................................................................70

1.      Overview of the Topical Drugs Conspiracy ............................................70

2.      The Early Days—Collusion From 2009 To Early 2012 ..................................82

a.      Key Relationships Among Generic Topical Manufacturers ..............82

b.      Long-Standing Competitor Relationships Lead to Collusion.............86

c.      G&W And Its Relationships...............................................101

d.      Additional Collusive Relationships .......................................105

3.      Focus On Price Increases Intensifies – Collusion From Late 2012 - 2016. 105

a.      Shifts In The Market Foster Collusion ...................................105

b.      Post-Fougera Acquisition, Sandoz Sales Executives Feel Pressure To Demonstrate Their Value...............................................108

c.      Key Relationships Emerge And Existing Relationships Strengthen 109

4.      Taro Emerges As A Leader Among Generic Topical Manufacturers ......... 116

a.      Increased Focus On Fair Share And Price Increases.......................116

b.      Building Upon Early Successes—Taro's Continued Collusion Over The Ensuing Years.......................................................135

5.      Sandoz And Its Other Relationships .................................................. 142

a.      Collusion Between Sandoz And Perrigo...................................144

b.      Collusion Between Sandoz And Glenmark................................159

c.      Collusion Between Sandoz And Aurobindo ..............................172

d.    Collusion Between Sandoz and non-defendant Rising.................... 180

6.    G&W And Its Other Relationships ................................................ 181

a.    Collusion Between G&W And Perrigo............................... 184

b.    Collusion Between G&W And Actavis............................... 190

c.    Collusion Between G&W And Glenmark........................... 198

d.    Collusion Between G&W And Lupin ................................. 204

B.    The Defendants' Profitability Increases Dramatically As A Result Of Collusive
Conduct............................................................................................................. 208

1.    Taro And Perrigo's Profits Increased Over 1300% From 2008 To Early 2016
................................................................................................................ 209

a.    Taro ................................................................................... 209

b.    Perrigo ............................................................................... 211

2.    Other Defendants' Revenues And Profits Also Multiply From 2008 To Early
2016 ..................................................................................................... 212

C.    Other Subject Drugs ......................................................................................... 214

1.    Ammonium Lactate ................................................................................ 214

2.    Atropine Sulfate Ophthalmic Solution .................................................. 215

3.    Carisoprodol tablets............................................................................... 216

4.    Exemestane tablets ................................................................................ 217

5.    Fluticasone Propionate Nasal Spray...................................................... 218

6.    Hydrocodone Acetaminophen tablets .................................................... 219

7.    Latanoprost ophthalmic solution ........................................................... 220

8.    Neomycin/Polymyxin/Hydrocortisone .................................................. 227

9.    Nystatin Triamcinolone cream and ointment......................................... 228

10.    Oxycodone HCL oral solution and tablets ....................................... 237

11.    Silver Sulfadiazine cream .................................................................. 239

12.    Tobramycin Dexamethasone .............................................................. 240

**REDACTED – PUBLIC VERSION**

13.    Trazodone HCL ........................................................................................ 241

IX.    HUMANA'S PURCHASES AND ANTITRUST INJURY ...................................................242

X.    INTERSTATE TRADE AND COMMERCE ..............................................................................242

XI.    TOLLING AND FRAUDULENT CONCEALMENT ............................................................243

XII.    DISCOVERY WILL ESTABLISH THE FULL SCOPE OF THE CONSPIRACY ..........245

XIII.    CAUSES OF ACTION .................................................................................................245

XIV.    DEMAND FOR JUDGMENT ........................................................................................439

XV.    JURY DEMAND ..............................................................................................................440

REDACTED – PUBLIC VERSION

Plaintiff Humana Inc. ("Humana") files this Supplemental and Amended Complaint ("Complaint")[1] against Defendants Actavis Elizabeth LLC, Actavis Holdco US, Inc., Actavis Pharma, Inc., Amneal Pharmaceuticals, LLC, Alvogen, Inc., Apotex Corp., Ascend Laboratories, LLC, Aurobindo Pharma U.S.A., Inc., Bausch Health Americas, Inc. f/k/a Valeant Pharmaceuticals International, Inc., Bausch Health US, LLC f/k/a Valeant Pharmaceuticals North America LLC, Fougera Pharmaceuticals Inc., Glenmark Pharmaceuticals Inc., USA, G&W Laboratories, Inc., Hikma Pharmaceuticals USA Inc. f/k/a West-Ward Pharmaceuticals Corp., Impax Laboratories, LLC f/k/a Impax Laboratories, Inc., Lannett Company, Inc., Lupin Pharmaceuticals, Inc., Mylan, Inc., Mylan, N.V., Mylan Pharmaceuticals Inc., Novartis AG, Par Pharmaceutical, Inc., Par Pharmaceutical Companies, Inc., Perrigo Company, plc, Perrigo New York, Inc., Sandoz AG, Sandoz, Inc., Sun Pharmaceutical Industries, Inc., Taro Pharmaceutical Industries, Ltd., Taro Pharmaceuticals USA, Inc., Teva Pharmaceuticals USA, Inc., and Wockhardt USA LLC, (collectively, the "Defendants") and alleges based on personal knowledge as to the facts pertaining to it and information made public during ongoing government investigations of Defendants and other generic drug companies, and upon information and belief as to all other matters, as follows:

I.      NATURE OF THE CASE

1.      Humana brings this action to recover damages it incurred from egregious overcharges it paid for certain widely-used generic drugs, arising from a far-reaching conspiracy among Defendants and others to blatantly fix the price of such drugs. This conspiracy increased the Defendants' profits, and that of others working with them, at the expense of Humana, a private health benefit provider, as well as consumers and the government.

---

[1] The supplemental and amended allegations primarily address facts relating to newly added Defendants Novartis AG and Sandoz AG, and except for updates to party identities, do not attempt to update any other allegations to account for factual developments over time.

Additionally, this Supplemental and Amended Complaint does not seek to take any action that would violate any applicable bankruptcy order with respect to any previously named defendant who initiated bankruptcy proceedings after the commencement of this case, including Par Pharmaceuticals, Inc. and Par Pharmaceutical Companies, Inc.

REDACTED – PUBLIC VERSION

2.      In the pharmaceutical industry, generic drug entry predictably and typically results in increased price competition, which reduces the price of drugs for wholesalers, retailers, consumers, and third-party payers ("TPPs") like Humana. Defendants here, however, along with other generic drug manufacturers, conspired to manipulate the relevant markets, allocate these markets amongst themselves, and obstruct generic competition in an ongoing scheme to fix, increase, stabilize, and/or maintain the price of the drugs identified in Section II below (the "Subject Drugs"). The Defendants' scheme continues to affect the generic drug markets for the Subject Drugs. While this Complaint alleges facts as to the Subject Drugs, this scheme and conspiracy extends to other generic drugs, including those that are the subject of Humana's Second Amended Complaint, as may be further amended, in *Humana Inc. v. Actavis Elizabeth, LLC*, No. 2:18-cv-03299-CMR, as well as Humana's Complaint, as may be further amended, in *Humana Inc. v. Actavis Elizabeth, LLC*, No. 2019-cv-04862-CMR.

3.      Defendants orchestrated their conspiracy through secret communications and meetings, both at private and public events, like trade association meetings held by the Generic Pharmaceutical Association ("GPhA") (n/k/a Association for Accessible Medicines), the Healthcare Distribution Management Association ("HDMA") (n/k/a Healthcare Distribution Alliance), the Efficient Collaborative Retail Marketing organization ("ECRM"), the Minnesota Multistate Contracting Alliance for Pharmacy ("MMCAP"), and the Healthcare Supply Chain Association ("HSCA"), among others.

4.      The conspiracy, which infected the entire generic marketplace, was designed to evade detection. Pursuant to a "fair share" scheme, Defendants predetermined market share, fixed prices, and rigged bids on the Subject Drugs listed below, as well as additional drugs. This fair share understanding was often referred to by Defendants as the "rules of engagement" for the generic drug industry and permeated every segment of the industry. The *modus operandi* was to avoid

REDACTED – PUBLIC VERSION

competition among generic manufacturers that would normally result in significant price erosion and significant savings for purchasers, particularly insurers—like Humana—responsible for paying the bulk of the prescription drug costs in the United States. This overarching conspiracy, effectuated by a series of drug-specific conspiracies, thwarted competition across the generic drug industry:

5.      Predictably, the results of the conspiracy were severe. The prices of generic drugs skyrocketed at unprecedented rates, some by more than 1000%.

6.      These price increases are consistent with Medicare Part D "extraordinary" price increases found by the Government Accountability Office ("GAO") for some of the Subject Drugs, specifically Atropine Sulfate, Carisoprodol, Methazolamide, Oxycodone HCL, and Promethazine HCL.[2]

7.      Defendants routinely and systematically communicated with one another to determine and agree on how much market share, and which customers, each conspirator was entitled to. They effectuated their market allocation by either refusing to bid for particular customers or providing outrageously high cover bids. This created an artificial equilibrium that enabled the conspirators to then collectively raise and/or maintain prices for a particular generic drug.

8.      Defendants understood and acted upon an underlying code of conduct widespread in the generic drug industry: any time a competitor enters a particular drug market, it can contact its competitors and allocate the market according to a generally agreed-upon standard of "fair share" in order to avoid competing and keep prices high. While different drugs may involve different competitors, this understanding remains constant and is the backbone of the industry wide conspiracy.

---

[2] Generic Drugs Under Medicare: Part D Generic Drug Prices Declined Overall, but Some Had Extraordinary Price Increases, GAO-16-706 (August 2016) ("the GAO Report").

REDACTED – PUBLIC VERSION

9.      The market for each of the Subject Drugs was small enough to foster collusion, but still large enough that prices should have remained at their historical, near marginal cost levels. Defendants overcame this obstacle and produced extraordinary price increases, as reflected in industry-wide data, by engaging in a concerted effort to grow their conspiracy and dominate the market for the Subject Drugs.

10.     This industry-wide data is consistent with the substantial price increases Humana suffered for the Subject Drugs.

11.     Defendants knew their conduct was unlawful. They limited their communications to in-person meetings, or mobile phone calls, to avoid creating a record of their conduct. When communications were reduced to writing or text messages, Defendants often destroyed the evidence of those communications.

12.     Executives and others at the highest levels in many of Defendant companies and other companies not named as Defendants, including among others, Ara Aprahamian (Actavis/Watson, Sun/Taro), Mitchell Blashinsky (Glenmark, Sun/Taro), Douglas Boothe (Actavis, Perrigo), James (Jim) Grauso (Aurobindo, Glenmark, G&W), Walter Kaczmarek (Fougera, Mallinckrodt), Armando Kellum (Fougera/Sandoz), Kurt Orlofsky (G&W), Michael Perfetto (Actavis, Sun/Taro), Erika Vogel-Baylor (G&W), and John Wesolowski (Perrigo), among others, conceived, directed, and ultimately benefitted from these schemes.

13.     This scheme to fix and maintain prices, allocate markets, and otherwise stifle competition caused, and continues to cause, significant harm to the United States healthcare system. Defendants' scheme violates Section 1 of the Sherman Act, 15 U.S.C. § 1, and various state antitrust and unfair competition laws, as alleged herein. As a result of the conspiracy, Humana paid substantially inflated and anticompetitive prices for generic pharmaceutical drugs, and Defendants illegally profited as a result.

14.    Humana seeks treble damages and injunctive relief on account of Defendants' unlawful scheme to fix, maintain, and stabilize prices for the Subject Drugs.

## II.    THE DRUGS SUBJECT TO THE CONSPIRACY

15.    <u>Ammonium Lactate</u>. Ammonium lactate is a topical medication used to treat dry or scaly skin and ichthyosis vulgaris, a hereditary dry skin condition.

16.    <u>Atropine Sulfate</u>. Atropine sulfate is an antimuscarinic agent used to treat bradycardia.

17.    <u>Calcipotriene</u>. Calcipotriene is a topical form of Vitamin D used to treat psoriasis.

18.    <u>Calcipotriene/Betamethasone Dipropionate</u>. Calcipotriene betamethasone dipropionate is a combination topical medication consisting of calcipotriene as described above and a topical corticosteroid used to treat psoriasis.

19.    <u>Carbidopa/Levodopa</u>. Carbidopa levodopa is a combination of carbidopa, a decarboxylase inhibitor, and levodopa, a central nervous system agent that causes the production of dopamine used to treat Parkinson's disease and other conditions that cause symptoms similar to those of Parkinson's disease.

20.    <u>Carisoprodol</u>. Carisoprodol is a muscle relaxer used to treat skeletal muscle injuries and conditions.

21.    <u>Cefpodoxime Proxetil</u>. Cefpodoxime proxetil is used to treat a variety of bacterial infections.

22.    <u>Danazol</u>. Danazol is an androgen used to treat endometriosis, fibrocystic breast disease, and hereditary angioedema.

23.    <u>Desoximetasone</u>. Desoximetasone is a topical medication used to treat a variety of skin conditions including eczema, dermatitis, allergies, and rash.

**REDACTED – PUBLIC VERSION**

24.    <u>Erythromycin Base Ethyl Alcohol</u>. Erythromycin base ethyl alcohol is a topical antibiotic medication combined with alcohol to dry oils from the skin used to treat acne.

25.    <u>Ethambutol HCL</u>. Ethambutol hydrochloride is an antibiotic used to treat tuberculosis. It is included on the World Health Organization's ("WHO") List of Essential Medicines.

26.    <u>Exemestane</u>. Exemestane is an aromatase inhibitor used to treat breast cancer.

27.    <u>Fluticasone Propionate</u>. Fluticasone propionate is a topical corticosteroid used to treat a variety of skin conditions including eczema, psoriasis, allergies, and rash.

28.    <u>Hydrocodone Acetaminophen</u>. Hydrocodone acetaminophen is a combination medication consisting of an opioid and non-opioid used to treat moderate to severe pain

29.    <u>Hydrocortisone Acetate</u>. Hydrocortisone acetate is a topical corticosteroid. In rectal suppository form, it is used to treat hemorrhoids and itching and swelling in the rectum and anus.

30.    <u>Latanoprost</u>. Latanoprost is a prostaglandin analog used to treat glaucoma and ocular hypertension. It is included on the WHO's List of Essential Medicines.

31.    <u>Methazolamide</u>. Methazolamide is a carbonic anhydrase inhibitor used to treat glaucoma.

32.    <u>Methyldopa</u>. Methyldopa is an antihypertensive used to treat high blood pressure. It is included on the WHO's List of Essential Medicines.

33.    <u>Mometasone Furoate</u>. Mometasone furoate is a topical corticosteroid used to treat a variety of skin conditions including eczema, psoriasis, allergies, and rash.

34.    <u>Nafcillin Sodium</u>. Nafcillin sodium is an antibiotic used to treat staphylococci and other bacterial infections.

35.    <u>Neomycin/Polymyxin/Hydrocortisone</u>. Neomycin polymyxin hydrocortisone is a combination medication consisting of two antibiotics and a corticosteroid used to treat outer ear infections caused by bacteria.

36.    <u>Nystatin/Triamcinolone</u>. Nystatin triamcinolone is a combination topical drug consisting of nystatin, an antifungal medication, and triamcinolone, an anti-inflammatory corticosteroid. It is used to treat fungal skin infections.

37.    <u>Ondansetron</u>. Ondansetron is used to prevent nausea and vomiting that may be caused by surgery, chemotherapy, or radiation treatment. It is included on the WHO's List of Essential Medicines.

38.    <u>Oxacillin Sodium</u>. Oxacillin sodium is an antibiotic used to treat staphylococci and other bacterial infections.

39.    <u>Oxycodone HCL</u>. Oxycodone hydrochloride is an opioid used to treat moderate to severe pain.

40.    <u>Promethazine HCL</u>. Promethazine hydrochloride is an antihistamine used to treat allergy symptoms, nausea, and vomiting caused by a reaction to anesthesia or motion sickness.

41.    <u>Silver Sulfadiazine</u>. Silver sulfadiazine is a topical antibiotic used to prevent and treat infections of burns. It is included on the WHO's List of Essential Medicines.

42.    <u>Tacrolimus</u>. Tacrolimus is a topical calcineurin inhibitor used to treat eczema.

43.    <u>Terconazole</u>. Terconazole is a topical antifungal medication used to treat yeast infections.

44.    <u>Tobramycin Dexamethasone</u>. Tobramycin dexamethasone is a combination medication consisting of an antibiotic and a corticosteroid used to treat bacterial infections in the eye.

REDACTED – PUBLIC VERSION

45.     <u>Trazodone HCL</u>. Trazodone hydrochloride is a tetracyclic antidepressant used to treat depression and anxiety disorders.

## III.     JURISDICTION AND VENUE

46.     This Court has jurisdiction over this action pursuant to 15 U.S.C. §§ 15 and 26, and 28 U.S.C. §§ 1331 and 1337. Humana asserts claims for relief under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15. This Court has jurisdiction over the state law claims alleged in this action pursuant to 28 U.S.C. § 1367, as the state law claims are so related to the federal antitrust claims as to form part of the same case or controversy.

47.     This Court has personal jurisdiction over Defendants because each Defendant transacted business throughout the United States (including in this District), sold and distributed one or more of the Subject Drugs throughout the United States (including in this District), has registered agents in the United States (including in this District), may be found in the United States (including in this District), engaged in an unlawful conspiracy to artificially increase prices for one or more of the Subject Drugs that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States (including in this District), and is otherwise subject to the service of process provisions of 15 U.S.C. § 22.

48.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15 and 22 and 28 U.S.C. §§ 1391(b)-(d). Defendants transact business within this District, have agents and can be found in this District, and the relevant interstate trade and commerce is carried out, in substantial part, in this District.

49.     Defendants sold and distributed generic pharmaceuticals in a continuous and uninterrupted flow of interstate commerce, which included sales of the Subject Drugs in the United States (including in this District). Defendants' conduct had a direct, substantial, and reasonably foreseeable effect on interstate commerce in the United States (including in this District).

REDACTED – PUBLIC VERSION

## IV.    THE PARTIES

### A.    Plaintiff

50.    Humana Inc. is incorporated in Delaware and headquartered at 500 West Main Street, Louisville, Kentucky. Humana is publicly traded under the NYSE symbol "HUM."

51.    Humana is the parent company, and assignee of the claims, of subsidiaries and affiliates that provide, *inter alia:* (1) Medicare benefits, through contracts with the Centers for Medicare and Medicaid Services ("CMS"), for Medicare beneficiaries through a variety of Medicare Advantage plans offered under Part C of Medicare, or prescription drug benefits under Part D of Medicare; and (2) private commercial health insurance plan benefits that cover the medical expenses incurred by plan beneficiaries on an individual or group basis. Humana's subsidiaries provide these benefits to beneficiaries in all 50 states, the District of Columbia, and Puerto Rico. Humana is the second largest Medicare Advantage Organization in the United States. These assignor subsidiaries and/or affiliates include: Arcadian Health Plan, Inc., CarePlus Health Plans, Inc., Cariten Health Plan Inc., Cariten Insurance Company, CHA HMO, Inc., CompBenefits Insurance Company, Emphesys Insurance Company, Health Value Management, Inc., dba ChoiceCare Network, Humana AdvantageCare Plan, Inc., Humana Behavioral Health, Inc., Humana Benefit Plan of Illinois, Inc., Humana Employers Health Plan of Georgia, Inc., Humana Health Benefit Plan of Louisiana, Inc., Humana Health Company of New York, Inc., Humana Health Insurance Company of Florida, Inc., Humana Health Plan of California, Inc., Humana Health Plan of Ohio, Inc., Humana Health Plan of Texas, Inc., Humana Health Plans of Puerto Rico, Inc., Humana Health Plan, Inc., Humana Insurance Company, Humana Insurance Company of Kentucky, Humana Insurance Company of New York, Humana Insurance of Puerto Rico, Inc., Humana Medical Plan of Pennsylvania, Inc., Humana Medical Plan of Utah, Inc., Humana Medical Plan, Inc., Humana Regional Health Plan, Inc., Humana Wisconsin Health Organization Insurance Corporation and

REDACTED – PUBLIC VERSION

M.D. Care, Inc. Humana's subsidiaries and affiliates expressly have assigned the claims pleaded herein to Humana.

52.     Humana is also the parent and assignee of claims of its subsidiary Humana Pharmacy, Inc. f/k/a Rightsource ("HPI"). HPI buys prescription drugs directly from manufacturers and wholesalers and dispenses them to Humana's benefits plan members on a mail-order and retail pharmacy basis, pursuant to members' doctors' prescriptions. HPI has purchased the numerous of the Subject Drugs directly from Defendants pursuant to various contractual agreements.

53.     Humana, either directly or through its health plan subsidiaries, insures and administers health plan benefits for its members and group customers, including self-funded group customers that contract with Humana to administer claims on their behalf and pursue recoveries related to those claims. Many of these health plan benefits provide members with prescription drug coverage under which claims for drugs manufactured by Defendants were submitted and paid. Humana is pursuing recovery related to those claims.

**B.     Defendants**

54.     Defendant Actavis Holdco US, Inc. ("Actavis Holdco") is a Delaware corporation with its principal place of business in Parsippany, New Jersey. In March 2015, Actavis plc, the then-parent company of Defendants Actavis Elizabeth, LLC and Actavis Pharma, Inc., merged with Allergan, Inc. and changed its name to Allergan plc ("Allergan"). In August 2016, Teva Pharmaceutical Industries Ltd., the Israeli parent company of Defendant Teva Pharmaceuticals USA, Inc., purchased Allergan's generics business, which included Defendants Actavis Elizabeth and Actavis Pharma, Inc. The assets and liabilities of Allergan's generics business were transferred to the newly-formed Actavis Holdco. Actavis Holdco is a wholly-owned subsidiary of Teva Pharmaceuticals USA, Inc.

55.     Defendant Actavis Elizabeth, LLC ("Actavis Elizabeth") is a Delaware limited liability company with its principal place of business in Elizabeth, New Jersey. It is a wholly-owned subsidiary of Actavis Holdco and is a research and development and manufacturing entity for the Actavis generics operations.

56.     Defendant Actavis Pharma, Inc., is a Delaware corporation with its principal place of business in Parsippany, New Jersey. It is a wholly-owned subsidiary of Actavis Holdco and is a principal operating company in the U.S. for Teva's generic products acquired from Allergan plc. It manufactures, markets, and/or distributes generic pharmaceuticals.

57.     Actavis Holdco, Actavis Elizabeth, and Actavis Pharma, Inc. are collectively referred to herein as "Actavis." At all times relevant to the Complaint, Actavis marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

58.     Defendant Alvogen, Inc. ("Alvogen") is a Delaware corporation with a principal place of business in Pine Brook, New Jersey. It is a privately held company that was founded in 2009 by a former CEO of Actavis. At all times relevant to the Complaint, Alvogen marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

59.     Defendant Amneal Pharmaceuticals LLC ("Amneal") is a Delaware limited liability company with its principal place of business in Bridgewater, New Jersey. At all times relevant to the Complaint, Amneal marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

60.     Defendant Apotex Corp. ("Apotex") is a Delaware corporation with a principal place of business in Weston, Florida. At all times relevant to the Complaint, Apotex marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

61.     Defendant Ascend Laboratories, LLC ("Ascend") is a New Jersey limited liability company with a principal place of business in Parsippany, New Jersey. At all times relevant to the

Complaint, Ascend marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

62.     Defendant Aurobindo Pharma USA, Inc., ("Aurobindo") is a Delaware corporation with its principal place of business in Dayton, New Jersey. At all times relevant to this Complaint, Aurobindo marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

63.     Defendant Bausch Health Americas, Inc. f/k/a Valeant Pharmaceuticals International, Inc. is a Delaware corporation with its principal place of business in Bridgewater, New Jersey. Bausch Health Americas, Inc. is the parent company of Defendant Bausch Health US, LLC.

64.     Defendant Bausch Health US, LLC f/k/a Valeant Pharmaceuticals North America LLC is a Delaware limited liability company with its principal place of business in Bridgewater, New Jersey.

65.     Unless addressed individually, Bausch Health Americas, Bausch Health USA, Valeant Pharmaceuticals International, Inc., and Valeant Pharmaceuticals North America LLC are collectively referred to as "Valeant." At all times relevant to the Complaint, Valeant marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

66.     Defendant Fougera Pharmaceuticals Inc. ("Fougera") is a New York corporation with its principal place of business in Melville, New York. Fougera is a wholly-owned subsidiary of Defendant Sandoz, Inc. Fougera specializes in the production, marketing, and sale of dermatological products. At all times relevant to the Complaint, Fougera marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

67.     Defendant G&W Laboratories, Inc. ("G&W") is a New Jersey corporation with its principal place of business in South Plainfield, New Jersey. At all times relevant to the Complaint,

G&W marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

68.    Defendant Glenmark Pharmaceuticals Inc., USA ("Glenmark") is a Delaware corporation with a principal place of business in Mahwah, New Jersey. At all times relevant to the Complaint, Glenmark marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

69.    Defendant Hikma Pharmaceuticals USA Inc. f/k/a West-Ward Pharmaceuticals Corp. ("West-Ward") is a Delaware corporation with a principal place of business in Eatontown, New Jersey. West-Ward is the United States agent and subsidiary of Hikma Pharmaceuticals PLC, a London-based global pharmaceutical company. At all times relevant to the Complaint, West-Ward marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

70.    Defendant Impax Laboratories, LLC f/k/a Impax Laboratories, Inc. ("Impax") is a Delaware limited liability company with a principal place of business in Hayward, California. At all times relevant to the Complaint, Impax marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

71.    Defendant Lannett Company, Inc., ("Lannett") is a Delaware corporation with its principal place of business in Philadelphia, Pennsylvania. At all times relevant to the Complaint, Lannett marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

72.    Defendant Lupin Pharmaceuticals, Inc., ("Lupin") is a Delaware corporation with its principal place of business in Baltimore, Maryland. Lupin is a wholly-owned subsidiary of Lupin Limited, an Indian company with its principal place of business in Mumbai, India. At all times

relevant to this Complaint, Lupin marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

73.     Defendant Mylan Inc. is a Pennsylvania corporation with its principal place of business in Morgantown, West Virginia. It is the parent company of Defendant Mylan Pharmaceuticals, Inc.

74.     Defendant Mylan Pharmaceuticals, Inc. is a West Virginia corporation with its principal place of business in Morgantown, Pennsylvania.

75.     Defendant Mylan N.V. is a Dutch company with its principal place of business and global headquarters in Canonsburg, Pennsylvania. Mylan N.V. is the former direct parent of Mylan Inc. and the former ultimate parent of Mylan Pharmaceuticals, Inc. and UDL Laboratories Inc.

76.     Mylan Inc., Mylan Pharmaceuticals, Inc., and Mylan N.V. are collectively defined as "Mylan." At all times relevant to this Complaint, Mylan marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

77.     Defendant Novartis AG ("Novartis") is a global pharmaceutical company organized and existing under the laws of Switzerland with its principal place of business in Basel, Switzerland.

78.     Defendant Par Pharmaceutical Companies, Inc., is a Delaware corporation with a principal place of business in Chestnut Ridge, New York.

79.     Defendant Par Pharmaceutical, Inc. is a New York corporation with a principal place of business in Chestnut Ridge, New York. Par Pharmaceutical, Inc. is a direct subsidiary of Par Pharmaceutical Companies, Inc.

80.     Par Pharmaceutical, Inc. and Par Pharmaceutical Companies, Inc. are each wholly-owned subsidiaries of Endo and collectively referred to as "Par." At all times relevant to the Complaint, Par marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

REDACTED – PUBLIC VERSION

81.     Defendant Perrigo Company plc ("Perrigo plc") is an Irish company with its principal place of business in Dublin, Ireland. Perrigo plc's North American base of operations is located in Allegan, Michigan 49010. Perrigo plc's prescription drug business focuses primarily on the manufacture and sale of extended topical prescription pharmaceuticals.

82.     Defendant Perrigo New York, Inc. ("Perrigo New York") is a Delaware corporation with its principal place of business in Bronx, New York. Perrigo New York is a wholly-owned subsidiary of Perrigo plc.

83.     Perrigo plc and Perrigo New York are collectively referred to as "Perrigo." During the relevant time period, Perrigo marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

84.     Defendant Sandoz AG is a company organized and existing under the laws of Switzerland with its principal place of business in Basel, Switzerland.

85.     Defendant Sandoz, Inc., ("Sandoz") is a Delaware corporation with its principal place of business in Princeton, New Jersey. At all times relevant to the Complaint, Sandoz marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

86.     Prior to October 4, 2023, Sandoz was an indirect, wholly owned subsidiary of Defendant Novartis through which Novartis operated its generic pharmaceutical business in the United States, and Sandoz AG was an indirect, wholly owned subsidiary of Novartis through which Novartis operated its global generic pharmaceutical business. On October 4, 2023, pursuant to a spin-off transaction, Sandoz became a direct subsidiary of Defendant Sandoz AG, and an indirect, wholly owned subsidiary of a new, standalone entity, Sandoz Group AG.

87.     Unless addressed individually, Fougera, Novartis AG, Sandoz AG, and Sandoz Inc. are collectively referred to herein as "Sandoz."

REDACTED – PUBLIC VERSION

88.     Defendant Sun Pharmaceuticals Industries, Inc. ("Sun") is a Michigan corporation with its principal place of business in Cranbury, New Jersey. Until February 2011, Sun was known as Caraco Pharmaceutical Laboratories, Ltd. Since 2011, Sun has been a wholly-owned subsidiary of Sun Pharmaceutical Industries Ltd., an Indian company with its principal place of business in Mumbai, India, which also owns, and owned throughout the relevant period, a large majority stake of Defendants Taro Pharmaceutical Industries Ltd. and Taro Pharmaceuticals USA, Inc. In late 2012, Sun acquired Defendant URL Pharma, Inc. ("URL") and its subsidiary, Mutual Pharmaceutical Company, Inc. ("Mutual"), both of which have their principal place of business in Philadelphia, Pennsylvania. Sun also does business under the name Caraco Pharmaceutical Laboratories ("Caraco"), a company Sun acquired in 1997. Unless addressed individually, Sun, URL, Mutual and Caraco are collectively referred to herein as "Sun." At all times relevant to the Complaint, Sun marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

89.     Defendant Taro Pharmaceutical Industries Ltd. ("Taro Israel") is an Israeli company with its principal place of business in Haifa Bay, Israel. Throughout the relevant time period, the Indian parent company of Defendant Sun has owned a large majority stake of Taro Israel. At all times relevant to the Complaint, Taro Israel participated in and directed the business activities of Defendant Taro Pharmaceuticals USA, Inc.

90.     Defendant Taro Pharmaceuticals USA, Inc. is a New York corporation with its principal place of business in Hawthorne, New York.

91.     Taro Israel and Taro Pharmaceuticals USA, Inc. are collectively referred to herein as "Taro." At all times relevant to the Complaint, Taro marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

REDACTED – PUBLIC VERSION

92.     Defendant Teva Pharmaceuticals USA, Inc., ("Teva") is a Delaware corporation with a principal place of business in North Wales, Pennsylvania. Teva is a wholly-owned subsidiary of Teva Pharmaceutical Industries Ltd., an Israeli corporation with its principal place of business in Petah Tikva Israel. At all times relevant to the Complaint, Teva marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

93.     Defendant Wockhardt USA LLC, ("Wockhardt") is a Delaware limited liability company with its principal place of business in Parsippany, New Jersey. At all times relevant to the Complaint, Wockhardt marketed and sold one or more of the Subject Drugs in this District and throughout the United States.

94.     When any allegation of the Complaint refers to any representation, act or transaction of Defendants, or any agent, employee or representative thereof, such allegation shall be deemed to mean that such principals, officers, directors, employees, agents or representatives of Defendants acted within the scope of their actual or apparent authority, and performed such representations, acts or transactions on behalf of Defendants.

### C.     Co-Conspirators

95.     Various other persons, firms, entities, and corporations not named as Defendants in this Complaint, including the individuals named below, have participated as co-conspirators with Defendants in the violations alleged herein, and have aided, abetted, and performed acts and made statements in furtherance of the conspiracy, including but not limited to those defendants named in Humana's Second Amended Complaint, as may be further amended, in *Humana Inc. v. Actavis Elizabeth, LLC*, No. 2:18-cv-03299-CMR, nor in Humana's Complaint, as may be further amended, in *Humana Inc. v. Actavis Elizabeth, LLC et al*, 2:19-cv-04862-CMR but who are not named in this Complaint.

96.     Among these co-conspirators is Mallinckrodt PLC, an Irish public limited company Mallinckrodt Inc., a Delaware corporation with its principal place of business in Webster Groves, Missouri, Mallinckrodt LLC a Delaware corporation with its principal place of business in St. Louis, Missouri, and SpecGx LLC is a Delaware corporation with its principal place of business in Webster Groves, Missouri. Mallinckrodt Inc., Mallinckrodt LLC, and SpecGx LLC are wholly-owned subsidiaries of Mallinckrodt PLC (collectively "Mallinckrodt"). At all times relevant to the Complaint, Mallinckrodt marketed and sold one or more of the Subject Drugs in this County and throughout the State.

97.     The true names of additional co-conspirators are presently unknown to Humana. Humana may amend this Complaint to allege the true names of additional co-conspirators as they are discovered.

98.     The wrongful acts alleged to have been done by any one Defendant or co-conspirator were authorized, ordered, or done by its directors, officers, managers, agents, employees, or representatives while actively engaged in the management, direction, or control of such Defendant's or co-conspirator's affairs.

**D.     Prior To The Sandoz Spin-Off, Sandoz And Novartis Operated As A Single Entity And Novartis Exercised Control Over Sandoz's Actions**

99.     Novartis was created as a result of the merger of Sandoz AG and CIBA-Geigy AG ("Merging Parties") on December 20, 1996 when all assets and liabilities of the Merging Parties were transferred by universal succession to Novartis (the "1996 Merger").3 The 1996 Merger was structured as a "merger of equals" and "based on an exchange of shares," with former Sandoz AG

---

3 Novartis AG, Form 20-F, as filed with the U.S. Securities and Exchange Commission on March 18, 2002, at F-8, https://www.sec.gov/Archives/edgar/data/1114448/000091205702010233/a2072042z20-f.htm.

shareholders receiving 55% of Novartis shares.  Under U.S. GAAP, Sandoz AG would be deemed to have acquired the assets and liabilities of CIBA-Geigy AG.

100.     Novartis and Sandoz Group AG share the same headquarters, the venerable St. Johann facility located in Basel, Switzerland.  Even following the 2023 spin-off, Novartis and Sandoz Group AG continue to share the same headquarters.

101.     After the 1996 Merger, the Sandoz name became dormant, with Novartis operating its generic business as Novartis generics.  Novartis relaunched and operated its global generics businesses under the Sandoz brand in 2003[4] through various subsidiary companies, including Sandoz, Inc., Sandoz AG, and Sandoz International GmbH. But Novartis and these subsidiary companies acted as a single functioning entity without regard to corporate formalities. For all practical purposes, Novartis treated Sandoz as part of a larger integrated company and exercised control over its actions, including its decisions related to the manufacture and sale of the generic drugs at issue in this litigation.

102.     The Sandoz, Inc. board of directors operated as a mere formality. Globally, the Novartis generics operation ████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████

103.     When Peter Goldschmidt was appointed CEO of Sandoz, Inc. in 2013, ████████
████████████████████████████████████████████████████

██[5] As part of the organizational reporting structure of Sandoz Inc., ████████████████████████

---

[4] http://test.pharmabiz.com/news/novartis-generics-to-be-rebranded-as-sandoz-15681; https://www.my-sandoz.com/za-en/en/about-sandoz.

[5] SDZMDL-009185562.

REDACTED – PUBLIC VERSION

███████████████████████████████████████████████████████

████████████[6] The CEO of Sandoz ████████████████████████████

████████████████████████████

104.    Sandoz's revenues and financial success were rolled up into the financial results of Sandoz's global operations, and then further consolidated into Novartis's financial statements with the ultimate objective of transferring value and profits to the Novartis organization as a whole, including the illegal profits that arose from the conspiracy alleged herein. In fact, ███████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

██████████████[7]  In other words, Novartis was strategizing how to improve Sandoz's profitability so that it could use those profits to compensate Novartis shareholders.  Responsibility for this █████████████████████████ was undertaken by Novartis' Board of Directors.

105.    As a result, Novartis dictated Sandoz's financial targets, and how Sandoz needed to achieve those targets to reap the profits and ██████████████████ for Novartis. For example, ████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████[9] In other words, Sandoz

---

[6] SDZMDL-009185562, at 5563.
[7] *Novartis in Society Integrated Report 2021*, at 4 (Feb. 1, 2022), https://www.novartis.com/sites/novartis_com/files/novartis-integrated-report-2021.pdf.
[8] SDZMDL-009107013, at 7016-17.
[9] *Id.*

REDACTED – PUBLIC VERSION

understood that its responsibility was to generate revenue for, and increase the profitability of, Novartis.

106.    Pursuant to Sandoz's internal guidelines, [10]

107.    Consistent with the commercial realities, Novartis continually identified Sandoz in its Annual Reports and investor communications as its generics "division" or "segment" or part of the "Novartis Group."  Additionally, pursuant to formal marketing guidelines directed by Novartis and intended to present the image of an integrated company, the Sandoz name in presentations and other documents was typically accompanied by the squib "A Novartis Company" or "A Novartis Division."  When dealing with customers and the public, Novartis presented the image of a single unified Novartis and blurred the distinctions between the various subsidiaries.  For example,

[12]

---

[10] SDZMDL-007343302.
[11] SDZMDL-002379650, at 9652.
[12] SDZMDL-002379650, at 9651.

108.     Furthermore, Novartis's Code of Conduct was applicable to all Novartis entities, including Sandoz, and provided: "We are committed to fair competition and will not breach competition laws and regulations."[13]

109.     In addition to treating Sandoz revenues and profits as its own, Novartis satisfied Sandoz's outstanding debts by issuing Novartis stock to debtholders.  For example, in a Form 20-F filed by Novartis with the SEC on March 18, 2002, Novartis reported that it would satisfy various debt obligations owed by Sandoz AG and its subsidiaries by issuing Novartis shares to the debtholders or otherwise paying such debtholders cash out of cash controlled by Novartis.[14]

110.     In addition, Novartis's communications with external parties represented that the creditworthiness of Sandoz entities was entirely dependent on the creditworthiness of Novartis. For example, ███████████████████████████████████████████████████ ██████████████████████████████████████████████████ ███████████████████████"[15] The Sandoz response, ███████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ████[16] Sandoz and Novartis refused to provide anything further, stating that ███████████ ███████████████████████████████████████████████████ ████[17]

_____

[13] Novartis Code of Conduct, available at https://www.novartis.com/sites/www.novartis.com/files/code-of-conduct-english.pdf.

[14] Novartis AG, Form 20-F, as filed with the U.S. Securities and Exchange Commission on March 18, 2002, at 77, https://www.sec.gov/Archives/edgar/data/1114448/000091205702010233/a2072042z20-f.htm.

[15] SDZMDL-002379650, at 9651-52.

[16] *Id.*

[17] SDZMDL-002379650, at 9651.

REDACTED – PUBLIC VERSION

111.    Moreover, personnel employed by Novartis made decisions regarding the direction of Sandoz's generics business, such as whether to integrate certain functions across its "divisions," and whether to keep supply and other relationships in-house or out.

112.    Prior to the 2023 spin-off, Novartis also controlled several of Sandoz's business functions, including: accounting, finance, quality and pharmacovigilance, human resources operations, pension administration, legal, real estate and facility services, including site security and executive protection, procurement, information technology, information security, commercial and medical support services, financial reporting and accounting operations.[18] ███████████████

████████████████████████████████████████████████████████████████

████████████████████████[19] Still more, during the period relevant to this case, ███

████████████████████████████████████████████████████████████

███████████████████████████████████[20] Novartis' technical operations unit managed the production, supply chain and quality of the Sandoz division.[21] █████████████████

████████████████████████████████████████████████████████████████

████████ ██ ███████████████████████████████████████████████████

████████████████████████[23]

---

[18] *See* Listing Prospectus dated August 18, 2023, Sandoz Group AG, at 58-59 [hereinafter the "August 18, 2023 Prospectus" or the "Prospectus"], available at https://prod.cms.sandoz.com/sites/spare53_sandoz_com/files/2023-10/Sandoz-Group-AG-Prospectus-2023-08_17.pdf; Tony Bonagura Tr. at 149:5-151:6-10.

[19] *See e.g.*, SDZCTAG-00067276-81; SDZCTAG-00076182; SDZCTAG-00171712 & SDZCTAG-00171713-16.

[20] Fang Tr. at 21:20-22:13.

[21] Prospectus at 58.

[22] Fang Tr. at 71:6-73:6.

[23] *Id.* at 22:20-23:2.

REDACTED – PUBLIC VERSION

113.    The intermingling of Sandoz and Novartis operations was so extensive that ██████

████████████████████████████████████████████████████ For example,

████████████████████████████████████████████████

███████████████████████[24] ████████████████████████████

████████████████████████████[25] ████████████████████

██████████████████[26] ██████████████████████████████

████████████████████[27]

114.    It is not surprising that employees were confused about the identity of their

employer because ███████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████[28] ███████████

████████████████████████████████████████████████████████

██████████████████████[29] ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████[30]

---

[24] Fang Tr. at 23:4-16.

[25] SDZMDL-000000069.

[26] See e.g., SDZCTAG-00065618-28; SDZMDL-011425641-50; SDZCTAG-00070806-09; SDZCTAG-01421867-80; SDZCTAG-01748965-74; SDZCTAG-02238110-17; SDZCTAG-02306457-64.

[27] Luis Jorge Tr. 64:2-65:9

[28] SDZCTAG-01175514 at 17.

[29] SDZCTAG-02625250; SDZCTAG-03511612 at 38; SDZMDL-002622406.

[30] SDZCTAG-06491657; see also SDZCTAG-06491663.

115.    Moreover, Novartis was heavily involved in, exercised control over, and dominated the Sandoz conduct at issue in this case. Pursuant to Sandoz's internal guidelines, ████

████████████████████████████████████████████████████

███████████████████[31]█████████████████████████████

████████████████████████████████████████████████████

████████████████████[32]██████████████████████████

████████████████████████████████████████████████████

████[33]████████████████████████████████

116.    In addition ████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████[34]████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████

117.    After Sandoz took price increases, ████████████████████████

████████████████████████████████████████████████████

---

[31] SDZMDL-007343302.

[32] See Bonagura Tr. at 169:15-171:18.

[33] Id. at 147:14-22.

[34] Bonagura Tr. at 167:9-16.

REDACTED – PUBLIC VERSION

████████████████████████████[35]████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████[36]██████████████████████

████████████████████████████████████████████████████████████

███████████[37]██████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████[38]████████████████████████████████

████████████████████████████████████████████████

118.    Novartis also participated in, exercised control over, and dominated bidding decisions at Sandoz. For example, ███████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████[39]████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████[40]███████████████████████████████████████████████

███████████████████████████████████

---

[35] *See, e.g.*, SDZMDL-002908140; SDZMDL-002908143; SDZMDL-003537073; SDZMDL-003584545; SDZMDL-004715341.

[36] SDZMDL-002908140; SDZMDL-002908143.

[37] *Id.*

[38] SDZMDL-003584545.

[39] Bonagura Tr. at 155:14-16 (emphasis added).

[40] Id. at 155:22-156:4.

119. █████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████[41]

120.    Novartis also exercised control over ███████████████████████

███████████████████████████████[42] ██████████

██████████████████████████████████████████

████████████████████████████████████████

████████████████[43] ██████████████████████

█████████████████████████████████████████████████

██████████████████████████████████████[44]

██████████████████████████████████████

████████[45] ████████████████████████████████

█████████████[46] ████████████████████████████

█████████████████████[47]

121.    Moreover, Novartis also exercised control and dominated over █████████████

███████████████████████████████████

███████████████████████████████████████



[41] Bonagura Tr. at 158:11-161:16.

[42] Della Lubke Vol. 1, 185:14-186:13; Lubke Vol. 4 655:22-656:16; SDZMDL-010742446; SDZMDL-007064338; SDZMDL-005075175

[43] Della Lubke Vol. 4 Tr. at 652:20-656:16; 806; 810:11-811:4; 817

[44] Lubke Vol, 1 Tr. at 181; 188; 201-202; Lubke Vol. 4 Tr. at 807.

[45] Lubke Vol. 4 Tr. at 806.

[46] Lubke Vol. 1 Tr. at 202:18-203:5

[47] Lubke Vol. 1 Tr. at 209:14-23; Lubke Vol. 2 Tr. at 338-339; 344-47; Lubke Vol. 4 Tr. at 812-817.



██████████████████████████████[48]██████████████████████████████

██████████████████████████████████████████████████████[49]

██████████████████████████████████████████████████████

████████████████[50]

122.    ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████ █████████████████████████

██████████████████████████████████████████████████████.

123.    Novartis also accepted financial responsibility for at least some of the illegal conduct

detailed herein ██████████████████████████████████████████

██████████████████████████████[52]██████████████████████████

█████████████████████████████████ Indeed, Note 20 to Item 18 in Novartis'

Consolidated Financial Statement, as filed with the SEC as part of Novartis' Form 20-F for 2022,

shows that its provision for non-current liabilities, specifically for "governmental investigations and

other legal matters" increased from $181 million in 2020 to $341 million in 2021 despite having

agreed to settle the DOJ investigation with, among other things, a payment of $185 million.[53]

---

[48] Stueck Tr. at 64:1-3.

[49] Stueck Tr. at 64:3-7.

[50] Stueck Tr. at 65:11-23.

[51] *See, e.g.,* SDZMDL-001862455; SDZMDL-001862463.

[52]  Stueck Tr. at 64:7-9.

[53] *See* Novartis AG, Form 20-F, at F-44-47 (2022), https://www.novartis.com/sites/novartis_com/files/novartis-annual-report-2022.pdf.

Novartis specifically identifies this Multi-District Litigation as one of several matters for which

Novartis has provisioned for further costs under Note 20.[54]

124.     In August 2022, Novartis announced its intention to "separate Sandoz, its generics

and biosimilars division into a new publicly traded standalone company, by way of a 100% spin-

off."[55] As a result of the spin-off, Sandoz, Inc. became a direct subsidiary of Sandoz AG, alongside

of Sandoz International GmbH, and an indirect subsidiary of the newly formed Sandoz Group

AG.[56]

## V.    REGULATORY AND ECONOMIC BACKGROUND

### A.    Generic Drugs Should Provide Lower-Priced Options for Purchasers

125.     Generic drugs provide a lower-cost but therapeutically equivalent substitute for

brand-name drugs. Congress enacted the Hatch-Waxman Act ("Hatch-Waxman") in 1984 to

encourage the production and sale of cheaper generic drugs by simplifying the regulatory hurdles

that generic pharmaceutical manufacturers must clear to market and sell their drug products.[57]

126.     To obtain marketing approval for a generic drug, an Abbreviated New Drug

Application ("ANDA") must be filed with the Food and Drug Administration's ("FDA") Center for

Drug Evaluation and Research's ("CDER"), Office of Generic Drugs ("OGD").

127.     When the FDA approves an ANDA, that generic drug receives an "AB" rating from

the FDA. This signifies the generic drug is therapeutically equivalent to a reference listed drug

("RLD"). RLD can either be a brand-name drug or a generic drug if the brand is not currently

---

[54] *See id.*

[55] Press Release, Novartis Announces Intention to Separate Sandoz Business to Create a Standalone Company by way of a 100% Spin-Off (Aug. 25, 2022), https://www.novartis.com/news/media-releases/novartis-announces-intention-separate-sandoz-business-create-standalone-company-way-100-spin.

[56] Prospectus at xiii.

[57] Drug Price Competition and Patent Term Restoration Act, Pub. L. No. 98-417, 98 Stat. 1585 (1984).

marketed. Therapeutic equivalence indicates the generic is both pharmaceutically equivalent (having the same active ingredient(s), same dosage form and route of administration, and identical strength or concentration) and bioequivalent (no significant difference in the rate and extent of absorption of the active pharmaceutical ingredient) to the RLD.

128.    Typically, AB-rated generic versions of brand-name drugs are priced significantly below their brand-name counterparts. The only material difference between a generic and its brand name counterparts is price. When multiple generic manufacturers enter the market, prices erode, sometimes by as much as 90%, as price competition increases. An FDA study recently noted that "generic competition is associated with lower drug prices, with the entry of the second generic competitor being associated with the largest price reduction." Because of this, AB-rated generic drugs gain market share rapidly. As more generic drugs enter the market, the price of those drugs should progressively decrease, resulting in lower costs for purchasers, like Humana. These cost reductions were the intent of Hatch-Waxman's expedited generic approval pathway.

129.    Because each generic of the same RLD is readily substitutable for another generic, the products behave like commodities; price is the only differentiating feature, and the basis for competition.[58] Generic competition, therefore, when functioning in a market undisturbed by anticompetitive forces, reduces drug costs by driving prices down for AB-rated generic versions of

---

[58] *See, e.g.,* Federal Trade Commission, *Authorized Generic Drugs: Short-Term Effects and Long-Term Impact,* at 17 (Aug. 2011) ("[G]eneric drugs are commodity products marketed to wholesalers and drugstores primarily on the basis of price."), *available at* https://www.ftc.gov/sites/default/files/documents/reports/authorized-generic-drugs-short-term-effects-and-long-term-impact-report-federal-trade-commission/authorized-generic-drugs-short-term-effects-and-long-term-impact-report-federal-trade-commission.pdf; U.S. Cong. Budget Office, *How Increased Competition from Generic Drugs Has Affected Proceed and Returns in the Pharmaceutical Industry* (July 1998), *available at* https://www.cbo.gov/sites/default/files/105th-congress-1997-1998/reports/pharm.pdf.

REDACTED – PUBLIC VERSION

brand-name drugs. Predictably, the longer generic drugs remain on the market, the lower their prices will become, ever nearing closer to a manufacturer's marginal costs.

130.    In the United States, a prescription drug may be dispensed to a patient only by a licensed pharmacist pursuant to a doctor's prescription that identifies the drug. The prescription may only be filled with either the brand-name drug identified or an AB-rated generic version. Pharmacists may (and, in most states, must) substitute an AB-rated generic for the brand-name drug, without seeking or obtaining permission from the prescribing doctor (unless the prescribing physician indicated "dispense as written" on the prescription).

131.    Generic competition enables purchasers like Humana to purchase a generic version of a brand-name drug at substantially lower prices. In fact, studies have shown that use of generic drugs saved the United States healthcare system $1.68 trillion between 2005 and 2014.[59]

## B.    The Prescription Drug Market

132.    The United States is a venue ripe for illegal anticompetitive exploitation of prescription drug prices due to laws that regulate how prescription drugs are prescribed and filled.

133.    For most consumer products, the person responsible for paying for the product selects the product. When the payer is also the user of the product, the price of the product plays an appropriate role in the person's choice. This incentivizes manufacturers to lower the price of their product. The pharmaceutical marketplace departs from this norm.

134.    In most instances, a pharmacist dispenses a prescription pursuant to a doctor's prescription, and the patient and his/her health insurer pay for the prescription drug. The pharmacist may dispense only the brand-name drug named in the prescription or its AB-rated, FDA-approved generic equivalent, as set forth above.

---

[59] GPhA, *Generic Drug Savings in the U.S.* (7th ed. 2015) at 1, *available at*
http://www.gphaonline.org/media/wysiwyg/PDF/GPhA_Savings_Report_2015.pdf.

135.     Therefore, the doctor's prescription defines the relevant product market, because it limits the consumer's (and the pharmacist's) choice to the drug named therein.

136.     Brand pharmaceutical sellers exploit this departure from consumer norms by employing "detailing" teams that persuade doctors to prescribe the branded product without advising the doctor on the cost of the product. The most important tool that insurers, like Humana, who bear the overwhelming majority of the cost of these prescription drugs, have is the availability of generic drugs in a competitive market. When drug manufacturers begin selling AB-rated generic drugs, insurers, along with others in the distribution chain, are able to substantially drive down the prices paid for those drugs.

137.     For example, TPP health insurers, like Humana, have complex formulary structures that incentivize doctors, pharmacists and insureds to prescribe, dispense, and fill AB-rated generic drugs when available.

### C.     The Prescription Drug Distribution System

138.     Drug manufacturers supply drug products. Rather than develop new drugs, generic manufacturers focus on manufacturing drugs that can be substituted for the brand drug product. Generic drugs can be manufactured in a variety of forms, including tablets, capsules, injectables, inhalants, liquids, ointments, creams, solutions, emollients, and gels. A manufacturer seeking to sell a drug in the United States must obtain FDA approval. The FDA typically evaluates whether the drug is safe and efficacious, the manufacturing process, labelling and quality control.

139.     Generic manufacturers operate facilities and compete with one another to sell the drugs they produce to wholesalers, distributors, retail pharmacy chains, mail-order and specialty pharmacies, hospital chains, and some health insurance plans. Competition among generic drug manufacturers is dictated by price and supply; as such generic manufacturers do not differentiate

their products. Consequently, generic drugs are usually marketed only by the name of the active ingredient.

140.     Drug suppliers include the manufacturers or other companies that contract with a manufacturer to sell a drug product made by the manufacturer. Drug manufacturers typically sell their products through supply agreements negotiated with wholesalers, distributors, pharmacy benefit managers, mail-order or specialty pharmacies.

141.      Generic manufacturers report list prices for each generic drug that they offer, including the average wholesale price ("AWP") and wholesale acquisition cost ("WAC"). The WAC represents the manufacturers' list price, and typically does not represent discounts that may be provided. Manufacturers may supply the same generic drug at several different prices depending on the customer or type of customer.

142.     Generic manufacturers must also report their average manufacturer prices ("AMP") to the Centers for Medicare and Medicaid if they enter into a Medicaid rebate agreement. AMP is the average price paid to the manufacturer for the drug in the United States by (a) wholesalers for drugs distributed to retail community pharmacies and (b) retail community pharmacies that purchase drugs directly from the manufacturer.

143.     Wholesalers and distributors purchase pharmaceutical products from manufacturers and distribute them to a variety of customers. Wholesalers and distributors pay lower prices to acquire generics than the corresponding branded drug.

144.     Pharmacies purchase drugs, either directly from manufacturers or from wholesalers/distributors. Pharmacies may be traditional retail pharmacies, specialty pharmacies, or mail-order pharmacies. Pharmacies also pay lower prices to acquire generic drugs than to acquire the corresponding branded drug.

145.     Finally, insurers and insureds purchase the prescribed drug, typically in some type of cost sharing arrangement, depending on an insurer's formulary placement, among other things.

146.     To combat rising costs, some third-party payers and PBMs have implemented Maximum Allowable Costs ("MACs") that set the upper limit on what they will pay for a generic drug. TPPs and PBMs set MACs based on a variety of factors, including the lowest acquisition cost in the market for that generic drug. MAC pricing effectively requires pharmacies, retailers, and PBMs to purchase the lowest-price version of a generic drug on the market, regardless of WAC. As a result, a manufacturer should not, in a properly functioning market, be able to significantly increase its price without incurring the loss of a significant volume of sales. A manufacturer can only raise its price in the presence of MAC pricing if it knows it is conspiring with competitors to raise their prices too.

**D.     The Market for Generic Drugs is Highly Susceptible to Collusion**

147.     Defendants' anticompetitive conduct is a *per se* violation of Section 1 of the Sherman Act, as it constitutes a conspiracy to fix prices and allocate markets and customers. As such, Humana is not required to define relevant markets. However, there are certain features characteristic of the market for generic drugs which indicate that it is susceptible to collusion and that collusion caused the price increases.

148.     Factors showing that a market is susceptible to collusion include:

a.     High level of industry concentration: A small number of competitors control roughly 100% of the market for each of the Subject Drugs. Beginning in 2005, the generic pharmaceutical market has undergone remarkable and extensive consolidation, rendering it ripe for collusion. As a result, for most of the Subject Drugs, there were between two and four manufacturers providing that drug for sale in the United States during the

relevant time period, rendering each market sufficiently concentrated to carry on collusive activities.

b.      Sufficient numbers to drive competition: While the market for each of the Subject Drugs had a small enough number of competitors to foster collusion, the number of sellers or potential sellers was large enough that prices should have remained at their historical, near marginal cost levels absent collusion.

c.      High barriers to entry: The high costs of manufacturing, developing, testing, securing regulatory approval, and oversight are among the barriers to entry in the generic drug market. The Defendants here control virtually all of the market for the Subject Drugs and sell those drugs pursuant to FDA approvals granted years before the price hikes began in 2010. Any potential new entrant would have to go through the lengthy ANDA approval process before commercially marketing its product. This type of barrier to entry increases a market's susceptibility to a coordinated effort among the dominant players to maintain supracompetitive prices.

d.      High inelasticity of demand and lack of substitutes: Each of the Subject Drugs are generally a necessity for each patient it is prescribed, regardless of price. Substituting non-AB rated drugs presents challenges, and both patients and physicians are unwilling to sacrifice patient wellbeing for cost savings. For many patients, the particular Subject Drug they are prescribed is the only effective treatment.

e.      Commoditized market: Defendants' products are fully interchangeable because they are bioequivalent. Thus, pharmacists may freely substitute one for another. The only differentiating feature, and therefore the only way a Defendant can gain market share, is by competing on price.

f.    Absence of departures from the market: There were no departures from the market during the relevant period that could explain the drastic price increases.

g.    Absence of non-conspiring competitors: Defendants have maintained all or virtually all of the market share for each of the Subject Drugs between 2010 and the present. Thus, Defendants have market power in the market for each of the Subject Drugs, which enables them to increase prices without loss of market share to non-conspirators.

h.    Opportunities for contact and communication among competitors: Defendants participate in the committees and events of the GPhA, HDMA, ECRM, MMCAP, HSCA, and other industry groups, as set forth below, which provide and promote opportunities to communicate. The grand jury subpoenas to Defendants targeting inter-Defendant communications further support the existence of communication lines between competitors with respect to generic pricing and market allocation.

i.    Size of Price Increases: The magnitude of the price increases involved in this case further differentiates it from examples of parallelism. Oligopolists testing price boundaries must take a measured approach. But the increases are not 5% or even 10% jumps—they are of far greater magnitude. A rational company would not implement such large increases unless it was certain that its conspirator-competitors would follow.

j.    Reimbursement of Generic Drugs: The generic market has institutional features that inhibit non-collusive, parallel price increases. These features include MAC pricing, insurers' formulary placements, and required substitution at the pharmacy level. As a result, the usual hesitance of an oligopolist to unilaterally raise prices is embedded in the generic reimbursement system.

## VI.    GOVERNMENT INVESTIGATIONS OF THE CONSPIRACY

149.    Defendants' and other generic drug manufacturers' conduct has resulted in extensive and widespread scrutiny by federal and state regulators, including the United States Department of Justice Antitrust Division, the United States Senate, the United States House of Representatives, and the Attorneys General of 46 states, the District of Columbia, and Puerto Rico ("the State AGs").

150.    The DOJ's and State AG's investigations followed a Congressional hearing and investigation, which itself was prompted by a January 2014 letter from the National Community Pharmacists Association ("NCPA") to the United States Senate Committee on Health, Education, Labor, and Pensions ("Senate HELP Cmte.") and the United States House Energy and Commerce Committee highlighting nationwide spikes in prices for generic drugs.

### A.    Congress Launched an Investigation into Generic Price Hikes

151.    In January 2014, the NCPA urged the Senate HELP Cmte. and the House Energy and Commerce Committee to hold hearings on significant generic pharmaceutical price spikes, citing surveys and data from over 1,000 community pharmacists who reported price hikes on essential generic pharmaceuticals exceeding 1,000%.

152.    On October 2, 2014, Senator Bernie Sanders, then Chair of the Subcommittee on Primary Health and Retirement Security of the Senate HELP Cmte. and Representative Elijah E. Cummings, Ranking Member of the House Committee on Oversight and Government Reform, sent letters to 14 drug manufacturers, including Defendants Actavis, Lannett, Mylan, Sun, Teva, and Zydus, requesting information about the escalating prices of generic drugs.[60] More recently on August 13, 2019, Senator Sanders and Rep. Cummings sent letters to executives of Mylan and Teva

---

[60] Press Release, U.S. Senator Bernie Sanders, Congress Investigating Why Generic Drug Prices Are Skyrocketing (Oct. 2, 2014), *available at* https://www.sanders.senate.gov/newsroom/press-releases/congress-investigating-why-generic-drug-prices-are-skyrocketing.

– companies that did not produce documents in response to the 2014 letters – asking for drug pricing information as part of their ongoing probe into the rising cost of generics.

153.    Senator Sanders and Rep. Cummings issued a joint press release, advising that "[w]e are conducting an investigation into the recent staggering price increases for generic drugs used to treat everything from common medical conditions to life-threatening illnesses." They noted the "huge upswings in generic drug prices that are hurting patients" and having a "very significant" impact, threatening pharmacists' ability to remain in business.[61]

154.    On February 24, 2015, Senator Sanders and Rep. Cummings sent a letter requesting that the Office of the Inspector General ("OIG") of the Department of Health and Human Services ("HHS") "examine recent increases in the prices being charged for generic drugs and the effect these price increases have had on generic drug spending within the Medicare and Medicaid programs."[62] The OIG responded to the request on April 13, 2015, advising it would examine pricing for the top 200 generic drugs to "determine the extent to which the quarterly [AMP] exceeded the specified inflation factor."[63]

155.    In August 2016, the OIG issued the GAO Report, a study examining Medicare Part D prices for 1,441 generic drugs between 2010 and 2015. The study found that 300 of the 1,441 drugs experienced at least one "extraordinary price increase" of 100% or more. Among the drugs

---

[61] *Id.*

[62] Letter from Bernie Sanders, United States Senator, and Elijah Cummings, United States Representative, to Inspector Gen. Daniel R. Levinson, Dep't of Health & Human Servs. (Feb. 24, 2015), *available at* https://www.sanders.senate.gov/download/sanders-cummings-letter?inline=file.

[63] Letter from Inspector Gen. Daniel R. Levinson, Dep't of Health & Human Servs., to Bernie Sanders, United States Senator (Apr. 13, 2015), *available at* https://www.sanders.senate.gov/download/oig-letter-to-sen-sanders-4-13-2015?inline=file.

with extraordinary price increases were five of the Subject Drugs: Atropine Sulfate, Carisoprodol, Methazolamide, Oxycodone HCL, and Promethazine HCL.[64]

**B.      The DOJ Investigates Criminal Generic Drug Collusion**

156.    The DOJ opened a criminal investigation into collusion in the generic pharmaceutical industry in 2014 that initially focused on just two drugs.[65] Most of the Defendants here have come under DOJ scrutiny.

157.    The DOJ first charged Heritage Pharmaceuticals, Inc. ("Heritage") executives Jeffrey Glazer and Jason Malek with criminal counts related to price collusion for generic doxycycline hyclate and glyburide. The two pleaded guilty to violating Section 1 of the Sherman Act for their participating in conspiracies to fix prices, rig bids, and allocate customers for generic drugs, including doxycycline and glyburide.

158.    The Hon. Barclay Surrick of this Court determined that there was a factual basis for both Glazer's and Malek's pleas, and convicted each individual of a felony violation of the Sherman Act. Sentencing for both Glazer and Malek was originally set for April 2017, but both sentencings have been repeatedly rescheduled as Glazer and Malek continue to cooperate with the DOJ.

159.    Defendants Actavis, Aurobindo, Fougera (through Sandoz), Lannett, Mylan, Sandoz, Sun, and Taro, admitted to receiving grand jury subpoenas from the DOJ. The DOJ executed a

---

[64] GAO Report at Appx. III.

[65] Joshua Sisco, *DoJ believes collusion over generic drug prices widespread-source*, POLICY AND REGULATORY REPORT (June 26, 2015), available at http://www.mergermarket.com/pdf/DoJ-Collusion-Generic-Drug-Prices-2015.pdf; David McLaughlin and Caroline Chen, *U.S. Charges in Generic-Drug Probe to be Filed by Year-End*, BLOOMBERG MARKETS (Nov. 3, 2016), available at https://www.bloomberg.com/news/articles/2016-11-03/u-s-charges-in-generic-drug-probe-said-to-be-filed-by-year-end.

search warrant on Mylan in the fall of 2016. In 2017, Perrigo disclosed that its offices were searched as well.[66]

160.    Upon information and belief, the DOJ has granted conditional amnesty to one pharmaceutical company that is the subject of this investigation.

161.    Information disclosed by some Defendants evidence the broad scope of the conspiracy.

162.    In Lannett's November 3, 2014 quarterly report filed with the Securities and Exchange Commission ("SEC"), it disclosed that its "Senior Vice President of Sales and Marketing of the Company was served with a grand jury subpoena relating to a federal investigation of the generic pharmaceutical industry into possible violations of the Sherman Act."[67] Lannett added that "[t]he subpoena requests corporate documents of the Company relating to communications or correspondence with competitors regarding the sale of generic prescription medications, but is not specifically directed to any particular product and is not limited to any particular time period."[68]

163.    Mylan has also disclosed that it received DOJ subpoenas relating to various generic drugs, and that DOJ executed search warrants in connection thereto.[69] Defendants Actavis, Sandoz, Par, Taro, and Teva also received DOJ subpoenas relating to their marketing and pricing of generic pharmaceuticals, and communications with competitors.[70] It is also believed that Aurobindo, Citron,

---

[66] A search warrant will only be issued if DOJ was able to persuade a federal judge that there was probable cause to believe that one or more antitrust violations had occurred, and that evidence of these violations would be found at the corporate offices of Mylan.

[67] Lannett Company, Inc., Quarterly Report (Form 10-Q) at 16 (Nov. 6, 2014).

[68] *Id.*

[69] Mylan Inc., Annual Report (Form 10-K) at 160 (Feb. 16, 2016); Mylan Inc., Quarterly Report (Form 10-Q) at 58 (Nov. 9, 2016).

[70] Novartis, 2016 ANNUAL REPORT at 217, available at https://www.novartis.com/sites/www.novartis.com/files/novartis-20-f-2016.pdf; Par Pharmaceutical Companies, Inc., Annual Report (Form 10-K) at 37 (Mar. 12, 2015); Taro

REDACTED – PUBLIC VERSION

Dr. Reddy's, Greenstone/Pfizer, Heritage, Impax, Lupin, Mallinckrodt, Mayne, Perrigo, Rising, Sun, West-Ward and Zydus received subpoenas.

164.     A DOJ grand jury subpoena is significant; it indicates "staff [ ] considered the likelihood that, if a grand jury investigation developed evidence confirming the alleged anticompetitive conduct, the Division would proceed with a criminal prosecution."[71]

165.     The DOJ has intervened in numerous civil antitrust actions that are now part of the consolidated and coordinated proceedings styled *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, No. 16-MD-2724 (E.D. Pa.), stating that these cases overlap with the DOJ's ongoing criminal investigation.

166.     On May 31, 2019, the DOJ released a statement that Heritage admitted that it "conspired to fix prices, rig bids, and allocate customers for glyburide," and agreed to pay $7 million in criminal penalty and civil damages, and to cooperate fully with ongoing parallel investigations into the generics industry. In that agreement, Heritage admitted, accepted, and acknowledged that it is responsible under United States law for the acts of its officers, directors, employees, and agents as charged in the Information. Jason Malek and Jeffrey Glazer are two of the "officers, directors, employees, and agents" whose acts for which Heritage admitted, acknowledged, and accepted responsibility.

167.     On December 3, 2019, Rising was charged by the DOJ with conspiring to fix prices and allocate customers for one generic drug.[17] The DOJ and Rising entered into a deferred prosecution agreement resolving the charge against Rising, under which the company admits that it

---

Pharmaceutical Industries Ltd., Report of Foreign Private Issuer (Form 6-K) (Sept. 9, 2016); Teva Pharmaceutical Industries Ltd., Report of Foreign Private Issuer (Form 6-K) at 33 (Nov. 15, 2016).

[71] DOJ, ANTITRUST DIV. MANUAL (5th ed. 2015) at III-82.

REDACTED – PUBLIC VERSION

conspired to fix prices and allocate customers for Benazepril HCTZ with a competing manufacturer of generic drugs and its executives from about April 2014 until at least September 2015.

168.    Rising agreed to pay $1,543,207 as restitution to victims of the charged conduct. In light of the separate civil penalties that Rising agreed to pay, the deferred prosecution agreement called for an offset of Rising's restitution, to $438,066.  The agreement also required Rising to pay a $1.5 million monetary penalty, reduced from the fine of approximately $3.6 million called for under the U.S. Sentencing Guidelines, due to Rising's financial condition and liquidation. Under the deferred prosecution agreement, Rising agreed to cooperate fully with the DOJ's ongoing criminal investigation.

169.    On February 4, 2020, the DOJ charged Ara Aprahamian, a former top executive at Taro, with participating in conspiracies to fix the prices and allocate the market for generic drugs, including Carbamazepine, Carbamazepine ER, Clobetasol (multiple formulations), Clotrimazole (cream and topical solution 1%), Desonide ointment, Etodolac IR and ER tablets, Fluocinonide (cream, emollient cream, gel, and ointment), Lidocaine ointment, Nystatin Triamcinolone (cream and ointment), and Warfarin. [72] Aprahamian was also charged with making false statements to the FBI.

170.    On February 14, 2020, Hector Armando Kellum, a former senior executive at Sandoz, pled guilty to conspiring to fix prices, rig bids, and allocate customers for generic drugs including, but not limited to, Clobetasol and Nystatin Triamcinolone cream. [73] As part of Kellum's

---

[72] Press release, Department of Justice Office of Public Affairs, Generic Drug Executive Indicted on Antitrust and False Statement Charges (Feb. 4, 2020), *available at* https://www.justice.gov/opa/pr/generic-drug-executive-indicted-antitrust-and-false-statement-charges.

[73] Press release, Department of Justice Office of Public Affairs, Former Generic Pharmaceutical Executive Pleads Guilty for Role in Criminal Antitrust Conspiracy, Fourth Executive to Be Charged in Ongoing Investigation (Feb. 14, 2020), *available at* https://www.justice.gov/opa/pr/former-generic-pharmaceutical-executive-pleads-guilty-role-criminal-antitrust-conspiracy.

REDACTED – PUBLIC VERSION

plea deal, he agreed to cooperate with the DOJ's ongoing investigation into criminal antitrust violations in the generic drug industry.

171.    On March 2, 2020, Sandoz was charged by the DOJ with conspiring to allocate customers, rig bids, and fix prices for five generic drugs.[74] The DOJ charged Sandoz with participating in four criminal antitrust conspiracies, each with a competing manufacturer of generic drugs and various individuals. Count One charged Sandoz for its role in a conspiracy, with a generic drug company based in New York and other individuals, relating to drugs including Desonide ointment, Nystatin triamcinolone cream, and multiple formulations of Clobetasol. The second count charged Sandoz for its role in a conspiracy to allocate customers and fix prices of Benazepril HCTZ. The third count charged Sandoz for its role in a conspiracy with a generic drug company, based in Michigan, relating to drugs that included Desonide ointment. The fourth count charged Sandoz for its role in a conspiracy with a generic drug company, based in Pennsylvania, relating to drugs including Tobramycin inhalation solution.

172.    The DOJ also announced a deferred prosecution agreement resolving the charges against Sandoz, under which the company agreed to pay a $195 million criminal penalty and admitted that its sales affected by the charged conspiracies exceeded $500 million. Under the deferred prosecution agreement, Sandoz admitted to conspiring with others to suppress and eliminate competition by allocating customers, rigging bids, and increasing and/or maintaining prices for certain generic drugs, including Benazepril HCTZ, Clobetasol (cream, emollient cream, gel, ointment, and solution), Desonide ointment, Nystatin Triamcinolone cream, and Tobramycin inhalation solution. It also agreed to cooperate fully with the ongoing criminal investigation.

---

[74] Press release, Department of Justice Office of Public Affairs, Major Generic Pharmaceutical Company Admits to Antitrust Crimes, Sandoz Inc. Agrees to Pay a $195 Million Criminal Penalty, the Largest for a Domestic Antitrust Case (March 2, 2020), *available at* https://www.justice.gov/opa/pr/major-generic-pharmaceutical-company-admits-antitrust-crimes.

173.    On May 7, 2020, Apotex was charged by the DOJ with fixing the price

of one generic drug.[21] The DOJ brought a one-count felony charge alleging Apotex and other

generic drug companies agreed to increase and maintain the price of Pravastatin beginning in May

2013 and continuing through December 2015. The single count charged that Apotex communicated

with competitors about the price increase and subsequently refrained from submitting competitive

bids to customers that previously purchased Pravastatin from a competing company

174.    The DOJ also announced a deferred prosecution agreement resolving the charge

against Apotex.  The company agreed to pay a $24.1 million criminal penalty and admit that it

conspired with other generic drug sellers to artificially raise the price of Pravastatin. Under

the deferred prosecution agreement, Apotex agreed to cooperate fully with the DOJ's ongoing

criminal investigation.

175.    On July 14, 2020 and August 25, 2020, a grand jury indicted Glenmark on charges

that it conspired to increase and maintain prices of Pravastatin and other generic drugs[22], beginning

in or around May 2013 and continuing until at least in or around December 2015. Apotex and Teva

were specifically identified as being involved in the conspiracy.

176.    On July 23, 2020, Taro was charged by the DOJ with participating in two criminal

antitrust conspiracies[23], each with a competing manufacturer of generic drugs and various

executives, to fix prices, allocate customers, and rig bids for numerous generic drugs between 2013

and 2015. One of the two charged conspiracies involved Sandoz, former Taro Vice President of

Sales and Marketing Ara Aprahamian, and other individuals.

177.    The Antitrust Division also announced a deferred prosecution agreement resolving

the charges against Taro, under which the company agreed to pay a $205,653,218 criminal penalty

and admitted that its sales affected by the charged conspiracies was in excess of $500 million. Under

REDACTED – PUBLIC VERSION

the DPA, Taro U.S.A. has agreed to cooperate fully with the Antitrust Division's ongoing criminal investigation.

178.    On August 25, 2020, Teva was indicted by the grand jury for conspiring to fix prices, rig bids, and allocate customers for generic drugs[24] by participating in three conspiracies from at least as early as May 2013 until at least in or around Dec. 2015. The first count charged Teva for its role in a conspiracy that included Glenmark, Apotex, and unnamed co-conspirators agreeing to increase prices for pravastatin and other generic drugs. The second count charged Teva for its role in a conspiracy with Taro U.S.A., its former executive Ara Aprahamian, and others agreeing to increase prices, rig bids, and allocate customers for generic drugs including, but not limited to, drugs used to treat and manage arthritis, seizures, pain, skin conditions, and blood clots. The third count charges Teva for its role in a conspiracy with Sandoz Inc. and others agreeing to increase prices, rig bids, and allocate customers for generic drugs including, but not limited to, drugs used to treat brain cancer, cystic fibrosis, arthritis, and hypertension.

### C.    State Attorneys General Launch Their Own Investigation

179.    In July 2014, the State of Connecticut initiated a non-public investigation into suspicious price increases for certain generic pharmaceuticals. Based on evidence procured through their own subpoena-power, the State AGs filed a civil action alleging a wide-ranging series of conspiracies implicating numerous generic drugs and manufacturers. *The Connecticut Mirror* reported that the State AGs "suspected fraud on a broader, nearly unimaginable scale," that "new subpoenas

are going out, and the investigation is growing beyond the companies named in the suit."[75] Then-CTAG George Jepsen called the evidence obtained in that investigation "mind-boggling."[76]

180.    Mr. Jepsen confirmed the scope of the State AGs' action in a press release in December 2016:

> My office has dedicated significant resources to this investigation for more than two years and has developed compelling evidence of collusion and anticompetitive conduct across many companies that manufacture and market generic drugs in the United States. . . While the principal architect of the conspiracies addressed in this lawsuit was Heritage Pharmaceuticals, we have evidence of widespread participation in illegal conspiracies across the generic drug industry. Ultimately, it was consumers - and, indeed, our healthcare system as a whole - who paid for these actions through artificially high prices for generic drugs.[77]

181.    In their consolidated amended complaint filed on June 18, 2018, the State AGs broadened their case to include fifteen drugs. At the time, CTAG Jepsen stated that "[t]he issues we're investigating go way beyond the two drugs and six companies. Way beyond…We're learning new things every day."[78] According to a recent interview with Joseph Nielsen, the court-appointed

---

[75] Mark Pazniokas, *How a small-state AG's office plays in the big leagues*, THE CONN. MIRROR (Jan. 27, 2017), available at https://ctmirror.org/2017/01/27/how-a-small-state-ags-office-plays-in-the-big-leagues/. *The Connecticut Mirror* further reported that the DOJ grand jury was convened in this District shortly after the CTAG issued its first subpoena. Id.

[76] *Id.*

[77] Press Release, Attorney General George Jepsen, Connecticut Leads 20 State Coalition Filing Federal Antitrust Lawsuit against Heritage Pharmaceuticals, other Generic Drug Companies (Dec. 15, 2016), available at https://portal.ct.gov/AG/Press-Releases/2016-Press-Releases/Connecticut-Leads-20-State-Coalition-Filing-Federal-Antitrust-Lawsuit-against-Heritage-Pharmaceutica.

[78] Kaiser Health News, *How Martinis, Steaks, and a Golf Round Raised Your Prescription Drug Prices,* THE DAILY BEAST, Dec. 21, 2016, http://www.thedailybeast.com/how-martinis-steaks-and-a-golf-round-raised-your-prescription-drug-prices?source=twitter&via=desktop.

REDACTED – PUBLIC VERSION

Liaison Counsel for the State AGs in these consolidated MDL proceedings, "[t]his is most likely the largest cartel in the history of the United States."[79]

182.    On May 10, 2019 the State AGs filed a new complaint focusing on a conspiratorial web Teva constructed with various other Defendant generic drug manufacturers, named herein, that led to either artificial stabilization or price increases on over 100 generic drug products ("State AG Complaint No. 2").[80] The allegations in the State AG Complaint No. 2 were based on "(1) the review of many thousands of documents produced by dozens of companies throughout the generic pharmaceutical industry, (2) an industry-wide phone call database consisting of more than 11 million phone call records from hundreds of individuals at various levels of Defendant companies and other generic manufacturers, and (3) information provided by several as-of-yet unidentified cooperating witnesses who were directly involved in the conduct alleged…"[81]

183.    On June 10, 2020, the State AGs filed a new complaint focusing on rampant collusion among various Defendant generic drug manufacturers, named herein, of topical products that led to either artificial stabilization or price increases additional generic drug products ("State AG Complaint No. 3). Many of the drugs identified in that complaint are the subject of this Complaint.

---

[79] Christopher Rowland, *Investigation of Generic "Cartel" Expands to 300 Drugs,* THE WASHINGTON POST, December 9, 2018, available at https://www.washingtonpost.com/business/economy/investigation-of-generic-cartel-expands-to-300-drugs/2018/12/09/fb900e80-f708-11e8-863c-9e2f864d47e7_story.html?utm_term=.a838a7f671cd.

[80] *Connecticut, et al v. Teva Pharmaceuticals USA, Inc.,* 2:19-cv-02407 (E.D. Pa.).

[81] State AG Complaint No. 2 at ¶ 4. The State AGs detail their extensive investigatory efforts in State AG Complaint No. 2. They have compiled over 7 million documents, issued more than 300 subpoenas to telephone carriers, issued over 30 subpoenas to generic drug manufacturers and examined the names and contact information of over 600 drug manufacturer employees, giving the State AGs a "unique perspective to know who in the industry was talking to who, and when" *Id.* ¶¶ 64-65. The State AGs have also corroborated these allegations through cooperating witnesses, including senior executives and employees of many Defendants named here.

184.    During the course of their investigation, the States AGs obtained cooperation from a number of individuals. The expected testimony from certain of those individuals will directly support and corroborate the allegations throughout the State AG Complaints and this Complaint. Some of those cooperating witnesses include:

a.    A former senior pricing executive at Sandoz during the time period relevant to this Complaint [referred to herein as CW-1];

b.    A former sales and marketing executive at Rising and senior sales executive at Sandoz during the time period relevant to this Complaint [referred to herein as CW-2];

c.    A former sales executive at Fougera, and then senior sales executive at Sandoz, during the time period relevant to this Complaint [referred to herein as CW-3];

d.    A former senior sales executive at Sandoz during the time period relevant to this Complaint [referred to herein as CW-4];

e.    A former senior executive at Glenmark during the time period relevant to this Complaint [referred to herein as CW-5]; and

f.    A former senior sales executive at Fougera and Aurobindo during the time period relevant to this Complaint [referred to herein as CW-6].

185.    In addition, the State AGs have obtained contemporaneous handwritten notes taken by CW-3 during the time period relevant to this Complaint, containing direct evidence of his collusion with several competitors. CW-3 maintained these notes in a two-volume notebook (referred to herein as the "Notebook"). The Notebook contains CW-3's notes from internal Sandoz meetings, as well as some, but not all, of his phone calls with competitors. CW-3 took these notes chronologically between 2009 and 2015. In 2012 and 2013, the notes are fairly comprehensive;

however, the Notebook is less comprehensive starting in 2014 because CW-3 changed his note-taking practices. CW-3 took notes because he was discussing many different prices and products with competitors and he could not keep track of it all without notes. CW-3 generally traveled with the Notebook and did not hide it from people, including competitors. Indeed, competitors often joked with him about his "little black books." References to the Notebook will be discussed throughout this Complaint to support the allegations alleged herein.

## VII.  THE GENERIC DRUG MARKET

### A.  The Cozy Nature of the Industry and Opportunities for Collusion

186.    The collusion alleged herein infested the generic drug industry.

187.    At all relevant times, Defendants conspired, combined, and contracted to fix, raise, maintain, and stabilize prices, rig bids, and engage in market and customer allocation concerning the Subject Drugs, along with other drugs, which had the actual and intended effect of causing Humana to pay artificially inflated prices at supracompetitive rates.

188.    In formulating and effectuating their conspiracy, Defendants engaged in various forms of anticompetitive conduct, including but not limited to:

> a.    Participating in, directing, authorizing, or consenting to the participation of subordinate employees in meetings, conversations, and communications with co-conspirators to discuss the sale and pricing of the Subject Drugs in the United States;

> b.    Participating in, directing, authorizing, or consenting to the participation of subordinate employees in meetings, conversations, and communications with co-conspirators to engage in market and customer allocation or bid-rigging for the Subject Drugs sold in the United States;

REDACTED – PUBLIC VERSION

c.       Agreeing during those meetings, conversations, and communications to engage in price increases, market and customer allocation, and/or bid-rigging for the Subject Drugs sold in the United States;

d.       Agreeing during those meetings, conversations, and communications not to compete against each other for certain customers with respect to the Subject Drugs sold in the United States;

e.       Submitting bids, withholding bids, and issuing price proposals in accordance with the agreements reached;

f.       Selling the Subject Drugs in the United States at collusive and noncompetitive prices; and

g.       Accepting payment for the Subject Drugs sold in the United States at collusive and noncompetitive prices.

189.    The Defendants ensured that all conspirators were adhering to their collective scheme by communicating (1) at trade association meetings and conferences; (2) at private meetings, dinners, and outings among smaller groups of employees of various generic drug manufacturers; and (3) through individual, private communications between and among Defendants' employees by use of the telephone, electronic messaging, and similar means.

### 1.    Trade Association Meetings and Conferences

190.    Throughout the year, many healthcare entities within the generic drug industry hold multi-day conferences wherein generic manufacturers are invited to attend. Further, Defendants and other generic drug manufacturers attend various trade shows throughout the year, including those hosted by the National Association of Chain Drug Stores ("NACDS"), the Healthcare Distribution Management Association ("HDMA")(now the Healthcare Distribution Alliance), the Generic Pharmaceutical Association ("GPhA") (now the Association of Accessible Medicine), Efficient

REDACTED – PUBLIC VERSION

Collaborative Retail Marketing ("ECRM"), the Minnesota Multistate Contracting Pharmacy Alliance ("MMCAP"), and the Healthcare Supply Chain Association ("HSCA"). Between February 20, 2013 and December 20, 2014, there were at least forty-four different tradeshows or customer conferences where Defendants had the opportunity to, and actually did, meet in person, which gave rise to the opportunity to reach these agreements without fear of detection.

191.    At the various trade shows and conferences, Defendants' employees interacted with one another and discussed their respective businesses. Many of these events included social and recreational outings such as golf, lunch, cocktail parties, and dinners that provided additional opportunities to meet with competitors. Defendants used these opportunities to share competitively-sensitive information concerning upcoming bids, specific generic drug markets, pricing strategies and pricing terms in their contracts with customers, and in turn to implement schemes that unreasonably restrain competition in the United States' market for generic drugs.

192.    In fact, in the Association for Accessible Medicine's Antitrust Compliance Policy Manual updated in January 2018 (well after litigation and investigation surrounding generic drug pricing conspiracies began), the trade association explicitly stated, "Meetings, communications and contacts that touch on antitrust matters present special challenges. A simple example will illustrate this. Suppose that competitors were to discuss their prices at a meeting or in a document, and that their prices increased shortly afterward. A jury might view this as evidence that their discussions led to an agreement on pricing, and thus violated the antitrust laws." It went on to warn "Do not discuss any subjects that might raise antitrust concerns (including prices, market allocations, refusals to deal, and the like) unless you have received specific clearance from counsel in advance." The Association also warns members to avoid creating written records, and "avoid language that might be misinterpreted to suggest that the Association condones or is involved in anticompetitive behavior."

a.    *National Association of Chain Drug Stores*

193.    NACDS "advances a pro-patient and pro-pharmacy agenda. For the ultimate benefit of the customers served by NACDS members, the mission of NACDS is to advance the interests and objectives of the chain community pharmacy industry, by fostering its growth and promoting its role as a provider of healthcare services and consumer products."

194.    NACDS hosts an Annual Meeting, attended only by member companies' executives, that it claims is "the industry's most prestigious gathering of its most influential leaders. It is the classic 'Top-to-Top' business conference, attended by industry decision makers." It boasts that it will give companies "a unique opportunity to gain new insights into today's changing marketplace and set your course for the future," and the "opportunity to meet and discuss strategic issues with key trading partners" to "set [] the stage for profitable business."

195.    NACDS also hosts a Total Store Expo annually, which similarly boasts that is it "the industry's largest gathering of its most influential leaders. It will give you and your company a unique opportunity to gain new insights into today's evolving marketplace and set your course for the future."

196.    NACDS members include Amneal, Aurobindo, Glenmark, Lannett, Lupin, Sandoz, Taro, and Wockhardt.

b.    *Generic Pharmaceutical Association*

197.    GPhA is the "nation's leading trade association for manufacturers and distributors of generic prescription drugs…"[82] GPhA was created in 2000 from the merger of three industry trade associations: the Generic Pharmaceutical Industry Association, the National Association of Pharmaceutical Manufacturers, and the National Pharmaceutical Alliance. Regular members are

---

[82] GPhA, Membership, available at http://web.archive.org/web/2015041303008/http://www.gphaonline.org:80/about/membership.

"corporations, partnerships or other legal entities whose primary U.S. business derives the majority of its revenues from sales of (1) finished dose drugs approved via ANDAs; (2) products sold as authorized generic drugs; (3) biosimilar/biogeneric products; or (4) DESI products."[83]

198.    GPhA's website offers members the opportunity to "participate in shaping the policies that govern the generic industry." GPhA's "member companies supply approximately 90 percent of the generic prescription drugs dispensed in the U.S. each year." It boasts networking opportunities as one of the cornerstone benefits of membership: "GPhA provides valuable membership services, such as business networking opportunities, educational forums, access to lawmakers and regulators, and peer-to-peer connections."[84]

199.    Actavis, Amneal, Glenmark, Lupin, Mylan, Perrigo, Sandoz, Sun, and Wockhardt are regular members of GPhA, and have been since 2013. Furthermore, executives of these companies frequently attend GPhA meetings and events.

200.    Executives from Actavis, Amneal, Lupin, Mylan, Perrigo, Sandoz, and Sun served on GPhA's Board of Directors during overlapping times at various points both prior to and after 2013, including:

    a.    2011 Board of Directors: Douglas S. Boothe, CEO, Actavis; Don DeGolyer, President and CEO, Sandoz; and Tony Mauro, President, Mylan North America, as Vice-Chair.

    b.    2012 Board of Directors: Douglas S. Boothe, CEO, Actavis; Don DeGolyer, President and CEO, Sandoz; Tony Mauro, President, Mylan North America as Chair; and Chirag Patel, President, Amneal.

---

[83] *Id.*

[84] *Id.*

    c.    2013 Board of Directors[85]: Tony Mauro, President, Mylan North America, as Chair; Don DeGolyer, President and CEO, Sandoz, as Vice Chair; Charlie Mayr, Chief Communications Officer - Global, Actavis Inc.; and Doug Boothe, Executive Vice President & General Manager, Perrigo Company;

    d.    2014 Board of Directors[86]: Doug Boothe, Executive Vice President & General Manager, Perrigo Company; Peter Goldschmidt, President, Sandoz US; Tony Mauro, President, Mylan Inc.; and Paul McGarty, President, Lupin, as at-large director.

    e.    2015 Board of Directors[87]: Doug Boothe, Executive Vice President & General Manager, Perrigo Company; Peter Goldschmidt, President, Sandoz US; Jim Kedrowski, Executive Vice President, Sun; Marcie McClintic Coates, Head of Global Regulatory Affairs, Mylan Inc.; and Paul McGarty, President, Lupin.

    f.    2016 Board of Directors: Heather Bresch, CEO, Mylan N.V. as Chair; Peter Goldschmidt, President, Sandoz US; Jim Kedrowski, Executive Vice President, Sun; Paul McGarty, President, Lupin; and Richard Stec, Vice President, Perrigo Company.

    c.    *Healthcare Distribution Management Association*

201.    HDMA, now called HDA, is a national trade association that represents "primary pharmaceutical distributors," connecting the nation's drug manufacturers to over 200,000

---

[85]    GPhA Announces 2013 Board of Directors, Ass'n for Accessible Meds., https://www.gphaonline.org/gpha-media/press/gpha-announces-2013-board-of-directors.

[86] GPhA Announces 2014 Board of Directors, Ass'n for Accessible Meds., https://www.gphaonline.org/gpha-media/press/gpha-announces-2014-board-of-directors.

[87] GPhA Announces 2015 Board of Directors, Ass'n for Accessible Meds., https://www.gphaonline.org/gpha-media/press/gpha-announces-2015-board-of-directors/.

pharmacies, hospitals, long-term care facilities, and clinics.[88] HDMA holds regular conferences at which its members, including generic drug manufacturers, meet to discuss various issues affecting the pharmaceutical industry.

202.    Several Defendants were members of HDMA at overlapping times between 2013 and the present. For instance, as of July 2015, HDMA's manufacturer membership list included Amneal, Aurobindo, Lannett, Lupin, Mylan, Sandoz, Sun, and Wockhardt, as well as Allergan, now a division of Actavis.[89] As of March 2016, HDMA's manufacturer membership list included Amneal, Aurobindo, Lannett, Lupin, Mylan, Perrigo, Sandoz, Sun, and Wockhardt, as well as Allergan.[90]

d.    *Efficient Collaborative Retail Marketing*

203.    ECRM hosts strategic events and offers innovative technology solutions to help buyers and manufacturers improve sales, reduce expenses, and enter the market faster and more efficiently.[91] It conducts "Efficient Program Planning Sessions" ("EPPS"), in which generic drug manufacturers, purchasers, and other industry professionals meet "to discuss new business opportunities, review contracting strategies, and future business planning activities."[92] Sessions include one-on-one strategic meetings meant to maximize time, grow sales, and uncover trends.

---

[88]    *About*, HAD, https://healthcaredistribution.org/about.

[89]    *Manufacturer Members*, HDMA, https://web.archive.org/web/20150715222616/http://www.healthcaredistribution.org:80/about/membership/manufacturer/manufacturer-members#.Wrj50y7wZpg.

[90]    *Manufacturer Members,* HDMA, https://web.archive.org/web/20160329122456/http://www.healthcaredistribution.org:80/about/membership/manufacturer/manufacturer-members

[91]    *See* Company Overview of Efficient Collaborative Retail Marketing Company, LLC, Bloomberg , https://www.bloomberg.com/research/stocks/private/snapshot.asp?privcapId=106996762; *See also Alkaline Water Co. Enjoys Valued Participation at National Retail Marketing Trade Show*, The Alkaline Water Co., http://thealkalinewaterco.com/2013/08/06/alkaline-water-co-enjoys-valued-participation-national-retail-marketing-trade-show/.

[92]    ECRM, Health System/Institutional Pharmacy EPPS, https://ecrm.marketgate.com/Sessions/2019/06/HospitalAlternateSitePharmacyPharmaceuticals.

204.    At annual meetings organized by ECRM, generic drug manufacturers schedule meetings with generic drug buyers at chain drug stores, supermarkets, mass merchants, wholesalers, distributors, and buy groups for independent pharmacies.

e.    *Minnesota Multistate Contracting Pharmacy Alliance*

205.    MMCAP hosts various meetings and conferences throughout the year that are regularly attended by Defendants' representatives with price setting capabilities. According to its website, MMCAP is a "free, voluntary group purchasing organization [("GPO")] for government facilities that provide healthcare services. MMCAP has been delivering pharmacy and healthcare value to members since 1985. MMCAP's membership extends across nearly every state in the nation, delivering volume buying power. Members receive access to a full range of pharmaceuticals and other healthcare products and service; such as medical supplies, influenza vaccine, dental supplies, drug testing, wholesaler invoice auditing and returned goods processing."

f.    *Healthcare Supply Chain Association*

206.    HSCA is a trade association that represents leading healthcare GPOs, including for-profit and not-for-profit corporations, purchasing groups, associations, multi-hospital systems and healthcare provider alliances. According to its website, "HSCA and its member GPOs are committed to delivering the best products at the best value to healthcare providers, to increasing competition and innovation in the market, and to being supply chain leaders in transparency and accountability." HSCA's annual event, the National Pharmacy Forum, connects supply chain professionals, pharmaceutical industry representatives, including generic drug manufacturers and suppliers, and others to provide "top-level educational opportunities coupled with one-to-one networking and business-building opportunities."

207.    GPhA, HDMA, ECRM, MMCAP, and HSCA frequently held meetings and events between 2012 and the present, and high-level representatives and corporate officers from

REDACTED – PUBLIC VERSION

Defendants, including employees with price-setting authority, attended these meetings. A list of those meetings and attendees is attached as Exhibit A.

208.    At these various conferences and trade shows, Defendants' employees and representatives, as well as representatives of other generic drug manufacturers, discussed their respective businesses and customers, and discussed the conspiratorial price increases alleged in this Complaint. In many of the conferences described above, attendees for each conspirator Defendant include individuals with generic drug pricing authority. Their discussions also occurred at lunches, cocktail parties, dinners, and golf outings that would typically accompany these events. Defendants' representatives used these opportunities to discuss and share upcoming bids, generic drug markets, pricing strategies, and contractual pricing terms specific to certain customers. [93]

### 2.    Industry Dinners and Private Meetings

209.    Senior executives and sales representatives also frequently gathered in small groups, providing inconspicuous facetime with their competitors where they could discuss sensitive information.

210.    Many Defendants are headquartered in close proximity, providing them with easy and frequent access to one another. At least forty-one (41) different generic drug manufacturers are located between New York City and Pennsylvania, including, among others, Actavis, Aurobindo, Fougera, Glenmark, Lannett, Mylan, Perrigo, Sandoz, Sun, and Taro.

211.    Defendants' high-level executives frequently gathered for "industry dinners." In January 2014, while generic drug prices were soaring, at least thirteen (13) high-ranking executives, including CEOs, Presidents, and Senior Vice Presidents of various generic drug manufactures, met

---

[93] *See, e.g.,* AG Compl. at ¶ 79.

at a steakhouse in Bridgewater, New Jersey. Executives from Actavis, Aurobindo, Lannett, and Sun among others, attended this particular dinner.

212.    At these dinners, one company is typically responsible for paying the bill for all attendees. For example, in December 2013 an executive joked "[y]ou guys are still buying for Mark and I, right?" Another executive responded "Well…I didn't think the topic would come up so quickly but…we go in alphabetical order by company and [another company] picked up the last bill.…PS.…no backing out now! Its [sic] amazing how many in the group like 18 year-old single malt scotch when they aren't buying."

213.    Other groups of competitors routinely gathered for golf outings. One such annual event was organized by a packaging contractor in Kentucky. From September 17-19, 2014, high-level executives from Actavis, Amneal, Lannett, and others attended the event at a country club in Bowling Green, Kentucky.

214.    Generic drug manufacturer employees also regularly convened for "Girls' Night Out" or "Women in the Industry" meetings and dinners. At these events, generic drug companies' employees met with their competitors and discussed proprietary and competitive information. Upon information and belief, several of these events occurred in May 2015 in Baltimore, Maryland, and in August 2015 in Denver, Colorado.

215.    Many "Women in the Industry" dinners were organized by █████████, a salesperson from Heritage. Other participants in these meetings were employees of other generic pharmaceutical manufacturers located in Minnesota or salespeople residing or traveling to the area. In November 2014, Sullivan of Lannett sent ████ (Heritage) a text message asking "[w]hen is your next industry women event? I'm due for a trip out there and I'd love to plan for it if possible…" ████ responded: "There is an Xmas [sic] party at Tanya' house on Dec 6th. Yes that is a Saturday. We do it about once a quarter and usually it is during the week – this was an exception."

216.    Dinners were also planned around visits of certain out-of-town competitors. When organizing one of these such dinners, ███ commented "Sorry if the meeting/dinner invite is a little short notice, but ███ of Dr. Reddy's will be in MN on Sept 29th and it would be a great time for everyone to get together! So much has been happening in the Industry too – we can recap all our findings from NACDS over a martini or glass of wine! 😊 Plus the food is super yummy!"

217.    Several different GNOs were held in 2015, including (1) at the ECRM conference in February; (2) in Baltimore in; and (3) at the NACDS conference on August 24, 2015. The Baltimore GNO in May 2015 consisted of a professional baseball game, drinks, and a spa day on May 13, wherein the competitors could discreetly and privately discuss competitively-sensitive information.

**3.    Personal Telephone Calls, E-Mails, and Text Message Communications**

218.    Defendants routinely conferred with one another on bids and pricing strategy. This included forwarding customer bid packages to a competitor, either on the forwarding company's own initiative or at the competitor's request.

219.    Defendants also shared information regarding the terms of their contracts with customers, including various terms relating to pricing, price protection, and rebates. Defendants used this information from their competitors to negotiate potentially better prices or terms with their customers, which ultimately harmed consumers like Humana.

220.    Representatives of several Defendants with pricing responsibility had frequent telephone calls with representatives of competitors. For example, executives at Teva had at least 1,501 contacts with competitors, including from Actavis, Aurobindo, Glenmark, Lannett, and Sandoz. Further, executives at Heritage had at least 513 contacts with executives from would-be competitors including from Actavis, Glenmark, Lannett, Sandoz, and Sun.

REDACTED – PUBLIC VERSION

**B.    The Overarching Conspiracy Between Generic Drug Manufacturers—Playing Nice in the Sandbox**

221.    As a result of the cozy nature of the industry, sales and marketing executives in the generic pharmaceutical industry are well aware of their competitors' current and future business plans. This reciprocal sharing of inside information greatly facilitates agreements among competitors to allocate markets to avoid price competition.

222.    The overarching conspiracy among generic manufacturers—which ties together all of the agreements on the Subject Drugs identified in this Complaint and Humana's other Complaints—is an agreed-upon code that each competitor is entitled to its "fair share" of the market, whether that market is a particular generic drug, or a number of generic drugs. That term is generally understood as an approximation of how much market share each competitor is entitled to. Fair share is based on the number of competitors in the market, with a potential adjustment based on the timing of entry or the anticompetitive allocation of buyers amongst similar or the same competitors in another generic drug market. Once a manufacturer has achieved its "fair share," it is generally understood that it will no longer compete for additional business. The common goal or purpose of this overarching agreement is to keep prices high, avoid price erosion, and serve as the basis for further supra-competitive price increases.

223.    This overarching agreement is widespread across the generic drug industry and is broader than the Defendant manufacturers named in this Complaint. Humana focuses here on the role of these named Defendants and their participation in, and agreement with, this overarching conspiracy as applied to the sale of the Subject Drugs, as well as how these specific conspiracies are also part of the larger overarching conspiracy.

224.    The exact contours of this "fair share" understanding, which has been in place for many years (and pre-dates any of the specific conduct detailed herein), has evolved over time during the numerous in-person meetings, telephonic communications, and other interactions between

generic manufacturers about specific drugs. These business and social events occur with such great frequency that there is an almost constant ability for Defendants to meet in person and discuss their business plans. For example, between February 20, 2013 and December 20, 2013 (a 41-week period), there were at least forty-four (44) different tradeshows or customer conferences where the Defendants had the opportunity to meet in person, some of which are described above. These in-person meetings gave the Defendants the opportunity and cover to have these conversations, and reach these agreements, without fear of detection.

225.    As described in more detail below, when necessary, this larger understanding was reinforced through phone calls and text messages between the Defendants to discuss "fair share" and the desire to maintain or raise prices with respect to specific drugs. These types of communications occur with great frequency across the industry, including among Defendants.

226.    The specific drug agreements often involve overlapping sets of Defendants in communication with each other, all following their agreed-upon "fair share" code of conduct. These are not isolated, one-off agreements, but rather demonstrate the ongoing, sprawling nature of the Defendants' overarching conspiracy.

227.    Referred to sometimes as the "rules of engagement" for the generic drug industry, the fair share understanding among Defendants dictates that, when two generic manufacturers enter the market at the same time, they generally expect that each competitor is entitled to approximately 50% of the market. When a third competitor enters, each competitor expects to obtain 33% share; when a fourth competitor enters, each expects 25%; and so on, as additional competitors enter the market.

228.    When a generic drug manufacturer is first to enter a particular drug market on an exclusive basis, it is commonly understood that that manufacturer is entitled to a little more than its proportional share of the market. For example,

REDACTED – PUBLIC VERSION

229.     Conversely, those generic manufacturers that enter later are typically entitled to a little less than their proportional share.

230.     Taro went so far as to create a graphic representation of that understanding, taking into account both the number of competitors and order of entry to estimate what its "fair share" should be in any given market:



231.     Although these general parameters are well-known, there is no precise method for apportioning "fair share" because market share is ultimately determined by either winning or maintaining the business of various customers, which is inherently variable in a given year. The shared objective, however, is to attain a state of equilibrium, where no competitors are incentivized to compete for additional market share by eroding price.

232.     This common goal was stated succinctly by Aprahamian, who advised the Taro Pricing Department in training documents from September and November 2013 that "[g]iving up share to new entrant (as warranted) shows responsibility and will save us in the long run" and "[d]on't rock the boat – [g]reedy hogs go to slaughter." Ironically, it was this exact greed that inspired this conspiracy. As demonstrated throughout the Complaint, Aprahamian's idea of "responsibility" meant constantly reaching out to competitors in order to coordinate giving up share to reach a "fair" allocation and keep prices high.

233.    This scheme to strangle competition and allocate "fair share" is typically

implemented as follows. First, Defendants allocate the market for an individual drug based on the

number of competitors and the timing of their entry so that each competitor obtains an acceptable

share of the market. Then, the competitors agree on ways to avoid competing on price and, at times,

significantly raise price. This pattern is frequently followed even in the absence of direct

communication between the competitors, demonstrating the universal code of conduct Defendants

agreed to.

234.    The "fair share" understanding has been particularly effective when a new

competitor enters the market—a time when, in a free-functioning, competitive market for generic

drugs, prices would be expected to go down. In today's generic drug markets, a new competitor will

either approach or be approached by existing competitors. Existing competitors will agree to "walk

away" from a specific customer or customers by either refusing to bid or submitting a cover bid.

The new competitor's transition into the market is seamless; the new entrant is ceded market share

and immediately charges a supra-competitive price. The competitors then continue this process of

dividing up customers until the market reaches a new artificial equilibrium. This is referred to as a

"stable" market.

235.    "Fair share" principles also dictate how generic drug manufacturers respond when a

competitor experiences supply issues. If the disruption is temporary, the existing competitors will

refrain from taking any action that might upset the market balance. By contrast, if the disruption is

for a longer term, the competitors will divide up customers until each player achieves a revised "fair

share" based on the number of players remaining in the market. For example, in July 2013, a retail

pharmacy customer e-mailed Taro stating that one of Mylan's products was on back order and asked

Taro to bid for the business. Aprahamian sent an internal e-mail stating "Not inclined to take on

new business . . . Wholesalers have product, let them pull from there temporarily and we can

certainly review if shortage persists. Don't want to overreact to this product. Not sure how long

Mylan is out."

236.    These rules about "fair share" apply equally to price increases. As long as everyone is

playing fair, and the competitors believe that they have their "fair share," the larger understanding

dictates that they will not seek to compete or take advantage of a competitor's price increase by

bidding a lower price to take that business. Doing so is viewed as "punishing" a competitor for

raising prices—which is against the "rules." Indeed, rather than competing for customers in the face

of a price increase, competitors often use this as an opportunity to follow with comparable price

increases of their own.

237.    When a generic manufacturer participates in this scheme, and prices stay high, this is

viewed as "playing nice in the sandbox."

238.    Sandoz, in turn, uses specific terminology to refer to its competitors that are acting in

accordance with "fair share" principles. For example, in internal company presentations throughout

2014, Sandoz consistently referred to Actavis as a "responsible competitor" and Taro as a "very

responsible price competitor."

239.    Adherence to the rules regarding "fair share" is critical in order to maintain high

prices. Indeed, that is the primary purpose of the agreement. If even one competitor does not

participate (and, thus behave in accordance with) the larger understanding, it can lead to unwanted

competition and lower prices. In the relatively few instances where a competitor prioritizes gaining

market share over the larger understanding of maintaining "fair share," that competitor is viewed as

"irresponsible," and is spoken to by other competitors.

240.    "Fair share," "playing nice in the sandbox," "rationalizing the market," and similar

terminology have become part of the industry lexicon, and thus part of the larger understanding

between Defendants. Generic drug manufacturers actively and routinely monitor their fair share and

that of their competitors, as well as discuss customer allocation amongst each other within the context of agreements on specific drugs, as well as allocation spanning across numerous drugs.

241.    For example, in July 2013, L.J., a senior marketing executive at Sandoz, sent an internal e-mail identifying 47 products where Sandoz did not have "fair share" of the market. After some back-and-forth internal joking among Sandoz executives about the idea that Sandoz might actually attempt to compete for business in those markets by driving prices down, Kellum responded by emphasizing the truly industry-wide nature of the agreement:

| | |
|---|---|
| **From:** | Kellum, Armando |
| **Sent:** | Tuesday, July 02, 2013 12:31 AM |
| **To:** | ███████████████████████████ |
| **Subject:** | Re: Product Sales and Market Share Performance_v17 (3).xls |

Fair Share for all!!!

242.    The concept of "fair share" is so well ingrained in the generic pharmaceutical industry that even customers are aware of, and at times facilitate, collusion among generic manufacturers.

243.    Customers at times also facilitate price increases, asking competitors to "rationalize" a market by raising prices. For example, in November 2013, S.G., a senior account executive at Sandoz, sent an internal e-mail stating "[a large wholesale customer] is indicating that Glenmark and Caraco had taken a price increase on [a drug not identified in the Complaint] in June. [The customer] is asking if Sandoz will be rationalizing the market. . . . Please advise on next steps. Our [lower] pricing is disrupting the market."

244.    The "fair share" agreement is not limited to any one market; these principles constantly inform and guide the market actions that generic drug manufacturers decide to take (or not take) both within and across product markets. "Fair share" decisions consider factors across

multiple generic drug markets. Customers in one drug market might be traded for customers in another drug market so to create a global "fair share" outcome. Or a putative competitor may decline to complete meaningfully on a bid for one drug in exchange for the opportunity to provide a pre-determined bid for a different drug. Or competitors might avoid challenging a price increase on one generic drug based on a *quid pro quo* arrangement from other competitors on different drugs.

245.    Indeed, Defendants understood that to effectuate a successful price-fixing and market allocation agreement on one drug, they would need to effectuate an agreement across each Defendant's portfolio of drugs. If the agreement were limited to one or two drugs, it could easily fall apart. For example, an agreement between two Defendants to raise prices or to allocate market share on one drug would not likely hold where those same two Defendants engaged in vigorous price competition on another drug, or where a third manufacturer not party to that agreement entered the market with an intent to compete on price.

246.    Unlike their branded counterparts, generic drugs are commodities and generic manufacturers are constantly making decisions to enter new markets and leave existing markets. Often these decisions are made, at least in part, based on who the competitors are and how strong the relationship is between the two companies. For example, in July 2013, Sandoz was looking to implement a "Taro Strategy" that involved temporarily delisting ten products that they overlapped on with Taro. This strategy would allow Taro to raise price on these products while Sandoz was out of the market, and then Sandoz could re-enter later at the higher price.

247.    This interdependence between generic manufacturers is further demonstrated by the countless examples of companies sharing sensitive information with competitors as a matter of course. The State AGs have gathered evidence going back more than a decade of generic companies routinely communicating and sharing information with each other about bids and pricing strategy.

REDACTED – PUBLIC VERSION

This includes forwarding bid packages received from a customer (e.g., a Request for Proposal or "RFP") to a competitor, either on their own initiative, or at the request of a competitor.

248.     Defendants and other generic drug manufacturers also share information among themselves regarding the terms of their contracts with customers, including pricing terms, price protection, and rebates. Defendants use this information to negotiate prices or terms that are more favorable to them, often to the ultimate detriment of payors and consumers.

249.     Defendants were well aware that what they were doing was illegal and took steps to cover up evidence of the overarching conspiracy. For example, in May 2014, a large customer of Taro's received a bid on a product not identified in this Complaint and gave Taro an opportunity to bid to retain the business. A.L., a senior contracting executive at Taro, sent an internal e-mail stating "FS ok, will not protect." E.G., a senior managed care executive at Taro, responded "explain FS, (Fair share)?" Aprahamian replied:

> No emails please. Phone call. ███ let's discuss.

250.     Similarly, handwritten notes from an internal Sandoz business review presentation from May 2017—after the States' investigation was well underway—read: "Avoid Fair share terminology on slides – underdeveloped or overdeveloped is better."

251.     To avoid creating a potentially incriminating paper trail, Kellum routinely admonished colleagues for putting information that was too blatant in e-mails, understanding that it could lead to significant legal exposure for both the company and the individuals involved.

252.     The examples referenced in this section, and in the sections that follow, include only illustrative examples of the types of conduct described.

REDACTED – PUBLIC VERSION

C.    **Generic Drug Price Spikes Since 2013**

253.    Against this industry backdrop, the prices for a large number of generic pharmaceutical drugs skyrocketed throughout at least 2013 and 2014. As Senator Sanders noted, the prices of more than 1,200 generic medications increased an average of 448 percent between July 2013 and July 2014.[94] An analysis conducted by Sandoz showed that during the calendar years 2013 and 2014, there were 1,487 "large price increases" (increases of the WAC price greater than 100%), of which 12% (178) were increased by greater than 1,000%.

254.    These increases in 2013 and 2014 were staggering compared to prior years. The following table (which contains information about WAC pricing changes through October 2014 only) demonstrates the dramatic surge in the number of large drug price increases per year in 2013 and 2014:

|  | Year | Total Number of Increases | Increases Greater than 100% | Increases Greater than 50% |
|---|---|---|---|---|
|  | 2010 | 3820 | 125 | 260 |
|  | 2011 | 4265 | 255 | 409 |
|  | 2012 | 4071 | 223 | 433 |
|  | 2013 | 5694 | 739 | 1072 |
| YTD Oct. | 2014 | 4461 | 637 | 1521 |

255.    A January 2014 survey of 1,000 members of the National Community Pharmacists Association ("NCPA") found that more than 75% of the pharmacists surveyed reported higher prices on more than 25 generic drugs, with the prices spiking by 600% to 2,000% in some cases.

256.    More than $500 million of Medicaid drug reimbursement during the twelve months ending on June 30, 2014 was for generic drugs whose prices had increased by over 100%.

---

[94] Why are Some Generic Drugs Skyrocketing in Price?: Hearing on S. 113-859 Before the S. Comm. on Health, Education, Labor, and Pensions, 113th Cong. 2 (2014) (statement of Sen. Bernie Sanders, Chairman, S. Subcommittee on Primary Health and Aging).

## VIII.   THE CONSPIRACY

257.    When entering a generic drug market, Defendants routinely and systematically sought out their competitors to reach agreement to allocate market share, maintain high prices and/or avoid competing on price. These agreements had the effect of artificially maintaining high prices for a large number of generic drugs and creating an appearance of competition where in fact little to none existed.

258.    Illustrative examples of these agreements are set forth below, organized by company relationship and describing specific examples relating to the Subject Drugs.

259.    By 2012 the overarching "fair share" conspiracy was well established in the industry, including among the Defendants. Generic manufacturers replaced competition with coordination in order to maintain their fair share of a given generic drug market and avoid price erosion. The structure and inner workings of the agreement were well understood and adopted throughout the industry.

260.    Around this time, however, manufacturers began to focus more on price increases than they had in the past. They were no longer satisfied to simply maintain stable prices—there was a concerted effort by many in the industry to significantly raise prices. Manufacturers started communicating with each other about those increases with greater and greater frequency.

261.    Starting sometime in 2012 or even earlier, and continuing for several years, competitors would systematically communicate with each other as they were identifying opportunities and planning new price increases, and then again shortly before or at the time of each increase. The purpose of these communications was not only to secure an agreement to raise prices, but also to reinforce the essential tenet underlying the fair share agreement—i.e., that they would not punish a competitor for leading a price increase or steal a competitor's market share on an increase. There was an understanding among many of these generic drug manufacturers—including the

Defendants—that a competitor's price increase be quickly followed; but even if it could not, the overarching conspiracy dictated that the competitors who had not increased their prices would, at a minimum, not seek to take advantage of a competitor's price increase by increasing their own market share (unless they had less than "fair share").

262.     Generic drug manufacturers could not always follow a competitor's price increase quickly. Various business reasons—including supply disruptions or contractual price protection terms with certain customers that would result in the payment of significant penalties—could cause such delays. In those instances when a co-conspirator manufacturer delayed following a price increase, the underlying fair share understanding operated as a safety net to ensure that the competitor not seek to take advantage of a competitor's price increase by stealing market share.

263.     Examples of specific collusive price increases on the Subject Drugs are set forth below.

### A.     Topical Drugs Conspiracy

#### 1.     Overview of the Topical Drugs Conspiracy

264.     Going back many years–from at least 2009 through early 2016–collusion has been rampant among manufacturers of generic topical products. Topical products include any drug that is administered by means of contact, most often with an external body surface. Such products typically face higher barriers to entry because technical hurdles associated with demonstrating bioequivalence to branded products are more time consuming and expensive, and manufacturing costs are high, compared to other types of generic drugs.

265.     The greater barriers to entry generally associated with topical products limit the number of competitors in any particular topical product market, creating an environment that is ripe for collusion. Many topical products have only two or three competitors. As a result, the sales and pricing executives at these companies know each other well and have used those business and

personal relationships as a means to collude to limit competition, allocate customers, and significantly raise prices on dozens of generic topical products.

266.    Indeed, the larger and more prominent topical manufacturers—including Taro, Perrigo, Fougera (now Sandoz), and Actavis—had long-standing agreements over the course of several years not to compete for each other's customers and to follow each other's price increases. To maintain these unlawful agreements, the competitors stayed in nearly constant communication—meeting regularly at trade shows and customer conferences and communicating frequently by phone and text message to reinforce their understandings. This Complaint is replete with examples demonstrating how these understandings manifested themselves with respect to specific products over a period of many years.

267.    These understandings were not limited to just the largest manufacturers of generic topical products, however.  The other manufacturers of those products—including all the Defendants named in this Complaint—understood the rules of the road and took the necessary steps to limit competition among them.

268.    As set forth above, for many years, the larger generic pharmaceutical industry has operated pursuant to an overarching understanding to avoid competing with each other and to instead settle for what these competitors refer to as their "fair share." This understanding has permeated every segment of the industry, and the purpose of the agreement was to avoid competition among generic manufacturers that would normally result in lower prices and greater savings to the ultimate consumer.

269.    Nowhere was this understanding more pronounced than with regard to the sale of generic topical products, where the competition is limited and the product overlap extensive. Indeed, companies recognized that reality and celebrated the fact that they operated in this segment of the industry. For example, G&W remarked in an internal e-mail from May 2013 ███████████

███████████████████████████████████████████████████████

████████

270.    Since at least 2007, the top three manufacturers, by sales, of generic topical products have consistently been Taro, Perrigo, and Fougera (now Sandoz). Between 2007 and 2014, these three companies controlled approximately two-thirds of the topical market segment. Several other manufacturers make up the remaining third, including Actavis, G&W, Glenmark, Mylan and others, as discussed throughout this Complaint. The following graphic shows the market share breakdown on generic topical products for June 2007 through June 2012:

████████████████████



271.    Similarly, the following chart from an internal Sandoz presentation details a consistent picture for 2014:

██████████████████████

REDACTED – PUBLIC VERSION



272.     Once the competitors had their "fair share" of a particular drug market, it was time

to increase prices. Indeed, it was generally understood that when a competitor increased prices, the

other competitors in the same drug market would either decline to bid for the business or would bid

high so as not to take advantage of the price increase. Typically, the competitor would then follow

with a comparable price increase of its own.

273.     Although manufacturers of generic topical products have been colluding on price

increases since at least 2009, the size and frequency of those increases grew exponentially in 2013

and 2014. During that time period, the prices of hundreds of generic drugs—including many at issue

in this Complaint—skyrocketed without explanation, sparking outrage from politicians, payers, and

consumers across the country whose costs have doubled, tripled, or even increased by 1,000% or

more. Generic drug manufacturers argued publicly that the significant price increases were due to a

myriad of lawful factors, such as industry consolidation, FDA- mandated plant closures, or

elimination of unprofitable generic drug product lines.

REDACTED – PUBLIC VERSION

274.    However, these reasons were far from the truth. In reality, there were several structural and personnel changes among generic topical manufacturers in late 2012 and early 2013 that fostered and facilitated collusion in that segment of the industry. These changes increased opportunities for coordination between competitors—and coordinate they did.

275.    First, in July 2012, Sandoz finalized its purchase of Fougera, a niche dermatology manufacturer, making Sandoz a much more prominent manufacturer of generic topical products. Sandoz publicly touted that the purchase positioned it "as the new #1 in generic dermatology medicines both globally and in the U.S."

276.    As a result of the acquisition, all of Fougera's sales executives lost their jobs, except for one executive who is now cooperating with the State AGs (referred to herein as CW-3).  Because of Sandoz's size, and the fact that it was an active participant in many different product markets, many competitors reached out to CW-3 when they learned he had transitioned to Sandoz because they viewed it as a strategic opportunity to collude on overlapping products. For example, Blashinsky, then a senior executive at Glenmark approached CW-3 at an industry event August 2012 and told him—█████████████████ and ████████████████████

277.    Over the ensuing years, CW-3 would leverage his competitor relationships— including his contacts at many of the Defendants—to prove his worth to Sandoz management by using those relationships to allocate customers and increase prices on dozens of products. His competitor contacts included Blashinsky, Aprahamian, and Kaczmarek, but there were many others. Indeed, CW-3 took contemporaneous notes to keep track of all the different prices and products he was discussing at any given time. CW-3 maintained this direct evidence of anticompetitive conduct in a notebook (of which there are two volumes) that his colleague, referred to hereafter as CW-1, coined the ████████████ as described more fully below. Various excerpts from the notebooks are referred to throughout this Complaint to support the allegations herein.

278.    Second, in the months following the Fougera acquisition, three key Actavis executives—Boothe, Perfetto, and Aprahamian—left Actavis to assume senior-level positions at competitor companies that were also prominent manufacturers of topical products. Boothe became an executive at Perrigo and Perfetto and Aprahamian became executives at Taro. These former colleagues turned competitors would use their longstanding relationships and new high-level positions as an opportunity to collude with their key competitors on overlap products.

279.    Perfetto and Aprahamian, in particular, wasted no time working together to implement changes designed to improve Taro's financial bottom line and firmly position the company as a price increase leader. Although Taro had been successful in implementing price increases in the past, the increases taken by Taro in 2013 and 2014 would be much more significant. These increases caught the attention of other generic drug manufacturers across the industry. Indeed, one sales executive at a generic manufacturer not named in this Complaint remarked in an internal e-mail that ███████████████████████████████████████████████ ███████████████████████████████ To that, his colleague responded █████ ████████████████████████████████████████████████████████ ██████████████████████

280.    For example, in June 2014, Taro initiated significant price increases on more than a dozen different drug products. As a result of the June 2014 increases, Credit Suisse analysts increased their price target for Taro and its parent company, Sun, from $85 to $150 per share. As justification for the increase, Credit Suisse emphasized that Taro's competitors had consistently followed the increases and prices remained high:

████████████████████



281.    Taro's success in implementing price increases depended, in large part, on the strength of the ongoing collusive relationships that Perfetto and Aprahamian had fostered with their contacts at competitor companies—both with manufacturers of topical products and beyond. These included Boothe, Blashinsky, Orlofski, and Vogel-Baylor, but there were others. Numerous examples of how this collusion unfolded with respect to specific products are discussed in detail below.

282.    The price increases taken by generic topical manufacturers during this time period resulted in the accrual of significant profits. Between 2008 and 2016, Taro and Perrigo both saw their profits from the sale of generic topical products increased by over 1300%. The other Defendants profited handsomely from this conduct as well.

283.    As set forth above, CW-3 took handwritten notes during the time period relevant to this Complaint, containing direct evidence of his collusion with several competitors. CW-3 maintained these notes in a two-volume notebook that his colleague, CW-1, referred to as the "████████████" (referred to herein as the "Notebook"). The Notebook contains CW-3's notes from internal Sandoz meetings, as well as some, but not all, of his phone calls with competitors. CW-3 took these notes chronologically between 2009 and 2015. In 2012 and 2013, the notes are fairly comprehensive; however, the Notebook is less comprehensive starting in 2014 because CW-3 changed his note-taking practices. CW-3 took notes because he was discussing many different prices and products with competitors and he could not keep track of it all without notes. CW-3 generally traveled with the Notebook and did not hide it from people, including competitors. Indeed, competitors often joked with him about his "little black books." References to the Notebook will be discussed throughout this Complaint to support the allegations alleged herein.

284.    Certain Defendants had separate long-standing agreements with some of their key competitors in the dermatology sector to limit competition on any products on which the companies overlapped. For instance, Sandoz had agreements going back many years with Taro and Perrigo that they would not poach each other's customers and would follow each other's price increases on overlap products.

285.    G&W had similar understandings with its key competitors Taro and Perrigo. For example, in February 2012, Vogel-Baylor exchanged e-mails with her supervisor, Orlofski, regarding responding to the annual McKesson One Stop RFP. Vogel-Baylor stated that she was waiting for McKesson ████████████████████████████████████████████ Once she confirmed the incumbents, she conveyed that information to Orlofski who replied: ████

████████████████████████████████████████████████████████████████

████████████████████████████ As discussed in more detail below, shortly thereafter, Vogel-

77

Baylor would strike up relationship with CW-5, a senior executive at Glenmark, and begin

communicating and colluding with that company in earnest as well.

286.    Further, in June 2014, Sandoz created a ███████████████████ that was

specifically designed to track Sandoz's market share with respect to dermatology products. As T.O.,

a Sandoz marketing executive, described in an internal e-mail: █████████████████████

██████████████████████████████ Similarly, in

November 2015, Sandoz compiled a spreadsheet containing various product opportunities that

contained comments demonstrating its agreements with certain competitors, such as: ████████

████████████ and ████████ or ████████

287.    It was also common for these manufacturers to communicate about, and collude on,

multiple products at any given time, regardless of whether the competitors were currently in the

market for those products. For example, in April 2013, while speaking with T.P., a sales executive at

Perrigo, CW-3, a Sandoz senior sales executive, took the following notes in his Notebook

concerning nine (9) different products that Perrigo had recently increased prices on:

████████████



CW-3 later conveyed that information to Kellum in an e-mail stating: ███████████ ███████████████████████████████████████████████ Notably, this list included several products that Sandoz did not sell at that time, including Halobetasol Propionate cream.

288.    Similarly, in April 2013, Orlofski of G&W asked his colleague Vogel-Baylor to run a report listing ██████████████████████ Vogel-Baylor responded: ███ ████████████████████████████████████████████████████ ███ Orlofsky answered: ██████████████████

289.    Unlike their branded counterparts, generic drugs are commodities and generic manufacturers are constantly making decisions to enter new markets and leave existing markets. Often these decisions are made, at least in part, on who the competitors are and how strong the relationship is between the two companies. As one example, in July 2013, Sandoz was looking to implement a ████████████ that involved temporarily delisting ten (10) products on which it overlapped with Taro. This strategy would allow Taro to raise price on these products while Sandoz was out of the market, and then Sandoz could re-enter later at the higher price.

290.    This interdependence between generic manufacturers is further demonstrated by the countless examples of generic manufacturers sharing sensitive information with competitors as a matter of course.

291.    For example, in June 2012, Grauso, then a senior executive at Aurobindo, forwarded a customer's bid request for multiple products to Orlofski, his former colleague at G&W. The request included Prochlorperazine Maleate suppositories—a product that G&W manufactured, but Aurobindo did not.

292.    Defendants and other generic drug manufacturers also share information among themselves regarding the terms of their contracts with customers, including pricing terms, price

protection, and rebates. Defendants use this information to negotiate prices or terms that are more

favorable to them, often to the ultimate detriment of payors and consumers.  For example, in

August 2010, CW-6, then a senior sales executive at Fougera, sent the following e-mail regarding

██████████████  to his supervisor, Kaczmarek:

██████████████



293.    Before sending this e-mail, CW-6 had spoken that same day with his contacts at

several of the competitors listed, including Grauso, then a senior sales executive at G&W, T.P., a

sales executive at Perrigo, D.C., a sales executive at Glenmark, M.R., a sales executive at West-Ward

Pharmaceuticals, and V.M., a sales executive at Core Pharma LLC. These calls are detailed in the

chart below:

**REDACTED – PUBLIC VERSION**

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 8/4/2010 | Voice | CW-6 (Fougera) | Outgoing | M.R. (West-Ward) | 9:55:28 | 0:01:40 |
| 8/4/2010 | Voice | CW-6 (Fougera) | Outgoing | Grauso, Jim (G&W) | 10:27:49 | 0:00:06 |
| 8/4/2010 | Voice | CW-6 (Fougera) | Outgoing | D.C. (Glenmark) | 10:30:30 | 0:07:40 |
| 8/4/2010 | Voice | CW-6 (Fougera) | Outgoing | D.C. (Glenmark) | 10:40:34 | 0:03:31 |
| 8/4/2010 | Voice | CW-6 (Fougera) | Incoming | Grauso, Jim (G&W) | 11:18:51 | 0:00:16 |
| 8/4/2010 | Voice | CW-6 (Fougera) | Incoming | Grauso, Jim (G&W) | 11:25:37 | 0:00:00 |
| 8/4/2010 | Voice | CW-6 (Fougera) | Outgoing | Grauso, Jim (G&W) | 11:34:56 | 0:03:29 |
| 8/4/2010 | Voice | CW-6 (Fougera) | Incoming | Grauso, Jim (G&W) | 11:39:05 | 0:26:34 |
| 8/4/2010 | Voice | CW-6 (Fougera) | Outgoing | D.C. (Glenmark) | 12:10:54 | 0:00:05 |
| 8/4/2010 | Voice | CW-6 (Fougera) | Outgoing | V.M. (Core Pharma) | 12:38:57 | 0:00:24 |
| 8/4/2010 | Voice | CW-6 (Fougera) | Incoming | V.M. (Core Pharma) | 12:41:09 | 0:12:30 |
| 8/4/2010 | Voice | CW-6 (Fougera) | Outgoing | M.R. (West-Ward) | 12:58:48 | 0:04:08 |

294.    Defendants understood that what they were doing was illegal and took steps to cover up evidence of the overarching conspiracy. For example, in May 2014, a large customer received a bid on Betamethasone Dipropionate lotion and gave Taro an opportunity to bid to retain the business. A.L., a pricing executive at Taro, sent an internal e-mail stating: "FS ok, will not protect." E.G., a Taro sales executive, responded, "explain FS, (Fair Share)?"  Aprahamian replied:



No emails please. Phone call. ████ let's discuss.

295.    To avoid  creating a potentially incriminating paper trail, Kellum routinely admonished colleagues for putting information that was too blatant in e-mails, understanding that it could lead to significant legal exposure for both the company and the individuals involved. Similarly, handwritten notes from an internal Sandoz business review presentation from May 2017—after the State AGs' investigation was well underway—read: "Avoid Fair Share terminology on slides—underdeveloped or overdeveloped is better."

296.    The examples referenced in this section, and in the sections that follow, include only illustrative examples of the types of conduct described.

297.    As detailed above, the overall understanding among the co-conspirators required a commitment that each competitor was entitled to its "fair share" of a given product market. Once the competitors were satisfied that they had their "fair share," they often turned to increasing prices.

REDACTED – PUBLIC VERSION

So long as each competitor had its "fair share," no competitor was incentivized to compete for business when another competitor increased price. It was generally understood that when a competitor increased price, the other competitors in the same drug market would either decline to bid for the business or would bid high so as not to take advantage of the price increase. Often, the competitor would then follow with a comparable price increase of its own.

298.     The concept of "fair share" and price increases went hand in hand. For example, and as discussed in more detail below, Sandoz's ongoing understandings with Taro and Perrigo that they would follow each other's price increases was predicated on the agreement that the follower would not poach the leader's customers after the increase. Aprahamian often spoke with CW-3 of Sandoz about coordinating price increases between the two companies. Almost invariably, he would conclude the conversations with phrases like "don't take my fucking customers," "don't take my business," or "don't be stupid."

299.     Because of this "fair share" understanding, it was not essential for the competitors to communicate with each other in advance of a price increase, although they often did so anyway. So long as the competitor knew before it was approached by customers that the reason for the solicitation was due to a price increase by the incumbent supplier, the competitor knew not to compete for the business. Similarly, the competitor knew it would have the opportunity, which it often took, to follow the increase with a comparable price increase of its own.

### 2.     The Early Days—Collusion From 2009 To Early 2012

#### a.     *Key Relationships Among Generic Topical Manufacturers*

300.     The key manufacturers of generic topical products during this early time period—Fougera (and later Sandoz), Perrigo, Taro, and Actavis—had ongoing understandings going back many years not to poach each other's customers and to follow each other's price increases. These competitors met with each other regularly at trade shows and customer conferences—in addition to

speaking frequently by phone—and specifically discussed and agreed on allocating customers and coordinating price increases on the products they had in common. The following section focuses on these relationships and provides illustrative examples of how these ongoing understandings manifested themselves with respect to the Subject Drugs and other drugs.

i.    *Fougera/Perrigo/Taro*

301.    CW-6 was a senior sales executive at Fougera between October 2004 and August 2012 and a central player in the collusion taking place among generic topical manufacturers at that time. Prior to working at Fougera, CW-6 was a lead buyer in the generics group at Cardinal Health where he developed extensive contacts in the industry.

302.    Upon moving to Fougera, CW-6 was instructed by his supervisor, Kaczmarek, a senior Fougera executive, to reach out to his contacts at competitor companies to discuss market allocation, price increases, and other commercially sensitive topics. If CW-6 did not have a contact at a competitor, Kaczmarek directed him to pass messages to that competitor through his contacts that did. This practice—facilitating anticompetitive conduct through a third competitor—was pervasive throughout the industry. During his tenure at Fougera, CW-6 frequently attended trade shows and customer conferences. At these events, he would regularly discuss competitively sensitive topics with his competitors. CW-6 was also a prolific communicator by phone and exchanged thousands of calls and text messages with his competitors. After speaking with a competitor, CW-6 would often report the competitive intelligence back to his supervisor, Kaczmarek, and Fougera would use that information to make competitive decisions, including which customers to give up to a competitor or what pricing actions to take and when.

303.    CW-6 had a particularly collusive relationship with T.P., a sales executive at Perrigo, dating back to at least 2010. CW-6 and T.P. were not social friends. If the two were communicating, it was to coordinate behavior on products where Fougera and Perrigo overlapped. CW-6 and T.P.

regularly met at trade shows and customer conferences and discussed competitively sensitive topics. The goal of these conversations was always to keep prices as high as possible. CW-6 and T.P. also spoke often by phone. For example, between February 2010 and August 7, 2012, CW-6 and T.P. exchanged at least three hundred and two (302) phone calls.

304.    CW-6 also had a collusive relationship with H.M., a sales executive at Taro, dating back to at least 2011. CW-6 spoke with H.M. in person at trade shows and customer conferences, as well as by phone. During these conversations, the competitors coordinated customer allocation and price increases on products where Fougera and Taro overlapped. Between January 2011 and August 2012, CW-6 and H.M. exchanged at least eighty-six (86) phone calls.

305.    There were several products where all three companies—Fougera, Perrigo, and Taro—sold a particular drug. In these instances, CW-6 would facilitate the communications, passing messages from one competitor to the other to ensure the anticompetitive agreement was understood by all three competitors. This was necessary because T.P. and H.M. did not have an independent relationship and depended on CW-6 to serve as a conduit to effectuate their collusion on overlapping products.

306.    During this early time period, T.P. and H.M. were acting at all times at the direction of, or with approval from, their superiors, including Wesolowski of Perrigo and Blashinsky of Taro.

*ii.    Actavis and Taro/Perrigo*

307.    Perfetto, then a senior sales and marketing executive at Actavis, had a collusive relationship with Blashinsky, then a senior marketing executive at Taro. Between January 2011 and May 2012, when Blashinsky moved to Glenmark, the competitors exchanged at least one hundred and twenty (120) phone calls.

308.    Similarly, M.D., a sales executive at Actavis, had a collusive relationship with T.P. of Perrigo going back many years. The two discussed market allocation and coordinated price increases

on products where Actavis and Perrigo overlapped. Between August 2011 and December 2013, the two competitors exchanged at least eighty-three (83) phone calls.

309.    During this early time period, M.D. was acting at all times at the direction of, or with approval from, his superiors at Actavis, including Perfetto.

*iii.    Sandoz/Taro*

310.    CW-4 worked as a senior sales executive at Sandoz for many years, including during this early time period (between 2009 and early 2012). At Sandoz, CW-4 was evaluated based on her ability to acquire competitive intelligence. Competitive intelligence included information concerning product launches, customer alignment, price increases, and supply disruptions.

311.    CW-4 obtained competitive intelligence from customers as well as competitors with whom she had relationships. CW-4 viewed providing this information as a way to demonstrate value to the company. CW-4 reported competitive intelligence to superiors, including Kellum and CW-1, both senior pricing executives at Sandoz. When CW-4 felt pressure from superiors to deliver useful information, she tended to engage in more anticompetitive conduct.

312.    CW-4 had a longstanding relationship with D.S., a sales executive at Taro. CW-4 first met D.S. when he was a buyer at a large grocery chain. The two developed a friendly relationship, in addition to a professional one.

313.    In 2009, shortly after D.S. joined Taro, he and CW-4 met in person at an industry event and had a high-level discussion about Taro's and Sandoz's philosophies with respect to market share and pricing. The two competitors agreed that both of their employers believed in price increases and maintaining higher pricing. D.S. explained that companies that compete on price to get more market share were bad for the market because they brought prices down. CW-4 agreed and the two discussed the importance of maintaining a fair share balance, not being greedy about market share, and following price increases on overlapping products.

314.    After this conversation, CW-4 and D.S. were confident that they had a consistent understanding, and that neither Sandoz nor Taro would compete aggressively against the other. This conversation paved the way for them to work cooperatively in orchestrating Sandoz's and Taro's movements on several drugs in the coming years.

315.    In addition to communicating frequently in-person, CW-4 and D.S. also spoke often by phone. For example, between January 2011 and October 2013 (when D.S. left Taro), the two exchanged at least seventy-three (73) phone calls.

316.    During this early time period, CW-4 and D.S. were acting at all times at the direction of, or with approval from, their superiors including Kellum of Sandoz and Blashinsky of Taro

　　　　b.    *Long-Standing Competitor Relationships Lead to Collusion.*

317.    The following Sections will discuss specific examples of how the long-standing competitor relationships detailed above manifested themselves regarding the Subject Drugs and other drugs between 2009 and early 2012.

　　　　　　i.    *Clotrimazole Betamethasone Dipropionate Cream and Lotion*

318.    Clotrimazole Betamethasone Dipropionate ("CBD") comes in both a cream ("CBD Cream") and a lotion ("CBD Lotion"). In 2013, annual sales of CBD Cream and Lotion in the United States exceeded $150 million.

　　　　　　(a)    *March And April 2011 - Actavis Raises Prices And Fougera*
　　　　　　　　　*And Taro Follow*

319.    In early 2011, the competitors in the generic market for CBD Cream were Fougera, Taro, and Actavis and the competitors in the generic market for CBD Lotion were Fougera and Taro.

320.    On March 9, 2011, J.R., a senior Actavis pricing executive, circulated internally a proposed price increase plan for four products, including CBD Cream, to take effect on March 28, 2011. Actavis planned to raise WAC prices for CBD Cream by 227% and to increase contract prices

to customers by as much as 1100%. Notably, Actavis had not yet conveyed the proposed increases to its customers. In fact, in that March 9, 2011 e-mail, J.R. specifically told his colleagues ███████ ████████████████████████

321.    Even though Actavis had not yet told its customers of these substantial price increases, its competitors, Fougera and Taro, were already aware. On March 9, 2011—the same day that J.R. circulated the price increase proposal internally at Actavis—D.H., a Fougera sales executive, sent a National Accounts Monthly Recap report for February 2011 to Kaczmarek. In that recap, D.H. reported that for CBD ████████████████████████ Further, D.H. reported: ██████ ████████████████████ The reference to ████████████ is a reference to all of Taro's betamethasone products, including CBD Cream and CBD Lotion. Taro had not yet raised its prices on those products.

322.    Fougera was already aware of its competitors' price increases for CBD products because, in the preceding month, representatives of Actavis, Fougera, and Taro were in contact with one another to ensure that each competitor would follow the other's price increases.

323.    For example, from February 1, 2011 to March 9, 2011, Perfetto, then a senior Actavis sales and marketing executive, spoke with Blashinsky, then a senior Taro marketing executive, eight (8) times for a total of approximately fifty-two (52) minutes. During that same time, H.M., a Taro sales executive, spoke with CW-6 of Fougera three (3) times for a total of approximately fifteen (15) minutes.

324.    On March 25, 2011, Actavis informed its customers of the price increases for CBD Cream. By chance, just days before the announcement, Actavis learned that its API costs for CBD Cream would increase. Actavis immediately recognized that it could use this news to mislead its customers and provide cover for its illegal price-fixing conspiracy.

REDACTED – PUBLIC VERSION

325.    Before the announcements went out, Perfetto e-mailed the Actavis sales executives, telling them to ███████████ and to stick to the story that the price increase is ███████████ ███████████ One sales executive even went so far as to tell Econdisc that the increase was necessary because Actavis's ███████████ In reality, Actavis knew the API ███████████ ███████████ for the pricing of prescription medications such as CBD Cream.

326.    In furtherance of their conspiracy to raise prices, Actavis, Taro, and Fougera remained in contact during the days leading up to Actavis's formal price increase announcement on March 25, 2011, including calls between the following individuals:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 3/17/2011 | Voice | H.M. (Taro) | Outgoing | CW-6 (Fougera) | 12:03:40 | 0:01:44 |
| 3/21/2011 | Voice | H.M. (Taro) | Outgoing | CW-6 (Fougera) | 10:50:22 | 0:00:00 |
| 3/21/2011 | Voice | H.M. (Taro) | Outgoing | CW-6 (Fougera) | 10:51:24 | 0:00:34 |
| 3/21/2011 | Voice | H.M. (Taro) | Outgoing | CW-6 (Fougera) | 12:27:28 | 0:02:38 |
| 3/22/2011 | Voice | H.M. (Taro) | Outgoing | CW-6 (Fougera) | 15:26:45 | 0:02:00 |
| 3/23/2011 | Voice | H.M. (Taro) | Outgoing | CW-6 (Fougera) | 12:31:15 | 0:00:24 |
| 3/23/2011 | Voice | Blashinsky, Mitchell (Taro) | Incoming | Perfetto, Mike (Actavis) | 12:44:00 | 0:09:00 |
| 3/23/2011 | Voice | Blashinsky, Mitchell (Taro) | Incoming | Perfetto, Mike (Actavis) | 13:07:00 | 0:15:00 |
| 3/24/2011 | Voice | Blashinsky, Mitchell (Taro) | Incoming | Perfetto, Mike (Actavis) | 6:49:00 | 0:15:00 |

327.    On March 30, 2011—just three business days after Actavis sent out its price increase notices for CBD Cream—Fougera sent out notices to its customers stating that it was raising prices for CBD Cream. Those increases, which took effect April 1, 2011, increased Fougera's WAC prices for CBD Cream by 54% and increased contract prices across the board, in some cases by over 1200%. The day after Fougera announced those price increases, CW-6 of Fougera and H.M. of Taro spoke three separate times for a total of eighteen (18) minutes.

328.    Within days, on April 4, 2011, Taro implemented its own substantial price increases across the board for both CBD Cream and CBD Lotion. For some customers, Taro raised prices for

REDACTED – PUBLIC VERSION

CBD Cream by approximately 1350% and raised prices for CBD Lotion by approximately 960%.
The next day, H.M. called CW-6 and they spoke for eighteen (18) minutes.

329.    On April 14, 2011, Fougera followed Taro with a price increase on CBD Lotion
raising its WAC by 71% and increasing its contract prices across the board, in some cases by over
900%. At the time, Fougera's gross profit margin on CBD Lotion was already 67%, yet, with this
price increase, their gross profit percentage would soar to 96%. Fougera estimated that these
increases accounted for an extra $1.8 million in profit for the rest of 2011 alone.

330.    In furtherance of the conspiracy, Fougera refrained multiple times from taking
customers that approached it for bids. For example, after Taro's increase, Wal-Mart, a Taro
customer for CBD Cream and Lotion, asked Fougera to bid for that business. Kaczmarek cautioned
██████████████████████████████████    In an effort to conceal the reason for not
bidding, Kaczmarek instructed his colleagues that the "████████████████████████
████████████████████████    Likewise, when Rite-Aid approached Fougera, Fougera
did not even consider making a competitive offer. Instead, a Fougera employee asked internally:
"█████████████████████████?" Kaczmarek determined that Fougera should opt for
the latter.

331.    Shortly after pulling off one massive coordinated price increase, Taro wasted no time
planning the next. In an e-mail to Kaczmarek on May 6, 2011, D.K., a senior Fougera executive,
detailed how Taro had already approached Fougera about raising CBD prices again:

██████████████████

**REDACTED – PUBLIC VERSION**



      *(b)      Taro Increases Prices On CBD Cream In April 2012 While Actavis And Fougera Play Nice In The Sandbox*

332.    By March 5, 2012, Taro reignited its desire to raise prices on CBD Cream. Over the next several weeks, representatives of Taro spoke several times with their contacts at Actavis and Fougera. During these calls, Taro conveyed  to its competitors its intentions to increase prices and secured their commitments not to poach Taro's customers.  These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 3/7/2012 | Voice | Blashinsky, Mitchell (Taro) | Incoming | Perfetto, Mike (Actavis) | 6:29:00 | 0:07:00 |
| 3/7/2012 | Voice | D.S. (Taro) | Incoming | K.K. (Fougera) | 13:18:00 | 0:01:00 |
| 3/7/2012 | Voice | D.S. (Taro) | Incoming | K.K. (Fougera) | 13:27:00 | 0:02:00 |
| 3/8/2012 | Voice | D.S. (Taro) | Incoming | K.K. (Fougera) | 13:19:00 | 0:03:00 |
| 3/9/2012 | Voice | CW-6 (Fougera) | Incoming | H.M. (Taro) | 4:05:00 | 0:08:00 |
| 3/12/2012 | Voice | Blashinsky, Mitchell (Taro) | Outgoing | Perfetto, Mike (Actavis) | 7:37:00 | 0:01:00 |
| 3/12/2012 | Voice | Blashinsky, Mitchell (Taro) | Outgoing | Perfetto, Mike (Actavis) | 9:42:00 | 0:01:00 |
| 3/12/2012 | Voice | Blashinsky, Mitchell (Taro) | Incoming | Perfetto, Mike (Actavis) | 9:49:00 | 0:02:00 |
| 3/12/2012 | Voice | Blashinsky, Mitchell (Taro) | Outgoing | Perfetto, Mike (Actavis) | 15:34:00 | 0:01:00 |
| 3/16/2012 | Voice | Blashinsky, Mitchell (Taro) | Incoming | Perfetto, Mike (Actavis) | 4:51:00 | 0:10:00 |
| 3/17/2012 | Voice | D.S. (Taro) | Outgoing | K.K. (Fougera) | 11:08:00 | 0:02:00 |
| 3/20/2012 | Voice | Blashinsky, Mitchell (Taro) | Outgoing | Perfetto, Mike (Actavis) | 11:11:00 | 0:05:00 |
| 3/20/2012 | Voice | Blashinsky, Mitchell (Taro) | Incoming | Perfetto, Mike (Actavis) | 11:29:00 | 0:01:00 |
| 3/22/2012 | Voice | CW-3 (Fougera) | Outgoing | Aprahamian, Ara (Actavis) | 7:32:00 | 0:13:00 |
| 3/29/2012 | Voice | Blashinsky, Mitchell (Taro) | Outgoing | Perfetto, Mike (Actavis) | 8:49:00 | 0:05:00 |
| 3/29/2012 | Voice | CW-6 (Fougera) | Outgoing | H.M. (Taro) | 10:58:00 | 0:05:00 |

333.    The day after the final calls detailed above, on March 30, 2012, Taro increased its WAC prices for CBD Cream by approximately 7% and its contract prices by 15% for most of its existing customers.

334.    In May 2012, McKesson twice asked Taro to reduce its price based on comparable sales by competitors. Both times Taro declined, comfortable that its competitors would not poach its business. Taro's confidence was well placed.

335.    On May 23, 2012, McKesson contacted L.P., an Actavis sales executive, asking if Actavis's recent RFP bid still stood because ███████████████████████████ ███████████████ At 5:02 p.m., L.P. forwarded McKesson's request to Perfetto and Aprahamian, then a senior pricing executive at Actavis. Perfetto said he was ███████████ ████████████████ and that Actavis ██████████████ Aprahamian replied, ██████████ ████████████████ The following day, Perfetto exchanged three calls with Blashinsky of Taro, including one call lasting fourteen (14) minutes. Following his calls with Blashinsky, Perfetto instructed Aprahamian to call him. Aprahamian called Perfetto the next morning on May 25, 2012. After that call, an Actavis employee suggested that Actavis should stick by their RFP price and take the business because it was █████████████████████████████████ Aprahamian, however, responded simply and directly: "████████."

        (c)    *Fougera And Taro Raise CBD Lotion Prices In Late 2012/Early 2013*

336.    In the fall of 2012, a fourth competitor (Prasco) was entering the CBD Cream market. However, Taro and Sandoz (which acquired Fougera in July 2012) were still the only competitors in the CBD Lotion market. Facing new competition on CBD Cream, Sandoz and Taro sought to maximize profits by raising the price of CBD Lotion.

337.    Starting in late August 2012, Sandoz began planning a 100% price increase on CBD Lotion to take place in October, which—assuming █████████████████████████—would

bring in an estimated additional $3.9 million to Sandoz annually. In the weeks leading up to its

planned increase, Sandoz made repeated overtures to Taro to secure that ████ behavior,

including the following calls:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 9/6/2012 | Voice | CW-3 (Sandoz) | Outgoing | H.M. (Taro) | 10:15:00 | 0:01:00 |
| 9/20/2012 | Voice | CW-3 (Sandoz) | Outgoing | H.M. (Taro) | 7:13:00 | 0:17:00 |
| 9/21/2012 | Voice | CW-3 (Sandoz) | Outgoing | H.M. (Taro) | 8:18:00 | 0:03:00 |
| 9/28/2012 | Voice | CW-3 (Sandoz) | Outgoing | H.M. (Taro) | 9:54:00 | 0:01:00 |
| 9/28/2012 | Voice | CW-3 (Sandoz) | Outgoing | H.M. (Taro) | 11:11:00 | 0:01:00 |
| 9/28/2012 | Voice | CW-3 (Sandoz) | Outgoing | H.M. (Taro) | 11:12:00 | 0:04:00 |
| 9/28/2012 | Voice | CW-3 (Sandoz) | Outgoing | H.M. (Taro) | 11:27:00 | 0:01:00 |
| 9/28/2012 | Voice | CW-3 (Sandoz) | Outgoing | H.M. (Taro) | 11:53:00 | 0:01:00 |
| 10/1/2012 | Voice | D.S. (Taro) | Incoming | CW-4 (Sandoz) | 6:25:00 | 0:02:00 |
| 10/1/2012 | Voice | D.S. (Taro) | Incoming | CW-4 (Sandoz) | 6:49:00 | 0:21:00 |
| 10/2/2012 | Voice | D.S. (Taro) | Outgoing | CW-4 (Sandoz) | 10:11:00 | 0:02:00 |
| 10/2/2012 | Voice | D.S. (Taro) | Outgoing | CW-4 (Sandoz) | 10:12:00 | 0:03:00 |
| 10/8/2012 | Voice | D.S. (Taro) | Incoming | CW-4 (Sandoz) | 10:32:00 | 0:09:00 |
| 10/11/2012 | Voice | CW-3 (Sandoz) | Outgoing | H.M. (Taro) | 7:00:00 | 0:01:00 |
| 10/11/2012 | Voice | CW-3 (Sandoz) | Incoming | H.M. (Taro) | 11:28:25 | 0:06:36 |
| 10/11/2012 | Voice | CW-3 (Sandoz) | Incoming | H.M. (Taro) | 11:28:25 | 0:06:36 |
| 10/11/2012 | Voice | CW-3 (Sandoz) | Incoming | H.M. (Taro) | 11:58:15 | 0:00:50 |
| 10/11/2012 | Voice | CW-3 (Sandoz) | Incoming | H.M. (Taro) | 11:58:15 | 0:00:50 |
| 10/12/2012 | Voice | CW-3 (Sandoz) | Outgoing | H.M. (Taro) | 11:12:00 | 0:01:00 |

338.    On October 18, 2012, Sandoz increased prices for CBD Lotion, doubling WAC

price (from $61.90 to $123.80) as well as its contract prices. As expected, Taro did not attempt to

poach Sandoz's customers. For example, when MMCAP e-mailed Taro on October 26, 2012 to

request a bid from Taro for a dual award in light of Sandoz's increase, Taro did not even respond to

the customer's request. Taro also made plans to follow the Sandoz price increase. On January 4,

2013, J.J., a senior Taro sales executive, instructed Taro sales executives, including H.M. and D.S., to

gather competitive intelligence on CBD Lotion in anticipation of Taro's planned price increase. That

same day, H.M. spoke with CW-3 of Sandoz for five (5) minutes. The pair spoke again on January 7,

2013 for thirteen (13) more minutes. Three days later, on January 10, 2013, D.S. spoke with CW-4 of

Sandoz for twenty-three (23) minutes.

339.    On February 12, 2013, Taro instituted its price increase on CBD Lotion, raising

WAC by approximately 80% and contract prices by approximately 60%. After Taro's increase was

issued, news of it spread throughout Sandoz. One Sandoz employee remarked ████████████

███████████" Just as Taro did not poach Sandoz's customers when Sandoz raised CBD Lotion

prices, Sandoz was careful not to poach Taro's customers. In fact, CW-1, a Sandoz senior pricing

executive, specifically instructed Sandoz employees to "██████████████████████" for CBD

Lotion bids, because "████████████████████"

*ii.    Erythromycin Base/Ethyl Alcohol Solution*

340.    In the summer of 2011, Fougera and Wockhardt were the only two competitors in

the market for Erythromycin Base/Ethyl Alcohol solution ("Erythromycin Solution"). However,

both manufacturers would experience intermittent supply issues that would require their exit from

the market for periods of time. Because of these supply problems, extensive coordination was

necessary between competitors to maintain a stable market.

341.    Between May 17 and May 19, 2011, Perrigo discussed internally whether to re-enter

the Erythromycin Solution market. The next day, May 20, 2011, T.P. of Perrigo called CW-6 of

Fougera and they spoke for seven (7) minutes. Immediately after that call, T.P. called his supervisor,

Wesolowski, and they spoke for three (3) minutes. The following Monday, on May 23, 2011,

Wesolowski gave the green light to move forward with Perrigo's plans to re-launch the product

within six months.

342.    On August 5, 2011, CW-3 of Fougera e-mailed his supervisor, Kaczmarek, stating,

████████████████████████████████████████████████████████████

████████████████████████████████████████

343.    Thereafter, on August 9, 2011, CW-6 of Fougera called M.C., a Wockhardt sales

executive, three times, including one call lasting ten (10) minutes. Notably, these were the first

REDACTED – PUBLIC VERSION

phone calls ever between the two competitors according to available phone records. CW-6 and M.C. were not friends and did not socialize together. If they did speak, it was to coordinate anticompetitive conduct relating to products on which Fougera and Wockhardt overlapped.

344.    Over the next week, CW-6 exchanged several calls with M.C. of Wockhardt and T.P. of Perrigo, the prospective new entrant. Because T.P. and M.C. did not have an independent relationship, CW-6 acted as the go-between—relaying information between the two. After speaking with his competitors, CW-6 called his supervisor, Kaczmarek, to report back what he had learned. These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 8/15/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 6:35:00 | 0:01:00 |
| 8/15/2011 | Voice | M.C. (Wockhardt) | Outgoing | CW-6 (Fougera) | 7:31:00 | 0:02:00 |
| 8/15/2011 | Voice | CW-6 (Fougera) | Outgoing | M.C. (Wockhardt) | 7:39:00 | 0:06:00 |
| 8/15/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 7:50:00 | 0:01:00 |
| 8/15/2011 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 8:11:37 | 0:11:55 |
| 8/15/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 8:53:00 | 0:09:00 |
| 8/15/2011 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 8:58:18 | 0:10:00 |
| 8/17/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 6:48:00 | 0:05:00 |
| 8/19/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 6:07:00 | 0:01:00 |

345.    On August 19, 2011, after the final call listed above, Fougera held an internal meeting to discuss Erythromycin Solution and the intelligence that CW-6 had gained from phone calls with competitors.

346.    On November 15, 2011, Wesolowski of Perrigo sent an internal e-mail to the Perrigo sales team, including to T.P., stating that Perrigo planned to launch Erythromycin Solution the following month in December 2011. Wesolowski stated, ███████████████████████████ ███████████████████████████ Beginning that day, and over the next few days, T.P. exchanged several calls with CW-6 of Fougera. At the same time, CW-6 was speaking with M.C. of Wockhardt.  These calls are detailed in the chart below:

**REDACTED – PUBLIC VERSION**

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 11/15/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 5:57:00 | 0:07:00 |
| 11/17/2011 | Voice | CW-6 (Fougera) | Incoming | T.P. (Perrigo) | 11:23:00 | 0:06:00 |
| 11/17/2011 | Voice | CW-6 (Fougera) | Outgoing | M.C. (Wockhardt) | 11:29:00 | 0:02:00 |
| 11/17/2011 | Voice | CW-6 (Fougera) | Outgoing | M.C. (Wockhardt) | 11:37:00 | 0:01:00 |
| 11/17/2011 | Voice | M.C. (Wockhardt) | Outgoing | CW-6 (Fougera) | 11:38:00 | 0:01:00 |

347.    The next day, on November 18, 2011, K.K., another Wockhardt sales executive, called CW-3 of Fougera. The call lasted two (2) minutes. Later, CW-3 sent the following e-mail to his supervisor, Kaczmarek:



348.    It was CW-3's customary practice to state that he learned information from a customer when he actually learned it from a competitor because he wanted to keep that information out of writing. In response to CW-3's e-mail, Kaczmarek stated simply: "███████████."

349.    On November 30, 2011, M.C. of Wockhardt called CW-6 and they spoke for four (4) minutes. Later that same day, CW-6 sent the following e-mail to Kaczmarek regarding Erythromycin Solution:



REDACTED – PUBLIC VERSION

350.     Kaczmarek forwarded the e-mail along internally to A.R., a Fougera operations manager. A.R. reminded Kaczmarek that Fougera was also having supply issues and had temporarily exited the market.

351.     A few weeks later, on December 19, 2011, Perrigo entered the Erythromycin Solution market and set WAC pricing that was significantly higher—about 200%--than the market WAC pricing at that time.

352.     CW-6 of Fougera exchanged several calls with T.P. of Perrigo in the weeks leading up to, and surrounding, Perrigo's launch, including on the date of the launch itself. On these calls, the competitors discussed pricing and the allocation of market share to the new entrant, Perrigo. These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 12/12/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 4:40:00 | 0:04:00 |
| 12/12/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 5:05:00 | 0:01:00 |
| 12/12/2011 | Voice | CW-6 (Fougera) | Incoming | T.P. (Perrigo) | 5:13:00 | 0:01:00 |
| 12/19/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 8:10:00 | 0:05:00 |
| 12/20/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 12:38:00 | 0:03:00 |
| 12/21/2011 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 6:35:00 | 0:01:00 |

353.     Several months later, between April 24 and April 27, 2012, the NACDS held its annual meeting in Palm Beach, Florida. Representatives from Fougera, Perrigo, and Wockhardt attended, including CW-6 and CW-3 of Fougera, Wesolowski of Perrigo, and M.C. of Wockhardt.

354.     At that time, Fougera was readying to re-enter the Erythromycin Solution market. Shortly after the NACDS annual meeting, on April 30, 2012, Kaczmarek e-mailed his sales team stating, ███████████████████████████████████████████

██████  CW-3 responded with the following e-mail:

██████████████████

REDACTED – PUBLIC VERSION



355.    Fougera's re-launch caused a flurry of communications among the three competitors on May 1 and May 2, 2013. Following his consistent practice, CW-6 reported these conversations back to his boss, Kaczmarek. These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 5/1/2012 | Voice | K.K. (Wockhardt) | Outgoing | CW-3 (Fougera) | 6:56:00 | 0:02:00 |
| 5/1/2012 | Voice | CW-6 (Fougera) | Incoming | CW-3 (Fougera) | 10:04:00 | 0:03:00 |
| 5/1/2012 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 10:07:00 | 0:02:00 |
| 5/1/2012 | Voice | K.K. (Wockhardt) | Outgoing | CW-3 (Fougera) | 13:12:00 | 0:01:00 |
| 5/2/2012 | Voice | CW-6 (Fougera) | Outgoing | CW-3 (Fougera) | 15:20:00 | 0:04:00 |
| 5/2/2012 | Voice | CW-6 (Fougera) | Outgoing | CW-3 (Fougera) | 15:24:00 | 0:01:00 |
| 5/2/2012 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 15:25:00 | 0:01:00 |

356.    The next day, on May 3, 2012, Fougera re-entered the market and matched Perrigo's increased WAC pricing. That morning, Kaczmarek sent the following e-mail to his sales team:



357.    That same day, CW-3 of Sandoz spoke with K.K. of Wockhardt for five (5) minutes and called A.F., a sales executive at Perrigo. Further, CW-6 called his contact at Perrigo, T.P., and

REDACTED – PUBLIC VERSION

the two competitors spoke for fifteen (15) minutes. Immediately after hanging up with T.P., CW-6 again called his supervisor, Kaczmarek, and they spoke for five (5) minutes.

358.    The following Monday, on May 7, 2012, Wesolowski of Perrigo sent the following e-mail regarding Erythromycin Solution to other Perrigo executives:



359.    On that same day, Kaczmarek circulated a proposed customer pricing grid for Erythromycin Solution to the Fougera sales team. Kaczmarek advised: ███████████████ ███████████████████████████ As he explained, blanketing the market with offers is ████████████████████

360.    Over the next several days, CW-3 and CW-6 exchanged calls with their respective contacts at Perrigo, A.F. and T.P. As was his practice, after hanging up with T.P., CW-6 immediately reported back to Kaczmarek what he had learned. These calls are detailed in the chart below:

REDACTED – PUBLIC VERSION

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 5/8/2012 | Voice | CW-3 (Fougera) | Outgoing | A.F. (Perrigo) | 7:06:00 | 0:01:00 |
| 5/8/2012 | Voice | CW-3 (Fougera) | Outgoing | A.F. (Perrigo) | 7:08:00 | 0:01:00 |
| 5/8/2012 | Voice | A.F. (Perrigo) | Outgoing | CW-3 (Fougera) | 7:10:41 | 0:01:52 |
| 5/8/2012 | Voice | A.F. (Perrigo) | Incoming | CW-3 (Fougera) | 7:12:36 | 0:00:00 |
| 5/8/2012 | Voice | CW-3 (Fougera) | Outgoing | A.F. (Perrigo) | 8:05:00 | 0:01:00 |
| 5/8/2012 | Voice | A.F. (Perrigo) | Outgoing | CW-3 (Fougera) | 8:52:56 | 0:10:52 |
| 5/8/2012 | Voice | A.F. (Perrigo) | Outgoing | CW-3 (Fougera) | 9:29:30 | 0:01:34 |
| 5/11/2012 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 5:09:00 | 0:05:00 |
| 5/11/2012 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 5:13:00 | 0:01:00 |
| 5/11/2012 | Voice | CW-6 (Fougera) | Incoming | T.P. (Perrigo) | 8:24:00 | 0:01:00 |
| 5/11/2012 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 8:26:00 | 0:11:00 |
| 5/11/2012 | Voice | CW-6 (Fougera) | Outgoing | Kaczmarek, Walt (Fougera) | 8:38:00 | 0:02:00 |
| 5/11/2012 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 12:10:00 | 0:01:00 |
| 5/11/2012 | Voice | CW-6 (Fougera) | Incoming | T.P. (Perrigo) | 12:39:00 | 0:02:00 |
| 5/14/2012 | Voice | CW-6 (Fougera) | Outgoing | T.P. (Perrigo) | 13:09:00 | 0:02:00 |

361.    On May 14, 2012, the date of the last calls detailed above, Kaczmarek sent the

following internal e-mail to his sales team, lying about the source of his information to avoid putting

evidence of illegal conduct into writing:



362.    Less than two months later, on June 7, 2012, Fougera recalled Erythromycin

Solution and again placed the product on back order. By that time, Fougera had approached and

secured approximately 12% market share on the product, including several customers on its target

list such as Rite Aid, Cardinal, Optisource, and SUPERVALU.

363.    By August 2012, Fougera had resolved those supply issues. Around this same time,

Sandoz had completed its acquisition of Fougera. As Fougera (now Sandoz) prepared to re-enter the

REDACTED – PUBLIC VERSION

Erythromycin Solution market, the company set an internal market share goal of 20% on the product.

364.     After the Fougera acquisition was completed, CW-6 left the company for another position. At some point before he left Fougera, CW-6 introduced CW-3—who would be remaining at Sandoz after the acquisition—to T.P. at Perrigo.  This was the beginning of a collusive relationship that would last several years and will be discussed in detail in subsequent Sections of this Complaint.

365.     The first ever phone calls between CW-3 and T.P., according to the available phone records, were on August 8, 2012. They spoke two times that day. The competitors spoke again on August 21, 2012, as Sandoz was preparing to re-enter the market for Erythromycin Solution.

366.     On September 5, 2012, S.G., a Sandoz sales executive, e-mailed CW-3 and Kellum to advise them that Sandoz had an opportunity to bid on Erythromycin Solution at Walgreens.  Kellum responded, ███████████████████████ On September 6, 2010, CV-3 called T.P. of Perrigo and they spoke for eleven (11) minutes.

367.     The next day, on September 7, 2012, CW-3 sent an internal e-mail including to CW-1, a Sandoz senior pricing executive, recommending that Sandoz target the same customers that Fougera had targeted when it re-launched Erythromycin Solution in May 2012. Not wanting to have a discussion in writing, CW-1 responded to CW-3 directly, stating, ███████████████████

368.     On September 13, 2012, CW-3 called T.P. of Perrigo and they spoke for three (3) minutes. CW-3 hung up and called R.T., a senior sales and marketing executive at Sandoz. The call lasted one (1) minute. Later that day, CW-3 called K.K. of Wockhardt. The call lasted one (1) minute.

369.     The following Monday, on September 17, 2012, CW-1 instructed CW-3 to put together offers for Cardinal and Wal-Mart and advised that they would be the only customers

REDACTED – PUBLIC VERSION

Sandoz would be bidding on at this time. That same day, K.K. of Wockhardt called CW-3 and they spoke for four (4) minutes.

370.    Between September 20 and September 21, 2012, CW-3 and T.P. of Perrigo exchanged six (6) calls, including two calls lasting eight (8) minutes and seven (7) minutes, respectively. By October 2012, Perrigo had conceded the Erythromycin Solution business at Cardinal and Wal-Mart to Sandoz.

c.    <em>G&W And Its Relationships</em>

371.    Although G&W is not a large company and does not manufacture as many topical products as some of the larger generic manufacturers discussed above, G&W has actively conspired with its competitors in the topical space for many years. During this early time period, G&W had anticompetitive relationships with Fougera and Glenmark and used those relationships to allocate markets and fix prices on a number of products on which those companies overlapped. These relationships, as well as some illustrative examples of how these relationships manifested themselves regarding specific products, are discussed in detail below.

i.    <em>G&W / Fougera</em>

372.    Grauso, then a senior sales and marketing executive at G&W, had a relationship with CW-6 of Fougera. Although Grauso and CW-6 were social friends, they also had an ongoing understanding, on behalf of the companies they represented, not to poach each other's customers and to follow each other's price increases. The two competitors conspired with regard to several products on which G&W and Fougera overlapped, one example of which are discussed below.

373.    Grauso was a prolific communicator who frequently engaged in anticompetitive conduct with his contacts at competitor companies. When CW-6 of Fougera needed to communicate with a competitor at which he did not have a contact, but Grauso did, Kaczmarek,

REDACTED – PUBLIC VERSION

CW-6's supervisor at Fougera, would direct him to call Grauso and ask him to convey the message to that competitor on behalf of Fougera.

374.    One example of this involved Grauso's relationship with Perfetto, then a senior sales and marketing executive at Actavis. Between January 1, 2010 and December 28, 2011, the two competitors exchanged at least eighty-nine (89) phone calls. Because CW-6 did not have a contact at Actavis, he used Grauso's relationship with Perfetto to collude on products that Fougera and Actavis overlapped on.

375.    During this early time period, Grauso was acting at all times at the direction of, or with approval from, his superior Orlofski.

376.    Grauso left G&W in December 2011 to take a position as a senior executive at Aurobindo. With Grauso's departure, CW-6 no longer had a contact at G&W and it became necessary for him to use Grauso to convey messages to Grauso's former colleagues, Orlofski and Vogel-Baylor. Orlofski was the President of G&W and Vogel-Baylor assumed Grauso's role as Vice President of Sales and Marketing after his departure.

377.    This worked well for the first few months of 2012. However, soon Orlofski believed it prudent to cut out the middleman and communicate directly with CW-6. Berthold, the Vice President of Sales at Lupin, introduced Orlofski to CW-6 and they set up a dinner meeting at an industry conference, which was also attended by Vogel-Baylor.

378.    At dinner, the competitors engaged in a high-level discussion to ensure that both companies continued to "play nice in the sandbox" and minimize competition with each other even though Grauso had left. No specific products were discussed at the meeting. The focus was to ensure that the competitors stayed the course and continued to coordinate customer allocation and price increases on products that G&W and Fougera overlapped on.

REDACTED – PUBLIC VERSION

379.    After the dinner, Vogel-Baylor began to communicate directly with CW-6. Between May 2012 and May 2013, when CW-6 left the industry, the two exchanged at least one hundred and thirty-three (133) phone calls and text messages. During this time period, Vogel-Baylor was acting at all times at the direction of, or with approval from, her superior Orlofski.

380.    The following sections discuss specific examples of how the long-standing competitor relationships detailed above manifested themselves regarding particular products between 2010 and early 2012.

(a)    *Calcipotriene Solution*

381.    In early 2010, the market for Calcipotriene was shared by Fougera, Hi-Tech Pharmacal Co. Inc. ("Hi-Tech"), and Impax Pharmaceuticals, Inc. ("Impax"). Even with three competitors in the market, pricing remained high and the product was "hugely profitable" for the sellers.

382.    On July 23, 2010, however, Hi-Tech received a warning letter from the FDA detailing numerous violations found during a recent manufacturing facility inspection. Even though G&W was not in the Calcipotriene market at the time, Grauso knew his contact at Fougera would be interested in the information. On July 28, 2010, he forwarded a copy of the FDA letter to CW-6 at Fougera. Pleased with the news, CW-6 replied: ████████████████

383.    By the end of July 2010, Hi-Tech had discontinued the product, leaving its approximate 35% market share open for competitors to claim.

384.    One year later, on June 6 and 7, 2011, CW-6 and Grauso exchanged several phone calls, with one call lasting eight (8) minutes. During those calls, Grauso informed CW-6 that G&W would soon be launching its own Calcipotriene. Shortly after speaking with Grauso, CW-6 e-mailed Kaczmarek and other colleagues at Fougera sharing the news that he had just learned from his competitor—G&W was launching that week.

REDACTED – PUBLIC VERSION

385.    G&W did, indeed, launch Calcipotriene that week, on June 10, 2011. As G&W was entering the market, CW-6 and Grauso continued to speak, including exchanging two calls on June 23, 2011 and one call on June 24, 2011 lasting sixteen (16) minutes.

386.    A few months later, between November 10 and November 17, 2011, CW-6 and Grauso exchanged at least seven separate phone calls. The topic of conversation during these calls was a G&W price increase that was about to become effective for Calcipotriene.

387.    At the end of this series of phone communications between Grauso and CW-6, G&W instituted a 54% price increase on Calcipotriene, effective November 18, 2011. Grauso sent an internal e-mail advising the team to "███████████████████████████████████████████████████████████████████████████████████████████████████████████████"

388.    Shortly after the G&W price increase became effective, on November 21, 2011, CW-6 of Fougera called his supervisor, Kaczmarek. Immediately upon hanging up, CW-6 called Grauso and they spoke for five (5) minutes. Within minutes after that call ended, CW-6 called Kaczmarek again to report the results of his call with the competitor. Almost simultaneously, Grauso was also reporting the substance of his conversation with CW-6 to his G&W colleagues, by placing calls to Orlofski and Vogel-Baylor.

389.    Fougera acted quickly.  Just two days later, it followed G&W's price increase. Fougera's new WAC price on Calcipotriene went into effect on November 23, 2011.

*ii.      G&W / Glenmark*

390.    In addition to colluding with CW-6 at Fougera, Vogel-Baylor at G&W also had a collusive relationship during these early days with CW-5, a senior executive at Glenmark. Although G&W and Glenmark did not overlap on a large number of products, Vogel-Baylor and CW-5 capitalized on their relationship to collude and enter into anticompetitive agreements on those products that they did have in common.

REDACTED – PUBLIC VERSION

391.     Vogel-Baylor and CW-5 first met at a Rite Aid event in Las Vegas, Nevada in March 2012. In the months that followed, the two stayed in constant communication through e-mails, text messages, and phone calls, while also meeting in person at various trade shows and customer conferences. Vogel-Baylor and CW-5 exchanged hundreds of text messages and phone calls in April 2012 alone. Between April 2012 and the end of that year, Vogel-Baylor and CW-5 exchanged at least 2,037 phone calls and text messages.

392.     A later Section of this Complaint will address additional collusion between the two competitors in March 2013 regarding various formulations of Mometasone Furoate.

d.     *Additional Collusive Relationships*

393.     The key relationships discussed above are examples and are not meant to be an exhaustive list of all the collusive relationships that the Defendants had with each other during this time period. Indeed, even if a company was not a prominent manufacturer of topical products, if there were product overlaps and a relationship, there was an opportunity to collude.

394.     The relationship between CW-6 of Fougera and E.B., a senior sales executive at Hi-Tech, is a good example. During his tenure at Fougera, CW-6 had only eight (8) calls with E.B., according to available phone records. However, Fougera overlapped with Hi-Tech on the product—Lidocaine Ointment—and CW-6 used his connection with E.B. to significantly raise price on that product prior to Hi-Tech's entry in early 2012.

**3.     Focus On Price Increases Intensifies – Collusion From Late 2012 - 2016**

a.     *Shifts In The Market Foster Collusion*

395.     In late 2012 and early 2013, there were several changes in and among various manufacturers of topical products—at both the corporate and personnel levels—that facilitated and fostered a heightened focus on collusion among many of these competitors.

396.    For example, in July 2012 Sandoz finalized its purchase of Fougera, a specialty dermatology company, making Sandoz a much more prominent manufacturer of topical products. Sandoz publicly touted that the purchase positioned it "as the new #1 in generic dermatology medicines both globally and in the U.S."

397.    As a result of the acquisition, most Fougera executives, including Kaczmarek and CW-6, eventually lost their jobs. Out of the five Fougera sales executives in place prior to the acquisition, CW-3 was the only one to retain a long-term position with Sandoz.

398.    Because of Sandoz's size and the fact that it manufactured and sold a large number of generic drugs, many competitors reached out to CW-3 when they learned he had transitioned to Sandoz because they viewed this as a strategic opportunity to collude on more overlapping products. In turn, and as discussed in further detail below, CW-3 would use these contacts to his own advantage by engaging in anticompetitive conduct in order to prove his worth to Sandoz management.

399.    Further, in the months following the Fougera acquisition, three key Actavis executives—Boothe, Perfetto, and Aprahamian—left Actavis to assume senior-level positions with competitors.  In December 2012, Boothe became the Executive Vice President and General Manager of Perrigo. One month later, in January 2013, Perfetto became the Chief Commercial Officer of Taro. And, in March 2013, Aprahamian followed his colleague Perfetto to Taro and assumed the role of Vice President of Sales and Marketing.

400.    As discussed below, these former colleagues—now competitors—would use their longstanding relationships and new high-level corporate positions to collude with their key competitors on many overlapping products.

401.    During this time, multiple waves of price increases were initiated and followed by various competitors. As part of the overarching fair share conspiracy, Teva led an effort with

**REDACTED – PUBLIC VERSION**

Actavis, Amneal, Dr. Reddy's, Heritage, Lannett, Mylan, Par, Sandoz, and Taro to anticompetitively increase prices on numerous drugs, as well as allocate market shares amongst the manufacturers.

402.    On January 28, 2015, Teva raised prices on a number of different drugs, including the drugs Carbidopa/Levodopa, Danazol, and Methyldopa, detailed in a spreadsheet found in a Teva Excel file. For example, ███████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████. Nisha Patel or David Rekenthaler arranged these price increases on calls with Defendants Actavis, Amneal, Dr. Reddy's, Heritage, Lannett, Mylan, Par, Sandoz, and Taro.

403.    A May 29, 2015 version of the spreadsheet contained additional notes on the coordinated price increases led by Teva: for example, █████████████████████████████ ██████████████████████████████.

404.    Following the same pattern, Patel also spoke to CW-5 of Glenmark to coordinate on a list of price incases implemented on May 16, 2013.  Effective that day, Glenmark increased price on several drugs where there was an overlap with Teva, including Ondansetron.  Patel also spoke to her contacts at Glenmark multiple times on May 17. After the implementation of the Glenmark price increases, and before Teva had the opportunity to follow those increases, Teva was approached by several customers looking for a lower price.  Teva refused to bid on most of these solicitations in order to maintain market stability.  When it did provide a customer with a bid, Teva intentionally bid high so that it would not win the business.  As Patel stated to a Teva colleague when a large wholesaler approached Teva about bidding on several Glenmark increase drugs: "IF we bid, we need to bid high, or we will disturb the market."

b.    *Post-Fougera Acquisition, Sandoz Sales Executives Feel Pressure To Demonstrate Their Value*

405.    As a result of the Fougera acquisition, Sandoz had more dermatology products than anyone else. Although Teva and Mylan were comparable in size to Sandoz, they had fewer topical products. The other key players in the topical space, Perrigo and Taro, were smaller companies.

406.    Sandoz moved at a much faster pace than Fougera and sold many more products. At the time, the company was also launching several high-value products and bringing even more new products to market. CW-3 was thrown into the position and spent a lot of time learning about new (to him) oral solid products. The mindset at Sandoz was not to celebrate work accomplishments, but to move quickly from one launch to the next. As a result, CW-3 experienced a significant amount of culture shock and felt stressed and overwhelmed with his new circumstances.

407.    In addition to his regular job duties and responsibilities, CW-3 was also required to participate in an informal working group created by Sandoz management to evaluate the profitability of the Fougera product line. Shortly after the acquisition, it quickly became apparent that Fougera sales were lagging below Sandoz's initial financial projections. As the lone holdover from Fougera, CW-3 felt a great deal of pressure from Sandoz management to come up with a plan to make the Fougera product line more profitable. CW-3 was responsible for identifying areas to help Sandoz meet its numbers, including recommending where to increase prices or where to increase market share.

408.    Other Sandoz sales executives were also feeling anxieties resulting from the Fougera acquisition. For example, CW-4, a longtime Sandoz senior sales executive, was required to re-interview for her position and felt an immense amount of pressure to perform. Although she ultimately retained her job, CW-4 continued to feel nervous about having to learn a whole new line of topical products and to prove her value to Sandoz management.

REDACTED – PUBLIC VERSION

c.    *Key Relationships Emerge And Existing Relationships Strengthen*

409.    The pressures that the Sandoz sales executives were experiencing translated into the emergence of new collusive relationships, and the strengthening of existing relationships, among many of the competitors for topical products. For example, just as his predecessor CW-6 had done, CW-3 would forge ongoing understandings over the next several years with his key competitors—Taro and Perrigo – with regard to overlapping products. Similarly, Perfetto would capitalize on his relationship with his former colleague Boothe to collude with respect to products on which Taro and Perrigo overlapped. Lastly, CW-4 would find solace in her existing relationship with D.S. of Taro who provided confirmation that the companies' understanding would continue unchanged despite the Fougera acquisition. Each of these relationships is explored in greater detail below.

i.    *Sandoz/Taro*

(a)    *CW-3's Relationships With Aprahamian And H.M. Of Taro*

410.    Around the time of the Fougera acquisition, CW-3 was approached by Aprahamian, then a senior pricing executive at Actavis. CW-3 and Aprahamian had known each other since 2006, when CW-3 worked at Cardinal and Aprahamian worked at ABC. The two men had lost touch over the years as they changed jobs, but they still saw each other throughout the years at trade shows and customer conferences.

411.    Once CW-3 became a Sandoz employee, he and Aprahamian started communicating regularly again. Although they had exchanged only two (2) calls in 2011 according to available phone records, CW-3 and Aprahamian exchanged at least two hundred and thirty-five (235) phone calls between April 2012 and August 2016 (when CW-3 left Sandoz to take a sales position with a competitor). CW-3 and Aprahamian almost always communicated by phone and rarely met in person.

412.    CW-3 and Aprahamian engaged in anticompetitive conduct with regard to several products that Sandoz and Actavis overlapped on while Aprahamian was still at Actavis. Once Aprahamian moved to Taro in March 2013, the extent of the product overlap between the two competitors increased significantly, and so did their collusion.

413.    Aprahamian's move to Taro was a promotion. As Vice President of Sales and Marketing, Aprahamian had the power to set prices. Similarly, when Aprahamian told CW-3 that Taro would give up a customer, CW-3 was confident, given Aprahamian's senior role, that he could rely on that representation.

414.    Over the years, Sandoz and Taro, primarily through CW-3 and Aprahamian, developed an ongoing understanding not to poach each other's customers and to follow each other's price increases. Every time that Taro increased prices on a product for which Sandoz was a competitor, Aprahamian informed CW-3 about the increases in advance and provided him with specific price points. CW-3 would write this information down and then pass the information along to his superiors, CW-1 and Kellum. The expectation was always that Sandoz would follow the increases—and Sandoz did.

415.    When there were other competitors in the market beyond Taro and Sandoz, CW-3 understood that Aprahamian was also coordinating with those competitors as he was coordinating with him. Many examples of this are discussed below in subsequent sections of this Complaint.

416.    Although Sandoz consistently followed Taro's price increases, the company could not always do so right away. This did not mean that there was not an agreement to follow. Because price increases could trigger price protection penalties from customers, Sandoz would sometimes push the increases to the next quarter to ensure it hit its financial targets. In the meantime, Kellum would order that Sandoz place the product on strict allocation—meaning that Sandoz would allocate

REDACTED – PUBLIC VERSION

product to a customer based on regular usage—so that there was not a run on Sandoz's inventory resulting from a competitor's increase.

417.    Further, when Taro increased prices, Aprahamian typically warned CW-3 not to take Taro's customers. Aprahamian was very animated and would say things like: "Don't take my f***ing customers," "Don't take my business," or "Don't be stupid." CW-3 understood these warnings to mean that if a Taro customer asked for an offer in response to a Taro price increase, Sandoz should not compete for the business.

418.    Aprahamian and CW-3 also coordinated on product launches. For a Taro launch into a Sandoz market, Aprahamian would share with CW-3 the customers Taro was targeting. CW-3 would then pass that information along to CW-1 and Kellum, and then subsequently report their responses back to Aprahamian.

419.    For a Sandoz launch into a Taro market, which was more often the case because Taro was a smaller company and did not launch as many new products, Aprahamian would give CW-3 specific contract price points for customers that Taro agreed to relinquish. Aprahamian provided these price points so that Sandoz did not launch at too low a price. Typically, when Aprahamian told CW-3 that Taro would give up a customer, it did.

420.    CW-3 also colluded with H.M. of Taro. Shortly after the Fougera acquisition, CW-6—who would not be staying at Sandoz—provided CW-3 with H.M.'s contact information. Although CW-3 and H.M. had met each other at a supplier meeting several years earlier, they did not actively start conspiring with one another until after CW-3 moved to Sandoz. According to available phone records, the two men spoke for the first time by phone in September 2012 and then exchanged at least fifty-one (51) phone calls and text messages through March 2014, when H.M. left Taro. CW-3 and H.M. were not social friends. If they were communicating by phone, it was to coordinate anticompetitive conduct with regard to products on which Sandoz and Taro overlapped.

421.     While at Taro, H.M. shared price points with CW-3 and Sandoz used that information to inform Sandoz's product launches and to obtain market share without significantly eroding prices. CW-3 considered H.M.'s information to be reliable. However, once Aprahamian moved to Taro, he told CW-3 not to bother calling H.M anymore and to simply call him directly because he was responsible for pricing.

422.     During this time period, CW-3 and H.M. were acting at all times at the direction of, or with approval from, their superiors, including CW-1 and Kellum of Sandoz and Aprahamian and Perfetto of Taro. In turn, Aprahamian was acting at the direction of, or with approval from, his superior, Perfetto.

(b)     *CW-4's Relationship With D.S. Of Taro*

423.     As detailed above, CW-4 of Sandoz and D.S. of Taro had an ongoing understanding going back to at least 2009 that Taro and Sandoz would behave responsibly in the market and not compete on overlapping products. However, CW-4 was unsure what impact the Fougera acquisition might have on that understanding and felt uneasy about having to learn a whole new product line.

424.     CW-4 reached out to D.S. to calm her nerves and the two competitors had several conversations—both in person and over the phone—during which they discussed which manufacturers of topical products were responsible and which were not. D.S. reiterated what he had conveyed to CW-4 previously – that ███████████████████████ CW-4 understood this to mean that Taro wanted to maintain a fair market-share balance and keep prices high. Both CW-4 and D.S. concurred (again) that this was the smart way of doing business.

425.     After these conversations, CW-4 felt more secure and less anxious about her new circumstances. CW-4 understood that she and D.S. would continue to be resources for each other and collude on overlapping products as they had in the past.

REDACTED – PUBLIC VERSION

426.    During this time period, CW-4 and D.S. were acting at all times at the direction of, or with approval from, their superiors, including Kellum of Sandoz and Perfetto and Aprahamian of Taro.

427.    Soon after the Fougera acquisition, CW-4 learned from Sandoz management that the company was looking to increase market share and take price increases on certain drugs in the Fougera product line to improve the profitability of the Fougera portfolio. At this time, there were several products where Fougera had less than its fair share.

428.    Shortly thereafter, CW-4 conveyed this information to D.S. at Taro. CW-4 wanted to make sure that if Sandoz tried to take a Taro customer, D.S. would not be alarmed and would understand that it was only because Sandoz was looking for its "fair share" on that product. Similarly, CW-4 wanted to signal to D.S. and Taro that if Sandoz took a price increase, Taro should follow, or vice versa. D.S. listened to what CW-4 said and did not disagree.

(c)    *CW-3's Relationship With T.P. Of Perrigo*

429.    Just as CW-6 had provided H.M.'s contact information to CW-3 shortly after the Fougera acquisition, he also introduced CW-3 to T.P. of Perrigo. The two competitors spoke for the first time by phone in August 2012 and then exchanged at least eighty-one (81) phone calls through the end of 2014.

430.    CW-3 and T.P. were not social friends. If they were communicating, it was to coordinate anticompetitive conduct with regard to products on which Sandoz and Perrigo overlapped. CW-3 and T.P. generally spoke only by phone. They did not exchange e-mails or text messages because T.P. did not want to create a written record of their communications. T.P. also did not like receiving voicemails. On one occasion, CW-3 left a voicemail for T.P. on his office phone. T.P. thereafter called CW-3 to admonish him, demanding that CW-3 not call his office phone but instead only call him on his personal cell phone.

REDACTED – PUBLIC VERSION

431.    CW-3 continued the ongoing understanding that his predecessor, CW-6, had in place with T.P.—that the competitors would not poach each other's customers and would follow each other's price increases.

432.    Conversations between CW-3 of Sandoz and T.P. of Perrigo about price increases were intended to encourage the other side to follow. Sandoz was typically a price-increase follower. Neither company wanted to disrupt the market or do anything to lower prices. CW-3 and T.P. provided each other with information about price increases with the understanding that the other company would not use the price increase as an opportunity to compete for market share and take the other's customers.

433.    Similarly, when Sandoz was launching into a Perrigo market, T.P. would provide CW-3 with a list of customers to target. T.P. also had access to Perrigo's pricing file. The file was searchable by customer and included non-public information such as contract pricing, dead nets, and cost of goods sold. T.P. provided pricing information to CW-3 when he requested it. However, on occasion, T.P. had to first check with his boss, Wesolowski, before he did so.

434.    When T.P. provided CW-3 with information, he typically cautioned that CW-3 should be "smart" with the information; meaning that Sandoz should not use the information against Perrigo. CW-3 could generally rely on the pricing and customer alignment information that T.P. provided to him.

435.    During this time period, T.P. was acting at all times at the direction of, or with approval from, his superiors, including Boothe and Wesolowski.

(d)    *Perfetto's Relationship With Boothe Of Perrigo*

436.    Prior to Sandoz's acquisition of Fougera, H.M. of Taro and T.P. of Perrigo used CW-6 as a conduit to collude on overlapping products because the two competitors did not have an independent relationship. That changed when former Actavis executives, Perfetto and Boothe,

moved to Taro and Perrigo, respectively. As a result of these moves, the two competitors could now communicate directly to coordinate their anticompetitive conduct with regard to products on which Taro and Perrigo overlapped.

437.    Between January 2013 and January 2016 (when Boothe left Perrigo), the competitors exchanged at least one hundred and nineteen (119) phone calls. During this time period, the two former colleagues colluded on numerous overlapping products. Some examples of these products are discussed in detail below.

(e)    *Sandoz Management Knew Of, And Encouraged, The Collusion With Competitors*

438.    Early on after the Fougera acquisition, CW-3 had a conversation with Kellum informing him that he could provide competitive intelligence on the Fougera product line. Shortly thereafter, CW-3 began providing Kellum and CW-1 with competitive intelligence he obtained from competitors regarding price increases, product launches, and customer allocation. Kellum and CW-1, Sandoz senior pricing executives, both knew that CW-3 obtained this information directly from competitors because he told them he did.

439.    CW-3 conveyed competitive intelligence to Kellum and CW-1 through e-mails and phone calls. When communicating by e-mail, CW-3 would disguise the true source of his information by stating that he had received it from a customer. When CW-3 had truly learned the information from a customer, it was always from a customer that he worked with, and he referred to that customer by name in his e-mail. CW-1 and Kellum understood that when CW-3 referred to hearing from a "customer" without identifying that customer—or if CW-3 provided information relating to customers that he did not have responsibility for—it meant that CW-3 had gotten that information from a competitor.

440.    As detailed above, CW-3's strongest relationships were with Aprahamian of Taro and T.P. of Perrigo, although he engaged in anticompetitive conduct with many others. These other

relationships are explored in greater detail in subsequent sections of this Complaint. Wherever possible, CW-3 leveraged his relationships with competitors to demonstrate his value to Sandoz management.

441.    For example, due to the strength of CW-3's relationship with Aprahamian, Sandoz management created what it referred to as a ███████████ in July 2013 to collude on products where Taro was a competitor. The ███████████ had a two-pronged approach: (1) implement concerted price increases on products where Sandoz and Taro were the only competitors in the market; and (2) exit the market for certain other products to allow Taro to raise prices and then Sandoz could re-enter the market later at the higher price.

442.    Although Kellum and CW-1 knew what they were doing was illegal, they continued to encourage and approve of the collusion with competitors. They did, however, seek to avoid documenting their illegal behavior. Kellum routinely admonished Sandoz employees for putting information that was too blatant into e-mails. At one point, Kellum told CW-1 ████████████ ████████████████████████████ Similarly, as time went on, CW-3 became increasingly anxious about his behavior and said to CW-1 ████████████████████ ██████ CW-1 agreed with him.

### 4.    Taro Emerges As A Leader Among Generic Topical Manufacturers

#### a.    *Increased Focus On Fair Share And Price Increases*

443.    As detailed above, in early 2013 Perfetto and Aprahamian left their positions at Actavis to take executive-level positions at Taro. The two men wasted no time working together to implement changes at Taro designed to improve the company's bottom line.

444.    First, Perfetto and Aprahamian focused their efforts on ensuring that Taro had its fair share of the market on the products it manufactured. To that end, the executives took steps to formalize internal processes for seeking and tracking competitive intelligence obtained by sales

executives at the field level. This included compiling intelligence from not only customers, but from competitors as well.

445.    For example, in January 2013, at Perfetto's request, J.J., a senior Taro sales executive, e-mailed the sales team asking them to obtain competitive intelligence relating to a list of priority products where ████████████████████ Taro then used that information to inform which products to bid on, at which customers, and at what price points to meet its fair share targets without eroding the market price.

446.    Second, Perfetto and Aprahamian positioned Taro as a price-increase leader and implemented significant price increases on a substantial portion of Taro's product portfolio in 2013 and 2014. Although Taro had had success implementing price increases in the past, the increases in these years would be much larger than they had been in past years.

447.    For example, in February 2013, Taro took increases on several products, including Nystatin Triamcinolone—its highest grossing product. When an executive at Dr. Reddy's, a generic manufacturer not named as a Defendant in this Complaint, learned of the news, he sent an e-mail stating: ██████████████████████████████████████ ██████████████████████ To that, a senior sales and marketing executive at Dr. Reddy's responded, ██████████████████████████████ ████████████████████████

448.    Similarly, in June 2014, Taro took simultaneous, significant price increases on more than a dozen different products. The chart below, which was included in a Credit Suisse investor report, details some of the products that Taro increased prices on in the summer of 2014, the percentage of Taro's sales implicated, and the size of the increases.

████████████████████



449.    As a result of these June 2014 increases, Credit Suisse increased its target pricing for Taro and its parent company Sun Pharmaceuticals from $85 to $150 per share. As justification for the increase, Credit Suisse emphasized that there had been zero rollbacks of Taro price increases in recent years:



REDACTED – PUBLIC VERSION



450.    These price increases, and others taken by Taro in 2013 and 2014, resulted in the accrual of significant profits to Taro. Between 2008 and 2016, Taro's profits increased by an astounding 1300%. As the graph below demonstrates, Taro's financial growth experienced a sharp uptick in 2013, when Perfetto and Aprahamian began at Taro and positioned the company as a price-increase leader.



451.    Taro's success in implementing these increases—and in obtaining its fair share on the products it manufactured—depended, in large part, on the strength of the ongoing collusive relationships that Perfetto and Aprahamian had with their contacts at competitor companies. Some of these relationships have been detailed above, but there were many more.

452.    For example, between March 2013 and October 2018, Aprahamian exchanged at least six hundred and eighteen (618) phone calls and text messages with his contacts at Sandoz, Glenmark, Actavis, Mylan, G&W, Wockhardt, Lannett, Amneal, non-defendant Hi-Tech, and Perrigo. These communications are detailed in the table below:

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| CW-3 (Sandoz) | 190 | 3/19/2013 | 8/18/2016 |
| Grauso, Jim (Glenmark) | 106 | 7/1/2014 | 10/16/2018 |
| M.D. (Actavis) | 50 | 3/19/2013 | 9/2/2016 |
| M.A. (Mylan) | 50 | 4/4/2013 | 2/9/2016 |
| Orlofski, Kurt (G&W) | 45 | 7/24/2013 | 6/10/2016 |
| M.C. (Wockhardt) | 27 | 5/7/2013 | 8/20/2017 |
| A.B. (Lannett) | 23 | 11/15/2013 | 12/14/2017 |
| Falkin, Marc (Actavis) | 21 | 4/17/2014 | 3/8/2016 |
| A.B. (Actavis) | 16 | 8/16/2013 | 4/19/2016 |
| M.B. (Actavis) | 13 | 5/13/2013 | 8/22/2015 |
| S.R. (Amneal) | 12 | 6/6/2014 | 4/29/2016 |
| M.B. (Glenmark) | 11 | 5/7/2013 | 3/26/2014 |
| E.B. (Hi-Tech) | 10 | 6/6/2014 | 7/11/2014 |
| Lannett Pharmaceuticals | 8 | 6/6/2014 | 4/29/2016 |
| Vogel-Baylor, Erika (G&W) | 6 | 3/27/2014 | 9/24/2015 |
| Boothe, Doug (Perrigo) | 6 | 11/15/2016 | 8/23/2017 |
| A.G. (Actavis) | 4 | 4/23/2013 | 4/30/2013 |
| Rogerson, Rick (Actavis) | 4 | 6/17/2013 | 4/16/2014 |
| G&W Labs | 4 | 1/8/2014 | 3/6/2017 |
| R.H. (Greenstone) | 3 | 8/14/2014 | 8/20/2014 |
| T.D. (Actavis) | 3 | 4/12/2013 | 7/10/2013 |
| Grauso, Jim (Aurobindo) | 2 | 1/9/2014 | 1/10/2014 |
| Wesolowski, John (Perrigo) | 2 | 5/9/2014 | 5/9/2014 |
| A.S. (Actavis) | 1 | 1/9/2014 | 1/9/2014 |
| Glenmark Pharmaceuticals | 1 | 10/17/2018 | 10/17/2018 |

453.     Similarly, between January 2013 and February 2018, Perfetto exchanged at least six hundred and ninety (690) phone calls and text messages with his contacts at G&W, Perrigo, Actavis, Glenmark, Aurobindo, Wockhardt, non-defendant Greenstone, Amneal, and Lannett. These communications are detailed in the table below:

REDACTED – PUBLIC VERSION

| Contact Name | Coun | Min Dat | Max Dat |
|---|---|---|---|
| Orlofski, Kurt (G&W) | 160 | 1/25/2013 | 9/1/2016 |
| Boothe, Douglas (Perrigo) | 130 | 3/5/2013 | 7/29/2016 |
| T.D. (Actavis) | 79 | 2/19/2013 | 4/14/2017 |
| Dorsey, Mike (Actavis) | 89 | 1/2/2013 | 5/12/2017 |
| Grauso, Jim (Glenmark) | 58 | 2/10/2014 | 2/3/2018 |
| Blashinsky, Mitchell (Glenmark) | 51 | 1/4/2013 | 4/29/2017 |
| M.B. (Actavis) | 31 | 2/25/2013 | 2/5/2017 |
| Grauso, Jim (Aurobindo) | 20 | 1/17/2013 | 1/16/2014 |
| M.C. (Wockhardt) | 24 | 1/9/2013 | 12/7/2017 |
| M.P. (G&W) | 18 | 7/2/2013 | 4/22/2017 |
| Falkin, Marc (Actavis) | 7 | 12/13/2013 | 1/17/2017 |
| T.G. (Ranbaxy) | 5 | 1/17/2014 | 1/30/2014 |
| M.P. (Sandoz) | 4 | 3/7/2017 | 3/8/2017 |
| Hatosy, Robin (Greenstone) | 4 | 11/21/2013 | 2/20/2017 |
| Boyer, Andy (Actavis) | 3 | 3/12/2013 | 4/30/2013 |
| Vogel-Baylor, Erika (G&W) | 2 | 3/21/2014 | 3/21/2014 |
| L.P. (Actavis) | 1 | 3/15/2013 | 3/15/2013 |
| S.R. (Amneal) | 1 | 4/7/2014 | 4/7/2014 |
| K.S. (Lannett) | 1 | 4/24/2015 | 4/24/2015 |
| M.T. (Ranbaxy) | 1 | 6/30/2016 | 6/30/2016 |
| C.V. (Perrigo) | 1 | 1/3/2014 | 1/3/2014 |

454.     Aprahamian and Perfetto capitalized on the foregoing relationships to set Taro apart as a leader in the topical space. Some examples of how these relationships manifested themselves regarding specific products are described in detail below.

      i.      *Setting the Stage For Future Collusion—Aprahamian And CW-3 Collude On Products Where Sandoz And Actavis Competed*

455.     The collusive relationship between Aprahamian and CW-3 dated back to Aprahamian's days at Actavis. Two of the first examples of collusion between the two competitors involved market allocation agreements on Ciclopirox Shampoo and Betamethasone Valerate Ointment—both products where Sandoz was entering the market and Actavis, acting through Aprahamian, agreed to cede share to the new entrant. A third product—Desonide Lotion—involved Sandoz increasing price while Actavis was out of the market and Actavis re-entering later at the

REDACTED – PUBLIC VERSION

higher price, in coordination with Sandoz. These agreements set the stage for how collusion would work between the two competitors when Aprahamian moved to Taro.

ii.     *Aprahamian Moves To Taro And Immediately Begins Colluding With CW-3 On Products On Which Sandoz And Taro Overlap*

456.    In March 2013, Aprahamian followed his former colleague, Perfetto, to Taro and assumed a senior sales and marketing position. The product overlap between Sandoz and Taro was much greater than it was between Sandoz and Actavis, thereby allowing the collusion between CW-3 and Aprahamian to become systematic and routine.

iii.    *Aprahamian And Perfetto Orchestrate And Lead Price Increases On A Number Of Key Products In May 2013*

457.    In addition to coordinating with Sandoz to allocate the market on several products on which the two competitors overlapped as detailed above, Aprahamian and Perfetto also began planning significant price increases on a number of products starting in early 2013, including two of the Subject Drugs. Aprahamian and Perfetto focused their efforts on increasing prices on those products where they had strong relationships and ongoing understandings with individuals at the competitor companies. The two men capitalized on these relationships to coordinate price increases and avoid competing with each other in the markets for those overlap drugs.

458.    One early example occurred in May 2013, when Taro increased its pricing on twelve (12) different products (the "May 2013 Increases"). As result of these price increases, Taro anticipated approximately $110 million in additional revenue. These products, their corresponding WAC increases, and Taro's competitors for each product are detailed in the chart below:

| PRODUCT DESCRIPTION | LARGEST % WAC INCREASE | COMPETITORS |
|---|---|---|
| Alclometasone Dipropionate 0.05% Topical Cream | 223% | Sandoz, Glenmark |
| Ammonium Lactate 12% Topical Cream | 97% | Perrigo, Actavis |
| Ammonium Lactate 12% Topical Lotion | 88% | Perrigo, Actavis |
| Betamethasone Dipropionate (Augmented) 0.05% Topical Lotion | 29% | Sandoz |
| Betamethasone Dipropionate 0.05% Topical Cream | 10% | Sandoz, Actavis |
| Betamethasone Valerate 0.1% Topical Cream | 44% | Sandoz, Actavis |
| Carbamazepine 400mg Extended-Release Tablet | 43% | Sandoz |
| Carbamazepine 100mg/5ml Suspension | 18% | Wockhardt |
| Clomipramine Hydrochloride 75mg Capsule | 3441% | Sandoz, Mylan |
| Desonide 0.05% Topical Cream | 703% | Perrigo, Actavis (entered in Aug. 2013) |
| Desonide 0.05% Topical Ointment | 501% | Perrigo, Sandoz (entered in Jan. 2014) |
| Terconazole 3 Day 0.8% Vaginal Cream | 55% | Sandoz, Actavis |

> iv.    *Aprahamian And Perfetto Communicate And Coordinate With Their Competitors In Advance Of The May 2013 Increases*

459.    In advance of the May 2013 Increases, Aprahamian and Perfetto spoke with their competitors on those products–Sandoz, Perrigo, Actavis, Mylan, and Glenmark—to discuss the increases and limit competition between them. Taro began communicating with competitors, and formulating its list of products for the increases, as early as April 2, 2013.

460.    For example, on April 2, 2013, Aprahamian spoke with CW-3 of Sandoz for six (6) minutes. During that call, the two competitors discussed the price increases that Taro was planning for May 2013 and CW-3 took the following contemporaneous notes in his Notebook:



461.    Immediately upon hanging up with Aprahamian, CW-3 called another competitor, T.P. of Perrigo, and they spoke for five (5) minutes. During that call, CW-3 discussed the May 2013 Increases with T.P. and T.P. told CW-3 that he already knew about them. When CW-3 hung up with

T.P., he immediately called Aprahamian back. The call lasted one (1) minute. A few minutes after

hanging up with Aprahamian, CW-3 called his superior Kellum. Later that morning, Aprahamian

called CW-3 and they spoke for another six (6) minutes.

462.    Two days later, on April 4, 2013, Aprahamian called M.A. of Mylan and the two

competitors spoke for fifteen (15) minutes. Immediately upon hanging up, Aprahamian called CW-3

of Sandoz and they spoke for six (6) minutes.  Mylan and Sandoz were competitors with Taro on the

product Clomipramine HCL Capsules ("Clomipramine"), one of the May 2013 Increase products.

463.    The following Monday, April 8, 2013, Mylan circulated a list of products that it

wanted to focus on to increase its market share.  For Clomipramine, Mylan noted:



464.    The fact that Clomipramine was a ███████████ had come directly from

M.A.'s conversation with Aprahamian, because Taro had not yet publicly announced its price

increase on this product and would not do so for several more weeks.[95]

465.    At the same time, Taro was communicating with Blashinsky of Glenmark.  On both

April 2, 2013 and April 9, 2013, a Taro employee—likely Perfetto—called Blashinsky from his office

phone. The calls lasted twenty-eight (28) minutes and twenty-three (23) minutes, respectively. Also

on April 9, 2013, Aprahamian exchanged two calls with CW-3 of Sandoz, including one call lasting

---

[95] The collusive relationship and interactions between Taro, Sandoz, and Mylan with regard to the
drug Clomipramine are addressed in greater detail in the Plaintiff States' Amended Complaint dated
November 1, 2019, MDL No. 2724, 2:19-cv-02407-CMR, Dkt. No. 106 (the Plaintiff States' "Teva
Complaint").  Although Humana do not seek relief relating to Clomipramine in this Complaint, the
collusive interactions are part of the larger pattern of conduct involving Taro, Sandoz, and Mylan,
and are discussed herein to provide context for the larger price increase strategy that Taro was
employing at this time, and to provide further support for the allegations herein.

seven (7) minutes. Sandoz and Glenmark were competitors with Taro on the product Alclometasone Dipropionate Cream ("Alclometasone Cream"), one of Taro's May 2013 Increase products.

466.    Further, on April 15, 2013 and April 16, 2013, CW-3 exchanged several calls with Aprahamian and Blashinsky. These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 4/15/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 5:26:00 | 0:18:00 |
| 4/15/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 5:49:00 | 0:01:00 |
| 4/15/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 11:58:00 | 0:09:00 |
| 4/16/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | CW-3 (Sandoz) | 6:29:00 | 0:01:00 |
| 4/16/2013 | Voice | CW-3 (Sandoz) | Outgoing | Blashinsky, Mitchell (Glenmark) | 6:32:00 | 0:12:00 |
| 4/16/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 10:38:00 | 0:01:00 |
| 4/16/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 11:04:00 | 0:11:00 |

467.    During these calls, the three competitors discussed, among other things, Taro's planned price increase on Alclometasone Cream. During at least one of those calls, CW-3 recorded the following contemporaneous notes in his Notebook:



468.    At the same time, Perfetto and Aprahamian were communicating frequently with their contacts at Perrigo and Actavis. Further, Perrigo and Actavis were also speaking directly with each other during this time period. Perrigo and Actavis had at least two May 2013 Increase products in common that overlapped with Taro, Ammonium Lactate Cream and Lotion. These calls are detailed in the chart below:

REDACTED – PUBLIC VERSION

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 4/5/2013 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 14:36:00 | 0:30:00 |
| 4/9/2013 | Voice | Perfetto, Mike (Taro) | Outgoing | M.D. (Actavis) | 14:50:00 | 0:19:00 |
| 4/11/2013 | Voice | M.D. (Actavis) | Incoming | T.P. (Perrigo) | 12:35:34 | 0:00:29 |
| 4/12/2013 | Voice | M.D. (Actavis) | Outgoing | T.P. (Perrigo) | 13:02:12 | 0:00:56 |
| 4/12/2013 | Voice | T.P. (Perrigo) | Outgoing | M.D. (Actavis) | 13:12:00 | 0:25:00 |
| 4/15/2013 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 3:59:00 | 0:01:00 |
| 4/15/2013 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 11:00:00 | 0:08:00 |

469.     While the competitors were communicating with each other, they kept their colleagues apprised of their communications with competitors. For example, after several of CW-3's calls with competitors, he immediately called Kellum or CW-1 to inform them of what he had learned. A few of these examples are detailed below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 4/9/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 5:50:00 | 0:01:00 |
| 4/9/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 5:51:00 | 0:07:00 |
| 4/9/2013 | Voice | CW-3 (Sandoz) | Outgoing | CW-1 (Sandoz) | 5:58:00 | 0:02:00 |

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 4/15/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 11:58:00 | 0:09:00 |
| 4/15/2013 | Voice | CW-3 (Sandoz) | Outgoing | Kellum, Armando (Sandoz) | 12:07:00 | 0:01:00 |

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 4/16/2013 | Voice | CW-3 (Sandoz) | Outgoing | Blashinsky, Mitchell (Glenmark) | 6:32:00 | 0:12:00 |
| 4/16/2013 | Voice | CW-3 (Sandoz) | Outgoing | Kellum, Armando (Sandoz) | 6:46:00 | 0:05:00 |

470.     By April 17, 2013, Aprahamian and Perfetto had finalized their list of products for the May 2013 Increases. That same day, S.G., a sales executive at Sandoz, sent an internal e-mail, including to CW-3 and CW-4, regarding potential supply issues on Carbamazepine ER Tablets—a drug on Taro's list.  S.G. stated, ██████████████████████████████████████ ████████████████████████████████████████████████████████

471.     After receiving the e-mail, CW-4 and D.S. of Taro spoke twice, with the calls lasting twelve (12) minutes and two (2) minutes, respectively. On those calls, D.S. explained that Taro did not have any long-term supply issues. After hanging up with D.S. for the second time, CW-4 responded to S.G.'s e-mail stating: ████████████████████████████████

**REDACTED – PUBLIC VERSION**

472.    At the same time, CW-3 forwarded S.G.'s request regarding Carbamazepine ER directly to Kellum in a separate e-mail stating, ██████████████████████████ ██—likely referring to the impending Taro price increase. To that, Kellum responded simply, ██

473.    In the days leading up to the May 2013 Increases, the competitors continued to communicate with each other in order to coordinate the price increases. Some of these communications are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 4/19/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 10:28:00 | 0:13:00 |
| 4/19/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | M.A. (Mylan) | 10:41:00 | 0:01:00 |
| 4/19/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 11:13:00 | 0:01:00 |
| 4/19/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 11:30:00 | 0:09:00 |
| 4/20/2013 | Voice | Perfetto, Mike (Taro) | Outgoing | Boothe, Douglas (Perrigo) | 5:12:00 | 0:01:00 |
| 4/20/2013 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 7:24:00 | 0:01:00 |
| 4/20/2013 | Voice | Perfetto, Mike (Taro) | Outgoing | Boothe, Douglas (Perrigo) | 10:44:00 | 0:02:00 |
| 4/20/2013 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 11:48:00 | 0:02:00 |
| 4/20/2013 | Voice | Perfetto, Mike (Taro) | Outgoing | Boothe, Douglas (Perrigo) | 11:49:00 | 0:02:00 |
| 4/22/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | M.A. (Mylan) | 5:43:00 | 0:04:00 |
| 4/22/2013 | Voice | Perfetto, Mike (Taro) | Outgoing | Boothe, Douglas (Perrigo) | 7:00:00 | 0:01:00 |
| 4/22/2013 | Voice | Boothe, Douglas (Perrigo) | Outgoing | Perfetto, Mike (Taro) | 13:42:00 | 0:08:00 |
| 4/23/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | A.G. (Actavis) | 11:51:00 | 0:02:00 |
| 4/24/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 7:42:00 | 0:01:00 |
| 4/24/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | A.G. (Actavis) | 7:52:00 | 0:02:00 |
| 4/24/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 13:34:00 | 0:05:00 |
| 4/25/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 11:43:00 | 0:01:00 |
| 4/26/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 7:30:00 | 0:08:00 |

474.    Also, between April 20 and April 23, 2013, the NACDS held its annual meeting at the Sands Convention Center in Palm Beach, Florida. Representatives from Taro, Sandoz, Perrigo, Actavis, Mylan, and Glenmark were all in attendance. The attendees included Aprahamian and Perfetto of Taro, A.B., a senior-most executive at Actavis, and Blashinsky of Glenmark.

475.    One week later, on April 29 and April 30, 2013, Taro sent notices to its customers informing them of the May 2013 Increases. The next day, on May 1, 2013, Taro published increased WAC pricing for the affected products. During this time, Aprahamian and Perfetto continued to communicate with their competitors. For example, on April 30, 2013, Aprahamian and CW-3

REDACTED – PUBLIC VERSION

exchanged two calls lasting fourteen (14) minutes and two (2) minutes, respectively. During those calls, Aprahamian and CW-3 discussed the May 2013 Increases and the seven Sandoz products that Taro had increased prices on. CW-3's notes from those phone calls are detailed below. The notes also include references to the other competitors on these products. For example, CW-3 listed "Alclo Cream – T & G," which stood for Taro and Glenmark:



After each call with Aprahamian, CW-3 hung up and immediately called Kellum to inform him of what he had learned from Aprahamian.

476.    At the same time, Aprahamian and Perfetto were also communicating with other competitors about the May 2013 Increases. Some of these calls, which surround the calls with CW-3, are detailed in the chart below.

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 4/30/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | A.G. (Actavis) | 6:30:00 | 0:01:00 |
| 4/30/2013 | Voice | Perfetto, Mike (Taro) | Incoming | A.B. (Actavis) | 7:14:00 | 0:10:00 |
| 4/30/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | M.D. (Actavis) | 10:24:23 | 0:00:06 |
| 4/30/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 11:50:00 | 0:14:00 |
| 4/30/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | A.G. (Actavis) | 12:44:00 | 0:15:00 |
| 4/30/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 13:37:00 | 0:02:00 |
| 5/1/2013 | Voice | D.S. (Taro) | Outgoing | Blashinsky, Mitchell (Glenmark) | 9:32:00 | 0:01:00 |
| 5/1/2013 | Voice | D.S. (Taro) | Incoming | Blashinsky, Mitchell (Glenmark) | 9:43:00 | 0:21:00 |
| 5/1/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | M.D. (Actavis) | 10:35:00 | 0:11:00 |

*v.      Taro's Competitors Uniformly Declined To Bid On Taro Customers And Followed The May 2013 Increases*

477.     Consistent with their ongoing understandings, Taro's competitors uniformly declined opportunities to bid on Taro's customers after the May 2013 Increases. Taro's competitors understood that to do so would violate the "rules of the road" and would disrupt the market-share balance that they had worked so hard to achieve. Indeed, rather than compete, these competitors began working on implementing price increases of their own.

478.     For example, on April 30, 2013, Publix e-mailed Sandoz stating that Taro had increased pricing on a number of Sandoz overlap products and asked whether Sandoz wanted to bid on them. The products included Betamethasone Dipropionate Lotion, Clomipramine, and Carbamazepine ER. Kellum e-mailed CW-4 stating, ███████████████████████████████ ███████████████████████████████████████████████ CW-4 replied: ███████████████████████████████████ By ███████████ Kellum and CW-4 both meant that this was a chance for Sandoz to raise its prices on these products as well.

479.     That same day, April 30, 2013, Publix e-mailed Actavis to notify it that Taro had raised pricing on Terconazole Cream and asked whether Actavis wanted to bid for the business. Two days later, and after several calls between Aprahamian and Perfetto and their former Actavis colleagues, M.B., a sales executive at Actavis, also refused to bid, stating: ██████████████ ████████████████████████████████████████████████████ ████

480.     Similarly, on May 7, 2013, CVS asked Sandoz if they would be interested in bidding on several of the May 2013 Increase products. C.P., a pricing analyst at Sandoz, responded internally stating, ████████████████████████████████████████████████████ ████████████████████████████████████████ To that, Kellum responded: ██████

████████████████████████████████████████████████████████████

████████████████

481.     At the same time, Taro was confident based on its conversations with competitors that its increases would stick. For example, when Kaiser gave Taro push back on the May 2013 Increases, including asking for ████████████████████████████████████████████ ████████ Aprahamian saw no need for explanation and in an internal e-mail responded simply, ████████████████████████████████████████ Ultimately, Aprahamian's approach yielded results and Taro retained the business at the higher pricing.

482.     Similarly, on May 8, 2013, Cardinal e-mailed D.S. of Taro stating that regarding Desonide, ████████████████████████████████████████████ ████████████████████ D.S. forwarded the e-mail internally and Aprahamian responded, ██████ ████████████████████████████████████████████ ████████████████ Perfetto added, ████████

483.     Further, by the time the May 2013 Increases were publicly announced, Taro's competitors were already well on their way to implementing comparable price increases of their own. For example, by May 1, 2013, the day that Taro published its increased WAC pricing, Actavis had already conducted its own price increase analysis for Terconazole Cream and had revised its contract pricing to follow the Taro increase.

484.     Similarly, one day later on May 2, 2013, Kellum e-mailed the Sandoz Pricing Committee recommending that Sandoz increase prices on six of the seven Sandoz products on Taro's May 2013 Increase list. The power point presentation that Kellum submitted to the Committee contained no detailed price increase analysis and noted simply that Sandoz should increase because Taro had raised prices on those products:

████████████████████

REDACTED – PUBLIC VERSION



485.    Over the next several months, and consistent with their ongoing understandings,
Taro's competitors—Sandoz, Perrigo, Actavis, Mylan, and Glenmark—followed Taro's May 2013
Increases with increases of their own. Several of these competitor price increases, and their
corresponding dates, are detailed in the chart below:

| Drug | Competitors | Lead/Followed | Date |
|---|---|---|---|
| Alclometasone Diproproprionate Cream | Sandoz | Followed | 5/10/13 |
| | Glenmark | Followed | 5/16/13 |
| Ammonium Lactate Cream | Actavis | Followed | 6/25/13 |
| | Perrigo | Followed | 7/30/13 |
| Ammonium Lactate Lotion | Actavis | Followed | 6/25/13 |
| | Perrigo | Followed | 7/30/13 |
| Betamethasone Diproprionate Lotion | Sandoz | Followed | 7/26/13 |
| Betamethasone Diproprionate Cream | Sandoz | Followed | 7/26/13 |
| Betamethasone Valerate Cream | Sandoz | Followed | 7/26/13 |
| Carbamazepine Extended Release Tablets | Sandoz | Followed | 5/10/13 |
| Clomipramine Hydrochloride Capsules | Mylan | Followed | 5/16/13 |
| | Sandoz | Followed | 7/22/13 |
| Desonide Cream | Perrigo | Followed | 5/21/13 |
| | Actavis | Re-entered and Matched | 8/15/13 |
| Desonide Ointment | Perrigo | Followed | 5/21/13 |
| | Sandoz | Re-entered and Matched | 1/17/14 |
| Terconazole Cream | Actavis | Followed | 6/5/2013 |

486.    Consistent with past practice, the competitors also often spoke before they followed
with a price increase.  By way of example, and as detailed in the chart above, Sandoz followed Taro's
price increases on Alclometasone Cream and Carbamazepine ER with its own price increases on

REDACTED – PUBLIC VERSION

May 10, 2013, and Glenmark followed Taro's and Sandoz's price increases on Alclometasone Cream shortly thereafter, on May 16, 2013. The following chart details the competitor calls surrounding those increases:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 5/6/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | CW-3 (Sandoz) | 7:33:00 | 0:01:00 |
| 5/6/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | Aprahamian, Ara (Taro) | 8:32:00 | 0:01:00 |
| 5/7/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | Blashinsky, Mitchell (Glenmark) | 6:01:00 | 0:07:00 |
| 5/8/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | Taro Pharmaceuticals | 2:44:00 | 0:02:00 |
| 5/8/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 5:09:00 | 0:08:00 |
| 5/8/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 13:30:00 | 0:09:00 |
| 5/9/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | Taro Pharmaceuticals | 4:42:00 | 0:02:00 |
| 5/9/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | Taro Pharmaceuticals | 4:45:00 | 0:01:00 |
| 5/9/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Incoming | Taro Pharmaceuticals | 4:51:00 | 0:07:00 |
| 5/9/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | Taro Pharmaceuticals | 5:29:00 | 0:01:00 |
| 5/13/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | Taro Pharmaceuticals | 13:10:00 | 0:01:00 |
| 5/14/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | Perfetto, Mike (Taro) | 3:52:00 | 0:01:00 |
| 5/14/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Incoming | Perfetto, Mike (Taro) | 4:00:00 | 0:18:00 |
| 5/14/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Incoming | Taro Pharmaceuticals | 5:23:00 | 0:01:00 |
| 5/17/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | CW-3 (Sandoz) | 11:56:00 | 0:01:00 |
| 5/17/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Incoming | CW-3 (Sandoz) | 12:27:00 | 0:05:00 |
| 5/17/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Incoming | CW-3 (Sandoz) | 12:49:00 | 0:05:00 |

487.    Similarly, Sandoz followed the Taro price increases on Betamethasone Dipropionate Cream and Lotion and Betamethasone Valerate Cream on July 28, 2013. In the days leading up to the Sandoz price increase, Aprahamian exchanged several calls with CW-3, including a call on July 23, 2013 that lasted three (3) minutes. During that call, CW-3 conveyed to Aprahamian that Sandoz would be increasing prices on several Taro products, including the Betamethasone products. CW-3's contemporaneous notes from that call are detailed below:

███████████████████



488.    Lastly, Perrigo followed the Taro price increases on Desonide Cream and Ointment on May 21, 2013 and Actavis re-entered the Desonide Cream market and matched the competitors' pricing on August 15, 2013. The chart below details at least some of the communications between the three competitors in the days surrounding these market events:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 5/10/2013 | Voice | Perfetto, Mike (Taro) | Outgoing | Boothe, Douglas (Perrigo) | 4:38:00 | 0:02:00 |
| 5/10/2013 | Voice | Perfetto, Mike (Taro) | Outgoing | T.D. (Actavis) | 4:41:00 | 0:11:00 |
| 5/10/2013 | Voice | Perfetto, Mike (Taro) | Outgoing | Boothe, Douglas (Perrigo) | 4:56:00 | 0:17:00 |
| 5/22/2013 | Voice | M.D. (Actavis) | Outgoing | T.P. (Perrigo) | 9:22:00 | 0:02:00 |
| 5/22/2013 | Voice | M.D. (Actavis) | Incoming | T.P. (Perrigo) | 12:32:20 | 0:00:19 |
| 5/22/2013 | Voice | M.D. (Actavis) | Outgoing | T.P. (Perrigo) | 12:46:00 | 0:14:00 |
| 5/23/2013 | Voice | M.D. (Actavis) | Outgoing | T.P. (Perrigo) | 11:01:47 | 0:24:02 |
| 8/7/2013 | Voice | Perfetto, Mike (Taro) | Outgoing | Boothe, Douglas (Perrigo) | 4:47:00 | 0:02:00 |
| 8/7/2013 | Voice | Perfetto, Mike (Taro) | Incoming | Boothe, Douglas (Perrigo) | 10:33:00 | 0:13:00 |
| 8/7/2013 | Voice | Boothe, Douglas (Perrigo) | Incoming | Falkin, Marc (Actavis) | 14:52:00 | 0:11:00 |
| 8/8/2013 | Voice | Perfetto, Mike (Taro) | Outgoing | Boothe, Douglas (Perrigo) | 6:32:00 | 0:06:00 |
| 8/8/2013 | Voice | M.D. (Actavis) | Outgoing | T.P. (Perrigo) | 9:24:00 | 0:03:00 |
| 8/8/2013 | Voice | M.D. (Actavis) | Incoming | T.P. (Perrigo) | 9:25:00 | 0:03:00 |
| 8/8/2013 | Voice | M.D. (Actavis) | Outgoing | T.P. (Perrigo) | 9:28:00 | 0:05:00 |
| 8/9/2013 | Voice | M.D. (Actavis) | Outgoing | T.P. (Perrigo) | 10:39:00 | 0:03:00 |
| 8/16/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | A.B. (Actavis) | 7:13:00 | 0:09:00 |

489.    Consistent with their ongoing understandings, Taro exercised restraint, just as its competitors had done, and did not poach customers from its competitors after they followed with price increases of their own.  For example, on May 23, 2013, Econdisc reached out to Taro asking for a bid on Alclometasone Cream. Aprahamian asked D.S., a Taro sales executive, why Econdisc

was looking for a bid and D.S. replied: ████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████ Aprahamian responded: ████████████████

████████ Consistent with Aprahamian's directive, Taro subsequently declined to bid on the

business.

490.    The competitors continued to communicate about the May 2013 Increase products

even after the competitors had followed the increases. These open lines of communication were

important to ensure that the competitors did not run afoul of the delicate market share balance they

had achieved with each other.

491.    For example, in September 2013, D.S. of Taro called CW-4 of Sandoz to tell her that

Taro's Carbamazepine ER product was being held up at the border. As a result, Sandoz would likely

be receiving requests from Taro customers for the product. By conveying this to CW-4, D.S. was

sending the message that Taro would lose customers if Sandoz sold too much and Taro would have

no choice but to compete to get its market share back. This would disrupt the market and cause

prices to deteriorate across the board.

492.    After speaking with D.S., CW-4 sent an internal e-mail, including to Kellum, stating:

"████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████ " Kellum responded in agreement: "████████████

████████████████████████████████████ "

b.    *Building Upon Early Successes—Taro's Continued Collusion Over The
        Ensuing Years*

493.    Over the next several years—indeed into at least early January 2016—Aprahamian

and Perfetto continued to use their contacts at competitor companies to collude on overlapping

products and improve Taro's bottom line. During these years, Aprahamian and Perfetto expanded

REDACTED – PUBLIC VERSION

their efforts to allocate markets and fix prices on additional products—including several non-topical products—and to collude with additional competitors. Although the Taro executives continued to collude with their key competitors—Sandoz, Perrigo, Actavis, Mylan, and Glenmark—they also coordinated with their contacts at other companies including non-defendant Rising, Lannett, Wockhardt, Amneal, and G&W. By 2016, a large majority of the company's business was implicated by the executives' anticompetitive conduct.

494.     The following Section discusses this collusion in further detail as it relates to specific products.

*i.     Taro's June 2014 Price Increases*

495.     Building on its successes in 2013, Taro set its sights even higher in 2014, implementing a number of significant price increases, including several of the largest WAC increases across the industry that year. As they had done in the past, Aprahamian and Perfetto focused their efforts on increasing prices on those products where they had strong relationships and ongoing understandings with individuals at competitor companies.

496.     In June 2014, Taro increased pricing on several different products (the "June 2014 Increases"). Some of these products had also been the subject of coordinated increases in 2013—including Carbamazepine ER Tablets (with Sandoz) and Hydrocortisone Valerate Cream (with Perrigo). As a result of these increases, Taro expected approximately $289 million in additional revenues—more than 2 ½ times what Taro had expected from the May 2013 Increases. Several of these products, their corresponding WAC increases, and Taro's competitors are detailed in the chart below:

REDACTED – PUBLIC VERSION

| PRODUCT DESCRIPTION | LARGEST % WAC INCREASE | COMPETITORS |
|---|---|---|
| Carbamazepine Tablet | 2337% | Teva, Torrent, Apotex |
| Carbamazepine Chewable Tablet | 392% | Teva, Torrent |
| Carbamazepine Extended Release Tablet | 23% | Sandoz |
| Clobetasol Proprionate Cream | 2138% | Sandoz, Hi-Tech, Actavis (entered in Mar 2015) |
| Clobetasol Proprionate Emollient Cream | 1011% | Sandoz, Hi-Tech |
| Clobetasol Proprionate Gel | 2008% | Sandoz, Hi-Tech, Perrigo |
| Clobetasol Proprionate Ointment | 2316% | Sandoz, Hi-Tech |
| Clobetasol Proprionate Solution | 953% | Sandoz, Hi-Tech, Wockhardt |
| Clobetasol Proprionate Lotion | 65% | Actavis, Perrigo |
| Clotrimazole Topical Solution | 208% | Teva |
| Fluocinonide Cream .05% | 754% | Teva |
| Fluocinonide Emollient Cream | 430% | Teva |
| Fluocinonide Gel | 491% | Teva, Sandoz |
| Fluocinonide Ointment | 483% | Teva |
| Hydrocortisone Valerate Cream | 44% | Perrigo |
| Phenytoin Sodium Extended Release Capsule | 210% | Amneal, Mylan, Sun |
| Warfarin Sodium Tablet | 220% | Teva, Zydus, Upsher-Smith |

497.    As it had done in the past, Taro communicated with several of its competitors in advance of the June 2014 Increases and, consistent with their ongoing understandings, the competitors agreed to follow with comparable price increases of their own.

498.    For example, on May 14, 2014, Taro had finalized its list of products to include in the June 2014 Increases and Aprahamian forwarded the list to K.S., a senior executive at Taro, for his review and approval. That same day, Aprahamian exchanged eight (8) text messages and one five (5) minute phone call with Patel of Teva. Taro overlapped with Teva on seven (7) of the June 2014 Increase products – including Fluocinonide, Carbamazepine, Clotrimazole, and Warfarin.[96]

499.    After speaking with Aprahamian, Patel directed a colleague to create a list of future Teva price increase candidates, based on a set of instructions and data she had given to her Teva colleague. On May 28, 2014, that colleague sent her a list titled "2014 Future Price Increase

---

[96] The collusive relationship and interactions between Taro and Teva with regard to these drugs are addressed in greater detail in Humana's other Complaints. Although Humana does not seek relief relating to those drugs in this Complaint, the collusive interactions are part of the larger pattern of conduct and are discussed herein to provide context for the larger price increase strategy that Taro was employing at this time, and to provide further support for the allegations herein.

**REDACTED – PUBLIC VERSION**

Candidate Analysis."  The list included several drugs from Taro's June 2014 Price Increase list – with the notation "Follow/Urgent" listed as the reason for the increase. Notably, however, Taro had not yet increased prices on those drugs or notified its customers that it would be doing so. The relevant portions of that spreadsheet are set forth below:

| Item Description | Product Family | BUCKET |
|---|---|---|
| CARBAMAZEPINE TABLETS 200MG 100 | CARBAMAZEPINE TABLETS | Follow/Urgent |
| CARBAMAZEPINE TABLETS 200MG 1000 | CARBAMAZEPINE TABLETS | Follow/Urgent |
| CLOTRIMAZOLE TOPICAL SOLUTION 1% 10ML | CLOTRIMAZOLE TOPICAL SOLUTION | Follow/Urgent |
| CLOTRIMAZOLE TOPICAL SOLUTION 1% 30ML | CLOTRIMAZOLE TOPICAL SOLUTION | Follow/Urgent |
| FLUOCINONIDE CREAM 0.05% 15GM | FLUOCINONIDE CREAM | Follow/Urgent |
| FLUOCINONIDE CREAM 0.05% 30GM | FLUOCINONIDE CREAM | Follow/Urgent |
| FLUOCINONIDE CREAM 0.05% 60GM | FLUOCINONIDE CREAM | Follow/Urgent |
| FLUOCINONIDE CREAM-E 0.05% 15GM | FLUOCINONIDE E CREAM | Follow/Urgent |
| FLUOCINONIDE CREAM-E 0.05% 30GM | FLUOCINONIDE E CREAM | Follow/Urgent |
| FLUOCINONIDE CREAM-E 0.05% 60GM | FLUOCINONIDE E CREAM | Follow/Urgent |
| FLUOCINONIDE GEL 0.05% 60GM | FLUOCINONIDE TOPICAL GEL | Follow/Urgent |
| FLUOCINONIDE OINTMENT 0.05% 15GM | FLUOCINONIDE OINTMENT | Follow/Urgent |
| FLUOCINONIDE OINTMENT 0.05% 30GM | FLUOCINONIDE OINTMENT | Follow/Urgent |
| FLUOCINONIDE OINTMENT 0.05% 60GM | FLUOCINONIDE OINTMENT | Follow/Urgent |

500.    Similarly, on Friday May 15, 2014, the day after Taro finalized its June 2014 Increase list, Aprahamian called CW-3 of Sandoz and the two competitors spoke for fifteen (15) minutes. Taro overlapped with Sandoz on seven of the June 2014 Increase products—including Carbamazepine ER Tablets and various formulations of Clobetasol Propionate. The following Monday, on May 19, 2014, CW-3 sent an internal e-mail, including to Kellum and CW-1, advising them of the Taro increases:



501.    Notably, the source of the information was not "a customer," but his competitor, Aprahamian.  Further, Taro had not yet increased pricing on these products and would not do so for another several weeks.  Later that day, CW-3 called Aprahamian.  The call lasted one (1) minute.

502.    Further, on May 27, 2014, Aprahamian exchanged three calls with M.C., a sales executive at Wockhardt, including one call lasting nine (9) minutes. Taro overlapped with Wockhardt on one June 2014 Increase product—Clobetasol Solution. That same day, ABC reached out to C.U., a sales executive at Taro, asking for a bid on Clobetasol Solution because Wockhardt was having issues with the FDA. Having spoken with M.C. earlier in the day and knowing that the competitors had discussed coordinating a price increase on the product, Aprahamian responded,

███████████████████████████████████████████████████████

████████████████████

503.    On June 2, 2014, Taro sent letters to its customers notifying them of the June 2014 Increases. The next day, on June 3, 2014, Taro published new WAC pricing for the affected products.  In the days leading up to these actions by Taro, and in the days that followed, Aprahamian and Perfetto reached out to their competitors—Sandoz, Perrigo, Actavis, Teva, Hi-

REDACTED – PUBLIC VERSION

Tech, Wockhardt, Mylan, and Amneal—to discuss the increases and limit competition between them. These communications are detailed in the chart below:

| Teva: Aprahamian speaks to Patel on 5/14, 6/3, 6/4 | Sandoz: Aprahamian speaks to CW-3 on 5/15, 5/19, 5/27, 5/28, 6/3, 6/4, 6/6 (2 calls) | Hi-Tech: Aprahamian speaks to E.B. on 6/6 (2 calls), 6/9 (2 calls) | Actavis: Aprahamian speaks to Falkin on 6/4 (2 calls) and M.D. on 6/4; Perfetto speaks to M.D. on 6/6 |
| --- | --- | --- | --- |

| PRODUCT DESCRIPTION | COMPETITORS |
| --- | --- |
| Carbamazepine Tablet | Teva, Torrent, Apotex |
| Carbamazepine Chewable Tablet | Teva, Torrent |
| Carbamazepine Extended Release Tablet | Sandoz |
| Clobetasol Proprionate Cream | Sandoz, Hi-Tech, Actavis (entered in Mar 2015) |
| Clobetasol Proprionate Emollient Cream | Sandoz, Hi-Tech |
| Clobetasol Proprionate Gel | Sandoz, Hi-Tech, Perrigo |
| Clobetasol Proprionate Ointment | Sandoz, Hi-Tech |
| Clobetasol Proprionate Solution | Sandoz, Hi-Tech, Wockhardt |
| Clobetasol Proprionate Lotion | Actavis, Perrigo |
| Clotrimazole Topical Solution | Teva |
| Fluocinonide Cream .05% | Teva |
| Fluocinonide Emollient Cream | Teva |
| Fluocinonide Gel | Teva, Sandoz |
| Fluocinonide Ointment | Teva |
| Hydrocortisone Valerate Cream | Perrigo |
| Phenytoin Sodium Extended Release Capsule | Amneal, Mylan, Sun |
| Warfarin Sodium Tablet | Teva, Zydus, Upsher-Smith |

| Perrigo: Perfetto speaks to Boothe on 6/3 (4 calls) | Wockhardt: Aprahamian speaks to M.C. on 5/27 (3 calls) | Amneal: Aprahamian speaks to S.R. on 6/6 (2 calls) | Mylan: Aprahamian speaks to M.A. on 6/4, 6/6, and 6/9 |
| --- | --- | --- | --- |

504.    After receiving notification of the increases, several customers complained to Taro about the size of the increases. However, confident in their strategy and the strength of the ongoing understandings they had with their competitors, Aprahamian advised his colleagues that Taro should stay the course and stick with the plan.

505.    For example, on June 24, 2014, McKesson e-mailed Taro stating, ███████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ E.G., a Taro sales executive, forwarded McKesson's e-mail to Aprahamian who responded, ████████████████████████████████████

**REDACTED – PUBLIC VERSION**

██████ E.G. replied, ██████████████████ and Aprahamian stated, ██████████
████████████████

506.    Similarly, on June 27, 2014, ABC sent out a request for bids on multiple products, including several that Taro had increased prices on, and cited the reason as including several that Taro had increased prices on, and cited the reason as ████████████████ C.U., a sales executive at Taro, forwarded the ABC request along internally, stating that he had left a message with the ABC representative to discuss the request. A.L., a Taro pricing executive, responded: ████
██████████████████████████████████████████
██████████████████████████████████████████
████ To that, Aprahamian replied: ████████████████████████████
██████████████████████

507.    Sandoz also received the ABC request on June 27, 2014. Kellum forwarded it along internally, including to CW-1, stating simply: ██████████████ Although CW-1 already knew that Taro had increased prices, he responded to Kellum's e-mail asking, ████████████████████ Kellum replied, ██████ and CW-1 quickly answered, ████████████████████████ Kellum responded sarcastically: ████████████████ Of course, and consistent with past practice and the ongoing understanding between the two competitors, Kellum and CW-1 did not want bid at CVS. Further, on July 1, 2014, Kellum e-mailed the larger Sandoz team about the ABC request stating, ██████████████████████████████████████
██████████████████████████████████████████
████████████████████

508.    Not surprisingly given Taro's understandings with its competitors, on July 11, 2014, ABC e-mailed C.U. to advise him that Taro had retained all of its business at ABC because ████████

███████████ C.U. forwarded the e-mail along to Aprahamian, stating excitedly, ████

Aprahamian then forwarded the e-mail to Perfetto stating: ██████████

509.    Consistent with past practice, and their ongoing understandings, the competitors uniformly followed the July 2014 Increases and matched Taro's increased WAC pricing. These competitor price increases, and their corresponding dates, are detailed in the chart below:

| Drug | Competitor | Lead/Follower | Date Action |
|---|---|---|---|
| Carbamazepine Tablet | Apotex | Followed | 7/11/14 |
| | Teva | Followed | 8/28/14 |
| | Torrent | Followed | 9/12/14 |
| Carbamazepine Chewable Tablet | Teva | Followed | 8/28/14 |
| | Torrent | Followed | 9/12/14 |
| Carbamazepine Extended Release Tablet | Sandoz | Followed | 8/26/14 |
| Clobetasol Proprionate Cream | Sandoz | Followed | 7/18/14 |
| | Hi-Tech | Followed | 8/9/14 |
| Clobetasol Proprionate Emollient Cream | Sandoz | Followed | 7/18/14 |
| | Hi-Tech | Followed | 8/9/14 |
| Clobetasol Proprionate Gel | Sandoz | Followed | 7/18/14 |
| | Hi-Tech | Followed | 8/9/14 |
| Clobetasol Proprionate Ointment | Sandoz | Followed | 7/18/14 |
| | Hi-Tech | Followed | 8/9/14 |
| Clobetasol Proprionate Solution | Sandoz | Followed | 7/18/14 |
| | Hi-Tech | Followed | 8/9/14 |
| | Wockhardt | Followed | 9/2/14 |
| Clotrimazole Solution | Teva | Followed | 8/28/14 |
| Fluocinonide Cream .05% | Teva | Followed | 7/1/14 |
| Fluocinonide Emollient Cream | Teva | Followed | 7/1/14 |
| Fluocinonide Gel | Teva | Followed | 7/1/14 |
| | Sandoz | Followed | 10/10/14 |
| Fluocinonide Ointment | Teva | Followed | 7/1/14 |
| Hydrocortisone Valerate Cream | Perrigo | Followed | 7/24/14 |
| Phenytoin Sodium Extended Release Tablets | Sun | Followed | 7/14/14 |
| | Mylan | Followed | 7/16/14 |
| | Amneal | Followed | 9/1/14 |
| Warfarin Sodium Tablet | Zydus | Followed | 6/13/14 |
| | Teva | Followed | 8/28/14 |

## 5.    Sandoz And Its Other Relationships

510.    As discussed in detail above, CW-3 colluded extensively with Aprahamian and H.M. of Taro on products that Sandoz and Taro overlapped on and had an ongoing understanding going

REDACTED – PUBLIC VERSION

back many years not to poach each other's customers and to follow each other's price increases. In addition, CW-3 was a prolific communicator who regularly colluded with many other competitors.

511.    Between June 2011 and August 2016, when he left Sandoz, CW-3 exchanged at least one thousand one hundred (1,100) phone calls and text messages with his contacts at Taro, non-defendant Mallinckrodt, Perrigo, Aurobindo, Actavis, Glenmark, G&W, Wockhardt, Mylan, Lannett, Lupin, non-defendant Greenstone, and non-defendant Rising. These communications are detailed in the chart below:

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| Aprahamian, Ara (Taro) | 187 | 3/15/2013 | 8/18/2016 |
| Kaczmarek, Walt (Mallinckrodt) | 146 | 11/14/2012 | 7/13/2016 |
| K.K. (Mallinckrodt) | 158 | 12/3/2012 | 6/20/2016 |
| T.P. (Perrigo) | 95 | 8/8/2012 | 2/4/2016 |
| CW-6 (Aurobindo) | 90 | 8/16/2012 | 5/10/2013 |
| CW-2 (Rising) | 80 | 8/2/2013 | 5/11/2016 |
| H.M. (Taro) | 53 | 9/6/2012 | 3/11/2014 |
| Aprahamian, Ara (Actavis) | 52 | 8/17/2011 | 3/11/2013 |
| Blashinsky, Mitchell (Glenmark) | 49 | 8/28/2012 | 10/9/2013 |
| S.G. (Rising) | 37 | 6/4/2015 | 6/15/2016 |
| K.K. (G&W) | 30 | 2/6/2014 | 3/30/2015 |
| A.F. (Perrigo) | 27 | 6/30/2011 | 7/19/2013 |
| K.K. (Wockhardt) | 25 | 7/29/2011 | 5/23/2012 |
| B.G. (Lannett) | 22 | 3/18/2016 | 8/19/2016 |
| T.G. (Aurobindo) | 20 | 3/11/2014 | 10/19/2015 |
| L.W. (Mylan) | 14 | 9/21/2012 | 7/23/2013 |
| Berthold, David (Lupin) | 3 | 2/7/2012 | 10/18/2012 |
| Grauso, Jim (Aurobindo) | 3 | 6/28/2012 | 7/16/2012 |
| Perfetto, Mike (Taro) | 2 | 8/11/2016 | 8/11/2016 |
| K.S. (Lannett) | 2 | 5/10/2012 | 5/15/2012 |
| D.C. (Glenmark) | 1 | 8/22/2013 | 8/22/2013 |
| A.G. (Actavis) | 1 | 8/22/2013 | 8/22/2013 |
| Nailor, Jill (Greenstone) | 1 | 5/29/2013 | 5/29/2013 |
| Taro Pharmaceuticals | 1 | 8/11/2016 | 8/11/2016 |
| Sullivan, Tracy (Lannett) | 1 | 5/8/2012 | 5/8/2012 |

512.    As detailed above, when CW-3 was coordinating with competitors, he was acting at all times at the direction of, or with approval from, his superiors, including CW-1 and Kellum.

REDACTED – PUBLIC VERSION

513.    Several of CW-3's relationships—including with Perrigo, Glenmark, Aurobindo, and non-defendants Rising and Mallinckrodt—as well as other relationships between various Sandoz executives and certain competitors, are explored in greater detail in the following Sections.

a.    *Collusion Between Sandoz And Perrigo*

514.    As detailed above, Sandoz and Perrigo had an ongoing understanding over many years not to poach each other's customers and to follow each other's price increases. This understanding was implemented primarily through communications between CW-3 of Sandoz and T.P. of Perrigo. CW-3 continued the relationship with T.P. after his predecessor, CW-6, left Fougera in August 2012. CW-3 and T.P. of Perrigo were not social friends.  If they were communicating with each other, it was to coordinate anticompetitive conduct with regard to drugs on which Sandoz and Perrigo overlapped.

515.    During this time period, T.P. was acting at all times at the direction of, or with approval from, his superiors, including Boothe and Wesolowski.

516.    Several examples of CW-3's coordination with T.P. on specific products are discussed in detail in the following Sections.

i.    *Calcipotriene Betamethasone Dipropionate Ointment*

517.    Calcipotriene Betamethasone Dipropionate Ointment ("CBD Ointment" or "Cal Beta") is available in 60gm and 100gm dosages.

518.    In early 2014, both Sandoz and Perrigo were preparing to launch CBD Ointment. Sandoz was preparing to launch as the first-to-file generic and Perrigo was preparing to launch as the authorized generic (the "AG"). Under the agreement that Perrigo had reached with the brand manufacturer, Perrigo could not launch until Sandoz, the first filer, entered the market. Typically, a first filer interested in gaining a competitive advantage would want to keep its launch date a secret from the company launching the AG so that the first filer could catch the AG by surprise and

maintain market exclusivity for a longer period of time. But that was not the case with regard to CBD Ointment.

519.    T.P., a sales executive at Perrigo, and CW-3, a senior sales executive at Sandoz, exchanged two calls in late February 2014. On those calls, T.P. told CW-3 that Perrigo would be launching the AG of CBD Ointment and asked CW-3 when Sandoz planned to launch its generic version.

520.    When first approached by T.P. about CBD Ointment, CW-3 was not aware that Sandoz was planning to launch it. After being approached by T.P., CW-3 reached out to others at Sandoz to find out what Sandoz's plans were. On March 4, 2014, A.S., a senior Sandoz launch executive, confirmed to CW-3 that Sandoz would be launching CBD Ointment. Within minutes of receiving A.S.'s confirmation the night of March 4, 2014, CW-3 e-mailed Kellum, stating: █████ ████████████████████████████████████

521.    The next day, on March 5, 2014, Sandoz held an internal ████████████████ teleconference to discuss its plans. Kellum, A.S., CW-1, a Sandoz senior pricing executive, and other members of the sales and launch teams attended the call. Additional meetings were held on March 10 and March 13, 2014 to coordinate the CBD Ointment launch.

522.    Also on March 13, 2014, CW-3 called T.P. two (2) times, with one of the calls lasting twelve (12) minutes. That same day, Perrigo scheduled its own teleconference for the following day to discuss its CBD Ointment launch. T.P., his supervisor Wesolowski, a senior executive at Perrigo, and over twenty (20) other Perrigo sales and launch team members attended the call. On the call, the Perrigo sales executives were directed to go after only six (6) select customer accounts, and no others.  These accounts were referred to as ████████████████████████████████

523.    Promptly following the call, J.B., a Perrigo marketing executive, circulated a document that was discussed on the call. The document was internally prepared at Perrigo and

indicated that Sandoz may launch on March 31, 2014 and that Perrigo's ███████ was 50% of the market. Perrigo's information was accurate. Sandoz ultimately launched the 100gm size on March 31, 2014 and the 60gm size on April 1, 2014. In harmony with Perrigo's target share goal of 50%, internal Sandoz e-mail correspondence circulated prior to launch stated that Sandoz also had a target market share of 50% for CBD Ointment.

524.     While Perrigo planned to approach a small, select group of potential customers, Sandoz was deciding which large customers to go after. Sandoz initially planned to target Walgreens and ABC for CBD Ointment. However, Sandoz remained involved in ongoing business disputes with Walgreens and ABC in the middle of March 2014. Sandoz was concerned that Walgreens and ABC would not award Sandoz their CBD Ointment business if the disputes were not resolved prior to launch.

525.     On the night of Friday, March 14, 2014, A.S. e-mailed P.G., the President of Sandoz US, stating that resolving the ABC and Walgreens disputes would be a ███████████ for the CBD Ointment launch. P.G. responded by directing A.S. to look for CBD Ointment business ███████████ and to ████████████████████████████

526.     A.S. forwarded his e-mail correspondence with P.G. to Kellum and others at Sandoz on the afternoon of March 16, 2014. Consistent with P.G.'s direction, A.S., Kellum, CW-3 and CW-1 immediately began to strategize how Sandoz could reach its market share target of 50% without Walgreens and ABC. A.S. determined that in order to reach that goal, Sandoz would need to have CVS as a customer. At an in-person meeting in Sandoz's Princeton offices, Kellum told CW-3 and CW-1 that he also wanted McKesson and Rite Aid as customers.

527.     On the next day, March 17, 2014, CW-3 called T.P. at Perrigo to resume their discussions about customer allocation and to exchange pricing information. Between March 17 and March 20, 2014, CW-3 and T.P. exchanged more than ten phone calls, with one call lasting eleven

REDACTED – PUBLIC VERSION

(11) minutes and another call lasting seventeen (17) minutes. Further, T.P. reported the substance of these calls to his supervisor, Wesolowski, seeking direction from him on how to respond to CW-3. T.P. often spoke with Wesolowski between calls with CW-3, sometimes even calling him immediately after hanging up with CW-3. This call pattern is detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 3/17/2014 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 13:38:00 | 0:01:00 |
| 3/18/2014 | Voice | T.P. (Perrigo) | Incoming | CW-3 (Sandoz) | 8:56:00 | 0:11:00 |
| 3/18/2014 | Voice | T.P. (Perrigo) | Incoming | Wesolowski, John (Perrigo) | 9:08:00 | 0:12:00 |
| 3/18/2014 | Voice | T.P. (Perrigo) | Incoming | CW-3 (Sandoz) | 12:42:00 | 0:04:00 |
| 3/18/2014 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 12:49:00 | 0:01:00 |
| 3/18/2014 | Voice | T.P. (Perrigo) | Incoming | CW-3 (Sandoz) | 13:13:00 | 0:04:00 |
| 3/18/2014 | Voice | T.P. (Perrigo) | Incoming | CW-3 (Sandoz) | 13:22:00 | 0:04:00 |
| 3/18/2014 | Voice | T.P. (Perrigo) | Incoming | Wesolowski, John (Perrigo) | 13:48:00 | 0:08:00 |
| 3/18/2014 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 13:56:00 | 0:04:00 |
| 3/18/2014 | Voice | T.P. (Perrigo) | Outgoing | Wesolowski, John (Perrigo) | 14:00:00 | 0:03:00 |
| 3/18/2014 | Voice | T.P. (Perrigo) | Incoming | Wesolowski, John (Perrigo) | 15:30:00 | 0:04:00 |
| 3/19/2014 | Voice | T.P. (Perrigo) | Incoming | CW-3 (Sandoz) | 16:20:00 | 0:17:00 |
| 3/20/2014 | Voice | T.P. (Perrigo) | Outgoing | Wesolowski, John (Perrigo) | 8:37:00 | 0:01:00 |
| 3/20/2014 | Voice | T.P. (Perrigo) | Incoming | Weslowksi, John (Perrigo) | 8:40:00 | 0:03:00 |
| 3/20/2014 | Voice | T.P. (Perrigo) | Outgoing | Weslowksi, John (Perrigo) | 12:37:00 | 0:08:00 |
| 3/20/2014 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 14:18:00 | 0:07:00 |
| 3/20/2014 | Voice | T.P. (Perrigo) | Outgoing | Weslowksi, John (Perrigo) | 14:24:00 | 0:01:00 |
| 3/20/2014 | Voice | T.P. (Perrigo) | Incoming | CW-3 (Sandoz) | 15:08:00 | 0:03:00 |

528.    Although most of T.P. and CW-3's calls were just between the two of them, occasionally other colleagues would join them. For example, CW-3 made a call early in the week of March 17, 2014 to T.P. from A.S.'s office in Princeton, and Kellum and CW-1 also joined the call.

529.    As noted above, over the course of these calls, T.P. and CW-3 discussed market pricing and customer allocation. In a call early in the week of March 17, 2014, T.P. shared Perrigo's proposed WAC pricing and AWP pricing for different types of customers. During that call, CW-3 took the following contemporaneous notes in his Notebook:

███████████████████

REDACTED – PUBLIC VERSION



530.    When Perrigo launched CBD Ointment about two weeks later, its WAC and AWP matched those price points. The two rows of WAC prices in the Notebook represent the different pricing for the 60gm and 100gm sizes. Sandoz's WAC prices at launch were close but slightly higher than Perrigo's, at $657.45 for the 60gm size and $968.40 for the 100gm size.

531.    T.P. also shared with CW-3 what Perrigo's non-public, "dead net" pricing would be for its customers. Perrigo ranked its customers into five "tiers." Customers in the same tier were typically sold a drug at the same "dead net" price. T.P. communicated the CBD Ointment pricing tiers to CW-3 by giving examples of the types of customers in a tier, such as large wholesalers like ABC and Cardinal or regional wholesalers like HD Smith or Optisource, and what the corresponding "dead net" pricing would be for that type of customer. CW-3's contemporaneous notes regarding Perrigo's dead net pricing for CBD Ointment are below:



532.    The pricing tiers T.P. gave to CW-3 matched the pricing tiers Perrigo planned to use. The following rows are from an internally prepared spreadsheet that shows Perrigo's main pricing tiers for the two different sizes of CBD Ointment:



533.    Moreover, Perrigo's offers to customers were in step with the "dead net" pricing noted above. For example, Perrigo made offers to Wal-Mart and Meijer, both so-called "tier 2" customers, that resulted in Wal-Mart and Meijer having "dead net" pricing of $426.31 and $627.94 for the 60g and 100g sizes respectively and offers to Optisource and Morris Dickson, both so-called "tier 3" customers, that resulted in Morris Dickson and Optisource having "dead net" pricing of $448.75 and 660.99 for the 60g and 100g sizes respectively.

534.    As noted earlier, T.P. and CW-3 did not just use these calls to share pricing information in anticipation of their launches. They also used them to allocate the customers that would be in the market. When CW-3 and T.P. spoke on calls early in the week of March 17, 2014, each shared his respective company's position on how customers should be divided between them to achieve "fair share."  CW-3 told T.P. that Sandoz wanted McKesson, Rite Aid, Econdisc, CVS, Cardinal, Omnicare and Kaiser. CW-3 documented this in his Notebook:

535.     T.P. responded that Perrigo wanted Anda, Walgreens, ABC, Wal-Mart, Rite Aid and

McKesson. CW-3 documented this in his Notebook:



The purpose of reaching agreement on the list of customers was to avoid competing with one

another as both companies entered the market simultaneously.

536.     As the lists above show, with the exception of Rite Aid and McKesson, Sandoz and

Perrigo were aligned on how significant customers should be allocated. In March 2014, Rite Aid was

purchasing generic drugs through McKesson's "OneStop Generics" program, so Perrigo and

Sandoz viewed these customers as a package or, put another way, whoever got McKesson also got

Rite Aid as a customer. Both of the competitors wanted that business.

537.     As the negotiations continued, Sandoz recognized that the list of customers it

wanted for CBD Ointment was more than its fair share of the market. However, in keeping with its

general strategic preference for selling to a smaller number of large customers, Sandoz did not want

to give up McKesson, Rite Aid, CVS, or Cardinal. To resolve the issue, Kellum, CW-3 and CW-1

brainstormed a list of other customers that, when combined, would have about the same market

share as Rite Aid and McKesson and that Sandoz was willing to give up to Perrigo. Ultimately, the

list of customers that Sandoz created included Optisource, Publix, Morris & Dickson (MD), PBA

Health (PBA), Meijer, and Kaiser.

538.     Thereafter, CW-3 called T.P. and proposed that Sandoz give up these customers to

Perrigo in exchange for McKesson and Rite Aid.  CW-3 documented this in his Notebook:

REDACTED – PUBLIC VERSION

████████████████████████████████████

Perrigo agreed.

539.    Following the plan, Perrigo submitted offers to the customers listed above and was awarded the business at Optisource, Publix, Morris & Dickson, Meijer, and Kaiser. In addition, and as planned, Perrigo bid on and won Anda, Walgreens, ABC and Wal-Mart, while Sandoz bid on and won McKesson, Rite Aid, CVS, Cardinal, and Omnicare.

540.    While Wesolowski encouraged the Perrigo sales team to go after their assigned customers, he was also careful to make sure they adhered to the agreement reached with Sandoz. For example, on March 21, 2014, Omnicare reached out to Perrigo asking for a bid on CBD Ointment. Omnicare was a customer allocated to Sandoz. P.H., a Perrigo sales executive, forwarded the request to Wesolowski who responded, ████████████████████████ Consistent with Wesolowski's direction, P.H. told Omnicare that Perrigo was ██████████████████ even though Perrigo was actively sending offers to other potential customers at that time.

541.    On March 31, 2014, CW-3 called T.P. The call lasted two (2) minutes. That same day, Sandoz officially launched the 100gm package size of CBD Ointment and Perrigo launched both the 100gm and 60gm package sizes. The next day, on April 1, 2014, Sandoz launched the 60gm size. Early in the morning of April 1, 2014, M.A., a Sandoz marketing executive, e-mailed Kellum and A.S. to advise that she received an alert that Perrigo had increased prices on CBD Ointment. She noted that she was ████████████████████████

542.    On April 7, 2014, D.A., a Sandoz launch executive, noted in an internal e-mail that Sandoz ██████████████████ At the end of April 2014, Sandoz and Perrigo had a virtually even split of the market for that product.

REDACTED – PUBLIC VERSION

ii.      *Tacrolimus Ointment*

543.    Tacrolimus Ointment ("Tacrolimus") is available in 30gm, 60gm and 100gm dosages. Recent annual sales of Tacrolimus Ointment in the United States exceeded $100 million.

544.    In August 2014, Sandoz and Perrigo were both preparing to launch Tacrolimus. Sandoz was the first-to-file generic and Perrigo was the authorized generic (the "AG").

545.    On August 13, 2014 at 3:57 p.m., E.D., a Sandoz launch executive, sent an internal e-mail asking if anyone knew whether there would be an AG for Tacrolimus or if any other competitors planned to enter the market. At 5:11 p.m. that same day, CW-3, a Sandoz senior sales executive, called T.P., a Perrigo sales executive, and they spoke for fifteen (15) minutes. Prior to this call, CW-3 and T.P. had not spoken since June 18, 2014. Within a half hour of hanging up with T.P., CW-3 sent the following e-mail responding to E.D.'s questions:



546.    On September 8, 2014, Sandoz held a Commercial Operations meeting during which they discussed the Tacrolimus launch. That same day, CW-3 called T.P. four times, with one call lasting eleven (11) minutes and another six (6) minutes. On those calls, CW-3 and T.P. discussed the Tacrolimus launch and decided to model it after the CBD Ointment launch. As discussed above in the previous section, in the spring of 2014 CW-3 and T.P. had colluded on CBD Ointment when Sandoz was entering as the first-to-file generic and Perrigo as the AG. By using CBD Ointment as a

**REDACTED – PUBLIC VERSION**

model, the competitors would not have to spend significant time negotiating the allocation of customers for Tacrolimus.

547.     That same day, on September 8, 2014, CW-3 sent the following e-mail to Sandoz launch executives, E.D. and A.S., with a copy to CW-1, a Sandoz senior pricing executive:



548.     Two days later, on September 10, 2014, CW-3 called T.P. and they spoke for fifteen (15) minutes. During that call, the competitors again talked about the Tacrolimus launch. Specifically, they discussed the allocation of certain customers to Sandoz and Perrigo so that each competitor could reach 50% market share. Further, T.P. provided CW-3 with Perrigo's WAC and AWP pricing for the three dosage sizes, and the dead net pricing that Perrigo was contemplating for various classes of customers. CW-3's contemporaneous notes from that call are pictured below:

REDACTED – PUBLIC VERSION



549.    In his notes, CW-3 recorded that the competitors would ▮▮▮▮▮▮▮▮▮▮ and listed the customers that they agreed to allocate to each other. Sandoz planned to target the customers listed in the box in the bottom right hand corner of the note, and Perrigo planned to target the customers listed above it.

550.    On November 10, 2014, A.F., a Perrigo sales executive, e-mailed Wesolowski, a senior Perrigo executive, to advise that a customer told her Sandoz was launching Tacrolimus that day. In turn, Wesolowski e-mailed T.P. and others at Perrigo asking them if the launch could be confirmed.  That same day, T.P. and CW-3 spoke two times, with one call lasting two (2) minutes and the second lasting three (3) minutes. During those calls, CW-3 told T.P. that Sandoz had not yet

REDACTED – PUBLIC VERSION

formally launched the product or started shipping to customers. Later that afternoon, T.P. reported back to Wesolowski:



In order to avoid any written evidence of his illegal activity, T.P. referred to his source as a "customer" even though it was actually his competitor, CW-3

551.    On November 19, 2014, Sandoz launched Tacrolimus and Perrigo launched on the following day, November 20, 2014. Consistent with the competitors' plans, Sandoz was awarded CVS, Cardinal, Omnicare, and Econdisc, among other customers. As planned, Perrigo won Walgreens, Walmart, ABC (secondary), Anda, Optisource, and Publix.

552.    On November 20, 2014, Boothe, a senior Perrigo executive, sent around a congratulatory e-mail to the Perrigo team that worked on the Tacrolimus launch. He specifically congratulated C.V., a Perrigo business development executive, and Wesolowski for █████████ ██████ A few days later, in response to a request from the Tacrolimus brand manufacturer on how sales were going, C.V. replied, ████████████████████████████████████████ ██████

*iii.    Methazolamide Tablets*

553.    Methazolamide tablets are available in 25mg and 50mg dosages.

554.    By the fall of 2013, there were two manufacturers marketing Methazolamide— Sandoz and non-defendant Fera Pharmaceuticals, Inc. ("Fera"). Both competitors had posted nearly identical WAC pricing for the 25mg and 50mg dosage sizes, respectively.

REDACTED – PUBLIC VERSION

555.    In early 2014, Sandoz began experiencing issues with its API supplier and was forced to temporarily withdraw from the market. At that time, Sandoz expected that its supply problems would be resolved in June 2014 and it would re-enter then.

556.    At the same time that Sandoz was experiencing supply problems, Perrigo acquired Fera's right to distribute Methazolamide. As a result of Perrigo's acquisition, Fera left the Methazolamide market.

557.    On March 6, 2014, Perrigo formally launched Methazolamide. Perrigo knew prior to its launch that Sandoz, its only competitor, was out of the market and was not expected to re-enter until the summer of 2014. Perrigo leveraged its temporary position as the only manufacturer with the ability to supply by implementing a large price increase. Perrigo's WAC pricing when it entered was 136% higher than Sandoz's. An internal Perrigo document circulated approximately one month prior to the launch indicated that Perrigo's target share for Methazolamide was ██████████ ████████████████████████████████████████████████████

558.    On June 17, 2014, Perrigo learned from a customer that Sandoz was back in the Methazolamide market. That same day, T.P. of Perrigo called CW-3, a Sandoz senior sales executive. The call lasted one (1) minute. After that call, T.P. called his supervisor, Wesolowski, and they spoke for three (3) minutes. The next day, on June 18, 2014, T.P. and CW-3 exchanged two more calls, with one call lasting three (3) minutes.  On Monday, June 23, 2014, T.P. e-mailed Wesolowski the following:

████████████████████

██████████████████████████████████

559.    Indeed, Sandoz had re-entered the market for the 25mg with a WAC price of $129.84—which was significantly lower than Perrigo's WAC price of $306.47.  Wesolowski was

upset that Sandoz did not reach out to Perrigo before re-entering the market. Had it done so, Sandoz would have known to raise its price, and to what level. Wesolowski forwarded T.P.'s e-mail above to Boothe, a senior Perrigo executive, and others at Perrigo with the following cover note:



560.    In the meantime, Perrigo would make sure that Sandoz did its ████████ before re-entering on the 50mg, and that it would correct its prior mistake on the 25mg.

561.    On October 21, 2014, CW-3 and T.P. spoke for fifteen (15) minutes. During that call, T.P. provided CW-3 with Perrigo's increased WAC pricing for the 25mg and 50mg package sizes of Methazolamide to ensure that Sandoz would match those prices when it re-entered the market. CW-3's contemporaneous notes from that call are pictured below:



562.    Shortly after the call, in early November 2014, Sandoz began ramping up for its re-entry into the Methazolamide market. On November 3, 2014, Sandoz held a Commercial

REDACTED – PUBLIC VERSION

Operations meeting during which Sandoz discussed its plans for the Methazolamide re-launch, including implementing significant price increases to align with Perrigo's pricing.

563.    The next day, on November 4, 2014, CW-1, a senior Sandoz pricing executive, sent an internal e-mail asking his colleague P.C. to evaluate the ████████████████ if Sandoz raised its WAC pricing to match Perrigo. The next day, CW-3 called T.P at Perrigo and the two competitors spoke for twelve (12) minutes. Also on that day, CW-1 directed the Sandoz pricing team to remove Methazolamide from any existing contracts. CW-1 explained that █████████
██████████████████████████████████████████████████
██████

564.    The two competitors continued to coordinate over the next several weeks as Sandoz made final preparations to re-enter the market and raise prices. On November 10, 2014, CW-3 called T.P. twice with one call lasting two (2) minutes and the other call lasting three (3) minutes.

565.    On December 4, 2014, CW-3 e-mailed Kellum, CW-1, and others at Sandoz regarding Methazolamide, providing them with specific, non-public pricing information he had learned from his competitor:

████████████████████
████████████████████████████████████

Internal Perrigo documents confirm that its so-called "dead net" pricing for group purchasing organizations (GPOs) at that time was approximately $250 for the 25mg and $500 for the 50mg. This pricing information was not publicly available.

566.    On December 5, 2014, Sandoz re-launched its 50mg dosage with a WAC price of $612.97, which matched Perrigo's WAC price. At the same time, Sandoz increased the WAC price on its 25mg dosage by 136% to match Perrigo's pricing.

REDACTED – PUBLIC VERSION

b. *Collusion Between Sandoz And Glenmark*

567.    In August 2012, not long after Sandoz acquired Fougera, Blashinsky, who had just

recently joined Glenmark as its Vice President of Sales and Marketing, approached CW-3 of Sandoz

at the NACDS conference in Denver, Colorado. During their conversation over breakfast at the

Marriot Hotel, Blashinsky told CW-3, among other things, ███████████████████ and █

████████████████████

568.    Over the next two years, the two competitors did "███████████" on both market

allocation and pricing—speaking at least fifty (50) times. Their communications were all collusive in

nature. The two competitors were not friends and had no other reason to speak except to

coordinate anticompetitive conduct. During that time period, Sandoz and Glenmark conspired to fix

prices and allocate markets on at least two products: (1) Fluticasone Propionate Lotion (60ml) and

(2) Desoximetasone Ointment.

i.    *Fluticasone Propionate*

569.    Glenmark was the first generic manufacturer to enter the market for Fluticasone

Propionate Lotion ("Fluticasone") on March 26, 2012. As the first generic manufacturer to file an

approved ANDA, Glenmark enjoyed a 180-day period of exclusivity during which time no other

competitors could sell the product. Even before Glenmark launched, Sandoz (then Fougera) was

planning to enter the market for Fluticasone after Glenmark's exclusivity period ended in September

2012 and understood that Perrigo was also planning to enter at the same time. Over the course of

several months, Fougera—in particular CW-6, at the direction of Kaczmarek—coordinated with

Glenmark frequently about Fluticasone, including market share targets and pricing, to prepare for its

eventual Fluticasone launch.

570.    After the Sandoz acquisition of Fougera in July 2012, as the end of Glenmark's 180-

day exclusivity period approached, Sandoz continued to stay in communication with Glenmark and

Perrigo about Fluticasone. As part of its launch strategy, Sandoz planned to obtain 33% of the market. Perrigo, however, only anticipated taking about one-quarter of the market.

571.    By mid-August 2012, Sandoz learned that its launch of Fluticasone would be delayed until the end of November 2012 because of production problems. As a result of this delay, Kellum was concerned that Perrigo would be able to launch earlier than Sandoz and wanted to learn more about Perrigo's launch strategy. On August 21, 2012, Kellum sent an e-mail to his sales team asking about ███████████████ Within minutes of receiving the e-mail, CW-3 reached out to T.P., his contact at Perrigo, by phone.

572.    CW-3 also sent a message to Perrigo through a customer. That same day, the customer sent an e-mail to a Perrigo sales executive, stating: █████████████████████████ ████████████████████████ The Perrigo sales executive informed the customer that Perrigo's Fluticasone launch had now been ████████ to the first quarter of 2013. The customer then forwarded that e-mail directly to CW-3 at Sandoz, who reported the information directly to Kellum and others at Sandoz the next day.

573.    Around this same time, Sandoz also began preparing to have conversations with "customers" about its Fluticasone launch while at the NACDS Conference in Denver in late August 2012. It was at that same conference where CW-3 first spoke to Blashinsky at Glenmark about working ████████ and making ███████████ In an internal e-mail to the Sandoz sales team on August 25, 2012, in advance of the NACDS Conference, R.T., a senior Sandoz sales and marketing executive, instructed his team on the current strategy which aligned with the larger "fair share" understanding: ████████████████████████████████████████ ████████████████████████████████████

574.    As its launch date for Fluticasone approached, Sandoz began to think more critically about which customers to target and began to communicate directly with Glenmark on the subject.

REDACTED – PUBLIC VERSION

On November 26, 2012, Sandoz scheduled an internal meeting to discuss which customers it should approach as part of its Fluticasone launch. That same day, CW-3 of Sandoz spoke to Blashinsky of Glenmark twice, with one call lasting five (5) minutes. After the second call with Blashinsky, CW-3 e-mailed his Sandoz colleagues a list of six (6) customers he thought Sandoz should target. That list would later grow to eight (8) customers. CW-3 also made it known to his Sandoz colleagues that Glenmark was planning a potential price increase on Fluticasone at some point in the future.

575.    The next day, November 27, 2012, a senior Sandoz marketing executive asked CW-3 to get Fluticasone ██████████ for the customers Sandoz had agreed to target. CW-3 responded that he was ██████████████████████████ As promised, the next morning (November 28) CW-3 called Blashinsky of Glenmark. The two spoke four (4) times that day, including one call lasting eight (8) minutes. Later that same day, CW-3 was again asked if he had been able to ████ ████████████████████████████████████ CW-3 responded: ████████████ ████████████████████

576.    The next morning, CW-3 sent an updated list of nine (9) customers that Sandoz should target for Fluticasone—based on his conversations with Blashinsky—but did not include the pricing information that had been requested. The senior Sandoz marketing executive responded immediately: ██████ CW-3 countered by referring to a then-popular song, suggesting that his boss should call him instead of asking for the information in writing:

████████████████

████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

577.    As Sandoz continued to prepare for its imminent launch, it also began to evaluate the usage expected from the nine customers that it had agreed with Glenmark to target. Sandoz found that those nine customers would not allow the company to reach its desired market share goals. As a result, on November 30, 2012 a senior Sandoz marketing executive suggested that Sandoz approach two large wholesaler customers, instead of one as originally agreed. CW-3 responded immediately, saying ███████████████████████ CW-3 then stated that ████████████████████████████████████████████████████████████ ████████████████████████████████ A few hours later, CW-3 called Blashinsky and left a message. Blashinsky promptly returned the call and the competitors spoke for three (3) minutes. Later that day, CW-3 also called and spoke to his contact at Perrigo, T.P., twice.

578.    Sandoz officially entered the market for Fluticasone on December 3, 2012, matching Glenmark's WAC pricing exactly. That same day, CW-3 of Sandoz called Blashinsky of Glenmark and they had a two (2) minute call. Also that day, Blashinsky directed the sales team to relinquish the Publix and Optisource accounts to Sandoz, two of the nine customers that Glenmark had agreed to give up to the new entrant.

579.    Sandoz continued to coordinate with Glenmark to make sure that it was targeting the appropriate customers and minimizing price erosion as it entered the Fluticasone market. For example, on December 13, 2012, a large wholesaler that Sandoz had agreed not to target approached Sandoz looking for an offer. That same day, CW-3 spoke to Blashinsky twice. When Sandoz refused to respond to the customer, the customer followed up again on December 21, 2012. Following the same pattern, CW-3 spoke to Blashinsky twice that day, including one call lasting four (4) minutes.

580.    Although Sandoz made sure to coordinate extensively with Glenmark, it had initial difficulty meeting its market share goal, in part because some of the customers already had a significant amount of inventory on hand. On January 9, 2013, CW-3 had a conversation with

REDACTED – PUBLIC VERSION

Blashinsky where the two competitors walked through a list of customers, identifying those that

Sandoz should target and those which it should not. CW-3 took detailed contemporaneous notes of

the conversation. Later in the day, after reviewing the list, CW-3 of Sandoz began to suspect that

Glenmark may have oversold to certain customers in advance of Sandoz's entry, stating in an e-mail

that he had ████████████████████████████████████

581.    By January 11, 2013, CW-1 of Sandoz sent around a summary of ████████████



In response, R.T. of Sandoz indicated that he was

████████████████████ but that 21.8% market share was ████████████ and that Sandoz should

continue to press for its original market share goal.

582.    During an internal Commercial Operations meeting on January 21, 2013, Sandoz

decided to approach another customer, CVS, in order to obtain additional market share. But before

doing so Sandoz wanted to confirm that this was acceptable with Glenmark. In his

contemporaneous notes of the meeting, CW-3 recorded in his Notebook that he was supposed to



583.    Sandoz subsequently learned why Glenmark was reluctant to give up more market

share to Sandoz. There was a discrepancy between the two competitors about how much market

share Sandoz had already obtained. On January 29, 2013, a senior Sandoz marketing executive

reported that ███████████████████████████████████████████████████

███████████████████████████████████ Two days later, on January 31,

2013, CW-3 and Blashinsky spoke two more times, for five (5) minutes each.

584.    Over the next several months, Sandoz and Glenmark continued to coordinate about

Fluticasone, including about a Glenmark price increase on that drug. For example, on April 16,

2013, as Glenmark was preparing for a large-scale price increase on several different drugs (in

coordination with several different competitors), CW-3 of Sandoz had two separate calls with

Blashinsky of Glenmark, including one call lasting thirteen (13) minutes. They talked about several

things, including Glenmark's potential entry and market share targets on a different drug,

Alclometasone, as well as a price increase on Fluticasone, as recorded by CW-3 in his

contemporaneous notes of the call:

███████████████ ]



585.    Blashinsky called CW-3 again on May 6, 2013, in advance of the Glenmark price

increase. He also called CW-3 on May 17, 2013—the day after the Glenmark price increase on

Fluticasone became effective. In all, the two competitors spoke three times on May 17, 2013,

including two separate five (5) minute calls.

586.    Throughout this time period, Sandoz also kept in close communication with Perrigo

about the details of Perrigo's anticipated entry into the Fluticasone market. In early April 2013 CW-3

of Sandoz spoke to T.P. of Perrigo multiple times, including calls lasting seventeen (17) and five (5)

minutes, respectively. CW-3 subsequently reported to his colleagues at Sandoz that Perrigo would be

delayed in entering the Fluticasone market ███████████████████████ On April

**REDACTED – PUBLIC VERSION**

9, 2013, a colleague at Sandoz followed up asking CW-3 for additional information about whether Perrigo planned to enter █████████████████████ The next day, CW-3 communicated directly with Perrigo to obtain the answer, calling and speaking with T.P. two (2) times.

587.    On May 21, 2013, as Perrigo was beginning to plan its entry into the market, a Perrigo executive asked T.P. to obtain █████████ for Fluticasone. Two days later, on May 23, 2013, T.P. called CW-3 at Sandoz. They ended up speaking twice that day, for five (5) and three (3) minutes, respectively. Immediately after their second call, CW-3 called Blashinsky at Glenmark—the other competitor on Fluticasone—and the two spoke for four (4) minutes.

588.    Similarly, on May 28, 2013 a senior Sandoz executive requested additional █████ ██████████ about Perrigo's entry timing on Fluticasone. That same day, CW-3 called T.P. at Perrigo and they spoke for four (4) minutes. The next day, T.P. called CW-3 back and they spoke again for two (2) minutes.

589.    By July 2013, Perrigo finally began preparing in earnest to enter the Fluticasone market. As of that time Sandoz had been able to obtain 30% market share, reaching its initial target goal for a three-player market with Glenmark and Perrigo. Sandoz understood that, because Glenmark still had a significant majority of the market share, Perrigo would target Glenmark customers as it entered.

590.    In the days and weeks leading up to Perrigo's launch, Perrigo was in frequent communication with Sandoz, as set forth below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 7/2/2013 | Voice | CW-3 (Sandoz) | Outgoing | T.P. (Perrigo) | 11:13:00 | 0:01:00 |
| 7/10/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 16:14:00 | 0:01:00 |
| 7/15/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 12:06:00 | 0:01:00 |
| 7/16/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 9:22:00 | 0:01:00 |
| 7/17/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 11:22:00 | 0:19:00 |
| 7/29/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 10:27:00 | 0:01:00 |
| 7/29/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 13:11:00 | 0:01:00 |
| 7/30/2013 | Voice | T.P. (Perrigo) | Incoming | CW-3 (Sandoz) | 10:09:00 | 0:13:00 |

| 8/1/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 13:32:00 | 0:01:00 |
| 8/1/2013 | Voice | T.P. (Perrigo) | Outgoing | CW-3 (Sandoz) | 13:42:00 | 0:05:00 |

591.    Perrigo held an internal meeting to discuss its Fluticasone launch on July 16, 2013. As can be seen in the table above, on the day of the meeting T.P. of Perrigo called CW-3 at Sandoz and left a message. He called CW-3 again the next day, and they were able to speak for nineteen (19) minutes. During these conversations, T.P. informed CW-3 that, consistent with the "fair share" understanding, Perrigo was targeting specific Glenmark customers and looking for approximately 25% market share. CW-3 took contemporaneous notes of his conversation with T.P., as set forth below:



592.    On July 30, 2013, Perrigo received FDA approval to begin selling Fluticasone. That same day, T.P. of Perrigo spoke to CW-3 of Sandoz for thirteen (13) minutes. Perrigo then formally launched the product on August 1, 2013, with the same exact WAC pricing as Glenmark and Sandoz. T.P. and CW-3 also spoke twice that day.

593.    As Perrigo entered the market it planned only a "▆▆▆▆▆▆▆," targeting only $1 million per year in sales. In accordance with the fair share understanding and the previous communications between the competitors, Perrigo targeted—and Glenmark conceded—multiple customers immediately.

**REDACTED – PUBLIC VERSION**

> *ii.*    *Desoximetasone Ointment*

594.    As of the summer of 2012, Taro was the only manufacturer of Desoximetasone Ointment.

> *(a)*    Sandoz Entry (September 2012)

595.    Starting in August 2012, Sandoz began making plans to enter the Desoximetasone market. Because it would be a 2-player market upon Sandoz's entry, and because Sandoz was the second manufacturer to enter the market, Sandoz initially decided—consistent with the "fair share" understanding outlined above—to target 40% market share.

596.    On the evening of August 21, 2012, Sandoz held an internal meeting to discuss its ██████████ and ████████████ regarding Desoximetasone. Shortly after the meeting, a Sandoz executive sent an initial list of eight (8) customers that Sandoz should consider approaching. The executive indicated that Sandoz's success would depend ████████████████████ and that more research was necessary regarding one of the larger customers, because approaching such a ███ customer could cause ██████████

597.    First thing the next morning, Sandoz began to coordinate with Taro. K.K., a national account executive at Sandoz, called D.S., a senior sales executive at Taro, and the two spoke for nine (9) minutes.

598.    On August 30, 2012, Sandoz held another internal meeting to discuss its Desoximetasone launch. That same day, K.K. of Sandoz spoke again to D.S. of Taro, this time for two (2) minutes. The day after this internal Sandoz meeting and the phone conversation with Taro, on August 31, 2012, CW-1 of Sandoz sent Kellum a ██████████ for Desoximetasone, which included specific pricing █████ and a more refined list of customers that would provide Sandoz with its target market share.

599.    As the Sandoz launch date approached, CW-3 of Sandoz also began speaking to H.M., an account executive at Taro, to coordinate Sandoz's entry into the market. The two competitors were not friends, and nearly all their conversations were collusive in nature. According to phone records, the first ever call between the two competitors was on September 6, 2012. They spoke again on September 21, 2012, as Sandoz was finalizing its launch plan. During these calls, H.M. provided CW-3 with Taro price points for various customers so that Sandoz could bid as high as possible and avoid price erosion, while still obtaining new customers as it entered the market. CW-3 passed that pricing information and list of customer targets on to CW-1 and Kellum at Sandoz. That same day, H.M. also sent an e-mail to J.M., a sales executive at Taro, relaying a ██████ that Sandoz would be entering the Desoximetasone market ████████████████ and suggesting six accounts as possible targets.

600.    Sandoz received FDA approval and formally launched Desoximetasone on September 28, 2012, matching Taro's WAC pricing exactly. That same day, CW-3 of Sandoz also called H.M. at Taro and left a message; H.M. returned the call almost immediately, leaving CW-3 a voicemail.

601.    Based on the conversations with Taro, Sandoz decided to take a ████████ ████████ in targeting customers, so as ████████████████ with its competitor. In an internal Sandoz e-mail on October 1, CW-1 indicated that Sandoz's initial ████████████ for this product had now been adjusted slightly lower based on ████████████████.

602.    Shortly after receiving approval, on October 1, 2012, Sandoz began approaching a limited set of customers, per its agreement with Taro. That same day, CW-4 of Sandoz reached out to D.S. at Taro—with whom CW-4 had colluded with in the past—and spoke two times, including one call lasting twenty-one (21) minutes.

REDACTED – PUBLIC VERSION

603.    Consistent with the understanding in place between the two competitors, Taro immediately started conceding customers to Sandoz. For example, on October 11, 2012, a high-ranking Taro executive sent an internal e-mail discussing Sandoz's launch of Desoximetasone. In the e-mail, the executive indicated that Taro had been aware of Sandoz's launch ███████████ and that Taro had just conceded two large customers to Sandoz, with the expectation of relinquishing ██████████████████ going forward. That same day, H.M. of Taro called CW-3 of Sandoz, likely to let him know that the customers had been conceded and confirm the plan moving forward. They spoke twice that day, including one call lasting more than six (6) minutes.

604.    Sandoz was able to obtain most of its targeted market share quickly, without any market disruption. By October 12, 2012, for example, R.T., a senior sales and marketing executive at Sandoz, provided a summary of the Desoximetasone launch, stating ████████████████ ██████████████████████████████████████████████████████████ ████████████████████████████

605.    At that point, Sandoz decided it needed to obtain at least one more customer to meet its fair share goals. Internally, Sandoz discussed sending a message to Taro that ███████████ ██████████████████ On October 23, 2012, CW-1, CW-3 and Kellum scheduled a conference call to discuss which customers to approach to ██████████████████████ That same day, CW-3 called H.M. at Taro and the two competitors spoke several times, including two separate fifteen (15) minute calls.

606.    As a result of these conversations, Taro agreed to relinquish additional customers to Sandoz. By February 2013, Sandoz had captured its original goal of 40% of the Desoximetasone market, without any significant disruption.

REDACTED – PUBLIC VERSION

(b)    *Glenmark Entry (September 2013)*

607.    Glenmark received FDA approval to sell Desoximetasone on September 20, 2013. In the days and weeks leading up to the Glenmark launch, Glenmark, Taro and Sandoz were speaking frequently to coordinate Glenmark's entry, including at least the following calls and text messages:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 8/15/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Incoming | Aprahamian, Ara (Taro) | 13:33:00 | 0:08:00 |
| 8/20/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Incoming | Aprahamian, Ara (Taro) | 9:40:00 | 0:02:00 |
| 8/20/2013 | Voice | S.G. (Sandoz) | Outgoing | D.I. (Glenmark) | 13:45:00 | 0:01:00 |
| 8/20/2013 | Voice | S.G. (Sandoz) | Outgoing | D.I. (Glenmark) | 13:56:00 | 0:02:00 |
| 8/21/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | Aprahamian, Ara (Taro) | 11:37:00 | 0:07:00 |
| 8/22/2013 | Text | CW-3 (Sandoz) | Incoming | D.C. (Glenmark) | 13:29:19 | 0:00:00 |
| 8/22/2013 | Text | CW-3 (Sandoz) | Incoming | D.C. (Glenmark) | 13:29:19 | 0:00:00 |
| 8/26/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 15:54:00 | 0:03:00 |
| 8/27/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | Perfetto, Mike (Taro) | 17:48:00 | 0:03:00 |
| 8/28/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Incoming | Perfetto, Mike (Taro) | 13:29:00 | 0:01:00 |
| 8/28/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 11:36:00 | 0:15:00 |
| 9/4/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | Taro Pharmaceuticals | 15:08:00 | 0:01:00 |
| 9/4/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | Taro Pharmaceuticals | 15:26:00 | 0:01:00 |
| 9/5/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | Aprahamian, Ara (Taro) | 15:29:00 | 0:03:00 |
| 9/6/2013 | Voice | D.S. (Taro) | Outgoing | CW-4 (Sandoz) | 11:05:00 | 0:01:00 |
| 9/6/2013 | Voice | D.S. (Taro) | Incoming | CW-4 (Sandoz) | 11:07:00 | 0:10:00 |
| 9/17/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Incoming | Taro Pharmaceuticals | 11:24:00 | 0:01:00 |
| 9/17/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | Taro Pharmaceuticals | 12:35:00 | 0:01:00 |

At the same time, Perfetto of Taro was also communicating with T.C., a senior-most executive at Glenmark, through e-mail.

608.    Glenmark's approval came on Friday, September 20, 2013. The following Monday, there was a flurry of additional communications between the three competitors to coordinate Glenmark's entry.

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 9/23/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | CW-3 (Sandoz) | 9:15:00 | 0:02:00 |
| 9/23/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 11:40:00 | 0:01:00 |
| 9/23/2013 | Voice | CW-3 (Sandoz) | Outgoing | Blashinsky, Mitchell (Glenmark) | 11:41:00 | 0:01:00 |
| 9/23/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 13:24:00 | 0:01:00 |
| 9/23/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Incoming | Perfetto, Mike (Taro) | 13:50:00 | 0:04:00 |
| 9/23/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 13:55:00 | 0:01:00 |
| 9/23/2013 | Voice | CW-3 (Sandoz) | Outgoing | CW-1 (Sandoz) | 14:22:00 | 0:03:00 |

REDACTED – PUBLIC VERSION

The day after that, September 24, CW-3 of Sandoz spoke to Aprahamian at Taro again for fifteen (15) minutes.  CW-3 then sent an e-mail to his superiors, including CW-1 and Kellum, alerting them to the situation: "FYI. Glenmark just received approval [on Desoximetasone Ointment]."

609.    On September 26th, there was another torrent of phone calls between Glenmark, Taro and Sandoz:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 9/26/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | Aprahamian, Ara (Taro) | 8:45:00 | 0:04:00 |
| 9/26/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | CW-3 (Sandoz) | 11:35:00 | 0:06:00 |
| 9/26/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 15:22:00 | 0:15:00 |
| 9/26/2013 | Voice | Blashinsky, Mitchell (Glenmark) | Outgoing | Taro Pharmaceuticals | 15:32:00 | 0:02:00 |
| 9/26/2013 | Voice | CW-3 (Sandoz) | Outgoing | Aprahamian, Ara (Taro) | 15:44:00 | 0:01:00 |

During these calls, the competitors reached an understanding about which customers Glenmark would target and what prices it would offer in order to avoid price erosion. That same day, September 26, 2013, CW-5, a senior executive at Glenmark, described Glenmark's launch strategy as a "[t]argeted launch so as not to disrupt the market."

610.    Because Taro still had a majority of the market share, it understood pursuant to the "fair share" understanding that it would be the primary target of Glenmark and would have to relinquish market share to Glenmark as it entered. Internally, Taro executives commented that it "wouldn't make sense to lower pricing even with a 3rd competitor coming into the market."

611.    Taro began to concede customers to Glenmark immediately. By October 17, 2013, CW-5 reported internally that Glenmark had already been able to obtain 30% market share for Desoximetasone.

612.    Because of the discussions between the competitors in advance, and because prices remained high, Taro was not upset about conceding this business to Glenmark. Taro executives continued to stress that "lowering the price at this point could erode the market" and "we can afford to give up a small percent and leave the price as is."

REDACTED – PUBLIC VERSION

613.    In early November 2013, Taro was approached by a customer to bid on Desoximetasone as part of an RFP. In deciding whether to provide a bid, Taro executives noted that the company had already ███████████████████ so that Glenmark could obtain market share. Nonetheless, Taro still decided not to bid, stating ████████████████████ ███████████████████████

c.    *Collusion Between Sandoz And Aurobindo*

614.    As a result of Sandoz's acquisition of Fougera, CW-6 left his job at Fougera in August 2012 and took a position as a sales executive at Aurobindo. CW-6 followed his former friend and colleague, Grauso, who moved to Aurobindo in December 2011 to assume a senior executive role.

615.    As detailed above, CW-6 had a long-standing, collusive relationship with Grauso dating back to when he worked at Fougera and Grauso worked at G&W. Further, the two had continued that relationship even after Grauso left G&W—with Grauso serving as a conduit to communicate messages between his former G&W colleagues, Orlofski and Vogel-Baylor, and CW-6 at Fougera.

616.    Because many of CW-6's key contacts worked at generic competitors that focused primarily on topical products, his move to Aurobindo—a company focused on oral solids—was a difficult transition. Without many of those prior relationships to rely on, CW-6 was concerned that he might not be able to prove his value at Aurobindo. Indeed, CW-3 at Sandoz was one of the few people that CW-6 knew who worked for a company that also manufactured a significant number of oral solids.

617.    For that reason, when Aurobindo sold a product that overlapped with Sandoz, CW-6 used his relationship with CW-3 to collude on that product. Although CW-6 and CW-3 were former colleagues, they were not social friends. When CW-6 called CW-3 during this time period, they were

engaging in anticompetitive conduct. Between August 2012, when CW-6 began at Aurobindo, and May 2013, when CW-6 left the industry, he exchanged at least one hundred and nine (109) phone calls with CW-3.

618.    During this time period, CW-6 was acting at all times at the direction of, or with approval from, his superiors, including Grauso.

619.    The following section will focus on the anticompetitive conduct engaged in by CW-3 and CW-6 with regard to several products on which Sandoz and Aurobindo overlapped during this time period.

*i.        Oxacillin Sodium and Nafcillin Sodium Injectable Vials*

620.    Oxacillin Sodium ("Oxacillin") and Nafcillin Sodium ("Nafcillin") are separately marketed antibiotics used to treat similar conditions.

621.    In 2012, non-defendant Sagent Pharmaceuticals and Sandoz were the primary generic suppliers of Oxacillin and Nafcillin. However, in December 2012, Aurobindo began making plans to enter the Nafcillin and Oxacillin markets as a third entrant.

622.    In advance of Aurobindo's entry into those markets, on December 26, 2012 for Nafcillin and January 22, 2013 for Oxacillin, CW-6 and CW-3 spoke several times to discuss pricing and the allocation of market share to the new entrant, Aurobindo. All the while, CW-6 kept his supervisor, Grauso, informed of his conversations with CW-3.

623.    On December 12, 2012, CW-6 called Grauso and they spoke for five (5) minutes. That set off a flurry of phone calls between CW-6 and CW-3, with nearly constant reporting back by CW-6 to his supervisor, Grauso, as the two competitors orchestrated how to avoid competition upon Aurobindo's entry. These calls are detailed in the chart below:

**REDACTED – PUBLIC VERSION**

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 12/12/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Grauso, Jim (Aurobindo) | 8:21:00 | 0:05:00 |
| 12/12/2012 | Voice | CW-6 (Aurobindo) | Outgoing | CW-3 (Sandoz) | 8:25:00 | 0:01:00 |
| 12/12/2012 | Voice | CW-6 (Aurobindo) | Outgoing | CW-3 (Sandoz) | 8:26:00 | 0:03:00 |
| 12/12/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Grauso, Jim (Aurobindo) | 8:28:00 | 0:02:00 |
| 12/12/2012 | Voice | CW-6 (Aurobindo) | Incoming | Grauso, Jim (Aurobindo) | 11:41:00 | 0:04:00 |
| 12/12/2012 | Voice | CW-6 (Aurobindo) | Incoming | CW-3 (Sandoz) | 11:50:00 | 0:04:00 |
| 12/12/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Grauso, Jim (Aurobindo) | 12:43:00 | 0:05:00 |

624.     Two weeks later, on December 26, 2012, Aurobindo received FDA approval to market Nafcillin and published WAC pricing that essentially matched Sandoz's WAC pricing. On the date that Aurobindo received approval, and in the days surrounding the launch, CW-6 spoke several more times with CW-3 during which they discussed the launch. As he had done before, CW-6 reported back to Grauso what they had discussed. These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 12/21/2012 | Voice | CW-6 (Aurobindo) | Incoming | Grauso, Jim (Aurobindo) | 9:29:00 | 0:03:00 |
| 12/21/2012 | Voice | CW-6 (Aurobindo) | Outgoing | CW-3 (Sandoz) | 9:46:00 | 0:01:00 |
| 12/21/2012 | Voice | CW-6 (Aurobindo) | Incoming | CW-3 (Sandoz) | 12:26:00 | 0:08:00 |
| 12/21/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Grauso, Jim (Aurobindo) | 12:43:00 | 0:01:00 |
| 12/21/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Grauso, Jim (Aurobindo) | 12:49:00 | 0:02:00 |
| 12/27/2012 | Voice | CW-6 (Aurobindo) | Outgoing | CW-3 (Sandoz) | 16:49:00 | 0:02:00 |
| 12/28/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Aurobindo Pharma | 3:19:00 | 0:13:00 |
| 12/28/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Grauso, Jim (Aurobindo) | 4:39:00 | 0:11:00 |
| 12/28/2012 | Voice | CW-6 (Aurobindo) | Incoming | Grauso, Jim (Aurobindo) | 5:24:00 | 0:01:00 |
| 12/28/2012 | Voice | CW-6 (Aurobindo) | Outgoing | CW-3 (Sandoz) | 5:51:00 | 0:01:00 |
| 12/28/2012 | Voice | CW-6 (Aurobindo) | Outgoing | CW-3 (Sandoz) | 7:32:00 | 0:01:00 |
| 12/28/2012 | Voice | CW-6 (Aurobindo) | Incoming | CW-3 (Sandoz) | 8:01:00 | 0:04:00 |

625.     The calls between the competitors continued into January 2013. On January 3, 2013, CW-6 spoke with Grauso three times for a total of twenty-five (25) minutes. Twenty minutes later, CW-3 called CW-6. The call lasted two (2) minutes. The next morning, CW-6 spoke with Grauso for four (4) minutes. That same morning, CW-6 called CW-3 of Sandoz twice, with one call lasting three (3) minutes.

626.     Two days later, on January 6, 2013, Sandoz put together a Monthly Business review regarding its key products, including Nafcillin and Oxacillin. Regarding Oxacillin, Sandoz noted that

REDACTED – PUBLIC VERSION

Aurobindo was ███████ to be entering the market. Sandoz stated that its ███████

███████ were to ███████████

███████ and ███████████

███████████

627.     Over the next several days, between January 7, 2013 and January 11, 2013, CW-6 and CW-3 spoke several more times by phone. After those calls, CW-6 promptly called Grauso to keep him apprised of his discussions. These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 1/7/2013 | Voice | CW-6 (Aurobindo) | Outgoing | CW-3 (Sandoz) | 4:44:00 | 0:02:00 |
| 1/7/2013 | Voice | CW-6 (Aurobindo) | Incoming | CW-3 (Sandoz) | 4:47:00 | 0:06:00 |
| 1/7/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Grauso, Jim (Aurobindo) | 4:53:00 | 0:01:00 |
| 1/7/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Grauso, Jim (Aurobindo) | 4:53:00 | 0:01:00 |
| 1/7/2013 | Voice | CW-6 (Aurobindo) | Incoming | CW-3 (Sandoz) | 5:00:00 | 0:02:00 |
| 1/7/2013 | Voice | CW-6 (Aurobindo) | Incoming | Grauso, Jim (Aurobindo) | 5:11:00 | 0:14:00 |
| 1/9/2013 | Voice | CW-6 (Aurobindo) | Incoming | CW-3 (Sandoz) | 6:39:00 | 0:07:00 |
| 1/9/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Grauso, Jim (Aurobindo) | 7:26:00 | 0:01:00 |
| 1/9/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Grauso, Jim (Aurobindo) | 8:37:00 | 0:06:00 |
| 1/11/2013 | Voice | CW-6 (Aurobindo) | Outgoing | CW-3 (Sandoz) | 3:59:00 | 0:01:00 |
| 1/11/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Grauso, Jim (Aurobindo) | 4:27:00 | 0:11:00 |
| 1/11/2013 | Voice | CW-6 (Aurobindo) | Incoming | CW-3 (Sandoz) | 5:34:00 | 0:02:00 |
| 1/11/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Grauso, Jim (Aurobindo) | 5:36:00 | 0:01:00 |
| 1/11/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Grauso, Jim (Aurobindo) | 8:32:00 | 0:08:00 |

628.     Two weeks later, on January 22, 2013, Aurobindo entered the Oxacillin market and again published WAC pricing that essentially matched Sandoz's WAC pricing. That same day, CW-6 spoke with Grauso for ten (10) minutes. Ten minutes after hanging up, CW-6 called CW-3 of Sandoz.  The call lasted one (1) minute. Over the next two days, CW-6 and CW-3 shared five (5) more phone call.

629.     In an e-mail dated January 30, 2013, Sandoz noted that it had ███████ its Oxacillin contract at Walgreens to the entrant, Aurobindo. That same day, CW-3 and CW-6 spoke by phone for four (4) minutes.

ii.     *Cefpodoxime Proxetil Oral Suspension and Tablets*

630.     Cefpodoxime Proxetil ("Cefpodoxime") is sold in both oral suspension and tablet form.

631.     On January 3, 2013, CW-3 of Sandoz called CW-6 of Aurobindo. The call lasted two (2) minutes. The next day, on January 4, 2013, CW-6 called CW-3 twice, with one call lasting three (3) minutes. A few minutes after hanging up, CW-3 called Kellum and they spoke for nine (9) minutes. After that call, Kellum sent the following e-mail to R.T., a senior sales and marketing executive at Sandoz:



R.T. responded, [REDACTED] to which Kellum replied, [REDACTED]

632.     The following business day, on January 7, 2013, CW-6 of Aurobindo and CW-3 of Sandoz exchanged three calls, including one lasting six (6) minutes. On these calls, CW-6 confirmed that Aurobindo planned to launch both formulations of Cefpodoxime that week. CW-3 told CW-6 that Sandoz planned to increase pricing on both formulations by 20%. CW-6 advised that Aurobindo was looking for 40% share and would start by targeting Cardinal and CVS. In turn, CW-3 gave his competitor specific non-public contract price points that Sandoz was charging to those customers.  CW-6 then stated: [REDACTED] CW-3's contemporaneous notes from this call are below:

REDACTED – PUBLIC VERSION



633.    Shortly after speaking with each other, CW-6 called Grauso and CW-3 called Kellum to report back what they had discussed. This call pattern is detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 1/7/2013 | Voice | CW-6 (Aurobindo) | Outgoing | CW-3 (Sandoz) | 4:44:00 | 0:02:00 |
| 1/7/2013 | Voice | CW-6 (Aurobindo) | Incoming | CW-3 (Sandoz) | 4:47:00 | 0:06:00 |
| 1/7/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Grauso, Jim (Aurobindo) | 4:53:00 | 0:01:00 |
| 1/7/2013 | Voice | CW-3 (Sandoz) | Outgoing | Kellum, Armando (Sandoz) | 4:53:00 | 0:07:00 |
| 1/7/2013 | Voice | CW-6 (Aurobindo) | Incoming | CW-3 (Sandoz) | 5:00:00 | 0:02:00 |
| 1/7/2013 | Voice | CW-6 (Aurobindo) | Incoming | Grauso, Jim (Aurobindo) | 5:11:00 | 0:14:00 |

REDACTED – PUBLIC VERSION

634.    On January 9, 2013 and January 11, 2013, the day that Sandoz increased WAC pricing on Cefpodoxime, CW-3 and CW-6 exchanged three more calls. After speaking with each other, CW-3 called Kellum and CW-6 called Grauso to report back what they had discussed. This call pattern is detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 1/9/2013 | Voice | CW-6 (Aurobindo) | Incoming | CW-3 (Sandoz) | 6:39:00 | 0:07:00 |
| 1/9/2013 | Voice | CW-3 (Sandoz) | Outgoing | Kellum, Armando (Sandoz) | 6:47:00 | 0:01:00 |
| 1/9/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Grauso, Jim (Aurobindo) | 7:26:00 | 0:01:00 |
| 1/11/2013 | Voice | CW-6 (Aurobindo) | Outgoing | CW-3 (Sandoz) | 3:59:00 | 0:01:00 |
| 1/11/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Grauso, Jim (Aurobindo) | 4:27:00 | 0:11:00 |
| 1/11/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Grauso, Jim (Aurobindo) | 4:38:00 | 0:01:00 |
| 1/11/2013 | Voice | CW-6 (Aurobindo) | Incoming | CW-3 (Sandoz) | 5:34:00 | 0:02:00 |
| 1/11/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Grauso, Jim (Aurobindo) | 5:36:00 | 0:01:00 |

635.    Due to an issue at its manufacturing facility, Aurobindo's launch of Cefpodoxime was delayed and the company was unable to launch in January 2013 as planned.

636.    Between February 24 and February 27, 2013, ECRM held its annual Retail Pharmacy Generic Pharmaceuticals Conference in Dallas, Texas. Representatives from Aurobindo and Sandoz were in attendance, including CW-6 and Grauso of Aurobindo and Kellum, CW-3, and CW-2 of Sandoz.

637.    On February 26, 2013, CW-2, a Sandoz senior sales executive, while still at the ECRM conference, sent the following e-mail to his Sandoz colleagues:



638.    On April 17, 2013, CW-6 of Aurobindo called CW-3 of Sandoz. The call lasted two (2) minutes. Less than an hour later, CW-3 called CW-6 back and they spoke for six (6) minutes. The next day, on April 18, 2013, CW-6 called CW-3 and they spoke for ten (10) minutes. That same day, Aurobindo launched both formulations of Cefpodoxime and matched Sandoz's increased WAC pricing.

639.    On April 30, 2013, CW-3 and CW-6 exchanged three phone calls, including one call lasting three (3) minutes. On these calls, the competitors again discussed Aurobindo's launch of Cefpodoxime Tablets, including that Aurobindo was looking for 40-50% market share.

640.    The competitors also discussed specific customers that Aurobindo was targeting. CW 3's contemporaneous notes from these calls are pictured below:



641.    In accordance with the plan, on May 22, 2013, Aurobindo made an offer to CVS for Cefpodoxime Tablets and the customer accepted that offer the very next day on May 23, 2013.

642.    Similarly, on August 29, 2013, Aurobindo made an offer to ABC for Cefpodoxime Tablets. The next day, on August 30, 2013, ABC e-mailed Sandoz to advise that it had received a competitive offer and asked whether Sandoz wanted to bid to retain the business. On September 4,

2013, S.G., a Sandoz sales executive, responded to ABC and declined the opportunity stating, █████

████████████████████████████ Later that same day, ABC awarded the business to

Aurobindo.

643.    Aurobindo would also win awards for Cefpodoxime Tablets at McKesson and

several other smaller customers, without substantially eroding the high pricing in the market.

644.    On September 9, 2013, P.S., an Aurobindo sales and marketing executive, pushed

Grauso to submit a bid for Wal-Mart's Cefpodoxime business. Grauso balked at the request stating,

 P.S. responded, ████████████████

████████████████████████████████████████████████████

█████ Given the market share breakdown, Grauso gave his approval to submit a bid to Wal-Mart.

Thereafter, on September 30, 2013, the customer accepted the bid and awarded Aurobindo its

business.

645.    Later, in December 2013, when Sandoz was looking to identify additional products

to supply to Wal-Mart, Kellum noted with respect to Cefpodoxime: "████████████████

█████████████████████████████████████████████████████"

d.    *Collusion Between Sandoz and non-defendant Rising*

646.    CW-3 and CW-2 worked together as senior sales executives at Sandoz until August

2013 when CW-2 left Sandoz to become a senior sales and marketing executive at Rising. While at

Sandoz, the two were close friends. CW-2 was responsible for Walmart and helped transition the

account to CW-3 when he moved to Rising.

647.    Beginning in 2013, and beyond, these former colleagues turned competitors used

their relationship to collude with regard to products on which Rising and Sandoz overlapped.

REDACTED – PUBLIC VERSION

### 6. G&W And Its Other Relationships

648.     Earlier sections of this Complaint discuss in detail G&W's collusion with several competitors between 2010 and July 2012, when Sandoz acquired Fougera—including collusion with Fougera, Perrigo, and Glenmark. Another section focuses on collusion between Taro and G&W in late 2015 and early 2016 on several products that G&W purchased from Teva.

649.     However, G&W's illegal behavior goes well-beyond those examples. During the time period relevant to this Complaint, the vast majority of G&W's business was implicated by its anticompetitive conduct.  Much of this collusion was spearheaded by Orlofski and Vogel-Baylor. Both were prolific communicators that used their many relationships with competitors to collude on overlap products.

650.     Between January 2011 and December 2016, when he left G&W, Orlofski exchanged at least one thousand eight hundred and sixty-three (1,863) phone calls and text messages with his contacts at Lupin, Aurobindo, Amneal, Wockhardt, Taro, Glenmark, Perrigo, Fougera, Actavis, and Sandoz. These communications are detailed in the chart below:

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| Berthold, David (Lupin) | 589 | 4/4/2011 | 10/13/2016 |
| Grauso, Jim (Aurobindo) | 406 | 12/28/2011 | 1/20/2014 |
| S.R.(1) (Amneal) | 265 | 8/29/2011 | 4/8/2016 |
| M.C. (Wockhardt) | 238 | 4/19/2011 | 12/27/2016 |
| Perfetto, Mike (Taro) | 136 | 1/25/2013 | 9/1/2016 |
| Grauso, Jim (Glenmark) | 66 | 2/12/2014 | 10/27/2016 |
| S.K. (Perrigo) | 56 | 1/20/2011 | 4/24/2012 |
| Aprahamian, Ara (Taro) | 45 | 7/24/2013 | 6/10/2016 |
| Boothe, Douglas (Perrigo) | 19 | 1/25/2013 | 1/8/2015 |
| K.K. (Wockhardt) | 11 | 8/29/2011 | 8/30/2011 |
| Taro Pharmaceuticals | 11 | 3/22/2012 | 8/5/2014 |
| Kaczmarek, Walt (Fougera) | 4 | 2/8/2012 | 2/10/2012 |
| Boyer, Andy (Actavis) | 4 | 9/7/2012 | 7/22/2013 |
| D.P. (Sandoz) | 3 | 8/13/2013 | 8/13/2013 |
| Wesolowski, John (Perrigo) | 3 | 9/16/2014 | 9/16/2014 |
| CW-6 (Aurobindo) | 3 | 10/31/2012 | 5/25/2013 |
| CW-6 (Fougera) | 2 | 2/1/2012 | 2/1/2012 |
| B.S. (Taro) | 1 | 4/24/2012 | 11/15/2012 |
| C.V. (Perrigo) | 1 | 6/1/2016 | 6/1/2016 |

651.     Similarly, between July 2011 and February 2017, Vogel-Baylor exchanged at least nine thousand two hundred and seventy-four (9,274) phone calls and text messages with her contacts at Aurobindo, Glenmark, non-defendant Greenstone, Wockhardt, Actavis, Lupin, Amneal, Perrigo, Fougera, Valeant, Taro, and Mylan. These communications are detailed in the chart below:

REDACTED – PUBLIC VERSION

| Contact Name | Count | Min Date | Max Date |
|---|---|---|---|
| Grauso, Jim (Aurobindo) | 2120 | 12/29/2011 | 1/30/2014 |
| CW-5 (Glenmark) | 2061 | 3/30/2012 | 2/21/2014 |
| Hatosy, Robin (Greenstone) | 1294 | 3/28/2012 | 4/22/2016 |
| M.M. (Wockhardt) | 1158 | 7/31/2011 | 10/22/2013 |
| K.K. (Wockhardt) | 868 | 7/29/2011 | 1/31/2014 |
| Grauso, Jim (Glenmark) | 692 | 2/4/2014 | 7/18/2016 |
| Rogerson, Rick (Actavis) | 438 | 8/8/2012 | 2/8/2017 |
| Berthold, David (Lupin) | 159 | 8/28/2011 | 4/16/2012 |
| CW-6 (Aurobindo) | 121 | 8/26/2012 | 5/3/2013 |
| J.P. (Amneal) | 113 | 3/26/2014 | 12/6/2016 |
| T.P. (Perrigo) | 94 | 7/8/2013 | 4/29/2016 |
| Brown, Jim (Glenmark) | 56 | 5/7/2013 | 10/2/2015 |
| S.R.(1) (Amneal) | 24 | 5/15/2012 | 5/16/2013 |
| S.K. (Wockhardt) | 16 | 9/14/2011 | 9/24/2012 |
| M.C. (Wockhardt) | 13 | 8/28/2011 | 6/13/2012 |
| CW-6 (Fougera) | 12 | 5/18/2012 | 8/7/2012 |
| B.P. (Valeant) | 9 | 11/20/2013 | 11/25/2015 |
| Aprahamian, Ara (Taro) | 6 | 3/27/2014 | 9/24/2015 |
| Aurobindo Pharma | 6 | 1/17/2012 | 6/15/2012 |
| J.K. (Aurobindo) | 6 | 6/4/2013 | 7/17/2013 |
| Glenmark Pharmaceuticals | 2 | 3/14/2014 | 9/9/2015 |
| D.I. (Glenmark) | 2 | 3/3/2014 | 3/7/2014 |
| Perfetto, Mike (Taro) | 2 | 3/21/2014 | 3/21/2014 |
| C.U. (Taro) | 1 | 1/6/2016 | 1/6/2016 |
| M.A. (Mylan) | 1 | 5/20/2014 | 5/20/2014 |

652.    At all relevant times herein, Vogel-Baylor was acting at the direction of her supervisor, Orlofski.  Orlofski was very much aware of her collusion with competitors and encouraged her to do it. The Complaint is replete with examples of Vogel-Baylor communicating with a competitor and then immediately calling Orlofski to report back what she had learned. Indeed, Vogel-Baylor was evaluated, at least in part, based on the strength of her competitive relationships.

653.    Vogel-Baylor also directed her subordinates to collude with competitors. For example, in February 2014, G&W hired K.K., previously a sales executive at Wockhardt. Immediately upon his arrival, K.K. began colluding in earnest with his contact at Sandoz, CW-3. Up

to that point, no G&W employee had a relationship with anyone at Sandoz. Although there had been a relationship with CW-6 of Fougera prior to the Sandoz acquisition, his departure from the company left a gap. K.K.'s relationship with CW-3 filled this void.

654.    Although it was a smaller company, G&W celebrated the fact that it was selling topical products, where it was able to form anticompetitive agreements with most of its primary competitors. For example, in May 2013, Vogel-Baylor was asked to put together a report for management regarding G&W's sales goals for the coming year. After listing out a number of G&W's price increases from 2012—all of which were the subject of collusion and many of which are discussed at various points throughout this Complaint—Vogel-Baylor concluded: "███████████████████

███████████████████████████████████████████████████████

████████████"

655.    The following Sections focus on G&W's relationships with Perrigo, Actavis, Glenmark, and Lupin, and discuss specific examples of how those anticompetitive relationships manifested themselves with respect to particular products.

a.    *Collusion Between G&W And Perrigo*

656.    As detailed above, after Sandoz's acquisition of Fougera in July 2012, CW-6 left Fougera and took a sales position at Aurobindo. Although Vogel-Baylor could no longer use CW-6 to collude with regard to products on which G&W and Fougera overlapped, she knew that CW-6 had a contact at another one of G&W's key competitors, T.P. at Perrigo. Over the next year, Vogel-Baylor and T.P. would use CW-6 as a conduit to pass information between them and reach anticompetitive agreements with regard to a number of products on which G&W and Perrigo overlapped.

657.    This collusive relationship was critical because G&W overlapped with Perrigo on more products than any other competitor during this time period.

658.    In May 2013, CW-6 suffered an illness and left the industry. With CW-6 no longer available to serve as middleman, Vogel-Baylor had no choice but to collude directly with T.P. of Perrigo. In July 2013, she placed her first calls ever to T.P. according to the available phone records. Over the ensuing years, Vogel-Baylor and T.P. colluded on several products that are discussed in detail below.

i.    *Hydrocortisone Acetate Suppositories*

659.    Hydrocortisone Acetate Suppositories ("Hydrocortisone Acetate") is also known by the G&W brand name Anucort-HC.

660.    During the time period relevant to this Complaint, Hydrocortisone Acetate was G&W's top-selling product. As of January 2016, the 25mg formulation of Hydrocortisone Acetate accounted for nearly half of all of G&W's annual sales, totaling more than $119.7 million. Similarly, Hydrocortisone Acetate was Perrigo's second-best selling product. During that same time period, Perrigo's moving annual sales for the 25mg and 30mg formulations accounted for approximately $78.3 million of Perrigo's total sales.

661.    In 2013, the Hydrocortisone Acetate market was split between G&W with 41% market share, Perrigo with 32%, and non-defendant County Line Pharmaceuticals ("County Line") with 25%. However, by late June 2013, County Line made the decision to exit the market for Hydrocortisone Acetate. County Line's exit created an opportunity for Perrigo and G&W to collude to significantly raise the price of Hydrocortisone Acetate in July 2013, and then again one year later in July 2014.

662.    On June 25, 2013, Vogel-Baylor of G&W e-mailed Wal-Mart, a County Line customer, stating that she had heard that County Line was discontinuing Hydrocortisone Acetate and asked whether Wal-Mart was interested in a new supplier.

663.     Similarly, on June 26, 2013, ABC, also a County Line customer, e-mailed G&W requesting a bid on Hydrocortisone Acetate due to a ████████████ Vogel-Baylor forwarded the request to her supervisor, Orlofski, explaining: ████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████

664.     Between June 27 and June 30, 2013, representatives from Perrigo and G&W, including Vogel-Baylor, attended the annual trade show, McKesson ideaShare, at the Venetian hotel in Las Vegas, Nevada.

665.     While at the trade show, on June 27, 2013, Vogel-Baylor received a call from S.S., a sales executive at Perrigo. The call lasted approximately one (1) minute. A few hours later, Vogel-Baylor called Orlofski and they spoke for nearly fifteen (15) minutes. Shortly thereafter, Vogel-Baylor sent an internal e-mail to her team notifying them that G&W would be implementing a price increase for Hydrocortisone Acetate and requesting that they draft customer notifications to that effect. The price increase included a 200% increase to WAC and would result in an estimated $27.9 million in increased sales for G&W.

666.     J.G., an operations manager at G&W, responded to Vogel-Baylor's e-mail stating, ██ ████████████████████████████ To which Vogel-Bayler responded: ██████████

667.     The next day, on June 28, 2013, Vogel-Baylor contacted Orlofski three more times from the trade show, including exchanging two (2) text messages and one call lasting more than nineteen (19) minutes.

REDACTED – PUBLIC VERSION

668.　　On July 8, 2013, T.P. of Perrigo and Vogel-Baylor exchanged two (2) calls and then connected for a call lasting more than seven (7) minutes, during which they coordinated their price increases on Hydrocortisone Acetate. After that call, both T.P. of Perrigo and Vogel-Baylor reported the substance of their conversations back to their supervisors. Immediately upon hanging up with T.P., Vogel-Baylor called Orlofski and they spoke for more than six (6) minutes. Similarly, T.P. called Wesolowski three (3) times after speaking with Vogel-Baylor, including two calls lasting one (1) minute and a third lasting six (6) minutes. The G&W price increases on Hydrocortisone Acetate went into effect on July 9. That same day, Perrigo issued a product announcement notifying its customers that it was also increasing its pricing on Hydrocortisone Acetate effective July 11, 2013. Perrigo increased its WAC by 473% on the 25mg formulation to essentially match G&W's WAC. That same day, July 11, 2013, T.P. of Perrigo called Vogel-Baylor.  The call lasted one (1) minute.

669.　　Also on July 11, 2013, ABC e-mailed Vogel-Baylor asking G&W to lower its dead net pricing for Hydrocortisone Acetate to match Perrigo's slightly lower dead net pricing. Vogel-Baylor forwarded the request to Orlofski who responded: ███████████ Vogel-Baylor replied, █ ███████████ Later that day, Vogel-Baylor responded to ABC and declined to lower its pricing.

670.　　On July 19, 2013, Harvard Drug Group e-mailed Vogel-Baylor asking why G&W was increasing its price on Hydrocortisone Acetate. Vogel-Baylor replied ███████████ ██████████████████████████████████████ ██████████████████████████████████████ ████████████████████

671.　　Several months later, on April 9, 2014, K.K., a G&W sales executive, e-mailed Vogel-Baylor regarding bidding on several products at Kaiser, including Hydrocortisone Acetate. Vogel-Baylor responded that G&W could not disrupt the market and pursue the customer,

reasoning that Kaiser █████████████████████████████████████████
██████████████████

672.    On June 11, 2014, Vogel-Baylor e-mailed Orlofski recommending that G&W increase McKesson's contract pricing for Hydrocortisone Acetate. That same day, Vogel-Baylor called T.P. of Perrigo. The call lasted less than one (1) minute. Two days later, on June 13, 2014, Vogel-Baylor tried to reach T.P. again by phone. The call lasted less than one (1) minute.

673.    Less than a week later, on June 26, 2014, Perrigo generated its own internal price increase analysis for Hydrocortisone Acetate. The analysis assumed zero percent unit loss as a result of the planned increase.

674.    On July 22, 2014, Perrigo notified its customers that it was increasing pricing on a list of products, including Hydrocortisone Acetate. This included a 235% increase to WAC for its 25mg formulation, effective on July 24, 2014.

675.    At the time the increase was announced, representatives from Perrigo and G&W, including Vogel-Baylor, attended the annual trade show, McKesson ideaShare, at the Gaylord Palms Hotel in Orlando, FL. Over the next several days, G&W heard from multiple customers that Perrigo had increased pricing on Hydrocortisone Acetate.

676.    In accordance with their ongoing understanding to follow each other's price increases, and consistent with past practice on this product and others, G&W went to work implementing a comparable price increase of its own.

677.    On July 29 and July 30, 2014, Vogel-Baylor and Orlofski exchanged e-mails finalizing the details of the price increase for Hydrocortisone Acetate. The increase included an increase to WAC for the 25mg, 12-count bottle that essentially matched Perrigo pricing.

678.     Also on July 30, 2014, Vogel-Baylor learned of pricing that Perrigo had offered to Schnucks and sent a text message to her superiors: ███████████████████████████ ██████████████████████████████████████████████

679.     The next day, on July 31, 2014, A.G., a senior G&W executive, e-mailed Vogel-Baylor stating: ████████████████████████████████████████████████████ ██████████████████████████████████████████████████

████████████████ Vogel-Baylor responded, ██████████████████████████████████ ████████████████████████████████████████████████

██████████

680.     The next day, on August 1, 2014, G&W began notifying its customers of the price increase on Hydrocortisone Acetate. Vogel-Baylor sent an internal e-mail advising the team that,

█████████████████████████████████████████████████████████

███████████████████████████████████████████ G&W sent out a second wave of letters to additional customers on August 5, 2014.

681.     The increase included a 200% increase to WAC for all three package sizes. According to an internal analysis, G&W projected an increase in Hydrocortisone Acetate sales from $41.3 million to $111.3 million as a result of the increase, or a total of $70 million in sales.

682.     The two competitors continued to coordinate after the price increases. On August 11, 2014, T.P. of Perrigo called Vogel-Baylor and they spoke for more than sixteen (16) minutes. One week later, on August 18, 2014, Vogel-Baylor called T.P. and they spoke for more than ten (10) minutes. Several customers did not react kindly to the increase. For example, when Vogel-Baylor e-mailed Econdisc to notify the customer of the price increase, Econdisc responded by stating that G&W's conduct was ████████████████████ Similarly, after learning of the increase, Schnucks sent the following e-mail to Vogel-Baylor:



   b.    *Collusion Between G&W And Actavis*

   683.    Vogel-Baylor met Rick Rogerson, a senior pricing executive at Actavis, while attending the NACDS Pharmacy and Technology Conference in Denver, Colorado, from August 25 to August 28, 2012.

   684.    After returning from the NACDS conference, Rogerson sent Vogel-Baylor an e-mail on August 30, 2012, stating:

REDACTED – PUBLIC VERSION

685.     Later that same day, on August 30, 2012, Vogel-Baylor called Rogerson and they spoke for seventeen (17) minutes. Over the ensuing months, the two competitors stayed in regular contact and colluded to raise prices on Promethazine HCL Suppositories twice—once in late 2012 and again in 2013. The collusion on this product is discussed in detail below.

i.     *Promethazine HCL Suppositories*

686.     The market for Promethazine HCL is mature. At all relevant times there were multiple manufacturers of Promethazine HCL.

687.     During the relevant timeframe, the primary manufacturers of Promethazine HCL were Actavis, G&W, Mylan, Perrigo, and Taro.

688.     For years, the prices for Promethazine HCL Suppositories were relatively low and stable. Beginning in August 2012, however, Actavis, G&W, and Perrigo coordinated large price increases—one in October 2012, and another in April 2013.

689.     In September 2014, Mylan joined the market and rather than offer lower prices to gain market share, it imposed prices even higher than Actavis, G&W, and Perrigo.

690.     In the summer of 2015, Taro entered the market, and it too offered inflated prices.

691.     Starting in late August 2012—around the same time that Vogel-Baylor first met Rogerson at Actavis—G&W began planning a price increase for Promethazine HCL. Prior to implementing that increase, and as it had done on other products, G&W reached out to its competitors to coordinate plans.

692.     On September 18, 2012, Vogel-Baylor sent an internal e-mail to M.S., a sales analyst at G&W, asking her to prepare a spreadsheet containing Promethazine sales data for the price increase. That same day, Vogel-Baylor also responded to a request from her boss, Orlofski, asking who the incumbent manufacturers were for the major wholesalers. Vogel-Baylor stated that G&W was the incumbent at ABC and Cardinal and Actavis supplied McKesson. The next day, on

**REDACTED – PUBLIC VERSION**

September 19, 2012, Orlofski replied: ███████████████████████

████████

693.     Meanwhile, Vogel-Baylor was actively communicating with Rogerson of Actavis regarding the increases. On September 18, 2012 alone, Vogel-Baylor exchanged thirty-four (34) text messages with Rogerson.

694.     Similarly, on September 19, 2012, Vogel-Baylor used her contact at Aurobindo, CW-6, as a conduit to communicate with T.P. of Perrigo, the other competitor on Promethazine HCL. This call pattern is detailed in the chart below. Notably, these are the same calls that Vogel-Baylor used to convey information regarding the price increase on Halobetasol, another product on which Perrigo and G&W overlapped, which was happening at the same time.

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 9/19/2012 | Text | Vogel-Baylor, Erika (G&W) | Outgoing | CW-6 (Aurobindo) | 10:16:11 | 0:00:00 |
| 9/19/2012 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 10:17:50 | 0:00:00 |
| 9/19/2012 | Text | Vogel-Baylor, Erika (G&W) | Outgoing | CW-6 (Aurobindo) | 10:18:49 | 0:00:00 |
| 9/19/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 13:44:00 | 0:01:00 |
| 9/19/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 13:45:00 | 0:04:00 |
| 9/19/2012 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 13:48:00 | 0:04:00 |
| 9/19/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 13:52:00 | 0:03:00 |
| 9/19/2012 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 13:54:00 | 0:04:00 |
| 9/19/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 13:57:00 | 0:02:00 |
| 9/19/2012 | Voice | CW-6 (Aurobindo) | Incoming | T.P. (Perrigo) | 14:03:00 | 0:02:00 |
| 9/19/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 14:04:00 | 0:02:00 |

695.     After speaking with CW-6 for the final time on September 19, 2012, Vogel-Baylor immediately called her boss, Orlofski, and spoke to him for thirteen (13) minutes.

696.     While Vogel-Baylor was communicating with T.P. of Perrigo through her contact CW-6, T.P. was also communicating directly with M.D., a sales executive at Actavis, and reporting that information back to his superior, Wesolowski. This call pattern, including the calls between T.P. and CW-6, are detailed in the chart below:

**REDACTED – PUBLIC VERSION**

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 9/19/2012 | Voice | T.P. (Perrigo) | Outgoing | M.D. (Actavis) | 13:38:00 | 0:11:00 |
| 9/19/2012 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Aurobindo) | 13:48:00 | 0:04:00 |
| 9/19/2012 | Voice | T.P. (Perrigo) | Incoming | CW-6 (Aurobindo) | 13:54:00 | 0:04:00 |
| 9/19/2012 | Voice | T.P. (Perrigo) | Outgoing | Wesolowski, John (Perrigo) | 13:58:00 | 0:02:00 |
| 9/19/2012 | Voice | T.P. (Perrigo) | Outgoing | Wesolowski, John (Perrigo) | 13:59:00 | 0:04:00 |
| 9/19/2012 | Voice | T.P. (Perrigo) | Outgoing | CW-6 (Aurobindo) | 13:02:00 | 0:02:00 |

697.     Over the next week, G&W worked to finalize its price increase for Promethazine HCL. On September 21, 2012, Vogel-Baylor forwarded her initial price increase analysis to Orlofski and scheduled a one-on-one meeting to discuss it on September 24, 2012. Two days later, on September 26, 2012, Vogel-Baylor e-mailed a revised price increase analysis to Orlofski and, after obtaining his approval, e-mailed that analysis to the team on September 28, 2012. In her e-mail, Vogel-Baylor informed the team that they were to send out their price increase notices to customers on October 5, 2013.

698.     Throughout this time period, Vogel-Baylor stayed in constant communication with Rogerson at Actavis. Between September 25, 2012 and October 5, 2012—the day the price increase notices were sent—Vogel-Baylor exchanged thirty-eight (38) text messages with Rogerson. Vogel-Baylor also continued to keep T.P. of Perrigo informed of G&W's plans through her conduit CW-6. This call pattern is detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 9/21/2012 | Voice | CW-6 (Aurobindo) | Incoming | Vogel-Baylor, Erika (G&W) | 6:30:00 | 0:03:00 |
| 9/21/2012 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 6:53:00 | 0:03:00 |
| 9/21/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 6:56:00 | 0:03:00 |
| 9/21/2012 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 6:58:00 | 0:01:00 |
| 9/21/2012 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 7:04:00 | 0:02:00 |
| 9/21/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 7:06:00 | 0:02:00 |
| 9/21/2012 | Voice | CW-6 (Aurobindo) | Incoming | Vogel-Baylor, Erika (G&W) | 11:53:00 | 0:15:00 |
| 9/27/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 4:02:00 | 0:04:00 |
| 9/27/2012 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 4:06:00 | 0:01:00 |
| 9/27/2012 | Voice | CW-6 (Aurobindo) | Incoming | T.P. (Perrigo) | 4:11:00 | 0:03:00 |
| 9/27/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 4:16:00 | 0:03:00 |
| 10/5/2012 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | CW-6 (Aurobindo) | 5:30:01 | 0:01:41 |
| 10/5/2012 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 5:38:00 | 0:02:00 |
| 10/5/2012 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 5:39:00 | 0:06:00 |

REDACTED – PUBLIC VERSION

699.    On October 8, 2012, G&W published increased WAC pricing for Promethazine

HCL, which included an 18% increase on the 25mg dosage and a 35% increase on the 12.5mg

dosage.

700.    Perrigo followed suit on December 4, 2012, when it notified customers that it would

be increasing contract pricing on Promethazine HCL effective January 5, 2013.  On February 12,

2013 and April 3, 2013, Actavis also followed and increased its WAC pricing to match G&W on the

12.5mg and 25mg dosages, respectively. On February 12, 2013, Rogerson called Vogel-Baylor and

they spoke for nearly twenty-two (22) minutes. Knowing now that all three competitors were on

board to increase prices, they began contemplating a second increase on Promethazine HCL—and

this time, it would be much larger.

701.    On March 25, 2013, M.S., a sales analyst at G&W, forwarded Vogel-Baylor updated

sales data for Promethazine HCL. That same day, Orlofski of G&W sent a text message to Boothe,

an executive at Perrigo. The next day, on March 26, 2013, Boothe called Orlofski back and they

spoke for six (6) minutes. Similarly, Vogel-Baylor continued to communicate with T.P. of Perrigo

through her conduit, CW-6, about Promethazine HCL. These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 3/26/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | CW-6 (Aurobindo) | 12:59:51 | 0:00:15 |
| 3/26/2013 | Voice | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 13:21:57 | 0:06:46 |
| 3/26/2013 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 13:28:00 | 0:01:00 |
| 3/26/2013 | Voice | CW-6 (Aurobindo) | Incoming | T.P. (Perrigo) | 17:33:00 | 0:02:00 |
| 3/26/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 17:36:00 | 0:01:00 |
| 3/27/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | CW-6 (Aurobindo) | 20:04:10 | 0:00:00 |
| 3/27/2013 | Voice | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 20:05:10 | 0:01:37 |
| 3/28/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | CW-6 (Aurobindo) | 18:19:55 | 0:00:03 |
| 3/28/2013 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 18:41:00 | 0:05:00 |
| 3/28/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 18:46:00 | 0:01:00 |

702.    On March 28, 2013, the same day as the last calls listed above, Vogel-Baylor finalized

a price increase analysis for Promethazine HCL and, on April 1, 2013, she forwarded that

information to Orlofski. Vogel-Baylor and Orlofski discussed some revisions to the analysis and, on

REDACTED – PUBLIC VERSION

April 10, 2013, Vogel-Baylor sent the revised analysis to Orlofski. G&W planned to implement the price increase on April 15, 2013, but ultimately sent the notices on April 16, 2013.

703.    Meanwhile, all three competitors continued to coordinate their plans on Promethazine HCL. Vogel-Baylor of G&W was speaking with Rogerson at Actavis, while T.P. at Perrigo was speaking to M.D. at Actavis. These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 4/1/2013 | Voice | Vogel-Baylor, Erika (G&W) | Incoming | Rogerson, Rick (Actavis) | 15:11:49 | 0:00:26 |
| 4/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Outgoing | Rogerson, Rick (Actavis) | 13:51:41 | 0:00:00 |
| 4/4/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | Rogerson, Rick (Actavis) | 13:55:41 | 0:01:30 |
| 4/4/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | Rogerson, Rick (Actavis) | 17:33:07 | 0:00:00 |
| 4/4/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | Rogerson, Rick (Actavis) | 19:32:16 | 0:00:00 |
| 4/11/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | Rogerson, Rick (Actavis) | 13:51:47 | 0:08:15 |
| 4/11/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | Rogerson, Rick (Actavis) | 13:51:47 | 0:08:15 |
| 4/11/2013 | Voice | T.P. (Perrigo) | Outgoing | M.D. (Actavis) | 7:35:00 | 0:01:00 |
| 4/12/2013 | Voice | T.P. (Perrigo) | Outgoing | M.D. (Actavis) | 13:12:00 | 0:25:00 |

704.    At the same time, Vogel-Baylor continued to use CW-6 as a conduit to communicate with T.P. of Perrigo regarding Promethazine HCL. This call pattern is detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 4/4/2013 | Voice | CW-6 (Aurobindo) | Incoming | Vogel-Baylor, Erika (G&W) | 11:37:55 | 0:07:00 |
| 4/5/2013 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 13:25:00 | 0:01:00 |
| 4/5/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 13:30:28 | 0:00:00 |
| 4/5/2013 | Text | Vogel-Baylor, Erika (G&W) | Outgoing | CW-6 (Aurobindo) | 13:36:07 | 0:00:00 |
| 4/5/2013 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 16:44:00 | 0:01:00 |
| 4/8/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | CW-6 (Aurobindo) | 11:59:40 | 0:00:00 |
| 4/8/2013 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 12:00:00 | 0:04:00 |
| 4/8/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 12:03:00 | 0:01:00 |
| 4/8/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | CW-6 (Aurobindo) | 12:18:02 | 0:00:03 |
| 4/8/2013 | Text | Vogel-Baylor, Erika (G&W) | Outgoing | CW-6 (Aurobindo) | 12:23:18 | 0:00:00 |
| 4/8/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | CW-6 (Aurobindo) | 12:36:24 | 0:00:03 |
| 4/8/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 12:53:00 | 0:04:00 |
| 4/8/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 13:26:00 | 0:02:00 |
| 4/9/2013 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 11:08:00 | 0:04:00 |
| 4/11/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | CW-6 (Aurobindo) | 13:50:56 | 0:00:29 |
| 4/11/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 14:00:00 | 0:06:00 |
| 4/11/2013 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 14:09:00 | 0:01:00 |
| 4/11/2013 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 16:52:00 | 0:06:00 |
| 4/11/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 16:59:00 | 0:01:00 |
| 4/11/2013 | Voice | CW-6 (Aurobindo) | Incoming | Vogel-Baylor, Erika (G&W) | 17:05:00 | 0:02:00 |

705.    According to the plan, on April 17, 2013 G&W published new WAC pricing for Promethazine HCL, increasing WAC from $38.99 to $116.97—an approximately 200% increase.

REDACTED – PUBLIC VERSION

706.    Around the time of the increase, G&W received an e-mail from a potential new customer seeking pricing on a list of products, including Promethazine HCL. M.S. forwarded the request to Vogel-Baylor who responded, ██████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████

707.    A few weeks later, Actavis followed G&W's price increase on Promethazine HCL and, on June 5, 2013, published WAC pricing that matched G&W. Perrigo followed suit in August of 2013.

708.    Prior to increasing its price, and as it had now done several times before, Actavis spoke with both G&W and Perrigo. These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 5/29/2013 | Voice | T.P. (Perrigo) | Outgoing | M.D. (Actavis) | 9:09:00 | 0:01:00 |
| 5/29/2013 | Voice | T.P. (Perrigo) | Incoming | M.D. (Actavis) | 12:12:00 | 0:02:00 |
| 5/29/2013 | Voice | T.P. (Perrigo) | Incoming | M.D. (Actavis) | 12:14:00 | 0:05:00 |
| 5/29/2013 | Voice | T.P. (Perrigo) | Incoming | M.D. (Actavis) | 12:19:00 | 0:02:00 |
| 5/31/2013 | Voice | M.D. (Actavis) | Outgoing | T.P. (Perrigo) | 4:04:00 | 0:09:00 |
| 5/31/2013 | Voice | M.D. (Actavis) | Incoming | T.P. (Perrigo) | 8:38:00 | 0:07:00 |
| 6/3/2013 | Voice | Vogel-Baylor, Erika (G&W) | Incoming | Rogerson, Rick (Actavis) | 12:00:52 | 0:14:17 |
| 6/4/2013 | Voice | Vogel-Baylor, Erika (G&W) | Incoming | Rogerson, Rick (Actavis) | 11:10:30 | 0:12:16 |

709.    On June 26, 2013, Vogel-Baylor e-mailed Orlofski to advise him that G&W had received Cardinal's 2013 RFP. Vogel-Baylor explained, ████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████ The next day, Vogel-Baylor received a short phone call from S.S., a sales executive at Perrigo. Several hours later, Vogel-Baylor placed a phone call to Orlofski.

710.    G&W had no reason to fear because a few weeks later, on July 30, 2013, Perrigo notified its customers that it was increasing price on a list of products, including Promethazine HCL, with an effective date of August 1, 2013. This included an increase to its WAC pricing that matched

G&W and Actavis. In the days leading up to Perrigo's price increase, the three competitors again spoke several times by phone. These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|------|-----------|-------------|-----------|--------------|----------|
| 7/29/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | Rogerson, Rick (Actavis) | 0:01:11 |
| 7/30/2013 | Voice | T.P. (Perrigo) | Incoming | Vogel-Baylor, Erika (G&W) | 0:03:00 |
| 7/30/2013 | Voice | T.P. (Perrigo) | Outgoing | Vogel-Baylor, Erika (G&W) | 0:01:00 |
| 7/30/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | T.P. (Perrigo) | 0:02:33 |
| 7/30/2013 | Voice | Vogel-Baylor, Erika (G&W) | Incoming | T.P. (Perrigo) | 0:00:00 |
| 7/30/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | T.P. (Perrigo) | 0:09:06 |
| 7/31/2013 | Voice | T.P. (Perrigo) | Outgoing | M.D. (Actavis) | 0:01:00 |
| 7/31/2013 | Voice | T.P. (Perrigo) | Outgoing | M.D. (Actavis) | 0:01:00 |
| 7/31/2013 | Voice | T.P. (Perrigo) | Incoming | M.D. (Actavis) | 0:21:00 |

711.    Several months later, the collusion continued for Promethazine HCL. On March 5, 2014, K.K., a G&W sales executive, informed Vogel-Baylor that Walgreens had received an offer from Actavis for a one time buy on the 25mg dosage at a significantly discounted price of $42.08. G&W would later learn that Actavis had made the offer because it had an excess of short-dated inventory on the 25mg dosage. This information stunned Vogel-Baylor, who asked ███████████ ████████

712.    Despite her initial surprise, Vogel-Baylor confidently reported to Orlofski: ████████ ████████████████████████████████████████████████████████████████████

To make good on her promise, Vogel-Baylor placed a call to Rogerson fifteen (15) minutes later. The two competitors continued to trade phone calls over the next several days, including a call on March 6, 2014 that lasted eleven (11) minutes.

713.    Apparently, Vogel-Baylor's communications with Rogerson did yield a solution to her problem. On March 18, 2014, she e-mailed Walgreens to advise the customer that G&W lowered its price on Promethazine HCL. Aware that the details of her interactions with Rogerson would be incriminating if reduced to writing, Vogel-Baylor offered only a vague statement to the customer: █████████████████████████████████

714.    Over the next several months, G&W would continue to decline to bid on new opportunities for Promethazine HCL so as not to upset the market share balance it had achieved with its competitors.

715.    For example, on May 5, 2014, L.C., a sales executive at G&W, summed up G&W's commitment to playing nice in the sandbox when she told a customer, PBA Health, that she wanted to identify opportunities for Promethazine HCL (and other drugs) only if she could do so ███████ ██████████████████ Similarly, on May 30, 2014, Vogel-Baylor instructed M.S. not to bid on the Promethazine HCL business at another customer, IPC, because ████████████████████ ████████████████████████████████ Further, on August 8, 2014, Vogel-Baylor told K.K. that, prior to bidding on Promethazine HCL at Humana, G&W would need to know who the incumbent was and whether there was a right of first refusal, reasoning it was ████████████ ███████████████████

716.    Lastly, on August 25, 2014, McKesson—an Actavis customer—e-mailed K.K. asking if G&W would like to bid on Promethazine HCL. K.K. knew that G&W would not bid but, in an effort to get the story straight, asked Vogel-Baylor if he should provide the pre-textual justification that G&W was at capacity. Vogel-Baylor approved that messaging in a response on August 28, 2014 stating: ████████████████████████████████████████████████████ ██████████████████

c.    *Collusion Between G&W And Glenmark*

717.    As detailed above in an earlier section, Vogel-Baylor of G&W had a long-standing relationship with CW-5, a senior executive at Glenmark, and the competitors used that relationship to fix prices on Ciclopirox Cream in April 2012.

718.    One year later, on May 16, 2013, Glenmark increased pricing on at least eighteen (18) different products, including Ciclopirox Cream and various formulations of Mometasone Furoate

REDACTED – PUBLIC VERSION

that were also manufactured by G&W.[97] The anticompetitive conduct relating to the latter product is discussed in further detail below.

i.    *Mometasone Furoate*

719.    Mometasone Furoate ("Mometasone") is available in several forms, including cream, ointment, and solution.

720.    As of May 2013, three competitors—Glenmark, Perrigo, and G&W—controlled a majority of the market share on the various formulations of Mometasone.

721.    Beginning as early as May 2, 2013, Glenmark began communicating with its competitors, including G&W, to coordinate its May 2013 price increases. Over the next several weeks, CW-5 and Jim Brown, a senior sales executive at Glenmark, had multiple calls with Vogel-Baylor of G&W during which they discussed and agreed to increase prices on Ciclopirox Cream and the various formulations of Mometasone. Prior to these calls, Vogel-Baylor had never spoken to Brown before, according to the available phone records. These calls are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 5/2/2013 | Voice | Vogel-Baylor, Erika (G&W) | Incoming | CW-5 (Glenmark) | 18:10:31 | 0:00:33 |
| 5/6/2013 | Voice | Vogel-Baylor, Erika (G&W) | Incoming | CW-5 (Glenmark) | 9:00:46 | 0:00:00 |
| 5/6/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | CW-5 (Glenmark) | 9:00:48 | 0:00:51 |
| 5/7/2013 | Voice | Vogel-Baylor, Erika (G&W) | Incoming | Brown, Jim (Glenmark) | 13:57:00 | 0:00:00 |
| 5/7/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | Brown, Jim (Glenmark) | 15:27:37 | 0:02:50 |
| 5/7/2013 | Voice | Vogel-Baylor, Erika (G&W) | Incoming | Brown, Jim (Glenmark) | 16:01:30 | 0:00:00 |
| 5/7/2013 | Voice | Vogel-Baylor, Erika (G&W) | Incoming | Brown, Jim (Glenmark) | 16:05:56 | 0:03:42 |
| 5/7/2013 | Voice | Vogel-Baylor, Erika (G&W) | Incoming | Brown, Jim (Glenmark) | 16:27:03 | 0:00:55 |
| 5/13/2013 | Text | Vogel-Baylor, Erika (G&W) | Outgoing | CW-5 (Glenmark) | 17:32:13 | 0:00:00 |
| 5/13/2013 | Text | Vogel-Baylor, Erika (G&W) | Outgoing | CW-5 (Glenmark) | 17:32:14 | 0:00:00 |
| 5/13/2013 | Text | Vogel-Baylor, Erika (G&W) | Outgoing | CW-5 (Glenmark) | 18:26:47 | 0:00:00 |
| 5/14/2013 | Voice | Vogel-Baylor, Erika (G&W) | Incoming | Brown, Jim (Glenmark) | 11:18:55 | 0:00:40 |
| 5/15/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | Brown, Jim (Glenmark) | 12:04:27 | 0:00:14 |
| 5/15/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | Brown, Jim (Glenmark) | 12:05:28 | 0:05:07 |
| 5/16/2013 | Voice | Vogel-Baylor, Erika (G&W) | Outgoing | Brown, Jim (Glenmark) | 12:12:12 | 0:06:33 |

---

[97] Notably, while Glenmark was colluding with G&W on these products, CW-5 and his colleagues were also colluding with competitors on other products on its price increase list.  For example, several of the products—Moexipril HCL Tablets, Moexipril HCL/HCTZ Tablets, Nabumetone Tablets, Pravastatin Sodium Tablets, and Ranitidine Tablets—overlapped with Teva and are addressed in other Humana Complaints.

REDACTED – PUBLIC VERSION

722.    Similarly, Vogel-Baylor, as she had done in the past, used her contact, CW-6—then at Aurobindo—to communicate with T.P. of Perrigo regarding the increases. As discussed above, CW-6 had formerly worked at Fougera and developed relationships with Vogel-Baylor and T.P. of Perrigo during his tenure there. At this time, G&W and Aurobindo had no products that overlapped, and CW-6 and Vogel-Baylor were not social friends. These communications are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 5/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 7:43:12 | 0:00:00 |
| 5/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 7:45:35 | 0:00:00 |
| 5/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 7:47:58 | 0:00:00 |
| 5/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 7:50:22 | 0:00:00 |
| 5/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 7:52:45 | 0:00:00 |
| 5/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 7:55:08 | 0:00:00 |
| 5/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 8:05:32 | 0:00:00 |
| 5/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 8:18:21 | 0:00:00 |
| 5/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 8:20:44 | 0:00:00 |
| 5/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 8:23:08 | 0:00:00 |
| 5/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 8:25:31 | 0:00:00 |
| 5/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 8:27:54 | 0:00:00 |
| 5/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 8:30:19 | 0:00:00 |
| 5/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 8:40:42 | 0:00:00 |
| 5/3/2013 | Text | Vogel-Baylor, Erika (G&W) | Incoming | CW-6 (Aurobindo) | 8:50:48 | 0:00:00 |
| 5/3/2013 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 12:47:00 | 0:01:00 |
| 5/3/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 12:48:00 | 0:02:00 |
| 5/3/2013 | Voice | CW-6 (Aurobindo) | Outgoing | T.P. (Perrigo) | 12:50:00 | 0:01:00 |
| 5/3/2013 | Voice | CW-6 (Aurobindo) | Incoming | T.P. (Perrigo) | 13:02:00 | 0:07:00 |
| 5/3/2013 | Voice | CW-6 (Aurobindo) | Outgoing | Vogel-Baylor, Erika (G&W) | 13:09:00 | 0:06:00 |

723.    Orlofski, G&W President, communicated by telephone with C.B., President of Impax's generic drugs division.

724.    As a result of these communications, Glenmark, G&W, Perrigo and Impax increased prices for Mometasone.

725.    Glenmark increased prices on Mometasone Cream, Ointment, and Solution first on May 16, 2013. Soon thereafter, G&W would follow with comparable increases of its own on the various formulations of Mometasone. Over the next several weeks, G&W consistently declined

opportunities to reduce pricing on the various formulations of Mometasone so as not to take advantage of the Glenmark price increases.

726.     For example, on May 15, 2013—the day before the Glenmark price increases would become effective and publicly visible—C.M., a G&W sales executive, e-mailed Vogel-Baylor to inform her that ANDA was requesting decreased pricing on several products because the prices were higher than their competitors. The list included Mometasone Solution and listed Glenmark's pre-increase pricing for Cardinal as the comparison price point. Knowing that Glenmark was increasing pricing on this product, Vogel-Baylor advised C.M. that G&W would not lower its pricing.

727.     Similarly, on May 17, 2013, the day after the Glenmark increases became effective, McKesson sent G&W a request for a bid on Mometasone Ointment because it ████████████ ████████████████████ Vogel-Baylor asked the customer who its incumbent was, and McKesson responded that it was Glenmark. Immediately upon receiving this response, Vogel-Baylor called CW-5 of Glenmark. The call lasted less than one (1) minute. She then hung up and called Brown of Glenmark. That call lasted less than one (1) minute. Fifteen minutes later, Brown called Vogel-Baylor back and they spoke for twelve (12) minutes. Later that day, Vogel-Baylor responded to McKesson and declined the opportunity, stating █████████████████████████ ████████████████████

728.     The next business day, on May 20, 2013, C.M. e-mailed Vogel-Baylor asking, ████████████████████████████████████████ ██████████████████████████ Vogel-Baylor responded by sending the following e-mail to C.M. and others on the sales team:

████████████████

REDACTED – PUBLIC VERSION



729.    That same day, Orlofski (G&W) exchanged text messages and placed a call to C.B. (Impax President of generics).

730.    On May 23, 2013, Vogel-Baylor e-mailed price increase analyses for Ciclopirox Cream and the Mometasone line to her supervisor, Orlofski. The next day, May 24, 2013, Vogel-Baylor called CW-5 at Glenmark twice.  The calls lasted less than one (1) minute each.

731.    On May 29, 2013, Target e-mailed C.M. of G&W stating that the customer had received a 250% price increase on another drug, Halobetasol, and asking whether C.M. could provide any insight into why. C.M. responded, ███████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████████

732.    On May 30 and May 31, 2013, Brown called Vogel-Baylor twice. The calls lasted four (4) minutes and less than one (1) minute, respectively.

733.     On June 4, 2013, G&W sent price increase notifications to its customers regarding the various Mometasone formulations. That same day, Vogel-Baylor (G&W) called Brown (Glenmark); Orlofski (G&W) and C.B. (Impax) exchanged multiple text messages and two phone calls, one lasting 2 minutes and one lasting 3 minutes.

734.     On June 5, 2013, Pharmacy Select e-mailed C.M. regarding the notification and asked him to provide new WAC pricing for the Mometasone line of products. C.M. forwarded the request to Vogel-Baylor asking, ███████████████████ Vogel-Baylor responded, ███████ ███████████████████████████

735.     G&W and Glenmark continued to coordinate even after their price increases. For example, on June 5, 2013, Rite Aid, a G&W customer for Mometasone, asked Glenmark whether it wanted to bid for the business because G&W had increased price. The next day, on June 6, 2013, Brown of Glenmark called Vogel-Baylor and they spoke for six (6) minutes. On June 7, 2013, Vogel-Baylor called Brown back. The call lasted less than one (1) minute. That same day, CW-5 e-mailed his colleagues Brown and Blashinsky regarding the Rite Aid opportunity stating ████████ ████████████████████████████

736.     After preparing the bid for Rite Aid, Brown e-mailed CW-5 and Blashinsky on Saturday, June 8, 2013 stating: ████████████████████████ The following Monday, on June 10, 2013, Brown called Vogel-Baylor. Vogel-Baylor returned the call and they spoke for more than six (6) minutes. Within ten (10) minutes of hanging up, and having confirmed the pricing with his competitor, Brown e-mailed his colleagues with specific price points that Glenmark should use to bid high and not take the Rite Aid business from G&W.

737.     Impax also imposed Mometasone price increases during this period. In December 2013, when assessing its year-to-date Mometasone sales, T.E., Impax Senior Director of Sales,

prepared an analysis for his boss, C.B., concluding that ████████████████████

████████████████████ into highly profitable products.

          d.     *Collusion Between G&W And Lupin*

738.     Orlofski of G&W had a long-standing relationship with Berthold, a senior sales executive at Lupin. As detailed above, it was Berthold who introduced Orlofski and Vogel-Baylor to CW-6 of Fougera. This connection allowed G&W and Fougera to continue their collusive relationship even after CW-6's contact, Grauso, had left G&W to take a senior position at Aurobindo.

739.     Notably, G&W and Lupin only overlapped on one product—Ethambutol HCL Tablets—during the time period relevant to this Complaint. This collusion is discussed in further detail below.

          i.     *Ethambutol HCL Tablets*

740.     In 2012, G&W marketed the authorized generic of Ethambutol HCL Tables ("Ethambutol") for the manufacturer, STI Pharma ("STI"), and Lupin, VersaPharm, and Teva sold the generic version.

741.     By late 2012 and early 2013, both VersaPharm and Teva were experiencing supply issues on Ethambutol. Viewing this as an opportunity, Lupin and G&W colluded to significantly raise price on the product while their competitors were out of the market.

742.     In November and December 2012, Orlofski and Vogel-Baylor of G&W exchanged several calls with Berthold of Lupin to discuss Ethambutol. At the same time, Berthold was keeping Kevin Green, a sales executive at Teva, apprised of his discussions with G&W.

743.     On November 15, 2012, Orlofski exchanged at least eight (8) text messages with Berthold. The next day, on November 16, 2012, Orlofski and Berthold spoke for nearly twelve (12) minutes. Shortly thereafter, Berthold spoke three separate times with Green, with the calls lasting

five (5) minutes, ten (10) minutes, and five (5) minutes, respectively. That same day, G&W reached

out to several VersaPharm customers, including Econdisc, HealthTrust, and FW Kerr, to inquire

whether they were interested in a new supplier for Ethambutol due to VersaPharm's supply issues.

744.    Over the next month, Berthold would continue to exchange numerous calls and text

messages with Vogel-Baylor and Orlofski during which they discussed a coordinated price increase

on Ethambutol. These communications are detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 11/18/2012 | Text | Berthold, David (Lupin) | Incoming | Vogel-Baylor, Erika (G&W) | 18:48:29 | 0:00:00 |
| 11/18/2012 | Text | Berthold, David (Lupin) | Incoming | Vogel-Baylor, Erika (G&W) | 18:48:33 | 0:00:00 |
| 11/20/2012 | Voice | Berthold, David (Lupin) | Incoming | Vogel-Baylor, Erika (G&W) | 12:55:26 | 0:00:03 |
| 11/20/2012 | Voice | Berthold, David (Lupin) | Outgoing | Vogel-Baylor, Erika (G&W) | 13:24:13 | 0:07:55 |
| 11/20/2012 | Voice | Berthold, David (Lupin) | Incoming | Vogel-Baylor, Erika (G&W) | 17:31:57 | 0:00:03 |
| 11/20/2012 | Voice | Berthold, David (Lupin) | Outgoing | Vogel-Baylor, Erika (G&W) | 17:57:55 | 0:03:11 |
| 11/22/2012 | Text | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 16:30:34 | 0:00:00 |
| 11/22/2012 | Text | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 16:30:36 | 0:00:00 |
| 11/22/2012 | Text | Berthold, David (Lupin) | Incoming | Orlofski, Kurt (G&W) | 20:11:04 | 0:00:00 |
| 11/22/2012 | Text | Berthold, David (Lupin) | Incoming | Orlofski, Kurt (G&W) | 20:11:08 | 0:00:00 |
| 11/22/2012 | Text | Berthold, David (Lupin) | Incoming | Orlofski, Kurt (G&W) | 20:11:15 | 0:00:00 |
| 11/22/2012 | Text | Berthold, David (Lupin) | Incoming | Orlofski, Kurt (G&W) | 20:11:19 | 0:00:00 |
| 11/22/2012 | Text | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 20:30:46 | 0:00:00 |
| 11/22/2012 | Text | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 20:30:48 | 0:00:00 |
| 12/9/2012 | Text | Berthold, David (Lupin) | Incoming | Orlofski, Kurt (G&W) | 14:54:28 | 0:00:00 |
| 12/9/2012 | Text | Berthold, David (Lupin) | Incoming | Orlofski, Kurt (G&W) | 14:54:33 | 0:00:00 |
| 12/9/2012 | Text | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 15:01:44 | 0:00:00 |
| 12/9/2012 | Text | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 15:01:45 | 0:00:00 |
| 12/9/2012 | Text | Berthold, David (Lupin) | Incoming | Orlofski, Kurt (G&W) | 15:05:03 | 0:00:00 |
| 12/9/2012 | Text | Berthold, David (Lupin) | Incoming | Orlofski, Kurt (G&W) | 15:05:08 | 0:00:00 |
| 12/9/2012 | Text | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 15:21:48 | 0:00:00 |
| 12/9/2012 | Voice | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 15:22:36 | 0:00:03 |
| 12/9/2012 | Text | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 15:57:26 | 0:00:00 |

745.    On December 9, 2012, the day after the final call listed above, J.G., a finance

executive at Lupin, e-mailed Berthold at 3:41 p.m. stating: ███████████████████████████

████████████████████████████████████████████████████████████████████

████████     Three minutes later, at 3:44 p.m., Berthold called Orlofski. The call lasted less than one

(1) minute. The next day, on December 11, 2012, Berthold called Vogel-Baylor and they spoke for

nearly six (6) minutes. A short time later, Orlofski sent a text message to Berthold and the two

competitors exchanged two (2) more calls that day, including one lasting nearly six (6) minutes.

REDACTED – PUBLIC VERSION

746.    On December 17, 2012, K.W., a Lupin sales executive, sent an internal e-mail including Berthold, attaching the price increase letters for Ethambutol that Lupin planned to send on December 18, 2012. Between December 17, 2012 and December 19, 2012, Berthold again exchanged several calls and text messages with Orlofski and Vogel-Baylor. These are detailed in the chart below:

| Date | Call Typ | Target Name | Direction | Contact Name | Time | Duration |
|------|----------|-------------|-----------|--------------|------|----------|
| 12/17/2012 | Voice | Berthold, David (Lupin) | Outgoing | Vogel-Baylor, Erika (G&W) | 17:32:53 | 0:00:14 |
| 12/17/2012 | Text | Berthold, David (Lupin) | Incoming | Orlofski, Kurt (G&W) | 21:48:43 | 0:00:00 |
| 12/17/2012 | Text | Berthold, David (Lupin) | Incoming | Orlofski, Kurt (G&W) | 21:51:13 | 0:00:00 |
| 12/17/2012 | Text | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 21:54:44 | 0:00:00 |
| 12/17/2012 | Text | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 21:54:48 | 0:00:00 |
| 12/18/2012 | Voice | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 8:19:40 | 0:00:02 |
| 12/18/2012 | Voice | Berthold, David (Lupin) | Incoming | Orlofski, Kurt (G&W) | 11:54:06 | 0:00:25 |
| 12/18/2012 | Voice | Berthold, David (Lupin) | Incoming | Vogel-Baylor, Erika (G&W) | 11:56:05 | 0:00:58 |
| 12/19/2012 | Voice | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 15:12:46 | 0:00:02 |
| 12/19/2012 | Voice | Berthold, David (Lupin) | Outgoing | Vogel-Baylor, Erika (G&W) | 15:13:09 | 0:00:07 |
| 12/19/2012 | Voice | Berthold, David (Lupin) | Incoming | Orlofski, Kurt (G&W) | 15:56:16 | 0:13:10 |
| 12/19/2012 | Voice | Berthold, David (Lupin) | Incoming | Vogel-Baylor, Erika (G&W) | 16:56:44 | 0:04:12 |
| 12/19/2012 | Voice | Berthold, David (Lupin) | Outgoing | Vogel-Baylor, Erika (G&W) | 17:06:52 | 0:04:52 |
| 12/19/2012 | Voice | Berthold, David (Lupin) | Incoming | Vogel-Baylor, Erika (G&W) | 17:25:24 | 0:00:02 |
| 12/19/2012 | Voice | Berthold, David (Lupin) | Outgoing | Vogel-Baylor, Erika (G&W) | 17:30:08 | 0:04:19 |

747.    On January 2, 2013, Orlofski e-mailed Vogel-Baylor suggesting that they discuss the Ethambutol price increase during their meeting scheduled for the next day. That same day, Vogel-Baylor called Berthold and they spoke for eleven (11) minutes. Later that evening, Vogel-Baylor e-mailed Orlofski a price increase analysis for Ethambutol.

748.    The next day, January 3, 2013, a customer, HEB, e-mailed C.M., a sales executive at G&W, to advise him that VersaPharm was out of the market. C.M. responded that he was aware and stated: ███████████████████████████████ That same day, Vogel-Baylor exchanged at least four (4) calls with Berthold, including one lasting more than four (4) minutes.

749.    On January 14, 2013, another customer, Morris & Dickson, e-mailed Lupin asking for a bid on Ethambutol. The customer explained that both VersaPharm and Teva were having

supply issues. That same day, Orlofski sent a text message to Berthold. Berthold also called Green of Teva and they spoke for nine (9) minutes.

750.    On January 28, 2013, the manufacturer of G&W's authorized generic, STI, e-mailed Vogel-Baylor to inform her that it would be shipping Ethambutol to G&W the following day stating: ███████████████████████████ Vogel-Baylor then forwarded the e-mail to Orlofski as an ████████ Later that day, Vogel-Baylor sent her Ethambutol price increase analysis to the sales team and asked them to draft letters to their customers advising them of the increases. The next day, on January 29, 2014, Orlofski sent a text message to Berthold and Berthold spoke two times with Green of Teva by phone, with calls lasting three (3) minutes and more than five (5) minutes, respectively.

751.    On January 31, 2013, Vogel-Baylor called Berthold and they spoke for three (3) minutes. The next day, on February 1, 2013, Vogel-Baylor called Berthold again. Berthold returned the call and they spoke for five (5) minutes. The following Monday, on February 4, 2013, Vogel-Baylor e-mailed Orlofski to inform him that G&W planned to send the Ethambutol price increase letters on February 7, 2013 and would call customers in advance to advise that they would be coming.

752.    Consistent with the plan, on February 6, 2013, G&W reached out to its customers to advise them of the Ethambutol increases. As Vogel-Baylor explained in her e-mail to Wal-Mart:

███████████████████████████████████████████████

███████████████████████████████████

753.    Berthold continued to communicate with Orlofski and Vogel-Baylor over the next several weeks. On February 19, 2013, Vogel-Baylor and Berthold had a joint dinner with representatives from two customers—ABC and Kroger.

REDACTED – PUBLIC VERSION

754.    On April 1, 2013, STI began notifying customers that it was terminating its relationship with G&W regarding Ethambutol. STI advised that it would be taking over the marketing and distribution of the product effective April 15, 2013. Between April 2, 2013 and April 15, 2013, Berthold exchanged several calls with Orlofski and Vogel-Baylor. The calls are detailed in the chart below:



| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 4/2/2013 | Voice | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 10:38:29 | 0:00:03 |
| 4/2/2013 | Voice | Berthold, David (Lupin) | Outgoing | Vogel-Baylor, Erika (G&W) | 10:38:57 | 0:03:49 |
| 4/2/2013 | Voice | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 16:48:27 | 0:00:07 |
| 4/2/2013 | Voice | Berthold, David (Lupin) | Incoming | Orlofski, Kurt (G&W) | 17:09:30 | 0:04:19 |
| 4/2/2013 | Voice | Berthold, David (Lupin) | Incoming | Orlofski, Kurt (G&W) | 17:09:30 | 0:04:18 |
| 4/2/2013 | Voice | Berthold, David (Lupin) | Outgoing | Vogel-Baylor, Erika (G&W) | 20:47:56 | 0:00:04 |
| 4/5/2013 | Voice | Berthold, David (Lupin) | Incoming | Vogel-Baylor, Erika (G&W) | 17:04:58 | 0:03:24 |
| 4/5/2013 | Voice | Berthold, David (Lupin) | Outgoing | Vogel-Baylor, Erika (G&W) | 17:24:05 | 0:00:08 |
| 4/5/2013 | Voice | Berthold, David (Lupin) | Incoming | Vogel-Baylor, Erika (G&W) | 17:24:29 | 0:02:27 |
| 4/13/2013 | Text | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 11:33:02 | 0:00:00 |
| 4/13/2013 | Text | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 11:35:51 | 0:00:00 |
| 4/13/2013 | Text | Berthold, David (Lupin) | Incoming | Orlofski, Kurt (G&W) | 11:48:32 | 0:00:00 |
| 4/13/2013 | Text | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 11:49:08 | 0:00:00 |
| 4/13/2013 | Text | Berthold, David (Lupin) | Incoming | Orlofski, Kurt (G&W) | 11:49:40 | 0:00:00 |
| 4/13/2013 | Text | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 11:50:02 | 0:00:00 |
| 4/13/2013 | Text | Berthold, David (Lupin) | Incoming | Orlofski, Kurt (G&W) | 11:50:42 | 0:00:00 |
| 4/13/2013 | Text | Berthold, David (Lupin) | Outgoing | Orlofski, Kurt (G&W) | 11:51:24 | 0:00:00 |
| 4/15/2013 | Text | Berthold, David (Lupin) | Outgoing | Vogel-Baylor, Erika (G&W) | 21:37:55 | 0:00:00 |
| 4/15/2013 | Text | Berthold, David (Lupin) | Outgoing | Vogel-Baylor, Erika (G&W) | 21:38:21 | 0:00:00 |

755.    After April 15, 2013, the date of the last two text messages listed above, Berthold and Vogel-Baylor would never communicate by phone again, according to the phone records available to the Plaintiff States.

**B.    The Defendants' Profitability Increases Dramatically As A Result Of Collusive Conduct**

756.    As discussed more fully above and in Humana's other Complaints, between 2009 and early 2016, the Defendants colluded to allocate markets and raise prices on several generic drugs. The impact of this anticompetitive conduct on the Defendants' profitability was dramatic.

REDACTED – PUBLIC VERSION

1.    **Taro And Perrigo's Profits Increased Over 1300% From 2008 To Early 2016**

757.    Both Taro and Perrigo's Prescription (Rx) Pharmaceuticals segment saw profits increase over 1300% between 2008 and early 2016. Taro often led price increases and Perrigo's Prescription (Rx) Pharmaceuticals segment reported revenues and profits for generic dermatology drugs disaggregated from other operations. Accordingly, the profits of these two companies are instructive in showing the dramatic profits the Defendants made from their collusive conduct.

a.    *Taro*

758.    By early 2016, Taro's operating income was 1303%, or more than thirteen (13) times, higher than it was in 2008. Similarly, in 2016, Taro's net income was 1673%, or more than sixteen (16) times higher than it was in 2008. Indeed, in 2016, Taro's net sales revenue reached nearly $1 billion, which was $600 million more than it made in 2008.

759.    The graph below shows Taro's consistent financial growth from 2008 through early 2016 and highlights how the timing dovetails with Taro's price increases on products at issue in this and other Complaints.

REDACTED – PUBLIC VERSION



[1] As discussed in earlier Sections of this Complaint, in May 2013 Taro raised its prices on 12 products.
[2] As discussed in earlier Sections of this Complaint, in June 2014 Taro raised its prices on 17 products.

760.    As depicted above, as Taro increased prices, its profits increased. Consistent with the allegations in the Complaint, Taro's profits grew steadily from 2010 through 2011, during the early days of collusion, and then increased exponentially from late 2012 through 2015 when price increases intensified across the industry.

761.    In SEC filings, Taro repeatedly attributed its increases in sales revenue and gross profits to price adjustments. For example, in its 2011 annual filing, Taro stated that its revenues and gross profits increased in the United States "primarily due to price increases on select products."

Similarly, in its 2013 annual filing, Taro stated that approximately $27 million of its increased sales in the first quarter of 2012 "resulted from price increases on seven dermatological topical products."

> b.    *Perrigo*

762.    Perrigo's profits also grew significantly as a result of its collusive conduct. As noted above, this analysis focuses on the profits of Perrigo's Prescription (Rx) Pharmaceuticals segment, which covers its U.S. generic drug sales, with a strong focus on extended topicals.

763.    In its fiscal year 2015, Perrigo's Prescription (Rx) Pharmaceuticals segment's operating income was 1648%, or over sixteen (16) times, higher than it was in 2008. The segment's net sales revenue was just over $1 billion in 2015, which was over $800 million more than it made in 2008.

764.    Perrigo's Prescription (Rx) Pharmaceuticals segment was the growth driver for Perrigo during this time period. Perrigo's other operations grew much slower by comparison. While the segment's operating income grew 1648%, Perrigo's operating income for all its operations when combined grew only 278%. Similarly, while the segment's net sales revenue grew 521%, Perrigo's net sales revenue for all its operations when combined was only 153%.

765.    The graph below shows Perrigo's consistent financial growth from 2008 through 2015 and highlights how the timing dovetails with Perrigo's price increases on products at issue in this and other Complaints.

REDACTED – PUBLIC VERSION



[1] As discussed in earlier Sections of this Complaint, on July 24, 2014 Perrigo increased its prices on Econazole Nitrate Cream, Hydrocortisone Acetate Suppositories, and Hydrocortisone Valerate Cream.
[2] As discussed in earlier Sections of this Complaint, on August 1, 2013 Perrigo increased it prices on Ciclopirox Solution, Hydrocortisone Valerate Cream, and Promethazine HCL Tablets.

766.    As depicted above, as Perrigo increased prices, the company profited handsomely.

767.    Further, and consistent with Taro's financial picture, Perrigo's profits from generic drug sales grew steadily during the early days of collusion, between 2010 and 2011, and then accelerated around 2012 when the industry began to focus more intensely on price increases.

### 2.    Other Defendants' Revenues And Profits Also Multiply From 2008 To Early 2016

768.    The other Defendants also profited from their collusive conduct. For example, G&W and Actavis's revenues multiplied as their focus on price increases intensified. G&W's sales

tripled from 2011 to 2014, increasing by over 30% each year during that period. In 2014, G&W's revenue from sales, at over $290 million, broke $200 million for the first time ever.

769.     Similarly, Actavis's global generics business saw its revenues grow between 2008 and 2013 from just over $1.4 billion to approximately $6.35 billion. Over that same time period, the company's profits from its generics business also grew from $416 million in 2008 to nearly $2 billion in 2013.

770.     Fougera and Sandoz also profited from their collusive conduct. In 2010 and 2011, during the early days of collusion, and prior to its acquisition by Sandoz, Fougera had gross profits of approximately $217 million and $304 million, respectively. Similarly, in 2010, Sandoz had over $1 billion of operating income and, in 2011, the company reported the highest operating income in its history at that time, just over $1.4 billion.

771.     After acquiring Fougera, Sandoz's sales in the United States rose steadily each year from 2012, which had sales of over $2.7 billion, through 2016, when sales reached $3.7 billion. Sandoz's operating income continued to exceed $1 billion each year during this period and, following years of collusive activity, in 2016 Sandoz's operating income exceeded the 2011 record and reached approximately $1.45 billion, the highest in Sandoz's history to date.

772.     Sandoz executives wrote about the significant positive impact that the Fougera business had on Sandoz's profits. For example, Sandoz noted in internal documents that a ███████ ███████████████████████ was a driver of US sales growth in 2013, in October 2104 the Fougera team ████████████████████████████, and in 2015 ████████████████████████ ████████████████████████████

213

REDACTED – PUBLIC VERSION

C.    **Other Subject Drugs**

1.    **Ammonium Lactate**

773.    The market for Ammonium Lactate is mature. At all relevant times there have been multiple manufacturers of the product.

774.    During the relevant time frame, Defendants Actavis, Perrigo, and Taro were the primary manufacturers of Ammonium Lactate Cream and Lotion.

775.    As part of Defendants' Fair Share Agreement, they conspired to fix, raise, maintain or stabilize the prices of Ammonium Lactate as early as April 2013.

776.    For years, the price for Ammonium Lactate was relatively low and stable. In April 2013, however, prices began to rise. Taro implemented a price increase on Ammonium Lactate Cream of ████████████, which was followed by Actavis and Perrigo. Ammonium Lactate Lotion showed similar pricing patterns.

777.    Before instituting its price increases, Taro reached out to Actavis and Perrigo to coordinate. In April 2013, Ara Aprahamian and Mike Perfetto, Taro's Vice President of Sales and Marketing, and Chief Commercial Officer, respectively, had multiple phone calls with representatives at Actavis and Perrigo. Perfetto spoke with Douglas Boothe, Perrigo's Executive Vice President and General Manager, and M.D., Actavis's Director of National Accounts. Aprahamian communicated with M.D. and A.G. (another Actavis Director of National Accounts).

778.    Actavis and Perrigo also communicated directly with one another during April 2013. For example, after Actavis's M.D. spoke with a representative from Taro, M.D. communicated by phone with T.P., Perrigo's Director of National Accounts.

779.    In April 2013, representatives from Actavis, Perrigo, and Taro also convened at the NACDS Annual Meeting.

780.    Actavis, Perrigo, and Taro's Ammonium Lactate prices remained elevated.

781.    The ability of Actavis, Perrigo, and Taro to reach agreement regarding Ammonium Lactate was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.

782.    The coordinated price increases by Actavis, Perrigo, and Taro are consistent with the Fair Share Agreement.

783.    Non-collusive market factors (e.g., product shortages) do not explain the artificially inflated prices.

784.    The agreement between Defendants Actavis, Perrigo, and Taro was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Ammonium Lactate Cream and Lotion.

### 2.    Atropine Sulfate Ophthalmic Solution

785.    Atropine Sulfate is an anticholinergic and is available as, for example, a 1% Ophthalmic Solution for use in eye examinations to dilate the pupil and to treat certain eye conditions.  It has been available in the United States for over a decade in a generic form.

786.    The market for Atropine Sulfate Ophthalmic Solution is mature. At all relevant times, there have been multiple manufacturers.

787.    Valeant and Sandoz dominated the sales of Atropine Sulfate with close to an 80/20 split at all relevant times.

788.    For several years, the price for Atropine Sulfate 1% ophthalmic solution was relatively stable. Prices began to rise in early 2010 with Valeant and Sandoz coordinating their price increases and continuing to maintain supracompetitive pricing for many years.

789.    The GAO noted that Atropine Sulfate had "extraordinary price increases" in the years 2010-2011.

790.    Valeant and Sandoz's prices remained elevated for many years.

791.    The ability of Valeant and Sandoz to reach agreements on Atropine Sulfate Ophthalmic Solution was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.

792.    The parallel price increases by Valeant and Sandoz are consistent with the Fair Share Agreement.

793.    Non-collusive market factors (e.g., product shortages) do not explain the artificially inflated prices.

794.    The agreement between Valeant and Sandoz was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Atropine Sulfate Ophthalmic Solution (1%).

### 3.    Carisoprodol tablets

795.    Carisoprodol is a muscle relaxant and pain reliever. It is available in Tablet form, including a 350 mg strength and has been available in the United States for many years in a generic form.

796.    The market for Carisoprodol is mature. At all relevant times, there have been multiple manufacturers.

797.    Par and Teva dominate sales of Carisoprodol Tablets with each accounting for roughly 55% and 35% of the market, respectively in the relevant times.

798.    Prices began to rise in early 2011 with Par and Teva coordinating their price increases and continuing to maintain supracompetitive pricing for many years.

799.    The GAO noted that Carisoprodol had "extraordinary price increases" in the years 2013-14.

REDACTED – PUBLIC VERSION

800. The ability of Par and Teva to reach agreements on Carisoprodol was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.

801. The parallel price increases by Par and Teva are consistent with the Fair Share Agreement.

802. Non-collusive market factors (e.g., product shortages) do not explain the artificially inflated prices.

803. The agreement between Par and Teva was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Carisoprodol Tablets (350 mg).

### 4. Exemestane tablets

804. Exemestane is used to treat certain types of breast cancer. It is available in Tablet form and has been available in the United States for many years as a generic medication.

805. The market for Exemestane is mature. At all relevant times, there have been multiple manufacturers of Exemestane.

806. West-Ward, Alvogen, and non-defendant Greenstone dominate sales of Exemestane Tablets with approximately a 50/50 split of the market in the relevant times.

807. For several years, the price for Exemestane was relatively stable. Prices began to rise in late 2013 with Greenstone and West-Ward coordinating their price increases and continuing to maintain supracompetitive pricing for multiple years. When Alvogen entered the market it matched the artificially elevated pricing.

808. The ability of Greenstone, West-Ward, and Alvogen to reach agreements on Exemestane was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.

809.    The parallel price increases by Greenstone, West-Ward, and Alvogen are consistent with the Fair Share Agreement.

810.    Non-collusive market factors (e.g., product shortages) do not explain the artificially inflated prices.

811.    The agreement between West-Ward and non-defendant Greenstone was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Exemestane Tablets (25 mg).

### 5.    Fluticasone Propionate Nasal Spray

812.    The market for Fluticasone Propionate nasal spray is mature. At all relevant times, there have been multiple manufacturers.

813.    Defendants Apotex, West-Ward, and Wockhardt and non-defendant Akorn dominate sales of Fluticasone Propionate nasal spray.

814.    Prices began to sharply rise in early 2010 with Akorn, Apotex, and West-Ward coordinating their price increases and continuing to maintain supracompetitive pricing for many years. When Wockhardt entered it did not disturb the artificially inflated pricing that was in place.

815.    The ability of Akorn, Apotex, West-Ward, and Wockhardt to reach agreements on Fluticasone Propionate was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.

816.    The parallel price increases by Akorn, Apotex, West-Ward, and Wockhardt are consistent with the Fair Share Agreement.

817.    Non-collusive market factors (e.g., product shortages) do not explain the artificially inflated prices.

REDACTED – PUBLIC VERSION

818.    The agreement between Defendants Akorn, Apotex, West-Ward, and Wockhardt was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Fluticasone Propionate nasal spray.

### 6.    Hydrocodone Acetaminophen tablets

819.    Hydrocodone Acetaminophen is a pain reliever and is available in tablet form in multiple strengths, including 5-325 mg and 10-325 mg Tablets. It has been available in the United States for over a decade in a generic form.

820.    The market for Hydrocodone Acetaminophen 5-325 mg and 10-325 mg Tablets is mature. At all relevant times, there have been multiple manufacturers.

821.    Amneal, non-defendant Mallinckrodt, Par, and Teva dominated the sales of Hydrocodone Acetaminophen 5-325 mg and 10-325 mg Tablets in the relevant period with Mallinckrodt, Par, and Teva having roughly equal shares of the 5-325 mg Tablet market, and Amneal having a smaller share. On the 10-325 mg Tablets, Mallinckrodt and Par had large shares of the market, Teva had a smaller but still significant share, and Amneal had a relatively small share of the market.

822.    For several years, the price for Hydrocodone Acetaminophen was relatively stable. Prices began to rise in mid-2014 with Amneal, Mallinckrodt, Par, and Teva coordinating their price increases and continuing to maintain supracompetitive pricing for many years.

823.    Amneal, Mallinckrodt, Par, and Teva's prices remained elevated.

824.    The ability of Amneal, Mallinckrodt, Par, and Teva to reach agreements on Hydrocodone Acetaminophen was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.

REDACTED – PUBLIC VERSION

825.     The parallel price increases by Amneal, Mallinckrodt, Par, and Teva are consistent with the Fair Share Agreement.

826.     Non-collusive market factors (e.g., product shortages) do not explain the artificially inflated prices.

827.     The agreement between Amneal, Mallinckrodt, Par, and Teva was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Hydrocodone Acetaminophen Tablets (5-325, 10-325 mg).

### 7.     Latanoprost ophthalmic solution

828.     Latanoprost is used to treat glaucoma and high pressure in the eyes. It has been available in the United States for many years in a generic form.

829.     The market for Latanoprost Opthalmic Liquid Eye (0.005%) is mature. At all relevant times, there have been multiple manufacturers. In 2013, the annual market for Latanoprost Drops in the United States exceeded $100 million.

830.     Valeant and Sandoz, along with non-defendants Akorn and Greenstone, dominate sales for Latanoprost. In early 2012, Greenstone had the largest market share with 42%, followed by Valeant with 30% and Sandoz with 19%. In April 2012, all three manufacturers raised their prices in direct coordination with one another.

831.     In early April 2012, Greenstone informed its customers that it would be taking a price increase on Latanoprost Drops. In the days and weeks leading up to the Greenstone price increase notice, Robin Hatosy of Greenstone acted as the conduit, sharing information between Sandoz and Valeant in order to secure an agreement from both to raise prices, through phone and text message exchanges with Kellum of Sandoz and B.P. of Valeant:

REDACTED – PUBLIC VERSION

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|------|-----------|-------------|-----------|--------------|------|----------|
| 3/1/2012 | Voice | Hatosy, Robin (Greenstone) | Incoming | B.P. (Valeant) | 12:35:30 | 0:00:00 |
| 3/1/2012 | Voice | Hatosy, Robin (Greenstone) | Outgoing | B.P. (Valeant) | 12:38:54 | 0:00:29 |
| 3/1/2012 | Voice | Hatosy, Robin (Greenstone) | Outgoing | B.P. (Valeant) | 12:39:39 | 0:00:46 |
| 3/5/2012 | Voice | Hatosy, Robin (Greenstone) | Incoming | Kellum, Armando (Sandoz) | 9:30:16 | 0:05:18 |
| 3/16/2012 | Voice | Hatosy, Robin (Greenstone) | Outgoing | Kellum, Armando (Sandoz) | 21:26:02 | 0:00:00 |
| 3/16/2012 | Text | Hatosy, Robin (Greenstone) | Outgoing | Kellum, Armando (Sandoz) | 21:27:11 | 0:00:00 |
| 3/17/2012 | Text | Hatosy, Robin (Greenstone) | Outgoing | Kellum, Armando (Sandoz) | 16:21:54 | 0:00:00 |
| 3/17/2012 | Text | Hatosy, Robin (Greenstone) | Outgoing | Kellum, Armando (Sandoz) | 20:13:55 | 0:00:00 |
| 3/17/2012 | Text | Hatosy, Robin (Greenstone) | Outgoing | Kellum, Armando (Sandoz) | 21:08:36 | 0:00:00 |
| 3/30/2012 | Text | Hatosy, Robin (Greenstone) | Outgoing | B.P. (Valeant) | 11:07:59 | 0:00:00 |
| 3/30/2012 | Text | Hatosy, Robin (Greenstone) | Outgoing | B.P. (Valeant) | 12:03:57 | 0:00:00 |
| 3/30/2012 | Text | Hatosy, Robin (Greenstone) | Outgoing | B.P. (Valeant) | 12:07:02 | 0:00:00 |
| 3/30/2012 | Text | Hatosy, Robin (Greenstone) | Outgoing | B.P. (Valeant) | 12:11:17 | 0:00:00 |
| 3/30/2012 | Text | Hatosy, Robin (Greenstone) | Outgoing | B.P. (Valeant) | 12:15:28 | 0:00:00 |
| 3/30/2012 | Text | Hatosy, Robin (Greenstone) | Outgoing | B.P. (Valeant) | 12:49:42 | 0:00:00 |
| 3/30/2012 | Text | Hatosy, Robin (Greenstone) | Outgoing | B.P. (Valeant) | 12:51:14 | 0:00:00 |
| 3/30/2012 | Text | Hatosy, Robin (Greenstone) | Outgoing | B.P. (Valeant) | 12:52:14 | 0:00:00 |

832.     On the day that Greenstone sent out the price increase notices, April 3, 2012, both CVS and Walgreens approached Sandoz looking for a lower price on Latanoprost Drops. That same day, R.H. and Kellum exchanged five text messages while Kellum replied internally to his colleagues at Sandoz, stating: "█████████████████████████████████████████████████ ██████████████████████████████████████" Later that evening, Kellum instructed his sales team not to make any "████████" for Latanoprost and to put the product on "█████████████" Kellum also instructed S.G., one of his sales executives, to lie to Walgreens about why Sandoz was unable to bid, instructing him to "████████████" even though Sandoz had plenty of supply.

833.     Sandoz immediately began preparing an increase of its own. On April 4, 2012, Kellum called R.H. but was unable to connect. He called her again on April 5, 2012, and the two competitors spoke for nearly two minutes.

834.     On April 6, 2012, Kellum requested a customer list from a colleague so that he could begin calculating the financial impact of a Sandoz price increase. He also added the item "████████████████████████████████████████████████████████████████ ████████?" After some quick calculations, Kellum determined that a Sandoz increase on Latanoprost Drops could increase the company's revenues by up to $14,900,000 per year.

835.    In a presentation he created that same day to support the Latanoprost price increase, Kellum was intentionally opaque about why Sandoz should take the increase, stating that "█████ ████████████████████████████████████████████████████ ████████████████████████" But that was a lie. Kellum had first learned of the Greenstone price increase directly from R.H., not a customer. In addition, the Valeant price increase had not even happened yet. In fact, it would not be effective until April 24, 2012, three weeks in the future; Kellum's inside information instead came directly from his prior conversations with his competitor, Greenstone.

836.    While he was in the midst of planning the Sandoz price increase on April 6, 2012, Kellum also exchanged two more text messages and had a nearly seven minute call with R.H. of Greenstone. R.H., in turn, then called B.P. at Valeant and the two spoke for nearly five minutes. Later that evening, Kellum told colleagues: "█████████████████████████████ █████████████████████"

837.    Things moved quickly from there. On April 9, 2012, Kellum sent around an agenda for the Pricing Committee meeting the next day. The agenda included "████████████████████ ████████████████" He also called R.H. of Greenstone but was unable to reach her. Kellum quickly obtained approval for the Latanoprost price increase; customers were notified of the increase on April 11, 2012, and it became effective on April 13, 2012. As a result of this quick action, Sandoz's price increase became effective even before Greenstone's.

838.    On April 12, 2012, a large retail pharmacy customer, Rite-Aid, sent Greenstone a request for a bid on Latanoprost. Knowing that this was likely an indication that Sandoz had followed Greenstone's price increase, R.H. (then using a different surname) forwarded the email directly to Kellum with an approving message:

████████████████████

REDACTED – PUBLIC VERSION



839.    That same day, a different customer, Optisource, approached Sandoz – angry that it was not notified in advance of Sandoz's Latanoprost price increase. A Sandoz sales executive told the customer that Sandoz was simply "███████████████████," but Optisource challenged that idea, saying that Valeant – which was also on a secondary contract with that customer – had not raised its price. Questioning Kellum's intel about the price increases, a senior sales and pricing executive at Sandoz forwarded the e-mail string directly to Kellum on Friday, April 13, 2012, asking: "███████████████████████████████ ███████?" Kellum's understanding, of course – based on his conversations with R.H. – was that Valeant would be raising, or already had raised, its price.

840.    The following Monday, April 16, 2012, Kellum called R.H. She called him back the next day, but they were unable to connect. On April 18 and 19, 2012, R.H. and B.P. of Valeant then communicated several times by phone and text message, including one call lasting nearly fourteen minutes.

841.    On April 24, 2012, Valeant raised its WAC pricing on Latanoprost to a point even higher than Sandoz's. That same day, Purcell of Valeant called R.H. of Greenstone, likely to report the news.

842.    Three price increases in the span of roughly three weeks caused a lot of customer activity and confusion – which in turn required additional coordination among the three manufacturers to make sure prices stayed high and the market remained stable. For the most part,

Sandoz tried to avoid taking any of its competitors' customers after the price increases, but it did want to pick up one customer to get closer to its "fair share" of the market.

843.    For example, on Friday May 4, 2012 – shortly after the Greenstone and Valeant price increases became effective – Cardinal approached Sandoz with an opportunity to bid and take the business with a lower price. Kellum called R.H. that day, but they were unable to connect. He called her again on Monday, and they spoke for more than six minutes. They spoke about Sandoz's desire to obtain another customer, and which customer it should target. Monday morning, before speaking to R.H., Kellum responded to the internal Sandoz e-mail saying, "███████████████████ █████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████?" The next day, after speaking to R.H., Kellum followed up the e-mail, confirming that Sandoz should pass on Cardinal, stating "█████████████████████████████████████████████ ████" Consistent with the agreement reached with Greenstone, Sandoz retained its secondary position with Cardinal, instead of bidding for the primary position, and decided to wait until ABC put its Latanoprost business out to bid and let Greenstone concede that customer instead.

844.    Around this same time, CW-1 started at Sandoz. He had previously worked with R.H. at a prior employer and thus had a pre-existing relationship with the Greenstone sales executive. When some confusion arose later in May 2012 around the Cardinal business, R.H. communicated with both CW-1 and Kellum from Sandoz, as well as B.P. of Valeant, in order to enforce the agreement already in place among the three manufacturers.

845.    For example, on the morning of May 31, 2012, B.P. of Valeant and R.H. of Greenstone exchanged one text message and had several phone calls of varying lengths. In the midst of those communications with B.P., R.H. was simultaneously communicating with CW-1 of Sandoz using iPhone chat, resulting in the following message exchange:



846.    As R.H. explained to CW-1, Valeant (B&L) had the Cardinal business, not Greenstone, but Cardinal was telling Valeant that Sandoz had a lower price in the market. R.H. expressed the need to call "Armando" [Kellum] because CW-1 had only recently started at Sandoz and thus did not completely understand the scope of the prior collusive communications between R.H. and Kellum about the Latanoprost price increases.

847.    Immediately following this exchange, R.H. did call Kellum, setting off a flurry of calls between the three competitors that day, as set forth below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 5/31/2012 | Voice | Hatosy, Robin (Greenstone) | Outgoing | Kellum, Armando (Sandoz) | 8:31:29 | 0:00:02 |
| 5/31/2012 | Voice | Hatosy, Robin (Greenstone) | Outgoing | Kellum, Armando (Sandoz) | 8:31:50 | 0:01:57 |
| 5/31/2012 | Voice | Hatosy, Robin (Greenstone) | Outgoing | B.P. (Valeant) | 8:34:24 | 0:03:15 |
| 5/31/2012 | Voice | Hatosy, Robin (Greenstone) | Outgoing | B.P. (Valeant) | 8:39:30 | 0:00:59 |
| 5/31/2012 | Voice | Hatosy, Robin (Greenstone) | Incoming | B.P. (Valeant) | 8:43:46 | 0:00:00 |
| 5/31/2012 | Voice | Hatosy, Robin (Greenstone) | Incoming | B.P. (Valeant) | 8:44:31 | 0:00:26 |
| 5/31/2012 | Voice | Hatosy, Robin (Greenstone) | Outgoing | Kellum, Armando (Sandoz) | 8:45:15 | 0:02:26 |
| 5/31/2012 | Voice | Hatosy, Robin (Greenstone) | Outgoing | B.P. (Valeant) | 9:17:22 | 0:02:29 |
| 5/31/2012 | Voice | Hatosy, Robin (Greenstone) | Outgoing | B.P. (Valeant) | 10:38:48 | 0:01:01 |

848.    Over the next several weeks, R.H. went to great lengths to make sure Sandoz and Valeant lived up to their agreement to keep prices high across the board for Latanoprost. For example, between June 26 and 28, 2012, R.H. and B.P. of Valeant exchanged twelve text messages.

849.    After that series of communications, on June 29, 2012, R.H. reached out again to CW-1 via iPhone chat (At the exact same time that R.H. was exchanging these iPhone chat messages with CW-1 at Sandoz, she was also exchanging separate text messages with B.P. of Valeant):

225

**REDACTED – PUBLIC VERSION**



850.    Those efforts were successful. On July 3, 2012, CW-1 followed up with R.H. via iPhone chat message confirming that Sandoz's pricing for Latanoprost was not low at Cardinal – or any other customer for that matter:



851.    Again, shortly after receiving this information from CW-1 about Sandoz's pricing, Hatosy sent a text message to Purcell at Valeant. They exchanged several other text messages that same day.

852.    Greenstone similarly lived up to its agreement to concede the ABC business to Sandoz, allowing Sandoz to get closer to its "fair share" of the Latanoprost market. On June 22, 2012, ABC requested a bid from Sandoz on Latanoprost, as expected, due to the Greenstone price increase. Consistent with the agreement, Greenstone quickly conceded the customer to Sandoz, allowing Sandoz to obtain the business "█████████████████████████."

853.    Remarkably, the Defendants were able to implement this price increase despite the fact that Akorn launched Latanoprost in July 2012 as well. Each of the competitors conceded

market share to Akorn, and in return, Akorn entered the market at the price set by Sandoz, Greenstone/Pfizer, and Valeant.

854.    This successful effort at price fixing convinced Kellum to recommend further efforts at price fixing with Greenstone on various formulations of Clindamycin beginning in August 2012, continuing through 2014. That history also paved the way for another successful price fixing agreement between Sandoz and Greenstone on Eplerenone Tablets, discussed above.

### 8.    Neomycin/Polymyxin/Hydrocortisone

855.    Neomycin/Polymyxin/Hydrocortisone is a topical antibiotic used to treat outer ear infections caused by bacteria. It is available in several forms, including a Solution and has been available in the United States for over a decade in a generic form.

856.    The market for Neomycin/Polymyxin/Hydrocortisone Solution (3.5mg-10MU 1%) is mature. At all relevant times, there have been multiple manufacturers.

857.    Valeant and Sandoz dominate sales of Neomycin/Polymyxin/Hydrocortisone with about a 70/30 split of the market in the relevant times.

858.    For several years, the price was relatively stable.  Prices began to rise in Spring 2010 with Valeant and Sandoz coordinating their price increases and continuing to maintain supracompetitive pricing for many years.

859.    The ability of Valeant and Sandoz to reach agreements on Neomycin Polymyxin Hydrocortisone was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.

860.    The parallel price increases by Valeant and Sandoz are consistent with the Fair Share Agreement.

861.    Non-collusive market factors (e.g., product shortages) do not explain the artificially inflated prices.

862.     The agreement between Valeant and Sandoz was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Neomycin Polymyxin Hydrocortisone Solution (3.5mg-10MU 1%).

### 9.     Nystatin Triamcinolone cream and ointment

863.     Nystatin Triamcinolone ("NT") is a steroid medication used to treat fungal infections.  It comes in a Cream and Ointment formulation, among others.

864.     It has been available in the United States in a generic form for several years.

865.     During the relevant time frame, Taro and Sandoz were the primary manufacturers of Nystatin Triamcinolone.

866.     Prior to certain Defendants launching Nystatin Triamcinolone, Taro and  Sandoz, engaged in conversations about their launch.  These conversations involved discussions of market and customer allocations.

867.     Sandoz and Taro have admitted that they conspired to fix, raise or stabilize the prices of Nystatin Triamcinolone cream and ointment in violation of federal law and have entered into deferred prosecution agreements with the U.S. Department of Justice.

868.     By early 2011, Sandoz had discontinued NT Cream and Ointment leaving Taro as the exclusive generic manufacturer of the products.

869.     Capitalizing on this exclusivity, Taro took several significant price increases on NT Cream and Ointment in 2011 and 2012, which resulted in a total WAC increase of more than 700% on certain formulations.

870.     Not surprisingly, during this time period, NT Cream and Ointment were Taro's highest grossing products and represented approximately 14.1% of the company's consolidated net sales for the year ending March 31, 2013.

REDACTED – PUBLIC VERSION

871.    Enticed by the high pricing, Sandoz began making plans to re-enter the NT Cream and Ointment markets in late 2012 and began coordinating regularly with Taro. On November 12, 2012 – before Aprahamian had joined Taro – CW-3 of Sandoz called Marcus, a Taro sales executive, three times with one call lasting four minutes, to alert him to the fact that Sandoz might be entering the market. That same day, CW-3 e-mailed M.A., a Sandoz marketing executive, regarding NT Ointment asking, "█████ ███████████████████████████████████," Anderson responded that Sandoz planned to launch all three package sizes.

872.    Two days later, on November 14, 2012, B.S., a senior Taro executive, sent an internal e-mail to other senior executives at Taro and Sun recommending price increases on several products where Taro was exclusive, including NT Cream and Ointment. B.S. explained that "███████ ████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████ ██████████████████████████████████."

873.    Sandoz's launch dates for NT Cream and Ointment would get pushed back, but CW-3 continued to keep H.M. informed. On January 4 and 7, 2013, CW-3 called H.M. of Taro. The calls lasted five minutes and thirteen minutes, respectively. One week later, on January 14, 2013, Taro held a Sales and Marketing conference call. During that call, Perfetto, then a Taro senior executive, informed the team that it was a "██████████████████████," that Taro was "████████ ████████████████" on NT Cream, and that the company should "████████████ ██████████████████."

874.    Two days later, on January 16, 2013, Perfetto e-mailed J.J., a senior Taro sales executive, advising that it was "████████████████████████████████████████ ████████████████," and asked J.J. to put together a list of Taro's top 10 customers. J.J.

REDACTED – PUBLIC VERSION

then forwarded the request along internally stating, "███████████████████

███████████████████████"

875.     On February 12, 2013, Taro increased WAC pricing on NT Cream by 25%. On

February 28, 2013, CW-3 e-mailed Anderson of Sandoz asking for an updated target launch date for

NT Ointment. She responded: "███████," That same day, CW-3 called H.M. of Taro to keep him

updated on Sandoz's plans, and they spoke for eleven minutes. Two days later, on March 2, 2013,

the two competitors exchanged three text messages.

876.     The following Monday, March 4, 2013, Taro held a Sales and Marketing conference

call. During that call, Perfetto informed the team that Sandoz was "██████████████████

██████████"

877.     On March 13, 2013, D.P., a senior sales executive at Sandoz, sent an internal e-mail

to the sales team, including to CW-3, requesting "██████████████" regarding pricing for certain

products that Sandoz was planning to re-launch, including NT Cream and Ointment.

878.     One week later, on March 18, 2013, Aprahamian started at Taro. Over the next

several days, Aprahamian and CW-3 exchanged several calls. These calls are detailed in the chart

below:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|------|-----------|-------------|-----------|--------------|----------|
| 3/19/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:16:00 |
| 3/19/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 0:01:00 |
| 3/19/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:01:00 |
| 3/21/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 0:12:00 |
| 3/22/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 0:01:00 |
| 3/22/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 0:18:00 |

879.     On March 19, 2013, D.P. sent CW-3 a "██████████" stating: "███████

██████████████████████." CW-3 understood from this e-mail that D.P. was

asking him to call his contact at Taro to obtain pricing. CW-3 responded: "████████████

████████████████████████████████████████████

██████████"

REDACTED – PUBLIC VERSION

880.    True to his word, on March 22, 2013, after the series of phone calls referenced above, CW-3 stated: "███████████████████████████████████████ ███████" Although CW-3 said his information came from ████████ the true source was Aprahamian at Taro. CW-3 also shared the file with Kellum and CW-1, a Sandoz senior pricing executive. Kellum and CW-1 understood at the time that CW-3 obtained this information directly from Taro.

881.    The file attached to CW-3's e-mail, which is pictured below, contained Taro's nonpublic contract pricing at several customers for several products, including specific price points for NT Cream and Ointment at Cardinal and Rite Aid. Notably, CW-3 did not have responsibility for either of those customers – which was a clear signal to his superiors that CW-3 had received the information from a competitor rather than a customer.



The pricing information had been provided directly by Aprahamian for the express purpose of allowing Sandoz to price as high as possible when entering the market.

882.    On the morning of April 15, 2013, Aprahamian called CW-3 and they spoke for eighteen minutes. A few minutes after hanging up, CW-3 called Aprahamian back. The call lasted one minute. During these calls, CW-3 told Aprahamian that Sandoz would be entering the market for NT Cream shortly. Later that day, Taro held a Sales and Marketing conference call. The minutes from the conference call stated: "████████████████████████████████████████ ██████████████"

231

883.    On that same day, April 15, 2013, Sandoz held its own Commercial Operations call during which they discussed NT Cream. During that call, Sandoz identified ABC, Walgreens, Rite Aid, Wal-Mart, and Omnicare as potential targets for the re-launch. CW-3's contemporaneous notes from that call are pictured below:



884.    Later that same day, on April 15, 2013, CW-3 called Aprahamian to further discuss the NT Cream launch. The two competitors spoke for nine minutes. CW-3's contemporaneous notes from that call are pictured below:



885.    On the call, Aprahamian provided CW-3 with Taro's non-public pricing at ABC, Walgreens, Rite Aid, and Omnicare. Aprahamian also told CW-3 that Taro would not defend these customers. CW-3 noted that by drawing arrows pointing at those customer names in his Notebook.

886.    After hanging up with Aprahamian, CW-3 immediately called Kellum to report his conversation with the competitor. The call lasted one minute. First thing the next morning, on April 16, 2013, CW-3 called Kellum again and they spoke for five minutes.

REDACTED – PUBLIC VERSION

887.     From April 20 to April 23, 2013, NACDS held its annual meeting in Palm Beach, Florida. Representatives from Taro, including Aprahamian and Perfetto, and Sandoz, including D.P. and Richard Tremonte, attended.

888.     The following day, on April 24, 2013, Aprahamian called CW-3 twice. The calls lasted one minute and five minutes, respectively. On April 25, 2013, CW-3 called Aprahamian. The call lasted one minute. That same day, Sandoz re-entered the NT Cream market and matched Taro's increased WAC pricing.

889.     On the day of Sandoz's re-entry, Rite Aid e-mailed Taro stating that it had received a competitive bid on NT Cream and asked whether Taro planned to bid to retain the business. H.M. of Taro forwarded the request to his colleagues J.J., Perfetto, and Aprahamian stating: "████████ ████████████████████████████████████████████." Aprahamian responded: "████ ████████████████████"

890.     The next day, on April 26, 2013, Aprahamian called CW-3 and they spoke for eight minutes. Consistent with Taro's agreement to cede that customer to Sandoz, Aprahamian e-mailed H.M. on April 27, 2013 asking him to call him Monday morning and stating, "██████████████ ██████████████████████"

891.     Also on April 26, 2013, Omnicare e-mailed Taro indicating that it had received an offer for NT Cream and gave Taro the opportunity to match the pricing. D.S. forwarded the request to Aprahamian who responded, "██████████████████████████████████████████ ██████████████████████"

892.     That same day, Perfetto sent an internal e-mail to J.K. and Michael Kalb, two senior Taro executives, and others including Aprahamian, reporting that over the last two days, Sandoz had approached several of Taro's customers, including ABC, Rite Aid and Omnicare. Perfetto concluded: "██████████████████████████"

REDACTED – PUBLIC VERSION

893.    On May 8, 2013, Perfetto sent an internal e-mail to Taro executives advising that Walgreens was moving its NT Cream business to Sandoz and stating that ███████████ ███████████████" That same day, Aprahamian called CW-3 and they spoke for eight minutes. CW-3 called Aprahamian back later that day and they spoke for another nine minutes.

894.    On May 28, 2013, NC Mutual e-mailed Taro stating that it had received an offer from Sandoz and asked whether Taro planned to lower its price to retain the business. E.G., a Taro sales executive, suggested that Taro defend the account, but Aprahamian disagreed, stating: "████████████████████████████████████████ ████████████" Two days later, on May 30, 2013, Aprahamian called CW-3. The call lasted one minute.

895.    On June 4, 2013, Taro circulated an internal spreadsheet tracking its customer gains and losses for May 2013 for various products. With respect to Nystatin Triamcinolone Cream, Taro noted that it lost the business at Omnicare because it was ██████████████" and the Walgreens business was ████████████████.

896.    Despite Sandoz's entry, prices for NT Cream remained extremely high. Around this same time, K.S., a policy executive at Taro, actually sent an internal e-mail to J.J., Perfetto, and Aprahamian asking whether there had ███████████████████████████████████ ██████████████████" because "██████████████████████████ █████████████████████" J.J. replied that Kaiser had begun "███████████████ ██████████████ in order to provide some financial relief to its patients.

897.    Following Sandoz's re-launch into the NT Cream market, Sandoz executives began discussing a larger "██████████" which involved "████████████████████ ████████████████████" The rationale was simple – allow Taro to grow these markets by increasing prices and then Sandoz could re-enter later at the higher prices, in coordination with

Taro. Sandoz referred to NT Cream as ████████ for the success of this suggested approach and further noted that it would ████████████████████ meaning that it would help Taro increase its profitability on other products in repayment for Taro's willingness to give up its market share to Sandoz on its most lucrative product.

898.    Indeed, the following chart from a Credit Suisse Investor report graphically illustrates the success of such an approach – depicting the price increases taken by Taro on NT Cream while Sandoz was out of the market and Sandoz's re-entry at the higher price:



899.    In November 2013, Sandoz began readying to re-enter the NT Ointment market. Sandoz executives, including Kellum, wanted to mirror the NT Ointment launch after the NT Cream launch by targeting the same customers as it had for NT Cream. Kellum specifically discussed this approach with CW-1.

900.    On November 13 and 15, 2013, Aprahamian and CW-3 exchanged several calls during which they discussed NT Ointment. CW-3 then reported what he discussed on those calls to CW-1. This call pattern is detailed in the chart below:

| Date | Call Type | Target Name | Direction | Contact Name | Time | Duration |
|---|---|---|---|---|---|---|
| 11/13/2013 | Voice | Aprahamian, Ara (Taro) | Outgoing | CW-3 (Sandoz) | 8:00:00 | 0:01:00 |
| 11/13/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 8:15:00 | 0:02:00 |
| 11/13/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 8:32:00 | 0:08:00 |
| 11/15/2013 | Voice | CW-3 (Sandoz) | Outgoing | CW-1 (Sandoz) | 6:33:00 | 0:08:00 |
| 11/15/2013 | Voice | Aprahamian, Ara (Taro) | Incoming | CW-3 (Sandoz) | 6:41:00 | 0:11:00 |
| 11/15/2013 | Voice | CW-3 (Sandoz) | Outgoing | CW-1 (Sandoz) | 6:55:00 | 0:01:00 |

REDACTED – PUBLIC VERSION

901.    During his calls with Aprahamian, CW-3 took the following contemporaneous notes in his Notebook regarding NT Cream and Ointment:



902.    On these calls, CW-3 and Aprahamian discussed Sandoz's plan to target the same customers that it had targeted on NT Cream – ABC, Walgreens, Rite Aid, and Omnicare. CW-3 drew an arrow from the customers listed under NT Cream to the NT Ointment pricing to demonstrate this. As he had done before, Aprahamian agreed that Taro would not defend those customers and provided CW-3 with Taro's pricing at those accounts.

903.    On November 22, 2013, Aprahamian called CW-3 and they spoke for seven minutes. That same day, Sandoz re-entered the NT Ointment market and matched Taro's increased WAC pricing. Per the competitors' agreement, Sandoz submitted offers to "███████████████ ██████████████████."

904.    The next day, on November 23, 2013, P.G.., Sandoz's President, emailed Kellum and D.P. regarding the NT Ointment re-launch. Goldschmidt asked who the other competitors were in the market and how much share Sandoz planned to target. D.P. responded: "██████████████ ████████████████████████████████████████ ████████████████████████."

905.    By December 2013, Sandoz had – as agreed – targeted and secured the NT Ointment business at ABC, Walgreens, Rite Aid, and Omnicare.

906.    In July 2015, Actavis entered the market for both NT Cream and Ointment, and Sandoz and Taro promptly arranged to concede to Actavis approximately 10% of the market for both formulations, and Actavis accepted this concession without disrupting pricing. Accordingly, by following the fair share rules, Sandoz, Taro, and Actavis were able to maintain supracompetitive pricing on NT Cream and Ointment, even as a third competitor entered the market for the drug.

### 10.    Oxycodone HCL oral solution and tablets

907.    Oxycodone HCL is an opioid agonist indicated for the management of moderate to severe acute and chronic pain where the use of an opioid analgesic is appropriate. It is available in several forms, including Tablet and Oral Solution, and has been available in the United States for over a decade in generic form.

908.    The market for Oxycodone HCL is mature. At all relevant times, there have been multiple manufacturers of Oxycodone HCL. Glenmark and Lannett dominated the market for Oxycodone HCL 20mg/ml Oral Solution with roughly an 80/20 split in the relevant times. Par,Actavis, , and Sun, along with non-defendant Mallinckrodt, were the primary manufacturers of Oxycodone HCL 5mg, 15 mg, and 30mg Tablets.

909.    For several years, the price for Oxycodone HCL Oral Solution was relatively stable. Prices began to rise in the spring of 2010 with Glenmark and Lannett coordinating their price increases and continuing to maintain supracompetitive pricing for many years.

910.    Glenmark and Lannett's prices remained elevated for many years.

911.    The ability of Glenmark and Lannett to reach agreements on Oxycodone HCL was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.

912.    The parallel price increases by Glenmark and Lannett are consistent with the Fair Share Agreement.

REDACTED – PUBLIC VERSION

913.    Non-collusive market factors (e.g., product shortages) do not explain the artificially inflated prices.

914.    The agreement between Glenmark and Lannett was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Oxycodone HCL Oral Solution (20mg/ml).

915.    Similarly, for several years, the price of 5mg, 15 mg, and 30 mg Oxycodone Tablets remained relatively stable. Prices began to rise in the fall of 2013 with Mallinckrodt, Par, Actavis, and Sun coordinating their price increases and continuing to maintain supracompetitive pricing for multiple years.

916.    The ability of Mallinckrodt, Par, Actavis, and Sun to reach agreements on Oxycodone HCL Tablets was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.

917.    The parallel price increases by Mallinckrodt, Par, Actavis, and Sun are consistent with the Fair Share Agreement.

918.    Non-collusive market factors (e.g., product shortages) do not explain the artificially inflated prices.

919.    The agreement between Mallinckrodt, Par, Actavis, and Sun was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Oxycodone HCL Tablets (15 mg and 30 mg).

11.   **Silver Sulfadiazine cream**

920.    Silver Sulfadiazine is an antibiotic used to treat second and third-degree burns. It has been available in the United States for many years in a generic form. It is available in a Cream formulation.

921.    The market for Silver Sulfadiazine 1% Cream is mature. At all relevant times there have been multiple manufacturers.

922.    Ascend and Teva dominate sales of Silver Sulfadiazine Cream (1% ) with a roughly 30/70 split of the market.

923.    For several years, the price for Silver Sulfadiazine was relatively stable. Prices began to rise in the spring of 2012 with Ascend and Teva coordinating their price increases and continuing to maintain supracompetitive pricing for many years.

924.    The ability of Ascend and Teva to reach agreements on Silver Sulfadiazine was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person. For example, representatives of Ascend and Teva attended the GPhA 2012 Annual Meeting from February 22-24, 2012 and the NACDS 2012 Pharmacy and Technology Conference in Denver, Colorado from August 25-28, 2012.

925.    The parallel price increases by Ascend and Teva are consistent with the Fair Share Agreement.

926.    Non-collusive market factors (e.g., product shortages) do not explain the artificially inflated prices.

927.    The agreement between Ascend and Teva was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Silver Sulfadiazine Cream (1%).

12.    **Tobramycin Dexamethasone**

928.    Tobramycin Dexamethasone is an antibiotic used to treat bacterial eye infections. It has been available in the United States for over a decade in a generic form.

929.    The market for Tobramycin Dexamethasone is mature. At all relevant times, there have been multiple manufacturers.

930.    Valeant and Sandoz dominate sales of Tobramycin Dexamethasone Ophthalmic Liquid (0.3-0.1%) with about a 50/50 split of the market in the relevant times.

931.    For several years, the price for Tobramycin Dexamethasone was relatively stable. Prices began to rise at the end of 2012 with Valeant and Sandoz coordinating their price increases and continuing to maintain supracompetitive pricing for many years.

932.    The ability of Valeant and Sandoz to reach agreements on Tobramycin Dexamethasone was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.

933.    The parallel price increases by Valeant and Sandoz are consistent with the Fair Share Agreement.

934.    Non-collusive market factors (e.g., product shortages) do not explain the artificially inflated prices.

935.    The agreement between Valeant and Sandoz was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Tobramycin Dexamethasone Ophthalmic Liquid (0.3-0.1%).

13.    **Trazodone HCL**

936.    Trazodone HCL is a serotonin uptake inhibitor that is used to treat depression. It is available in tablet form in several strengths, including 100 mg Tablets. It has been available in the United States for over a decade in a generic form.

937.    The market for Trazodone HCL is mature. At all relevant times, there have been multiple manufacturers of Trazodone HCL. Teva and Par dominated the market for Trazodone HCL 100mg Tablets, with Teva holding about 70% of the market and Par holding about 15% within that timeframe. Apotex and Sun each held smaller shares.

938.    For several years, the price for 100 mg Trazodone HCL tablets was relatively stable. Prices began to rise in early 2015 with Apotex, Par, Sun, and Teva coordinating their price increases and continuing to maintain supracompetitive pricing for many years.

939.    The ability of Apotex, Par, Sun, and Teva to reach agreements on Trazodone HCL was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.

940.    The parallel price increases by Apotex, Par, Sun, and Teva are consistent with the Fair Share Agreement.

941.    Non-collusive market factors (e.g., product shortages) do not explain the artificially inflated prices.

942.    The agreement between Apotex, Par, Sun, and Teva was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including 100mg Trazodone HCL Tablets (100 mg).

REDACTED – PUBLIC VERSION

## IX.    HUMANA'S PURCHASES AND ANTITRUST INJURY

943.    During the relevant time period, HPI purchased hundreds of millions of dollars' worth of the Subject Drugs directly and indirectly.

944.    Because of Defendants' illegal conduct, Humana has been compelled to pay artificially inflated prices for each of the Subject Drugs listed above.

945.    The Subject Drugs' prices have been substantially higher than the prices that Humana would have paid for the Subject Drugs but for Defendants' collusion.

946.    Consequently, Humana has sustained substantial losses and damages to its business and property in the form of overcharges. The full amount, forms, and components of such damages will be determined after discovery and upon proof at trial.

947.    Defendants' unlawful conduct has successfully eliminated competition in the market, and Humana has sustained, and continues to sustain, significant losses in the form of artificially inflated prices paid to Defendants. The full amount of such damages will be calculated after discovery and upon proof at trial.

948.    Defendants, through their unlawful acts, reduced competition in the United States market for the Subject Drugs, increased prices, and caused antitrust injury to Humana.

949.    Prices for the Subject Drugs have been and will continue to be inflated as a direct and foreseeable result of Defendants' anticompetitive conduct. The inflated prices that Humana has paid, and will continue to pay, are traceable to, and the foreseeable result of, Defendants' unlawful conduct.

## X.    INTERSTATE TRADE AND COMMERCE

950.    Defendants are the leading manufacturers and suppliers of the Subject Drugs sold in the United States. At all material times, the Subject Drugs were manufactured and sold by Defendants, directly or through one of more of their affiliates, throughout the United States in a

continuous and uninterrupted flow through interstate commerce, including through and into this District.

951.    Between at least 2012 and the present, in connection with the purchase and sale of the Subject Drugs, monies as well as contracts, bills, and other forms of business communication and transactions were transmitted in a continuous and uninterrupted flow across state lines.

952.    Defendants' and their co-conspirators' activities were within the flow of interstate commerce, intending to have and having a substantial effect on interstate commerce in the United States.

953.    Defendants' and their co-conspirators' conduct, including the marketing and sale of the Subject Drugs, took place within, has had, and was intended to have, a direct, substantial, and reasonably foreseeable anticompetitive effect upon interstate commerce in the United States.

954.    The conspiracy alleged herein has directly and substantially affected interstate commerce; Defendants deprived Humana and others of the benefit of free and open competition in the purchase of the Subject Drugs within the United States.

955.    Defendants' agreement to increase, fix, maintain, and stabilize prices, rig bids, and engage in market and customer allocation of the Subject Drugs, and their actual inflating, fixing, maintaining, or artificially stabilizing prices of the Subject Drugs, were intended to have, and have had, a direct, substantial, and reasonably foreseeable effect on interstate commerce within the United States.

## XI.    TOLLING AND FRAUDULENT CONCEALMENT

956.    The claims asserted in this Complaint have been tolled as Defendants engaged in affirmative and fraudulent concealment of the conspiracies alleged in this Complaint.

957.    Defendants knew their actions were illegal and consistently took overt steps to conceal their illegal conduct and destroy evidence of their agreements.

958.    Among other things, as alleged in the State AG Complaint No. 2, Defendants' executives took affirmative steps to conceal and destroy evidence of their wrongdoing since as early as 2012. These steps included failing to maintain a document retention policy, instructing each other and their co-conspirators not to put communications relating to the conspiracy in writing, intentionally withholding documents subject to subpoenas, and deleting text messages from their telephones, as alleged in paragraphs 158, 546, 647, 1117, among others, of the State AG Complaint No. 2, which is incorporated by reference.

959.    Furthermore, Defendants spoke and met in secret to conceal the conspiracies, often under the pretext of legitimate trade association and industry activities as set forth above and took steps (beyond those alleged above) to ensure that communications relating to the conspiracies were not recoded in writing. In some cases, as alleged above, price increases were staggered to conceal the existence of the price-fixing agreements. Also, as alleged above, Defendants engaged in bid coordination and straw bidding activity, which were intended to, and did, give a false impression of competition among Defendants.

960.    Humana acted with due diligence at all relevant times by, among other things, monitoring available prices for the Subject Drugs and seeking to obtain the most competitive prices possible, efforts that were hindered by Defendants' concealment. As a result, Humana did not know or reasonably suspect the existence of the claims alleged in this Complaint more than four years before the filing of this Complaint, nor was Humana aware of any facts more than four years before filing this Complaint that would have put it on reasonable notice of its claims.

961.    Finally, Humana's claims against Defendant Novartis are tolled by virtue of a tolling agreement Humana and Novartis entered into on December 18, 2018. Pursuant to that agreement, Humana and Novartis agreed to suspend and toll as of November 18, 2018, and continuing through

REDACTED – PUBLIC VERSION

January 31, 2024, any and all applicable limitations, laches or repose periods that may apply to Novartis with respect to this litigation.

## XII.    DISCOVERY WILL ESTABLISH THE FULL SCOPE OF THE CONSPIRACY

962.    Discovery is necessary to determine the full scope of Defendants' conspiracy, including years, products, and participants. Plaintiff reserves all rights to amend or supplement this Complaint to add additional Defendants, claims, years, products, or other allegations based upon discovery and further investigation.

## XIII.  CAUSES OF ACTION

### COUNT I

### VIOLATION OF SECTION 1 OF THE SHERMAN ACT

### (As to Actavis and All Other Defendants Under Joint and Several Liability)

963.    Humana incorporates by reference the preceding allegations.

964.    Actavis knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States, in violation of Section 1 of the Sherman Act (the "Actavis Drugs"). This conspiracy was *per se* unlawful price-fixing.

> Ammonium Lactate
> Carbidopa/Levodopa
> Carisoprodol
> Nystatin Triamcinolone
> Oxycodone HCL Tablets
> Promethazine HCL
> Silver Sulfadiazine
> Terconazole

965.    Actavis has committed at least one overt act to further the conspiracy alleged in this Complaint. Actavis's anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing prices of the Actavis Drugs throughout the United States.

966.    The conspiracy realized its intended effect; Actavis has benefited, and continues to benefit, from its anticompetitive agreements which have artificially inflated the prices of the Actavis Drugs.

967.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

       a.    Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Actavis Drugs;

       b.    Humana was deprived of the benefits of free and open competition in the sale of the Actavis Drugs in the United States market; and

       c.    Competition in establishing the prices paid for the Actavis Drugs was unlawfully restrained, suppressed, or eliminated.

968.    Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Actavis Drugs until the market achieves a steady state.

969.    As a direct and proximate result of Actavis's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Actavis Drugs than it would have paid in the absence of Actavis's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

970.    Actavis is *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by its contract, combination, and conspiracy in restraint of trade as alleged herein.

971.    There is no legitimate, non-pretextual, pro-competitive business justification for Actavis's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

REDACTED – PUBLIC VERSION

972.    Actavis's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

973.    Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of the Actavis Drugs, or by assignment from its other subsidiaries that directly purchased the Actavis Drugs during the relevant period.

## COUNT II

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT
### OF TRADE UNDER STATE LAWS

**(As to Actavis and All Other Defendants Under Joint and Several Liability)**

974.    Humana incorporates by reference the preceding allegations.

975.    Actavis knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of the Actavis Drugs in the United States. This conspiracy was *per se* unlawful price-fixing.

976.    Actavis has committed at least one overt act to further the conspiracy alleged in this Complaint. Actavis's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Actavis Drugs throughout the United States.

977.    The conspiracy realized its intended effect; Actavis has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Actavis Drugs.

978.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

> a.    Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Actavis Drugs;

> b.    Humana was deprived of the benefits of free and open competition in the sale of the Actavis Drugs in the United States market; and

REDACTED – PUBLIC VERSION

    c.   Competition in establishing the prices paid for the Actavis Drugs was unlawfully restrained, suppressed, or eliminated.

979.    Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Actavis Drugs until the market achieves a steady state.

980.    As a direct and proximate result of Actavis's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Actavis Drugs than it would have paid in the absence of Actavis's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

981.    There is no legitimate, non-pretextual, pro-competitive business justification for Actavis's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

982.    Actavis's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

983.    Actavis's conduct violated the following state antitrust or competition practices laws:

    a.   Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

    b.   Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

    c.   Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut.

    d.   D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

    e.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

    f.   Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

    g.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

    h.   Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

    i.   Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

REDACTED – PUBLIC VERSION

j.   Md. Comm. L. §§ 11-201, et seq., with respect to purchases in Maryland.

k.   Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

l.   Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

m.   Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

n.   Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

o.   Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

p.   Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

q.   Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

r.   Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

s.   N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

t.   N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

u.   N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

v.   N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

w.   Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

x.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

y.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

z.   S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

aa.  Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

bb.  Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

cc.  Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

dd. W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

ee. Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

## COUNT III

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Actavis and All Other Defendants Under Joint and Several Liability)

984.    Humana incorporates by reference the preceding allegations.

985.    Actavis engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Actavis's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase the Actavis Drugs at prices restrained by competition and forced to pay artificially inflated prices.

986.    There was and is a gross disparity between the price that Humana paid and continues to pay for the Actavis Drugs, including by assignment from its subsidiaries, and the value received, given that more cheaply priced Actavis Drugs should have been available, and would have been available, absent Actavis's illegal conduct.

987.    By engaging in the foregoing conduct, Actavis engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

a. Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

b. Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

c. Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

d. D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

e. Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f. Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

g.  Idaho Code §§ 48-601, et seq., with respect to the purchases in Idaho.

h.  815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

i.  5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j.  Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k.  Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l.  Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m.  Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n.  Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o.  Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p.  N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New Hampshire.

q.  N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r.  N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s.  N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t.  Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u.  73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v.  R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w.  S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x.  Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y.  Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z.  Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa.  West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West Virginia.

REDACTED – PUBLIC VERSION

## COUNT IV

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Actavis and All Other Defendants Under Joint and Several Liability)

988.    Humana incorporates by reference the preceding allegations.

989.    Actavis has benefitted from artificial prices in the sale of the Actavis Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

990.    Actavis's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Actavis Drugs by Humana.

991.    Humana has conferred upon Actavis an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

992.    It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Actavis Drugs.

993.    It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Actavis Drugs, as it is not liable and would not compensate Humana for the impact of Actavis's unlawful conduct.

994.    The economic benefit of overcharges derived by Actavis through charging supracompetitive and artificially inflated prices for the Actavis Drugs is a direct and proximate result of Actavis's unlawful conduct.

995.    The economic benefits derived by Actavis rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Actavis.

996.    It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Actavis to be permitted to retain any of the overcharges for the Actavis Drugs derived

REDACTED – PUBLIC VERSION

from Actavis's unfair and unconscionable methods, acts, and trade practices alleged in this

Complaint.

997.    Actavis is aware of and appreciates the benefits bestowed upon it by Humana.

998.    Actavis should be compelled to disgorge in a common fund for the benefit of

Humana all unlawful or inequitable proceeds it received.

999.    A constructive trust should be imposed upon all unlawful or inequitable sums

received by Actavis traceable to Humana.

## COUNT V

## DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

### (As to Actavis and All Other Defendants Under Joint and Several Liability)

1000.    Humana incorporates by reference the preceding allegations.

1001.    Actavis knowingly, intentionally, and cooperatively engaged in an anticompetitive

scheme designed to artificially inflate prices of the Actavis Drugs. Actavis injured Humana through

this conduct.

1002.    But for Actavis's scheme to inflate the price of the Actavis Drugs, Humana would

have purchased lower-priced Actavis Drugs.

1003.    Humana has suffered harm, and will continue to suffer harm in the future, as a result

of paying higher prices for the Actavis Drugs than it would have paid absent Actavis's continuing

anticompetitive conduct.

1004.    Humana has purchased substantial amounts of the Actavis Drugs during the relevant

period.

1005.    Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and

28 U.S.C. § 2201(a) ruling that Actavis's conduct violates Sections 1 and 2 of the Sherman Act.

REDACTED – PUBLIC VERSION

1006.   Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Actavis's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT VI

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT

### (As to Alvogen and All Other Defendants Under Joint and Several Liability)

1007.   Humana incorporates by reference the preceding allegations.

1008.   Alvogen knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States, in violation of Section 1 of the Sherman Act (the "Alvogen Drugs"). This conspiracy was *per se* unlawful price-fixing.

Exemestane

1009.   Alvogen has committed at least one overt act to further the conspiracy alleged in this Complaint. Alvogen's anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing prices of the Alvogen Drugs throughout the United States.

1010.   The conspiracy realized its intended effect; Alvogen has benefited, and continues to benefit, from its anticompetitive agreements which have artificially inflated the prices of the Alvogen Drugs.

1011.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

   a.   Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Alvogen Drugs;

REDACTED – PUBLIC VERSION

    b.   Humana was deprived of the benefits of free and open competition in the sale of the Alvogen Drugs in the United States market; and

    c.   Competition in establishing the prices paid for the Alvogen Drugs was unlawfully restrained, suppressed, or eliminated.

1012.   Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Alvogen Drugs until the market achieves a steady state.

1013.   As a direct and proximate result of Alvogen's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Alvogen Drugs than it would have paid in the absence of Alvogen's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

1014.   Alvogen is *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by its contract, combination, and conspiracy in restraint of trade as alleged herein.

1015.   There is no legitimate, non-pretextual, pro-competitive business justification for Alvogen's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1016.   Alvogen's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1017.   Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of the Alvogen Drugs, or by assignment from its other subsidiaries that directly purchased the Alvogen Drugs during the relevant period.

## COUNT VII

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAWS

**(As to Alvogen and All Other Defendants Under Joint and Several Liability)**

1018.    Humana incorporates by reference the preceding allegations.

1019.    Alvogen knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of the Alvogen Drugs in the United States. This conspiracy was *per se* unlawful price-fixing.

1020.    Alvogen has committed at least one overt act to further the conspiracy alleged in this Complaint. Alvogen's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Alvogen Drugs throughout the United States.

1021.    The conspiracy realized its intended effect; Alvogen has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Alvogen Drugs.

1022.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

    a.    Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Alvogen Drugs;

    b.    Humana was deprived of the benefits of free and open competition in the sale of the Alvogen Drugs in the United States market; and

    c.    Competition in establishing the prices paid for the Alvogen Drugs was unlawfully restrained, suppressed, or eliminated.

1023.    Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Alvogen Drugs until the market achieves a steady state.

1024.    As a direct and proximate result of Alvogen's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Alvogen Drugs than it would have paid in the absence of Alvogen's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

REDACTED – PUBLIC VERSION

1025.    There is no legitimate, non-pretextual, pro-competitive business justification for Alvogen's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1026.    Alvogen's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1027.    Alvogen's conduct violated the following state antitrust or competition practices laws:

    a.   Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

    b.   Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

    c.   Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut.

    d.   D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

    e.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

    f.   Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

    g.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

    h.   Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

    i.   Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

    j.   Md. Comm. L. §§ 11-201, et seq., with respect to purchases in Maryland.

    k.   Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

    l.   Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

    m.   Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

    n.   Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

REDACTED – PUBLIC VERSION

  o. Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

  p. Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

  q. Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

  r. Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

  s. N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

  t. N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

  u. N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

  v. N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

  w. Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

  x. 10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

  y. R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

  z. S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

  aa. Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

  bb. Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

  cc. Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

  dd. W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

  ee. Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

## COUNT VIII

### UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

#### (As to Alvogen and All Other Defendants Under Joint and Several Liability)

1028. Humana incorporates by reference the preceding allegations.

REDACTED – PUBLIC VERSION

1029.    Alvogen engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Alvogen's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase the Alvogen Drugs at prices restrained by competition and forced to pay artificially inflated prices.

1030.    There was and is a gross disparity between the price that Humana paid and continues to pay for the Alvogen Drugs, including by assignment from its subsidiaries, and the value received, given that more cheaply priced Alvogen Drugs should have been available, and would have been available, absent Alvogen's illegal conduct.

1031.    By engaging in the foregoing conduct, Alvogen engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

   a.    Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

   b.    Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

   c.    Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

   d.    D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

   e.    Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

   f.    Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

   g.    Idaho Code §§ 48-601, et seq., with respect to purchases in Idaho.

   h.    815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

   i.    5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

   j.    Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

   k.    Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

REDACTED – PUBLIC VERSION

l.   Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m.   Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n.   Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o.   Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p.   N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New Hampshire.

q.   N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r.   N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s.   N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t.   Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u.   73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v.   R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w.   S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x.   Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y.   Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z.   Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa.  West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West Virginia.

## COUNT IX

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Alvogen and All Other Defendants Under Joint and Several Liability)

1032.   Humana incorporates by reference the preceding allegations.

REDACTED – PUBLIC VERSION

1033.   Alvogen has benefitted from artificial prices in the sale of the Alvogen Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

1034.   Alvogen's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Alvogen Drugs by Humana.

1035.   Humana has conferred upon Alvogen an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

1036.   It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Alvogen Drugs.

1037.   It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Alvogen Drugs, as it is not liable and would not compensate Humana for the impact of Alvogen's unlawful conduct.

1038.   The economic benefit of overcharges derived by Alvogen through charging supracompetitive and artificially inflated prices for the Alvogen Drugs is a direct and proximate result of Alvogen's unlawful conduct.

1039.   The economic benefits derived by Alvogen rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Alvogen.

1040.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Alvogen to be permitted to retain any of the overcharges for the Alvogen Drugs derived from Alvogen's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

1041.   Alvogen is aware of and appreciates the benefits bestowed upon it by Humana.

1042.   Alvogen should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds it received.

REDACTED – PUBLIC VERSION

1043.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Alvogen traceable to Humana.

## COUNT X

### DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

#### (As to Alvogen and All Other Defendants Under Joint and Several Liability)

1044.   Humana incorporates by reference the preceding allegations.

1045.   Alvogen knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Alvogen Drugs. Alvogen injured Humana through this conduct.

1046.   But for Alvogen's scheme to inflate the price of the Alvogen Drugs, Humana would have purchased lower-priced Alvogen Drugs.

1047.   Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Alvogen Drugs than it would have paid absent Alvogen's continuing anticompetitive conduct.

1048.   Humana has purchased substantial amounts of the Alvogen Drugs during the relevant period.

1049.   Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Alvogen's conduct violates Sections 1 and 2 of the Sherman Act.

1050.   Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Alvogen's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT XI

REDACTED – PUBLIC VERSION

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT

### (As to Amneal and All Other Defendants Under Joint and Several Liability)

1051.    Humana incorporates by reference the preceding allegations.

1052.    Amneal knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States, in violation of Section 1 of the Sherman Act (the "Amneal Drugs"). This conspiracy was *per se* unlawful price-fixing.

> Hydrocodone Acetaminophen

1053.    Amneal has committed at least one overt act to further the conspiracy alleged in this Complaint. Amneal's anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing prices of the Amneal Drugs throughout the United States.

1054.    The conspiracy realized its intended effect; Amneal has benefited, and continues to benefit, from its anticompetitive agreements which have artificially inflated the prices of the Amneal Drugs.

1055.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

    a.    Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Amneal Drugs;

    b.    Humana was deprived of the benefits of free and open competition in the sale of the Amneal Drugs in the United States market; and

    c.    Competition in establishing the prices paid for the Amneal Drugs was unlawfully restrained, suppressed, or eliminated.

1056.    Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Amneal Drugs until the market achieves a steady state.

REDACTED – PUBLIC VERSION

1057.    As a direct and proximate result of Amneal's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Amneal Drugs than it would have paid in the absence of Amneal's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

1058.    Amneal is *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by its contract, combination, and conspiracy in restraint of trade as alleged herein.

1059.    There is no legitimate, non-pretextual, pro-competitive business justification for Amneal's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1060.    Amneal's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1061.    Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of the Amneal Drugs, or by assignment from its other subsidiaries that directly purchased the Amneal Drugs during the relevant period.

## COUNT XII

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAWS

#### (As to Amneal and All Other Defendants Under Joint and Several Liability)

1062.    Humana incorporates by reference the preceding allegations.

1063.    Amneal knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of the Amneal Drugs in the United States. This conspiracy was *per se* unlawful price-fixing.

1064.    Amneal has committed at least one overt act to further the conspiracy alleged in this Complaint. Amneal's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Amneal Drugs throughout the United States.

1065.    The conspiracy realized its intended effect; Amneal has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Amneal Drugs.

1066.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

      a.    Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Amneal Drugs;

      b.    Humana was deprived of the benefits of free and open competition in the sale of the Amneal Drugs in the United States market; and

      c.    Competition in establishing the prices paid for the Amneal Drugs was unlawfully restrained, suppressed, or eliminated.

1067.    Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Amneal Drugs until the market achieves a steady state.

1068.    As a direct and proximate result of Amneal's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Amneal Drugs than it would have paid in the absence of Amneal's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

1069.    There is no legitimate, non-pretextual, pro-competitive business justification for Amneal's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1070. Amneal's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1071. Amneal's conduct violated the following state antitrust or competition practices laws:

a. Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

b. Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

c. Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut.

d. D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

e. Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f. Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

g. 740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

h. Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

i. Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

j. Md. Comm. L. §§ 11-201, et seq., with respect to purchases in Maryland.

k. Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

l. Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

m. Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

n. Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

o. Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

p. Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

q. Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

r. Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

REDACTED – PUBLIC VERSION

s.   N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

t.   N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

u.   N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

v.   N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North
     Dakota.

w.   Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

x.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

y.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

z.    S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South
     Dakota.

aa.  Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

bb.  Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

cc.  Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

dd.  W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

ee.  Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

## COUNT XIII

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Amneal and All Other Defendants Under Joint and Several Liability)

1072.   Humana incorporates by reference the preceding allegations.

1073.   Amneal engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Amneal's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase the Amneal Drugs at prices restrained by competition and forced to pay artificially inflated prices.

REDACTED – PUBLIC VERSION

1074.    There was and is a gross disparity between the price that Humana paid and continues to pay for the Amneal Drugs, including by assignment from its subsidiaries, and the value received, given that more cheaply priced Amneal Drugs should have been available, and would have been available, absent Amneal's illegal conduct.

1075.    By engaging in the foregoing conduct, Amneal engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

    a.    Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

    b.    Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

    c.    Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

    d.    D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

    e.    Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

    f.    Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

    g.    Idaho Code §§ 48-601, et seq., with respect to the purchases in Idaho.

    h.    815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

    i.    5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

    j.    Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

    k.    Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

    l.    Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

    m.    Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

    n.    Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

    o.    Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

REDACTED – PUBLIC VERSION

p.  N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New Hampshire.

q.  N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r.  N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s.  N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t.  Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u.  73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v.  R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w.  S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x.  Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y.  Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z.  Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa. West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West Virginia.

## COUNT XIV

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Amneal and All Other Defendants Under Joint and Several Liability)

1076.   Humana incorporates by reference the preceding allegations.

1077.   Amneal has benefitted from artificial prices in the sale of the Amneal Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

1078.   Amneal's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Amneal Drugs by Humana.

1079.   Humana has conferred upon Amneal an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

REDACTED – PUBLIC VERSION

1080.   It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Amneal Drugs.

1081.   It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Amneal Drugs, as it is not liable and would not compensate Humana for the impact of Amneal's unlawful conduct.

1082.   The economic benefit of overcharges derived by Amneal through charging supracompetitive and artificially inflated prices for the Amneal Drugs is a direct and proximate result of Amneal's unlawful conduct.

1083.   The economic benefits derived by Amneal rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Amneal.

1084.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Amneal to be permitted to retain any of the overcharges for the Amneal Drugs derived from Amneal's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

1085.   Amneal is aware of and appreciates the benefits bestowed upon it by Humana.

1086.   Amneal should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds it received.

1087.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Amneal traceable to Humana.

## COUNT XV

## DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

### (As to Amneal and All Other Defendants Under Joint and Several Liability)

REDACTED – PUBLIC VERSION

1088.    Humana incorporates by reference the preceding allegations.

1089.    Amneal knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Amneal Drugs. Amneal injured Humana through this conduct.

1090.    But for Amneal's scheme to inflate the price of the Amneal Drugs, Humana would have purchased lower-priced Amneal Drugs.

1091.    Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Amneal Drugs than it would have paid absent Amneal's continuing anticompetitive conduct.

1092.    Humana has purchased substantial amounts of the Amneal Drugs during the relevant period.

1093.    Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Amneal's conduct violates Sections 1 and 2 of the Sherman Act.

1094.    Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Amneal's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT XVI

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT

### (As to Apotex and All Other Defendants Under Joint and Several Liability)

1095.    Humana incorporates by reference the preceding allegations.

1096.    Apotex knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States, in

REDACTED – PUBLIC VERSION

violation of Section 1 of the Sherman Act (the "Apotex Drugs"). This conspiracy was *per se* unlawful price-fixing.

> Fluticasone Propionate Nasal Spray
> Trazodone HCL

1097.    Apotex has committed at least one overt act to further the conspiracy alleged in this Complaint. Apotex's anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing prices of the Apotex Drugs throughout the United States.

1098.    The conspiracy realized its intended effect; Apotex has benefited, and continues to benefit, from its anticompetitive agreements which have artificially inflated the prices of the Apotex Drugs.

1099.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

> a.    Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Apotex Drugs;
>
> b.    Humana was deprived of the benefits of free and open competition in the sale of the Apotex Drugs in the United States market; and
>
> c.    Competition in establishing the prices paid for the Apotex Drugs was unlawfully restrained, suppressed, or eliminated.

1100.    Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Apotex Drugs until the market achieves a steady state.

1101.    As a direct and proximate result of Apotex's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Apotex Drugs than it would have paid in the absence of Apotex's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

REDACTED – PUBLIC VERSION

1102.   Apotex is *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by its contract, combination, and conspiracy in restraint of trade as alleged herein.

1103.   There is no legitimate, non-pretextual, pro-competitive business justification for Apotex's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1104.   Apotex's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1105.   Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of the Apotex Drugs, or by assignment from its other subsidiaries that directly purchased the Apotex Drugs during the relevant period.

## COUNT XVII

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAWS

#### (As to Apotex and All Other Defendants Under Joint and Several Liability)

1106.   Humana incorporates by reference the preceding allegations.

1107.   Apotex knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of the Apotex Drugs in the United States. This conspiracy was *per se* unlawful price-fixing.

1108.   Apotex has committed at least one overt act to further the conspiracy alleged in this Complaint. Apotex's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Apotex Drugs throughout the United States.

1109.   The conspiracy realized its intended effect; Apotex has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Apotex Drugs.

1110.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

    a.   Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Apotex Drugs;

    b.   Humana was deprived of the benefits of free and open competition in the sale of the Apotex Drugs in the United States market; and

    c.   Competition in establishing the prices paid for the Apotex Drugs was unlawfully restrained, suppressed, or eliminated.

1111.    Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Apotex Drugs until the market achieves a steady state.

1112.    As a direct and proximate result of Apotex's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Apotex Drugs than it would have paid in the absence of Apotex's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

1113.    There is no legitimate, non-pretextual, pro-competitive business justification for Apotex's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1114.    Apotex's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1115.    Apotex's conduct violated the following state antitrust or competition practices laws:

    a.   Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

    b.   Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

    c.   Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut.

REDACTED – PUBLIC VERSION

d.  D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

e.  Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f.  Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

g.  740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

h.  Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

i.  Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

j.  Md. Comm. L. §§ 11-201, et seq., with respect to purchases in Maryland.

k.  Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

l.  Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

m.  Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

n.  Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

o.  Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

p.  Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

q.  Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

r.  Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

s.  N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

t.  N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

u.  N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

v.  N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

w.  Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

REDACTED – PUBLIC VERSION

    x.  10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

    y.  R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

    z.  S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

    aa.  Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

    bb.  Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

    cc.  Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

    dd.  W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

    ee.  Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

## COUNT XVIII

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Apotex and All Other Defendants Under Joint and Several Liability)

1116.   Humana incorporates by reference the preceding allegations.

1117.   Apotex engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Apotex's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase the Apotex Drugs at prices restrained by competition and forced to pay artificially inflated prices.

1118.   There was and is a gross disparity between the price that Humana paid and continues to pay for the Apotex Drugs, including by assignment from its subsidiaries, and the value received, given that more cheaply priced Apotex Drugs should have been available, and would have been available, absent Apotex's illegal conduct.

1119.   By engaging in the foregoing conduct, Apotex engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

a. Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

b. Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

c. Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

d. D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

e. Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f. Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

g. Idaho Code §§ 48-601, et seq., with respect to the purchases in Idaho.

h. 815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

i. 5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j. Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k. Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l. Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m. Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n. Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o. Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p. N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New Hampshire.

q. N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r. N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s. N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t. Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u. 73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

REDACTED – PUBLIC VERSION

    v.  R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

    w.  S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

    x.  Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

    y.  Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

    z.  Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

    aa.  West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West Virginia.

## COUNT XIX

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Apotex and All Other Defendants Under Joint and Several Liability)

1120.    Humana incorporates by reference the preceding allegations.

1121.    Apotex has benefitted from artificial prices in the sale of the Apotex Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

1122.    Apotex's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Apotex Drugs by Humana.

1123.    Humana has conferred upon Apotex an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

1124.    It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Apotex Drugs.

1125.    It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Apotex Drugs, as it is not liable and would not compensate Humana for the impact of Apotex's unlawful conduct.

REDACTED – PUBLIC VERSION

1126.   The economic benefit of overcharges derived by Apotex through charging supracompetitive and artificially inflated prices for the Apotex Drugs is a direct and proximate result of Apotex's unlawful conduct.

1127.   The economic benefits derived by Apotex rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Apotex.

1128.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Apotex to be permitted to retain any of the overcharges for the Apotex Drugs derived from Apotex's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

1129.   Apotex is aware of and appreciates the benefits bestowed upon it by Humana.

1130.   Apotex should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds it received.

1131.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Apotex traceable to Humana.

## COUNT XX

### DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

#### (As to Apotex and All Other Defendants Under Joint and Several Liability)

1132.   Humana incorporates by reference the preceding allegations.

1133.   Apotex knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Apotex Drugs. Apotex injured Humana through this conduct.

1134.   But for Apotex's scheme to inflate the price of the Apotex Drugs, Humana would have purchased lower-priced Apotex Drugs.

1135.   Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Apotex Drugs than it would have paid absent Apotex's continuing anticompetitive conduct.

1136.   Humana has purchased substantial amounts of the Apotex Drugs during the relevant period.

1137.   Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Apotex's conduct violates Sections 1 and 2 of the Sherman Act.

1138.   Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Apotex's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT XXI

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT

### (As to Ascend and All Other Defendants Under Joint and Several Liability)

1139.   Humana incorporates by reference the preceding allegations.

1140.   Ascend knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States, in violation of Section 1 of the Sherman Act (the "Ascend Drugs"). This conspiracy was *per se* unlawful price-fixing.

Silver Sulfadiazine

1141.    Ascend has committed at least one overt act to further the conspiracy alleged in this Complaint. Ascend's anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing prices of the Ascend Drugs throughout the United States.

1142.    The conspiracy realized its intended effect; Ascend has benefited, and continues to benefit, from its anticompetitive agreements which have artificially inflated the prices of the Ascend Drugs.

1143.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

     a.    Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Ascend Drugs;

     b.    Humana was deprived of the benefits of free and open competition in the sale of the Ascend Drugs in the United States market; and

     c.    Competition in establishing the prices paid for the Ascend Drugs was unlawfully restrained, suppressed, or eliminated.

1144.    Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Ascend Drugs until the market achieves a steady state.

1145.    As a direct and proximate result of Ascend's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Ascend Drugs than it would have paid in the absence of Ascend's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

1146.    Ascend is *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by its contract, combination, and conspiracy in restraint of trade as alleged herein.

REDACTED – PUBLIC VERSION

1147.    There is no legitimate, non-pretextual, pro-competitive business justification for Ascend's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1148.    Ascend's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1149.    Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of the Ascend Drugs, or by assignment from its other subsidiaries that directly purchased the Ascend Drugs during the relevant period.

## COUNT XXII

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAWS

### (As to Ascend and All Other Defendants Under Joint and Several Liability)

1150.    Humana incorporates by reference the preceding allegations.

1151.    Ascend knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of the Ascend Drugs in the United States. This conspiracy was *per se* unlawful price-fixing.

1152.    Ascend has committed at least one overt act to further the conspiracy alleged in this Complaint. Ascend's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Ascend Drugs throughout the United States.

1153.    The conspiracy realized its intended effect; Ascend has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Ascend Drugs.

1154.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

    a.   Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Ascend Drugs;

    b.   Humana was deprived of the benefits of free and open competition in the sale of the Ascend Drugs in the United States market; and

    c.   Competition in establishing the prices paid for the Ascend Drugs was unlawfully restrained, suppressed, or eliminated.

1155.   Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Ascend Drugs until the market achieves a steady state.

1156.   As a direct and proximate result of Ascend's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Ascend Drugs than it would have paid in the absence of Ascend's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

1157.   There is no legitimate, non-pretextual, pro-competitive business justification for Ascend's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1158.   Ascend's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1159.   Ascend's conduct violated the following state antitrust or competition practices laws:

    a.   Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

    b.   Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

    c.   Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut.

    d.   D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

    e.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f.   Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

g.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

h.   Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

i.   Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

j.   Md. Comm. L. §§ 11-201, et seq., with respect to purchases in Maryland.

k.   Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

l.   Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

m.   Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in
     Michigan.

n.   Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to
     purchases in Minnesota.

o.   Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

p.   Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

q.   Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

r.   Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

s.   N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

t.   N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

u.   N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

v.   N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North
     Dakota.

w.   Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

x.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

y.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

REDACTED – PUBLIC VERSION

z.  S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

aa. Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

bb. Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

cc. Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

dd. W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

ee. Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

## COUNT XXIII

### UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

#### (As to Ascend and All Other Defendants Under Joint and Several Liability)

1160.  Humana incorporates by reference the preceding allegations.

1161.  Ascend engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Ascend's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase the Ascend Drugs at prices restrained by competition and forced to pay artificially inflated prices.

1162.  There was and is a gross disparity between the price that Humana paid and continues to pay for the Ascend Drugs, including by assignment from its subsidiaries, and the value received, given that more cheaply priced Ascend Drugs should have been available, and would have been available, absent Ascend's illegal conduct.

1163.  By engaging in the foregoing conduct, Ascend engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

a.  Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

b.  Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

c.    Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

d.    D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

e.    Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f.    Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

g.    Idaho Code §§ 48-601, et seq., with respect to the purchases in Idaho.

h.    815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

i.    5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j.    Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k.    Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l.    Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m.    Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n.    Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o.    Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p.    N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New Hampshire.

q.    N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r.    N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s.    N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t.    Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u.    73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v.    R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w.    S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

REDACTED – PUBLIC VERSION

x.  Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y.  Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z.  Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa. West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West
    Virginia.

## COUNT XXIV

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Ascend and All Other Defendants Under Joint and Several Liability)

1164.  Humana incorporates by reference the preceding allegations.

1165.  Ascend has benefitted from artificial prices in the sale of the Ascend Drugs resulting
from the unlawful and inequitable acts alleged in this Complaint.

1166.  Ascend's financial benefit resulting from its unlawful and inequitable acts are
traceable to overpayments for the Ascend Drugs by Humana.

1167.  Humana has conferred upon Ascend an economic benefit, profits from unlawful
overcharges, to the economic detriment of Humana.

1168.  It would be futile for Humana to seek a remedy from any party with whom it has
privity of contract for its indirect purchases of the Ascend Drugs.

1169.  It would be futile for Humana to seek to exhaust any remedy against the immediate
intermediary in the chain of distribution from which it purchased the Ascend Drugs, as it is not
liable and would not compensate Humana for the impact of Ascend's unlawful conduct.

1170.  The economic benefit of overcharges derived by Ascend through charging
supracompetitive and artificially inflated prices for the Ascend Drugs is a direct and proximate result
of Ascend's unlawful conduct.

REDACTED – PUBLIC VERSION

1171.    The economic benefits derived by Ascend rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Ascend.

1172.    It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Ascend to be permitted to retain any of the overcharges for the Ascend Drugs derived from Ascend's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

1173.    Ascend is aware of and appreciates the benefits bestowed upon it by Humana.

1174.    Ascend should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds it received.

1175.    A constructive trust should be imposed upon all unlawful or inequitable sums received by Ascend traceable to Humana.

## COUNT XXV

### DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

#### (As to Ascend and All Other Defendants Under Joint and Several Liability)

1176.    Humana incorporates by reference the preceding allegations.

1177.    Ascend knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Ascend Drugs. Ascend injured Humana through this conduct.

1178.    But for Ascend's scheme to inflate the price of the Ascend Drugs, Humana would have purchased lower-priced Ascend Drugs.

REDACTED – PUBLIC VERSION

1179.    Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Ascend Drugs than it would have paid absent Ascend's continuing anticompetitive conduct.

1180.    Humana has purchased substantial amounts of the Ascend Drugs during the relevant period.

1181.    Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Ascend's conduct violates Sections 1 and 2 of the Sherman Act.

1182.    Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Ascend's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT XXVI

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT

### (As to Aurobindo and All Other Defendants Under Joint and Several Liability)

1183.    Humana incorporates by reference the preceding allegations.

1184.    Aurobindo knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States, in violation of Section 1 of the Sherman Act (the "Aurobindo Drugs"). This conspiracy was *per se* unlawful price-fixing.

> Cefpodoxime Proxetil
> Nafcillin Sodium
> Oxacillin Sodium

1185.    Aurobindo has committed at least one overt act to further the conspiracy alleged in this Complaint. Aurobindo's anticompetitive acts had a substantial and foreseeable effect on

interstate commerce by raising and fixing prices of the Aurobindo Drugs throughout the United States.

1186.   The conspiracy realized its intended effect; Aurobindo has benefited, and continues to benefit, from its anticompetitive agreements which have artificially inflated the prices of the Aurobindo Drugs.

1187.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

   a.   Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Aurobindo Drugs;

   b.   Humana was deprived of the benefits of free and open competition in the sale of the Aurobindo Drugs in the United States market; and

   c.   Competition in establishing the prices paid for the Aurobindo Drugs was unlawfully restrained, suppressed, or eliminated.

1188.   Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Aurobindo Drugs until the market achieves a steady state.

1189.   As a direct and proximate result of Aurobindo's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Aurobindo Drugs than it would have paid in the absence of Aurobindo's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

1190.   Aurobindo is *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by its contract, combination, and conspiracy in restraint of trade as alleged herein.

REDACTED – PUBLIC VERSION

1191.   There is no legitimate, non-pretextual, pro-competitive business justification for Aurobindo's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1192.   Aurobindo's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1193.   Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of the Aurobindo Drugs, or by assignment from its other subsidiaries that directly purchased the Aurobindo Drugs during the relevant period.

## COUNT XXVII

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAWS

#### (As to Aurobindo and All Other Defendants Under Joint and Several Liability)

1194.   Humana incorporates by reference the preceding allegations.

1195.   Aurobindo knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of the Aurobindo Drugs in the United States. This conspiracy was *per se* unlawful price-fixing.

1196.   Aurobindo has committed at least one overt act to further the conspiracy alleged in this Complaint. Aurobindo's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Aurobindo Drugs throughout the United States.

1197.   The conspiracy realized its intended effect; Aurobindo has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Aurobindo Drugs.

1198.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

REDACTED – PUBLIC VERSION

    a.   Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Aurobindo Drugs;

    b.   Humana was deprived of the benefits of free and open competition in the sale of the Aurobindo Drugs in the United States market; and

    c.   Competition in establishing the prices paid for the Aurobindo Drugs was unlawfully restrained, suppressed, or eliminated.

1199.    Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Aurobindo Drugs until the market achieves a steady state.

1200.    As a direct and proximate result of Aurobindo's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Aurobindo Drugs than it would have paid in the absence of Aurobindo's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

1201.    There is no legitimate, non-pretextual, pro-competitive business justification for Aurobindo's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1202.    Aurobindo's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1203.    Aurobindo's conduct violated the following state antitrust or competition practices laws:

    a.   Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

    b.   Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

    c.   Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut.

    d.   D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

REDACTED – PUBLIC VERSION

    e.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

    f.   Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

    g.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

    h.   Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

    i.   Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

    j.   Md. Comm. L. §§ 11-201, et seq., with respect to purchases in Maryland.

    k.   Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

    l.   Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

    m.   Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

    n.   Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

    o.   Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

    p.   Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

    q.   Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

    r.   Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

    s.   N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

    t.   N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

    u.   N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

    v.   N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

    w.   Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

    x.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

    y.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

z.    S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South
Dakota.

aa.  Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

bb.  Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

cc.  Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

dd.  W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

ee.  Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

## COUNT XXVIII

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Aurobindo and All Other Defendants Under Joint and Several Liability)

1204.   Humana incorporates by reference the preceding allegations.

1205.   Aurobindo engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Aurobindo's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase the Aurobindo Drugs at prices restrained by competition and forced to pay artificially inflated prices.

1206.   There was and is a gross disparity between the price that Humana paid and continues to pay for the Aurobindo Drugs, including by assignment from its subsidiaries, and the value received, given that more cheaply priced Aurobindo Drugs should have been available, and would have been available, absent Aurobindo's illegal conduct.

1207.   By engaging in the foregoing conduct, Aurobindo engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

a.    Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

b.    Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

REDACTED – PUBLIC VERSION

c.  Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

d.  D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

e.  Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f.  Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

g.  Idaho Code §§ 48-601, et seq., with respect to the purchases in Idaho.

h.  815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

i.  5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j.  Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k.  Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l.  Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m.  Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n.  Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o.  Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p.  N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New Hampshire.

q.  N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r.  N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s.  N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t.  Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u.  73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v.  R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w.  S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

REDACTED – PUBLIC VERSION

    x.   Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

    y.   Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

    z.   Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

    aa.  West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West
Virginia.

## COUNT XXIX

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Aurobindo and All Other Defendants Under Joint and Several Liability)

1208.   Humana incorporates by reference the preceding allegations.

1209.   Aurobindo has benefitted from artificial prices in the sale of the Aurobindo Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

1210.   Aurobindo's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Aurobindo Drugs by Humana.

1211.   Humana has conferred upon Aurobindo an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

1212.   It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Aurobindo Drugs.

1213.   It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Aurobindo Drugs, as it is not liable and would not compensate Humana for the impact of Aurobindo's unlawful conduct.

1214.   The economic benefit of overcharges derived by Aurobindo through charging supracompetitive and artificially inflated prices for the Aurobindo Drugs is a direct and proximate result of Aurobindo's unlawful conduct.

REDACTED – PUBLIC VERSION

1215.    The economic benefits derived by Aurobindo rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Aurobindo.

1216.    It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Aurobindo to be permitted to retain any of the overcharges for the Aurobindo Drugs derived from Aurobindo's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

1217.    Aurobindo is aware of and appreciates the benefits bestowed upon it by Humana.

1218.    Aurobindo should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds it received.

1219.    A constructive trust should be imposed upon all unlawful or inequitable sums received by Aurobindo traceable to Humana.

## COUNT XXX

### DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

#### (As to Aurobindo and All Other Defendants Under Joint and Several Liability)

1220.    Humana incorporates by reference the preceding allegations.

1221.    Aurobindo knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Aurobindo Drugs. Aurobindo injured Humana through this conduct.

1222.    But for Aurobindo's scheme to inflate the price of the Aurobindo Drugs, Humana would have purchased lower-priced Aurobindo Drugs.

REDACTED – PUBLIC VERSION

1223.   Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Aurobindo Drugs than it would have paid absent Aurobindo's continuing anticompetitive conduct.

1224.   Humana has purchased substantial amounts of the Aurobindo Drugs during the relevant period.

1225.   Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Aurobindo's conduct violates Sections 1 and 2 of the Sherman Act.

1226.   Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Aurobindo's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT XXXI

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT

### (As to Glenmark and All Other Defendants Under Joint and Several Liability)

1227.   Humana incorporates by reference the preceding allegations.

1228.   Glenmark knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States, in violation of Section 1 of the Sherman Act (the "Glenmark Drugs"). This conspiracy was *per se* unlawful price-fixing.

> Desoximetasone
> Fluticasone Propionate Lotion
> Mometasone Furoate
> Ondansetron
> Oxycodone HCL Oral Solution

1229.   Glenmark has committed at least one overt act to further the conspiracy alleged in this Complaint. Glenmark's anticompetitive acts had a substantial and foreseeable effect on

interstate commerce by raising and fixing prices of the Glenmark Drugs throughout the United States.

1230.    The conspiracy realized its intended effect; Glenmark has benefited, and continues to benefit, from its anticompetitive agreements which have artificially inflated the prices of the Glenmark Drugs.

1231.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

   a.   Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Glenmark Drugs;

   b.   Humana was deprived of the benefits of free and open competition in the sale of the Glenmark Drugs in the United States market; and

   c.   Competition in establishing the prices paid for the Glenmark Drugs was unlawfully restrained, suppressed, or eliminated.

1232.    Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Glenmark Drugs until the market achieves a steady state.

1233.    As a direct and proximate result of Glenmark's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Glenmark Drugs than it would have paid in the absence of Glenmark's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

1234.    Glenmark is *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by its contract, combination, and conspiracy in restraint of trade as alleged herein.

REDACTED – PUBLIC VERSION

1235.   There is no legitimate, non-pretextual, pro-competitive business justification for Glenmark's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1236.   Glenmark's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1237.   Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of the Glenmark Drugs, or by assignment from its other subsidiaries that directly purchased the Glenmark Drugs during the relevant period.

## COUNT XXXII

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAWS

**(As to Glenmark and All Other Defendants Under Joint and Several Liability)**

1238.   Humana incorporates by reference the preceding allegations.

1239.   Glenmark knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of the Glenmark Drugs in the United States. This conspiracy was *per se* unlawful price-fixing.

1240.   Glenmark has committed at least one overt act to further the conspiracy alleged in this Complaint. Glenmark's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Glenmark Drugs throughout the United States.

1241.   The conspiracy realized its intended effect; Glenmark has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Glenmark Drugs.

1242.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

    a.   Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Glenmark Drugs;

    b.   Humana was deprived of the benefits of free and open competition in the sale of the Glenmark Drugs in the United States market; and

    c.   Competition in establishing the prices paid for the Glenmark Drugs was unlawfully restrained, suppressed, or eliminated.

1243.   Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Glenmark Drugs until the market achieves a steady state.

1244.   As a direct and proximate result of Glenmark's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Glenmark Drugs than it would have paid in the absence of Glenmark's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

1245.   There is no legitimate, non-pretextual, pro-competitive business justification for Glenmark's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1246.   Glenmark's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1247.   Glenmark's conduct violated the following state antitrust or competition practices laws:

    a.   Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

    b.   Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

    c.   Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut.

    d.   D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

REDACTED – PUBLIC VERSION

e.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f.   Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

g.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

h.   Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

i.   Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

j.   Md. Comm. L. §§ 11-201, et seq., with respect to purchases in Maryland.

k.   Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

l.   Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

m.   Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

n.   Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

o.   Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

p.   Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

q.   Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

r.   Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

s.   N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

t.   N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

u.   N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

v.   N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

w.   Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

x.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

y.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

REDACTED – PUBLIC VERSION

z.    S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South

Dakota.

aa.  Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

bb.  Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

cc.  Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

dd.  W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

ee.  Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

## COUNT XXXIII

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Glenmark and All Other Defendants Under Joint and Several Liability)

1248.   Humana incorporates by reference the preceding allegations.

1249.   Glenmark engaged in unfair competition or unfair, unconscionable, deceptive, or

fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a

direct and proximate result of Glenmark's anticompetitive, deceptive, unfair, unconscionable, and

fraudulent conduct, Humana was deprived of the opportunity to purchase the Glenmark Drugs at

prices restrained by competition and forced to pay artificially inflated prices.

1250.   There was and is a gross disparity between the price that Humana paid and continues

to pay for the Glenmark Drugs, including by assignment from its subsidiaries, and the value

received, given that more cheaply priced Glenmark Drugs should have been available, and would

have been available, absent Glenmark's illegal conduct.

1251.   By engaging in the foregoing conduct, Glenmark engaged in unfair competition or

deceptive acts and practices in violation of the following state laws:

a.    Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

b.    Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

REDACTED – PUBLIC VERSION

    c.   Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

    d.   D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of

        Columbia.

    e.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

    f.   Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

    g.   Idaho Code §§ 48-601, et seq., with respect to the purchases in Idaho.

    h.   815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

    i.   5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

    j.   Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

    k.   Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

    l.   Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to

        purchases in Minnesota.

    m.   Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

    n.   Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

    o.   Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

    p.   N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New

        Hampshire.

    q.   N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

    r.   N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

    s.   N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

    t.   Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

    u.   73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

    v.   R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

    w.   S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

REDACTED – PUBLIC VERSION

    x.   Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

    y.   Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

    z.   Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

    aa.  West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West
Virginia.

## COUNT XXXIV

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Glenmark and All Other Defendants Under Joint and Several Liability)

1252.   Humana incorporates by reference the preceding allegations.

1253.   Glenmark has benefitted from artificial prices in the sale of the Glenmark Drugs
resulting from the unlawful and inequitable acts alleged in this Complaint.

1254.   Glenmark's financial benefit resulting from its unlawful and inequitable acts are
traceable to overpayments for the Glenmark Drugs by Humana.

1255.   Humana has conferred upon Glenmark an economic benefit, profits from unlawful
overcharges, to the economic detriment of Humana.

1256.   It would be futile for Humana to seek a remedy from any party with whom it has
privity of contract for its indirect purchases of the Glenmark Drugs.

1257.   It would be futile for Humana to seek to exhaust any remedy against the immediate
intermediary in the chain of distribution from which it purchased the Glenmark Drugs, as it is not
liable and would not compensate Humana for the impact of Glenmark's unlawful conduct.

1258.   The economic benefit of overcharges derived by Glenmark through charging
supracompetitive and artificially inflated prices for the Glenmark Drugs is a direct and proximate
result of Glenmark's unlawful conduct.

REDACTED – PUBLIC VERSION

1259.   The economic benefits derived by Glenmark rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Glenmark.

1260.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Glenmark to be permitted to retain any of the overcharges for the Glenmark Drugs derived from Glenmark's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

1261.   Glenmark is aware of and appreciates the benefits bestowed upon it by Humana.

1262.   Glenmark should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds it received.

1263.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Glenmark traceable to Humana.

## COUNT XXXV

## DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

### (As to Glenmark and All Other Defendants Under Joint and Several Liability)

1264.   Humana incorporates by reference the preceding allegations.

1265.   Glenmark knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Glenmark Drugs. Glenmark injured Humana through this conduct.

1266.   But for Glenmark's scheme to inflate the price of the Glenmark Drugs, Humana would have purchased lower-priced Glenmark Drugs.

1267.   Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Glenmark Drugs than it would have paid absent Glenmark's continuing anticompetitive conduct.

1268.   Humana has purchased substantial amounts of the Glenmark Drugs during the relevant period.

1269.   Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Glenmark's conduct violates Sections 1 and 2 of the Sherman Act.

1270.   Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Glenmark's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT XXXVI

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT

### (As to G&W and All Other Defendants Under Joint and Several Liability)

1271.   Humana incorporates by reference the preceding allegations.

1272.   G&W knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States, in violation of Section 1 of the Sherman Act (the "G&W Drugs"). This conspiracy was *per se* unlawful price-fixing.

> Calcipotriene
> Ethambutol HCL
> Hydrocortisone Acetate
> Mometasone Furoate
> Promethazine HCL

REDACTED – PUBLIC VERSION

1273.     G&W has committed at least one overt act to further the conspiracy alleged in this Complaint. G&W's anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing prices of the G&W Drugs throughout the United States.

1274.     The conspiracy realized its intended effect; G&W has benefited, and continues to benefit, from its anticompetitive agreements which have artificially inflated the prices of the G&W Drugs.

1275.     The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

      a.     Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the G&W Drugs;

      b.     Humana was deprived of the benefits of free and open competition in the sale of the G&W Drugs in the United States market; and

      c.     Competition in establishing the prices paid for the G&W Drugs was unlawfully restrained, suppressed, or eliminated.

1276.     Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the G&W Drugs until the market achieves a steady state.

1277.     As a direct and proximate result of G&W's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the G&W Drugs than it would have paid in the absence of G&W's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

1278.     G&W is *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by its contract, combination, and conspiracy in restraint of trade as alleged herein.

REDACTED – PUBLIC VERSION

1279.    There is no legitimate, non-pretextual, pro-competitive business justification for G&W's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1280.    G&W's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1281.    Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of the G&W Drugs, or by assignment from its other subsidiaries that directly purchased the G&W Drugs during the relevant period.

## COUNT XXXVII

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT
### OF TRADE UNDER STATE LAWS

**(As to G&W and All Other Defendants Under Joint and Several Liability)**

1282.    Humana incorporates by reference the preceding allegations.

1283.    G&W knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of the G&W Drugs in the United States. This conspiracy was *per se* unlawful price-fixing.

1284.    G&W has committed at least one overt act to further the conspiracy alleged in this Complaint. G&W's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the G&W Drugs throughout the United States.

1285.    The conspiracy realized its intended effect; G&W has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the G&W Drugs.

1286.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

    a.   Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the G&W Drugs;

    b.   Humana was deprived of the benefits of free and open competition in the sale of the G&W Drugs in the United States market; and

    c.   Competition in establishing the prices paid for the G&W Drugs was unlawfully restrained, suppressed, or eliminated.

1287.   Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the G&W Drugs until the market achieves a steady state.

1288.   As a direct and proximate result of G&W's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the G&W Drugs than it would have paid in the absence of G&W's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

1289.   There is no legitimate, non-pretextual, pro-competitive business justification for G&W's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1290.   G&W's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1291.   G&W's conduct violated the following state antitrust or competition practices laws:

    a.   Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

    b.   Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

    c.   Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut.

    d.   D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

    e.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

REDACTED – PUBLIC VERSION

     f.   Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

     g.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

     h.   Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

     i.   Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

     j.   Md. Comm. L. §§ 11-201, et seq., with respect to purchases in Maryland.

     k.   Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

     l.   Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

     m.   Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

     n.   Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

     o.   Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

     p.   Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

     q.   Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

     r.   Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

     s.   N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

     t.   N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

     u.   N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

     v.   N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

     w.   Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

     x.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

     y.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

REDACTED – PUBLIC VERSION

z.   S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South

Dakota.

aa.  Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

bb.  Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

cc.  Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

dd.  W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

ee.  Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

## COUNT XXXVIII

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to G&W and All Other Defendants Under Joint and Several Liability)

1292.   Humana incorporates by reference the preceding allegations.

1293.   G&W engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of G&W's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase the G&W Drugs at prices restrained by competition and forced to pay artificially inflated prices.

1294.   There was and is a gross disparity between the price that Humana paid and continues to pay for the G&W Drugs, including by assignment from its subsidiaries, and the value received, given that more cheaply priced G&W Drugs should have been available, and would have been available, absent G&W's illegal conduct.

1295.   By engaging in the foregoing conduct, G&W engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

a.   Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

b.   Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

c.  Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

d.  D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

e.  Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f.  Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

g.  Idaho Code §§ 48-601, et seq., with respect to the purchases in Idaho.

h.  815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

i.  5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j.  Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k.  Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l.  Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m.  Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n.  Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o.  Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p.  N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New Hampshire.

q.  N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r.  N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s.  N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t.  Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u.  73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v.  R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w.  S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

REDACTED – PUBLIC VERSION

    x.   Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

    y.   Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

    z.   Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

    aa.  West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West
         Virginia.

## COUNT XXXIX

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to G&W and All Other Defendants Under Joint and Several Liability)

1296.   Humana incorporates by reference the preceding allegations.

1297.   G&W has benefitted from artificial prices in the sale of the G&W Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

1298.   G&W's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the G&W Drugs by Humana.

1299.   Humana has conferred upon G&W an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

1300.   It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the G&W Drugs.

1301.   It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the G&W Drugs, as it is not liable and would not compensate Humana for the impact of G&W's unlawful conduct.

1302.   The economic benefit of overcharges derived by G&W through charging supracompetitive and artificially inflated prices for the G&W Drugs is a direct and proximate result of G&W's unlawful conduct.

REDACTED – PUBLIC VERSION

1303.   The economic benefits derived by G&W rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting G&W.

1304.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for G&W to be permitted to retain any of the overcharges for the G&W Drugs derived from G&W's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

1305.   G&W is aware of and appreciates the benefits bestowed upon it by Humana.

1306.   G&W should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds it received.

1307.   A constructive trust should be imposed upon all unlawful or inequitable sums received by G&W traceable to Humana.

## COUNT XL

### DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

#### (As to G&W and All Other Defendants Under Joint and Several Liability)

1308.   Humana incorporates by reference the preceding allegations.

1309.   G&W knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the G&W Drugs. G&W injured Humana through this conduct.

1310.   But for G&W's scheme to inflate the price of the G&W Drugs, Humana would have purchased lower-priced G&W Drugs.

REDACTED – PUBLIC VERSION

1311.    Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the G&W Drugs than it would have paid absent G&W's continuing anticompetitive conduct.

1312.    Humana has purchased substantial amounts of the G&W Drugs during the relevant period.

1313.    Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that G&W's conduct violates Sections 1 and 2 of the Sherman Act.

1314.    Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by G&W's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT XLI

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT

### (As to Impax and All Other Defendants Under Joint and Several Liability)

1315.    Humana incorporates by reference the preceding allegations.

1316.    Impax knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States, in violation of Section 1 of the Sherman Act (the "Impax Drugs"). This conspiracy was *per se* unlawful price-fixing.

> Calcipotriene
> Mometasone Furoate

1317.    Impax has committed at least one overt act to further the conspiracy alleged in this Complaint. Impax's anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing prices of the Impax Drugs throughout the United States.

1318.   The conspiracy realized its intended effect; Impax has benefited, and continues to benefit, from its anticompetitive agreements which have artificially inflated the prices of the Impax Drugs.

1319.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

   a.   Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Impax Drugs;

   b.   Humana was deprived of the benefits of free and open competition in the sale of the Impax Drugs in the United States market; and

   c.   Competition in establishing the prices paid for the Impax Drugs was unlawfully restrained, suppressed, or eliminated.

1320.   Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Impax Drugs until the market achieves a steady state.

1321.   As a direct and proximate result of Impax's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Impax Drugs than it would have paid in the absence of Impax's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

1322.   Impax is *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by its contract, combination, and conspiracy in restraint of trade as alleged herein.

1323.   There is no legitimate, non-pretextual, pro-competitive business justification for Impax's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

REDACTED – PUBLIC VERSION

1324.   Impax's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1325.   Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of the Impax Drugs, or by assignment from its other subsidiaries that directly purchased the Impax Drugs during the relevant period.

## COUNT XLII

## FOR CONSPIRACY AND COMBINATION IN RESTRAINT
## OF TRADE UNDER STATE LAWS

### (As to Impax and All Other Defendants Under Joint and Several Liability)

1326.   Humana incorporates by reference the preceding allegations.

1327.   Impax knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of the Impax Drugs in the United States. This conspiracy was *per se* unlawful price-fixing.

1328.   Impax has committed at least one overt act to further the conspiracy alleged in this Complaint. Impax's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Impax Drugs throughout the United States.

1329.   The conspiracy realized its intended effect; Impax has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Impax Drugs.

1330.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

    a.   Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Impax Drugs;

    b.   Humana was deprived of the benefits of free and open competition in the sale of the Impax Drugs in the United States market; and

      c.   Competition in establishing the prices paid for the Impax Drugs was unlawfully restrained, suppressed, or eliminated.

1331.   Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Impax Drugs until the market achieves a steady state.

1332.   As a direct and proximate result of Impax's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Impax Drugs than it would have paid in the absence of Impax's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

1333.   There is no legitimate, non-pretextual, pro-competitive business justification for Impax's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1334.   Impax's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1335.   Impax's conduct violated the following state antitrust or competition practices laws:

      a.   Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

      b.   Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

      c.   Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut.

      d.   D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

      e.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

      f.   Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

      g.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

      h.   Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

      i.   Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

j.   Md. Comm. L. §§ 11-201, et seq., with respect to purchases in Maryland.

k.   Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

l.   Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

m.   Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

n.   Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

o.   Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

p.   Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

q.   Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

r.   Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

s.   N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

t.   N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

u.   N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

v.   N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

w.   Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

x.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

y.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

z.    S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

aa.  Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

bb.  Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

cc.  Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

REDACTED – PUBLIC VERSION

dd. W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

ee. Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

## COUNT XLIII

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Impax and All Other Defendants Under Joint and Several Liability)

1336.    Humana incorporates by reference the preceding allegations.

1337.    Impax engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Impax's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase the Impax Drugs at prices restrained by competition and forced to pay artificially inflated prices.

1338.    There was and is a gross disparity between the price that Humana paid and continues to pay for the Impax Drugs, including by assignment from its subsidiaries, and the value received, given that more cheaply priced Impax Drugs should have been available, and would have been available, absent Impax's illegal conduct.

1339.    By engaging in the foregoing conduct, Impax engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

a.  Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

b.  Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

c.  Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

d.  D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

e.  Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f.  Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

REDACTED – PUBLIC VERSION

g.  Idaho Code §§ 48-601, et seq., with respect to the purchases in Idaho.

h.  815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

i.  5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j.  Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k.  Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l.  Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m.  Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n.  Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o.  Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p.  N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New Hampshire.

q.  N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r.  N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s.  N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t.  Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u.  73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v.  R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w.  S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x.  Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y.  Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z.  Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa. West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West Virginia.

REDACTED – PUBLIC VERSION

## COUNT XLIV

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Impax and All Other Defendants Under Joint and Several Liability)

1340.    Humana incorporates by reference the preceding allegations.

1341.    Impax has benefitted from artificial prices in the sale of the Impax Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

1342.    Impax's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Impax Drugs by Humana.

1343.    Humana has conferred upon Impax an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

1344.    It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Impax Drugs.

1345.    It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Impax Drugs, as it is not liable and would not compensate Humana for the impact of Impax's unlawful conduct.

1346.    The economic benefit of overcharges derived by Impax through charging supracompetitive and artificially inflated prices for the Impax Drugs is a direct and proximate result of Impax's unlawful conduct.

1347.    The economic benefits derived by Impax rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Impax.

1348.    It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Impax to be permitted to retain any of the overcharges for the Impax Drugs derived

REDACTED – PUBLIC VERSION

from Impax's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

1349.    Impax is aware of and appreciates the benefits bestowed upon it by Humana.

1350.    Impax should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds it received.

1351.    A constructive trust should be imposed upon all unlawful or inequitable sums received by Impax traceable to Humana.

## COUNT XLV

### DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

**(As to Impax and All Other Defendants Under Joint and Several Liability)**

1352.    Humana incorporates by reference the preceding allegations.

1353.    Impax knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Impax Drugs. Impax injured Humana through this conduct.

1354.    But for Impax's scheme to inflate the price of the Impax Drugs, Humana would have purchased lower-priced Impax Drugs.

1355.    Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Impax Drugs than it would have paid absent Impax's continuing anticompetitive conduct.

1356.    Humana has purchased substantial amounts of the Impax Drugs during the relevant period.

1357.    Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Impax's conduct violates Sections 1 and 2 of the Sherman Act.

REDACTED – PUBLIC VERSION

1358.    Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Impax's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT XLVI

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT

### (As to Lannett and All Other Defendants Under Joint and Several Liability)

1359.    Humana incorporates by reference the preceding allegations.

1360.    Lannett knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States, in violation of Section 1 of the Sherman Act (the "Lannett Drugs"). This conspiracy was *per se* unlawful price-fixing.

> Danazol
> Oxycodone HCL Oral Solution

1361.    Lannett has committed at least one overt act to further the conspiracy alleged in this Complaint. Lannett's anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing prices of the Lannett Drugs throughout the United States.

1362.    The conspiracy realized its intended effect; Lannett has benefited, and continues to benefit, from its anticompetitive agreements which have artificially inflated the prices of the Lannett Drugs.

1363.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a.    Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Lannett Drugs;

325

REDACTED – PUBLIC VERSION

    b.   Humana was deprived of the benefits of free and open competition in the sale of the Lannett Drugs in the United States market; and

    c.   Competition in establishing the prices paid for the Lannett Drugs was unlawfully restrained, suppressed, or eliminated.

1364.   Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Lannett Drugs until the market achieves a steady state.

1365.   As a direct and proximate result of Lannett's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Lannett Drugs than it would have paid in the absence of Lannett's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

1366.   Lannett is *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by its contract, combination, and conspiracy in restraint of trade as alleged herein.

1367.   There is no legitimate, non-pretextual, pro-competitive business justification for Lannett's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1368.   Lannett's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1369.   Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of the Lannett Drugs, or by assignment from its other subsidiaries that directly purchased the Lannett Drugs during the relevant period.

## COUNT XLVII

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAWS

**(As to Lannett and All Other Defendants Under Joint and Several Liability)**

1370.   Humana incorporates by reference the preceding allegations.

1371.   Lannett knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of the Lannett Drugs in the United States. This conspiracy was *per se* unlawful price-fixing.

1372.   Lannett has committed at least one overt act to further the conspiracy alleged in this Complaint. Lannett's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Lannett Drugs throughout the United States.

1373.   The conspiracy realized its intended effect; Lannett has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Lannett Drugs.

1374.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

      a.   Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Lannett Drugs;

      b.   Humana was deprived of the benefits of free and open competition in the sale of the Lannett Drugs in the United States market; and

      c.   Competition in establishing the prices paid for the Lannett Drugs was unlawfully restrained, suppressed, or eliminated.

1375.   Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Lannett Drugs until the market achieves a steady state.

1376.   As a direct and proximate result of Lannett's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Lannett Drugs than it would have paid in the absence of Lannett's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

REDACTED – PUBLIC VERSION

1377.    There is no legitimate, non-pretextual, pro-competitive business justification for Lannett's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1378.    Lannett's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1379.    Lannett's conduct violated the following state antitrust or competition practices laws:

    a.    Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

    b.    Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

    c.    Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut.

    d.    D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

    e.    Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

    f.    Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

    g.    740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

    h.    Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

    i.    Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

    j.    Md. Comm. L. §§ 11-201, et seq., with respect to purchases in Maryland.

    k.    Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

    l.    Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

    m.    Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

    n.    Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

    o.    Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

REDACTED – PUBLIC VERSION

p.  Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

q.  Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

r.  Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

s.  N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

t.  N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

u.  N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

v.  N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

w.  Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

x.  10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

y.  R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

z.   S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

aa. Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

bb. Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

cc. Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

dd. W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

ee. Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

## COUNT XLVIII

### UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Lannett and All Other Defendants Under Joint and Several Liability)

1380.  Humana incorporates by reference the preceding allegations.

1381.  Lannett engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a

REDACTED – PUBLIC VERSION

direct and proximate result of Lannett's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase the Lannett Drugs at prices restrained by competition and forced to pay artificially inflated prices.

1382.    There was and is a gross disparity between the price that Humana paid and continues to pay for the Lannett Drugs, including by assignment from its subsidiaries, and the value received, given that more cheaply priced Lannett Drugs should have been available, and would have been available, absent Lannett's illegal conduct.

1383.    By engaging in the foregoing conduct, Lannett engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

    a.  Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

    b.  Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

    c.  Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

    d.  D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

    e.  Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

    f.  Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

    g.  Idaho Code §§ 48-601, et seq., with respect to purchases in Idaho.

    h.  815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

    i.  5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

    j.  Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

    k.  Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

    l.  Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

    m.  Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n.  Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o.  Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p.  N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New Hampshire.

q.  N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r.  N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s.  N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t.  Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u.  73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v.  R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w.  S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x.  Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y.  Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z.  Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa. West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West Virginia.

## COUNT XLIX

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Lannett and All Other Defendants Under Joint and Several Liability)

1384.   Humana incorporates by reference the preceding allegations.

1385.   Lannett has benefitted from artificial prices in the sale of the Lannett Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

1386.   Lannett's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Lannett Drugs by Humana.

1387.   Humana has conferred upon Lannett an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

1388.   It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Lannett Drugs.

1389.   It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Lannett Drugs, as it is not liable and would not compensate Humana for the impact of Lannett's unlawful conduct.

1390.   The economic benefit of overcharges derived by Lannett through charging supracompetitive and artificially inflated prices for the Lannett Drugs is a direct and proximate result of Lannett's unlawful conduct.

1391.   The economic benefits derived by Lannett rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Lannett.

1392.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Lannett to be permitted to retain any of the overcharges for the Lannett Drugs derived from Lannett's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

1393.   Lannett is aware of and appreciates the benefits bestowed upon it by Humana.

1394.   Lannett should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds it received.

1395.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Lannett traceable to Humana.

**COUNT L**

REDACTED – PUBLIC VERSION

## DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

### (As to Lannett and All Other Defendants Under Joint and Several Liability)

1396.    Humana incorporates by reference the preceding allegations.

1397.    Lannett knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Lannett Drugs. Lannett injured Humana through this conduct.

1398.    But for Lannett's scheme to inflate the price of the Lannett Drugs, Humana would have purchased lower-priced Lannett Drugs.

1399.    Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Lannett Drugs than it would have paid absent Lannett's continuing anticompetitive conduct.

1400.    Humana has purchased substantial amounts of the Lannett Drugs during the relevant period.

1401.    Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Lannett's conduct violates Sections 1 and 2 of the Sherman Act.

1402.    Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Lannett's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT LI

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT

### (As to Lupin and All Other Defendants Under Joint and Several Liability)

1403.    Humana incorporates by reference the preceding allegations.

1404.   Lupin knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States, in violation of Section 1 of the Sherman Act (the "Lupin Drugs"). This conspiracy was *per se* unlawful price-fixing.

Ethambutol HCL

1405.   Lupin has committed at least one overt act to further the conspiracy alleged in this Complaint. Lupin's anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing prices of the Lupin Drugs throughout the United States.

1406.   The conspiracy realized its intended effect; Lupin has benefited, and continues to benefit, from its anticompetitive agreements which have artificially inflated the prices of the Lupin Drugs.

1407.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a.   Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Lupin Drugs;

b.   Humana was deprived of the benefits of free and open competition in the sale of the Lupin Drugs in the United States market; and

c.   Competition in establishing the prices paid for the Lupin Drugs was unlawfully restrained, suppressed, or eliminated.

1408.   Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Lupin Drugs until the market achieves a steady state.

1409.   As a direct and proximate result of Lupin's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Lupin Drugs than it would have

REDACTED – PUBLIC VERSION

paid in the absence of Lupin's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

1410. Lupin is *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by its contract, combination, and conspiracy in restraint of trade as alleged herein.

1411. There is no legitimate, non-pretextual, pro-competitive business justification for Lupin's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1412. Lupin's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1413. Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of the Lupin Drugs, or by assignment from its other subsidiaries that directly purchased the Lupin Drugs during the relevant period.

## COUNT LII

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAWS

#### (As to Lupin and All Other Defendants Under Joint and Several Liability)

1414. Humana incorporates by reference the preceding allegations.

1415. Lupin knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of the Lupin Drugs in the United States. This conspiracy was *per se* unlawful price-fixing.

1416. Lupin has committed at least one overt act to further the conspiracy alleged in this Complaint. Lupin's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Lupin Drugs throughout the United States.

REDACTED – PUBLIC VERSION

1417.   The conspiracy realized its intended effect; Lupin has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Lupin Drugs.

1418.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

      a.   Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Lupin Drugs;

      b.   Humana was deprived of the benefits of free and open competition in the sale of the Lupin Drugs in the United States market; and

      c.   Competition in establishing the prices paid for the Lupin Drugs was unlawfully restrained, suppressed, or eliminated.

1419.   Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Lupin Drugs until the market achieves a steady state.

1420.   As a direct and proximate result of Lupin's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Lupin Drugs than it would have paid in the absence of Lupin's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

1421.   There is no legitimate, non-pretextual, pro-competitive business justification for Lupin's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1422.   Lupin's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1423.   Lupin's conduct violated the following state antitrust or competition practices laws:

      a.   Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

b.  Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

c.  Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut.

d.  D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

e.  Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f.  Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

g.  740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

h.  Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

i.  Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

j.  Md. Comm. L. §§ 11-201, et seq., with respect to purchases in Maryland.

k.  Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

l.  Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

m.  Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

n.  Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

o.  Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

p.  Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

q.  Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

r.  Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

s.  N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

t.  N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

u.  N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

REDACTED – PUBLIC VERSION

    v.   N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

    w.  Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

    x.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

    y.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

    z.   S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

    aa. Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

    bb. Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

    cc. Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

    dd. W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

    ee. Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

## COUNT LIII

### UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Lupin and All Other Defendants Under Joint and Several Liability)

1424.   Humana incorporates by reference the preceding allegations.

1425.   Lupin engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Lupin's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase the Lupin Drugs at prices restrained by competition and forced to pay artificially inflated prices.

1426.   There was and is a gross disparity between the price that Humana paid and continues to pay for the Lupin Drugs, including by assignment from its subsidiaries, and the value received,

REDACTED – PUBLIC VERSION

given that more cheaply priced Lupin Drugs should have been available, and would have been available, absent Lupin's illegal conduct.

1427.  By engaging in the foregoing conduct, Lupin engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

a.  Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

b.  Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

c.  Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

d.  D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

e.  Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f.  Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

g.  Idaho Code §§ 48-601, et seq., with respect to the purchases in Idaho.

h.  815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

i.  5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j.  Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k.  Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l.  Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m.  Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n.  Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o.  Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p.  N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New Hampshire.

q.  N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

REDACTED – PUBLIC VERSION

    r.  N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

    s.  N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

    t.  Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

    u.  73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

    v.  R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

    w.  S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

    x.  Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

    y.  Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

    z.  Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

    aa.  West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West Virginia.

## COUNT LIV

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Lupin and All Other Defendants Under Joint and Several Liability)

1428.    Humana incorporates by reference the preceding allegations.

1429.    Lupin has benefitted from artificial prices in the sale of the Lupin Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

1430.    Lupin's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Lupin Drugs by Humana.

1431.    Humana has conferred upon Lupin an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

1432.    It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Lupin Drugs.

REDACTED – PUBLIC VERSION

1433.    It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Lupin Drugs, as it is not liable and would not compensate Humana for the impact of Lupin's unlawful conduct.

1434.    The economic benefit of overcharges derived by Lupin through charging supracompetitive and artificially inflated prices for the Lupin Drugs is a direct and proximate result of Lupin's unlawful conduct.

1435.    The economic benefits derived by Lupin rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Lupin.

1436.    It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Lupin to be permitted to retain any of the overcharges for the Lupin Drugs derived from Lupin's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

1437.    Lupin is aware of and appreciates the benefits bestowed upon it by Humana.

1438.    Lupin should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds it received.

1439.    A constructive trust should be imposed upon all unlawful or inequitable sums received by Lupin traceable to Humana.

## COUNT LV

## DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

### (As to Lupin and All Other Defendants Under Joint and Several Liability)

1440.    Humana incorporates by reference the preceding allegations.

1441.    Lupin knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Lupin Drugs. Lupin injured Humana through this conduct.

1442.    But for Lupin's scheme to inflate the price of the Lupin Drugs, Humana would have purchased lower-priced Lupin Drugs.

1443.    Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Lupin Drugs than it would have paid absent Lupin's continuing anticompetitive conduct.

1444.    Humana has purchased substantial amounts of the Lupin Drugs during the relevant period.

1445.    Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Lupin's conduct violates Sections 1 and 2 of the Sherman Act.

1446.    Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Lupin's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT LVI

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT

### (As to Mylan and All Other Defendants Under Joint and Several Liability)

1447.    Humana incorporates by reference the preceding allegations.

1448.    Mylan knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States, in violation of Section 1 of the Sherman Act (the "Mylan Drugs"). This conspiracy was *per se* unlawful price-fixing.

> Carbidopa/Levodopa
> Methyldopa
> Promethazine HCL

1449.    Mylan has committed at least one overt act to further the conspiracy alleged in this Complaint. Mylan's anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing prices of the Mylan Drugs throughout the United States.

1450.    The conspiracy realized its intended effect; Mylan has benefited, and continues to benefit, from its anticompetitive agreements which have artificially inflated the prices of the Mylan Drugs.

1451.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

> a.    Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Mylan Drugs;
>
> b.    Humana was deprived of the benefits of free and open competition in the sale of the Mylan Drugs in the United States market; and
>
> c.    Competition in establishing the prices paid for the Mylan Drugs was unlawfully restrained, suppressed, or eliminated.

1452.    Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Mylan Drugs until the market achieves a steady state.

1453.    As a direct and proximate result of Mylan's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Mylan Drugs than it would have paid in the absence of Mylan's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

REDACTED – PUBLIC VERSION

1454.    Mylan is *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by its contract, combination, and conspiracy in restraint of trade as alleged herein.

1455.    There is no legitimate, non-pretextual, pro-competitive business justification for Mylan's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1456.    Mylan's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1457.    Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of the Mylan Drugs, or by assignment from its other subsidiaries that directly purchased the Mylan Drugs during the relevant period.

## COUNT LVII

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAWS

#### (As to Mylan and All Other Defendants Under Joint and Several Liability)

1458.    Humana incorporates by reference the preceding allegations.

1459.    Mylan knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of the Mylan Drugs in the United States. This conspiracy was *per se* unlawful price-fixing.

1460.    Mylan has committed at least one overt act to further the conspiracy alleged in this Complaint. Mylan's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Mylan Drugs throughout the United States.

1461.    The conspiracy realized its intended effect; Mylan has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Mylan Drugs.

1462.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

     a.   Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Mylan Drugs;

     b.   Humana was deprived of the benefits of free and open competition in the sale of the Mylan Drugs in the United States market; and

     c.   Competition in establishing the prices paid for the Mylan Drugs was unlawfully restrained, suppressed, or eliminated.

1463.   Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Mylan Drugs until the market achieves a steady state.

1464.   As a direct and proximate result of Mylan's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Mylan Drugs than it would have paid in the absence of Mylan's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

1465.   There is no legitimate, non-pretextual, pro-competitive business justification for Mylan's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1466.   Mylan's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1467.   Mylan's conduct violated the following state antitrust or competition practices laws:

     a.   Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

     b.   Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

     c.   Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut.

REDACTED – PUBLIC VERSION

d.  D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

e.  Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f.  Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

g.  740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

h.  Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

i.  Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

j.  Md. Comm. L. §§ 11-201, et seq., with respect to purchases in Maryland.

k.  Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

l.  Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

m.  Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

n.  Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

o.  Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

p.  Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

q.  Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

r.  Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

s.  N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

t.  N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

u.  N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

v.  N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

w.  Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

REDACTED – PUBLIC VERSION

    x.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

    y.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

    z.   S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

    aa.  Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

    bb.  Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

    cc.  Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

    dd.  W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

    ee.  Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

## COUNT LVIII

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Mylan and All Other Defendants Under Joint and Several Liability)

1468.   Humana incorporates by reference the preceding allegations.

1469.   Mylan engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Mylan's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase the Mylan Drugs at prices restrained by competition and forced to pay artificially inflated prices.

1470.   There was and is a gross disparity between the price that Humana paid and continues to pay for the Mylan Drugs, including by assignment from its subsidiaries, and the value received, given that more cheaply priced Mylan Drugs should have been available, and would have been available, absent Mylan's illegal conduct.

1471.   By engaging in the foregoing conduct, Mylan engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

REDACTED – PUBLIC VERSION

a.  Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

b.  Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

c.  Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

d.  D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of
    Columbia.

e.  Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f.  Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

g.  Idaho Code §§ 48-601, et seq., with respect to the purchases in Idaho.

h.  815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

i.  5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j.  Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k.  Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l.  Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to
    purchases in Minnesota.

m.  Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n.  Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o.  Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p.  N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New
    Hampshire.

q.  N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r.  N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s.  N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t.  Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u.  73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

REDACTED – PUBLIC VERSION

v.   R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w.  S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x.   Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y.   Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z.   Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa. West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West Virginia.

## COUNT LIX

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Mylan and All Other Defendants Under Joint and Several Liability)

1472.   Humana incorporates by reference the preceding allegations.

1473.   Mylan has benefitted from artificial prices in the sale of the Mylan Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

1474.   Mylan's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Mylan Drugs by Humana.

1475.   Humana has conferred upon Mylan an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

1476.   It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Mylan Drugs.

1477.   It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Mylan Drugs, as it is not liable and would not compensate Humana for the impact of Mylan's unlawful conduct.

REDACTED – PUBLIC VERSION

1478. The economic benefit of overcharges derived by Mylan through charging supracompetitive and artificially inflated prices for the Mylan Drugs is a direct and proximate result of Mylan's unlawful conduct.

1479. The economic benefits derived by Mylan rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Mylan.

1480. It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Mylan to be permitted to retain any of the overcharges for the Mylan Drugs derived from Mylan's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

1481. Mylan is aware of and appreciates the benefits bestowed upon it by Humana.

1482. Mylan should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds it received.

1483. A constructive trust should be imposed upon all unlawful or inequitable sums received by Mylan traceable to Humana.

## COUNT LX

### DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

### (As to Mylan and All Other Defendants Under Joint and Several Liability)

1484. Humana incorporates by reference the preceding allegations.

1485. Mylan knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Mylan Drugs. Mylan injured Humana through this conduct.

REDACTED – PUBLIC VERSION

1486.    But for Mylan's scheme to inflate the price of the Mylan Drugs, Humana would have purchased lower-priced Mylan Drugs.

1487.    Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Mylan Drugs than it would have paid absent Mylan's continuing anticompetitive conduct.

1488.    Humana has purchased substantial amounts of the Mylan Drugs during the relevant period.

1489.    Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Mylan's conduct violates Sections 1 and 2 of the Sherman Act.

1490.    Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Mylan's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT LXI

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT

### (As to Par and All Other Defendants Under Joint and Several Liability)

1491.    Humana incorporates by reference the preceding allegations.

1492.    Par knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States, in violation of Section 1 of the Sherman Act (the "Par Drugs"). This conspiracy was *per se* unlawful price-fixing.

> Carisoprodol
> Hydrocodone Acetaminophen
> Oxycodone HCL Tablets
> Trazodone HCL

1493.    Par has committed at least one overt act to further the conspiracy alleged in this Complaint. Par's anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing prices of the Par Drugs throughout the United States.

1494.    The conspiracy realized its intended effect; Par has benefited, and continues to benefit, from its anticompetitive agreements which have artificially inflated the prices of the Par Drugs.

1495.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

      a.   Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Par Drugs;

      b.   Humana was deprived of the benefits of free and open competition in the sale of the Par Drugs in the United States market; and

      c.   Competition in establishing the prices paid for the Par Drugs was unlawfully restrained, suppressed, or eliminated.

1496.    Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Par Drugs until the market achieves a steady state.

1497.    As a direct and proximate result of Par's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Par Drugs than it would have paid in the absence of Par's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

1498.    Par is *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by its contract, combination, and conspiracy in restraint of trade as alleged herein.

REDACTED – PUBLIC VERSION

1499.   There is no legitimate, non-pretextual, pro-competitive business justification for Par's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1500.   Par's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1501.   Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of the Par Drugs, or by assignment from its other subsidiaries that directly purchased the Par Drugs during the relevant period.

## COUNT LXII

## FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAWS

### (As to Par and All Other Defendants Under Joint and Several Liability)

1502.   Humana incorporates by reference the preceding allegations.

1503.   Par knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of the Par Drugs in the United States. This conspiracy was *per se* unlawful price-fixing.

1504.   Par has committed at least one overt act to further the conspiracy alleged in this Complaint. Par's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Par Drugs throughout the United States.

1505.   The conspiracy realized its intended effect; Par has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Par Drugs.

1506.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

REDACTED – PUBLIC VERSION

    a.   Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Par Drugs;

    b.   Humana was deprived of the benefits of free and open competition in the sale of the Par Drugs in the United States market; and

    c.   Competition in establishing the prices paid for the Par Drugs was unlawfully restrained, suppressed, or eliminated.

1507.   Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Par Drugs until the market achieves a steady state.

1508.   As a direct and proximate result of Par's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Par Drugs than it would have paid in the absence of Par's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

1509.   There is no legitimate, non-pretextual, pro-competitive business justification for Par's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1510.   Par's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1511.   Par's conduct violated the following state antitrust or competition practices laws:

    a.   Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

    b.   Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

    c.   Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut.

    d.   D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

    e.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

REDACTED – PUBLIC VERSION

    f.   Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

    g.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

    h.   Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

    i.   Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

    j.   Md. Comm. L. §§ 11-201, et seq., with respect to purchases in Maryland.

    k.   Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

    l.   Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

    m.   Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

    n.   Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

    o.   Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

    p.   Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

    q.   Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

    r.   Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

    s.   N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

    t.   N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

    u.   N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

    v.   N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

    w.   Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

    x.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

    y.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

REDACTED – PUBLIC VERSION

z.   S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

aa.  Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

bb.  Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

cc.  Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

dd.  W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

ee.  Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

## COUNT LXIII

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Par and All Other Defendants Under Joint and Several Liability)

1512.  Humana incorporates by reference the preceding allegations.

1513.  Par engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Par's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase the Par Drugs at prices restrained by competition and forced to pay artificially inflated prices.

1514.  There was and is a gross disparity between the price that Humana paid and continues to pay for the Par Drugs, including by assignment from its subsidiaries, and the value received, given that more cheaply priced Par Drugs should have been available, and would have been available, absent Par's illegal conduct.

1515.  By engaging in the foregoing conduct, Par engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

a.   Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

b.   Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

c.  Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

d.  D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

e.  Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f.  Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

g.  Idaho Code §§ 48-601, et seq., with respect to the purchases in Idaho.

h.  815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

i.  5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j.  Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k.  Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l.  Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m.  Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n.  Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o.  Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p.  N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New Hampshire.

q.  N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r.  N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s.  N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t.  Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u.  73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v.  R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w.  S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

REDACTED – PUBLIC VERSION

    x.   Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

    y.   Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

    z.   Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

    aa.  West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West Virginia.

## COUNT LXIV

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Par and All Other Defendants Under Joint and Several Liability)

1516.   Humana incorporates by reference the preceding allegations.

1517.   Par has benefitted from artificial prices in the sale of the Par Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

1518.   Par's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Par Drugs by Humana.

1519.   Humana has conferred upon Par an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

1520.   It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Par Drugs.

1521.   It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Par Drugs, as it is not liable and would not compensate Humana for the impact of Par's unlawful conduct.

1522.   The economic benefit of overcharges derived by Par through charging supracompetitive and artificially inflated prices for the Par Drugs is a direct and proximate result of Par's unlawful conduct.

REDACTED – PUBLIC VERSION

1523.   The economic benefits derived by Par rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Par.

1524.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Par to be permitted to retain any of the overcharges for the Par Drugs derived from Par's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

1525.   Par is aware of and appreciates the benefits bestowed upon it by Humana.

1526.   Par should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds it received.

1527.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Par traceable to Humana.

## COUNT LXV

### DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

#### (As to Par and All Other Defendants Under Joint and Several Liability)

1528.   Humana incorporates by reference the preceding allegations.

1529.   Par knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Par Drugs. Par injured Humana through this conduct.

1530.   But for Par's scheme to inflate the price of the Par Drugs, Humana would have purchased lower-priced Par Drugs.

1531.   Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Par Drugs than it would have paid absent Par's continuing anticompetitive conduct.

REDACTED – PUBLIC VERSION

1532.   Humana has purchased substantial amounts of the Par Drugs during the relevant period.

1533.   Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Par's conduct violates Sections 1 and 2 of the Sherman Act.

1534.   Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Par's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT LXVI

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT

### (As to Perrigo and All Other Defendants Under Joint and Several Liability)

1535.   Humana incorporates by reference the preceding allegations.

1536.   Perrigo knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States, in violation of Section 1 of the Sherman Act (the "Perrigo Drugs"). This conspiracy was *per se* unlawful price-fixing.

> Ammonium Lactate
> Calcipotriene Betamethasone Dipropionate
> Erythromycin Solution
> Fluticasone Propionate Lotion
> Hydrocortisone Acetate
> Methazolamide
> Promethazine HCL
> Tacrolimus

1537.   Perrigo has committed at least one overt act to further the conspiracy alleged in this Complaint. Perrigo's anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing prices of the Perrigo Drugs throughout the United States.

REDACTED – PUBLIC VERSION

1538.    The conspiracy realized its intended effect; Perrigo has benefited, and continues to benefit, from its anticompetitive agreements which have artificially inflated the prices of the Perrigo Drugs.

1539.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

      a.    Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Perrigo Drugs;

      b.    Humana was deprived of the benefits of free and open competition in the sale of the Perrigo Drugs in the United States market; and

      c.    Competition in establishing the prices paid for the Perrigo Drugs was unlawfully restrained, suppressed, or eliminated.

1540.    Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Perrigo Drugs until the market achieves a steady state.

1541.    As a direct and proximate result of Perrigo's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Perrigo Drugs than it would have paid in the absence of Perrigo's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

1542.    Perrigo is *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by its contract, combination, and conspiracy in restraint of trade as alleged herein.

1543.    There is no legitimate, non-pretextual, pro-competitive business justification for Perrigo's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

REDACTED – PUBLIC VERSION

1544.    Perrigo's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1545.    Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of the Perrigo Drugs, or by assignment from its other subsidiaries that directly purchased the Perrigo Drugs during the relevant period.

## COUNT LXVII

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT
### OF TRADE UNDER STATE LAWS

### (As to Perrigo and All Other Defendants Under Joint and Several Liability)

1546.    Humana incorporates by reference the preceding allegations.

1547.    Perrigo knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of the Perrigo Drugs in the United States. This conspiracy was *per se* unlawful price-fixing.

1548.    Perrigo has committed at least one overt act to further the conspiracy alleged in this Complaint. Perrigo's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Perrigo Drugs throughout the United States.

1549.    The conspiracy realized its intended effect; Perrigo has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Perrigo Drugs.

1550.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

      a.    Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Perrigo Drugs;

      b.    Humana was deprived of the benefits of free and open competition in the sale of the Perrigo Drugs in the United States market; and

    c.   Competition in establishing the prices paid for the Perrigo Drugs was unlawfully restrained, suppressed, or eliminated.

1551.   Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Perrigo Drugs until the market achieves a steady state.

1552.   As a direct and proximate result of Perrigo's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Perrigo Drugs than it would have paid in the absence of Perrigo's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

1553.   There is no legitimate, non-pretextual, pro-competitive business justification for Perrigo's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1554.   Perrigo's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1555.   Perrigo's conduct violated the following state antitrust or competition practices laws:

    a.   Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

    b.   Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

    c.   Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut.

    d.   D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

    e.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

    f.   Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

    g.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

    h.   Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

    i.   Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

REDACTED – PUBLIC VERSION

j.   Md. Comm. L. §§ 11-201, et seq., with respect to purchases in Maryland.

k.   Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

l.   Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

m.   Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in

    Michigan.

n.   Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to

    purchases in Minnesota.

o.   Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

p.   Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

q.   Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

r.   Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

s.   N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

t.   N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

u.   N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

v.   N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North

    Dakota.

w.   Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

x.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

y.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

z.    S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South

    Dakota.

aa.  Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

bb.  Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

cc.  Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

REDACTED – PUBLIC VERSION

dd. W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

ee. Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

## COUNT LXVIII

### UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Perrigo and All Other Defendants Under Joint and Several Liability)

1556. Humana incorporates by reference the preceding allegations.

1557. Perrigo engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Perrigo's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase the Perrigo Drugs at prices restrained by competition and forced to pay artificially inflated prices.

1558. There was and is a gross disparity between the price that Humana paid and continues to pay for the Perrigo Drugs, including by assignment from its subsidiaries, and the value received, given that more cheaply priced Perrigo Drugs should have been available, and would have been available, absent Perrigo's illegal conduct.

1559. By engaging in the foregoing conduct, Perrigo engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

a. Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

b. Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

c. Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

d. D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

e. Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f. Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

365

REDACTED – PUBLIC VERSION

g.  Idaho Code §§ 48-601, et seq., with respect to the purchases in Idaho.

h.  815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

i.  5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j.  Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k.  Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l.  Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m.  Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n.  Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o.  Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p.  N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New Hampshire.

q.  N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r.  N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s.  N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t.  Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u.  73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v.  R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w.  S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x.  Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y.  Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z.  Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa. West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West Virginia.

REDACTED – PUBLIC VERSION

## COUNT LXIX

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Perrigo and All Other Defendants Under Joint and Several Liability)

1560.    Humana incorporates by reference the preceding allegations.

1561.    Perrigo has benefitted from artificial prices in the sale of the Perrigo Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

1562.    Perrigo's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Perrigo Drugs by Humana.

1563.    Humana has conferred upon Perrigo an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

1564.    It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Perrigo Drugs.

1565.    It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Perrigo Drugs, as it is not liable and would not compensate Humana for the impact of Perrigo's unlawful conduct.

1566.    The economic benefit of overcharges derived by Perrigo through charging supracompetitive and artificially inflated prices for the Perrigo Drugs is a direct and proximate result of Perrigo's unlawful conduct.

1567.    The economic benefits derived by Perrigo rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Perrigo.

1568.    It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Perrigo to be permitted to retain any of the overcharges for the Perrigo Drugs derived

REDACTED – PUBLIC VERSION

from Perrigo's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

1569.    Perrigo is aware of and appreciates the benefits bestowed upon it by Humana.

1570.    Perrigo should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds it received.

1571.    A constructive trust should be imposed upon all unlawful or inequitable sums received by Perrigo traceable to Humana.

## COUNT LXX

## DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

### (As to Perrigo and All Other Defendants Under Joint and Several Liability)

1572.    Humana incorporates by reference the preceding allegations.

1573.    Perrigo knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Perrigo Drugs. Perrigo injured Humana through this conduct.

1574.    But for Perrigo's scheme to inflate the price of the Perrigo Drugs, Humana would have purchased lower-priced Perrigo Drugs.

1575.    Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Perrigo Drugs than it would have paid absent Perrigo's continuing anticompetitive conduct.

1576.    Humana has purchased substantial amounts of the Perrigo Drugs during the relevant period.

1577.    Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Perrigo's conduct violates Sections 1 and 2 of the Sherman Act.

1578.    Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Perrigo's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT LXXI

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT

### (As to Sandoz and All Other Defendants Under Joint and Several Liability)

1579.    Humana incorporates by reference the preceding allegations.

1580.    Sandoz knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States, in violation of Section 1 of the Sherman Act (the "Sandoz Drugs"). This conspiracy was *per se* unlawful price-fixing.

> Atropine Sulfate
> Calcipotriene
> Calcipotriene Betamethasone Dipropionate
> Cefpodoxime Proxetil
> Desoximetasone
> Erythromycin Solution
> Fluticasone Propionate Lotion
> Latanoprost
> Methazolamide
> Nafcillin Sodium
> Neomycin/Polymixin/Hydrocortisone
> Nystatin Triamcinolone
> Oxacillin Sodium
> Tacrolimus
> Terconazole
> Tobramycin Dexamethasone

1581.    Sandoz has committed at least one overt act to further the conspiracy alleged in this Complaint. Sandoz's anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing prices of the Sandoz Drugs throughout the United States.

REDACTED – PUBLIC VERSION

1582.    The conspiracy realized its intended effect; Sandoz has benefited, and continues to benefit, from its anticompetitive agreements which have artificially inflated the prices of the Sandoz Drugs.

1583.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

      a.  Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Sandoz Drugs;

      b.  Humana was deprived of the benefits of free and open competition in the sale of the Sandoz Drugs in the United States market; and

      c.  Competition in establishing the prices paid for the Sandoz Drugs was unlawfully restrained, suppressed, or eliminated.

1584.    Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Sandoz Drugs until the market achieves a steady state.

1585.    As a direct and proximate result of Sandoz's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Sandoz Drugs than it would have paid in the absence of Sandoz's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

1586.    Sandoz is *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by its contract, combination, and conspiracy in restraint of trade as alleged herein.

1587.    There is no legitimate, non-pretextual, pro-competitive business justification for Sandoz's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

REDACTED – PUBLIC VERSION

1588.    Sandoz's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1589.    Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of the Sandoz Drugs, or by assignment from its other subsidiaries that directly purchased the Sandoz Drugs during the relevant period.

## COUNT LXXII

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT
### OF TRADE UNDER STATE LAWS

**(As to Sandoz and All Other Defendants Under Joint and Several Liability)**

1590.    Humana incorporates by reference the preceding allegations.

1591.    Sandoz knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of the Sandoz Drugs in the United States. This conspiracy was *per se* unlawful price-fixing.

1592.    Sandoz has committed at least one overt act to further the conspiracy alleged in this Complaint. Sandoz's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Sandoz Drugs throughout the United States.

1593.    The conspiracy realized its intended effect; Sandoz has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Sandoz Drugs.

1594.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

    a.    Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Sandoz Drugs;

    b.    Humana was deprived of the benefits of free and open competition in the sale of the Sandoz Drugs in the United States market; and

    c.   Competition in establishing the prices paid for the Sandoz Drugs was unlawfully restrained, suppressed, or eliminated.

1595.   Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Sandoz Drugs until the market achieves a steady state.

1596.   As a direct and proximate result of Sandoz's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Sandoz Drugs than it would have paid in the absence of Sandoz's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

1597.   There is no legitimate, non-pretextual, pro-competitive business justification for Sandoz's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1598.   Sandoz's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1599.   Sandoz's conduct violated the following state antitrust or competition practices laws:

    a.   Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

    b.   Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

    c.   Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut.

    d.   D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

    e.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

    f.   Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

    g.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

    h.   Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

    i.   Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

j. Md. Comm. L. §§ 11-201, et seq., with respect to purchases in Maryland.

k. Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

l. Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

m. Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

n. Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

o. Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

p. Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

q. Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

r. Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

s. N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

t. N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

u. N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

v. N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

w. Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

x. 10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

y. R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

z.  S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

aa. Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

bb. Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

cc. Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

REDACTED – PUBLIC VERSION

dd. W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

ee. Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

## COUNT LXXIII

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Sandoz and All Other Defendants Under Joint and Several Liability)

1600.    Humana incorporates by reference the preceding allegations.

1601.    Sandoz engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Sandoz's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase the Sandoz Drugs at prices restrained by competition and forced to pay artificially inflated prices.

1602.    There was and is a gross disparity between the price that Humana paid and continues to pay for the Sandoz Drugs, including by assignment from its subsidiaries, and the value received, given that more cheaply priced Sandoz Drugs should have been available, and would have been available, absent Sandoz's illegal conduct.

1603.    By engaging in the foregoing conduct, Sandoz engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

a. Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

b. Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

c. Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

d. D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

e. Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f. Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

g.   Idaho Code §§ 48-601, et seq., with respect to the purchases in Idaho.

h.   815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

i.   5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j.   Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k.   Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l.   Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to
     purchases in Minnesota.

m.   Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n.   Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o.   Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p.   N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New
     Hampshire.

q.   N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r.   N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s.   N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t.   Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u.   73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v.   R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w.   S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x.   Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y.   Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z.   Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa.  West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West
     Virginia.

REDACTED – PUBLIC VERSION

COUNT LXXIV

UNJUST ENRICHMENT UNDER STATE LAW

(As to Sandoz and All Other Defendants Under Joint and Several Liability)

1604.    Humana incorporates by reference the preceding allegations.

1605.    Sandoz has benefitted from artificial prices in the sale of the Sandoz Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

1606.    Sandoz's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Sandoz Drugs by Humana.

1607.    Humana has conferred upon Sandoz an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

1608.    It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Sandoz Drugs.

1609.    It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Sandoz Drugs, as it is not liable and would not compensate Humana for the impact of Sandoz's unlawful conduct.

1610.    The economic benefit of overcharges derived by Sandoz through charging supracompetitive and artificially inflated prices for the Sandoz Drugs is a direct and proximate result of Sandoz's unlawful conduct.

1611.    The economic benefits derived by Sandoz rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Sandoz.

1612.    It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Sandoz to be permitted to retain any of the overcharges for the Sandoz Drugs derived

REDACTED – PUBLIC VERSION

from Sandoz's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

1613.    Sandoz is aware of and appreciates the benefits bestowed upon it by Humana.

1614.    Sandoz should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds it received.

1615.    A constructive trust should be imposed upon all unlawful or inequitable sums received by Sandoz traceable to Humana.

## COUNT LXXV

## DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

### (As to Sandoz and All Other Defendants Under Joint and Several Liability)

1616.    Humana incorporates by reference the preceding allegations.

1617.    Sandoz knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Sandoz Drugs. Sandoz injured Humana through this conduct.

1618.    But for Sandoz's scheme to inflate the price of the Sandoz Drugs, Humana would have purchased lower-priced Sandoz Drugs.

1619.    Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Sandoz Drugs than it would have paid absent Sandoz's continuing anticompetitive conduct.

1620.    Humana has purchased substantial amounts of the Sandoz Drugs during the relevant period.

1621.    Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Sandoz's conduct violates Sections 1 and 2 of the Sherman Act.

REDACTED – PUBLIC VERSION

1622.    Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Sandoz's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT LXXVI

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT

### (As to Sun and All Other Defendants Under Joint and Several Liability)

1623.    Humana incorporates by reference the preceding allegations.

1624.    Sun knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States, in violation of Section 1 of the Sherman Act (the "Sun Drugs"). This conspiracy was *per se* unlawful price-fixing.

>    Oxycodone HCL Tablets
>    Trazodone HCL

1625.    Sun has committed at least one overt act to further the conspiracy alleged in this Complaint. Sun's anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing prices of the Sun Drugs throughout the United States.

1626.    The conspiracy realized its intended effect; Sun has benefited, and continues to benefit, from its anticompetitive agreements which have artificially inflated the prices of the Sun Drugs.

1627.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

>    a.    Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or
>    stabilized prices at supracompetitive levels for the Sun Drugs;

REDACTED – PUBLIC VERSION

    b.   Humana was deprived of the benefits of free and open competition in the sale of the Sun Drugs in the United States market; and

    c.   Competition in establishing the prices paid for the Sun Drugs was unlawfully restrained, suppressed, or eliminated.

1628.   Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Sun Drugs until the market achieves a steady state.

1629.   As a direct and proximate result of Sun's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Sun Drugs than it would have paid in the absence of Sun's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

1630.   Sun is *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by its contract, combination, and conspiracy in restraint of trade as alleged herein.

1631.   There is no legitimate, non-pretextual, pro-competitive business justification for Sun's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1632.   Sun's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1633.   Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of the Sun Drugs, or by assignment from its other subsidiaries that directly purchased the Sun Drugs during the relevant period.

## COUNT LXXVII

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAWS

**(As to Sun and All Other Defendants Under Joint and Several Liability)**

1634.   Humana incorporates by reference the preceding allegations.

1635.   Sun knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of the Sun Drugs in the United States. This conspiracy was *per se* unlawful price-fixing.

1636.   Sun has committed at least one overt act to further the conspiracy alleged in this Complaint. Sun's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Sun Drugs throughout the United States.

1637.   The conspiracy realized its intended effect; Sun has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Sun Drugs.

1638.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

      a.   Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Sun Drugs;

      b.   Humana was deprived of the benefits of free and open competition in the sale of the Sun Drugs in the United States market; and

      c.   Competition in establishing the prices paid for the Sun Drugs was unlawfully restrained, suppressed, or eliminated.

1639.   Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Sun Drugs until the market achieves a steady state.

1640.   As a direct and proximate result of Sun's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Sun Drugs than it would have paid in the absence of Sun's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

REDACTED – PUBLIC VERSION

1641.    There is no legitimate, non-pretextual, pro-competitive business justification for Sun's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1642.    Sun's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1643.    Sun's conduct violated the following state antitrust or competition practices laws:

    a.   Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

    b.   Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

    c.   Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut.

    d.   D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

    e.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

    f.   Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

    g.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

    h.   Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

    i.   Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

    j.   Md. Comm. L. §§ 11-201, et seq., with respect to purchases in Maryland.

    k.   Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

    l.   Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

    m.   Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

    n.   Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

    o.   Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

REDACTED – PUBLIC VERSION

    p.   Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

    q.   Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

    r.   Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

    s.   N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

    t.   N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

    u.   N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

    v.   N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

    w.   Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

    x.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

    y.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

    z.   S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

    aa.  Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

    bb.  Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

    cc.  Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

    dd.  W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

    ee.  Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

## COUNT LXXVIII

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Sun and All Other Defendants Under Joint and Several Liability)

1644.   Humana incorporates by reference the preceding allegations.

1645.   Sun engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a

REDACTED – PUBLIC VERSION

direct and proximate result of Sun's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase the Sun Drugs at prices restrained by competition and forced to pay artificially inflated prices.

1646.    There was and is a gross disparity between the price that Humana paid and continues to pay for the Sun Drugs, including by assignment from its subsidiaries, and the value received, given that more cheaply priced Sun Drugs should have been available, and would have been available, absent Sun's illegal conduct.

1647.    By engaging in the foregoing conduct, Sun engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

    a.  Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

    b.  Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

    c.  Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

    d.  D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

    e.  Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

    f.  Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

    g.  Idaho Code §§ 48-601, et seq., with respect to purchases in Idaho.

    h.  815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

    i.  5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

    j.  Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

    k.  Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

    l.  Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

    m.  Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

REDACTED – PUBLIC VERSION

n.   Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o.   Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p.   N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New
     Hampshire.

q.   N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r.   N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s.   N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t.   Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u.   73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v.   R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w.   S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x.   Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y.   Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z.   Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa.  West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West
     Virginia.

## COUNT LXXIX

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Sun and All Other Defendants Under Joint and Several Liability)

1648.   Humana incorporates by reference the preceding allegations.

1649.   Sun has benefitted from artificial prices in the sale of the Sun Drugs resulting from
the unlawful and inequitable acts alleged in this Complaint.

1650.   Sun's financial benefit resulting from its unlawful and inequitable acts are traceable to
overpayments for the Sun Drugs by Humana.

REDACTED – PUBLIC VERSION

1651.    Humana has conferred upon Sun an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

1652.    It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Sun Drugs.

1653.    It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Sun Drugs, as it is not liable and would not compensate Humana for the impact of Sun's unlawful conduct.

1654.    The economic benefit of overcharges derived by Sun through charging supracompetitive and artificially inflated prices for the Sun Drugs is a direct and proximate result of Sun's unlawful conduct.

1655.    The economic benefits derived by Sun rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Sun.

1656.    It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Sun to be permitted to retain any of the overcharges for the Sun Drugs derived from Sun's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

1657.    Sun is aware of and appreciates the benefits bestowed upon it by Humana.

1658.    Sun should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds it received.

1659.    A constructive trust should be imposed upon all unlawful or inequitable sums received by Sun traceable to Humana.

## COUNT LXXX

### DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

REDACTED – PUBLIC VERSION

**(As to Sun and All Other Defendants Under Joint and Several Liability)**

1660.    Humana incorporates by reference the preceding allegations.

1661.    Sun knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Sun Drugs. Sun injured Humana through this conduct.

1662.    But for Sun's scheme to inflate the price of the Sun Drugs, Humana would have purchased lower-priced Sun Drugs.

1663.    Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Sun Drugs than it would have paid absent Sun's continuing anticompetitive conduct.

1664.    Humana has purchased substantial amounts of the Sun Drugs during the relevant period.

1665.    Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Actavis's conduct violates Sections 1 and 2 of the Sherman Act.

1666.    Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Actavis's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

**COUNT LXXXI**

**VIOLATION OF SECTION 1 OF THE SHERMAN ACT**

**(As to Taro and All Other Defendants Under Joint and Several Liability)**

1667.    Humana incorporates by reference the preceding allegations.

1668.    Taro knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States, in

violation of Section 1 of the Sherman Act (the "Taro Drugs"). This conspiracy was *per se* unlawful price-fixing.

> Ammonium Lactate
> Desoximetasone
> Nystatin Triamcinolone
> Promethazine HCL
> Terconazole

1669.    Taro has committed at least one overt act to further the conspiracy alleged in this Complaint. Taro's anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing prices of the Taro Drugs throughout the United States.

1670.    The conspiracy realized its intended effect; Taro has benefited, and continues to benefit, from its anticompetitive agreements which have artificially inflated the prices of the Taro Drugs.

1671.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

    a.    Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Taro Drugs;

    b.    Humana was deprived of the benefits of free and open competition in the sale of the Taro Drugs in the United States market; and

    c.    Competition in establishing the prices paid for the Taro Drugs was unlawfully restrained, suppressed, or eliminated.

1672.    Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Taro Drugs until the market achieves a steady state.

1673.    As a direct and proximate result of Taro's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Taro Drugs than it would have

REDACTED – PUBLIC VERSION

paid in the absence of Taro's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

1674.    Taro is *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by its contract, combination, and conspiracy in restraint of trade as alleged herein.

1675.    There is no legitimate, non-pretextual, pro-competitive business justification for Taro's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1676.    Taro's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1677.    Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of the Taro Drugs, or by assignment from its other subsidiaries that directly purchased the Taro Drugs during the relevant period.

## COUNT LXXXII

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT
### OF TRADE UNDER STATE LAWS

#### (As to Taro and All Other Defendants Under Joint and Several Liability)

1678.    Humana incorporates by reference the preceding allegations.

1679.    Taro knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of the Taro Drugs in the United States. This conspiracy was *per se* unlawful price-fixing.

1680.    Taro has committed at least one overt act to further the conspiracy alleged in this Complaint. Taro's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Taro Drugs throughout the United States.

REDACTED – PUBLIC VERSION

1681.    The conspiracy realized its intended effect; Taro has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Taro Drugs.

1682.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

a.    Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Taro Drugs;

b.    Humana was deprived of the benefits of free and open competition in the sale of the Taro Drugs in the United States market; and

c.    Competition in establishing the prices paid for the Taro Drugs was unlawfully restrained, suppressed, or eliminated.

1683.    Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Taro Drugs until the market achieves a steady state.

1684.    As a direct and proximate result of Taro's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Taro Drugs than it would have paid in the absence of Taro's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

1685.    There is no legitimate, non-pretextual, pro-competitive business justification for Taro's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1686.    Taro's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1687.    Taro's conduct violated the following state antitrust or competition practices laws:

a.    Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

REDACTED – PUBLIC VERSION

    b.   Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

    c.   Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut.

    d.   D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

    e.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

    f.   Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

    g.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

    h.   Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

    i.   Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

    j.   Md. Comm. L. §§ 11-201, et seq., with respect to purchases in Maryland.

    k.   Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

    l.   Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

    m.   Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

    n.   Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

    o.   Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

    p.   Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

    q.   Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

    r.   Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

    s.   N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

    t.   N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

    u.   N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

REDACTED – PUBLIC VERSION

v.   N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North

Dakota.

w.   Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

x.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

y.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

z.    S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South

Dakota.

aa.  Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

bb.  Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

cc.  Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

dd.  W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

ee.  Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

## COUNT LXXXIII

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Taro and All Other Defendants Under Joint and Several Liability)

1688.   Humana incorporates by reference the preceding allegations.

1689.   Taro engaged in unfair competition or unfair, unconscionable, deceptive, or

fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a

direct and proximate result of Taro's anticompetitive, deceptive, unfair, unconscionable, and

fraudulent conduct, Humana was deprived of the opportunity to purchase the Taro Drugs at prices

restrained by competition and forced to pay artificially inflated prices.

1690.   There was and is a gross disparity between the price that Humana paid and continues

to pay for the Taro Drugs, including by assignment from its subsidiaries, and the value received,

given that more cheaply priced Taro Drugs should have been available, and would have been available, absent Taro's illegal conduct.

1691.    By engaging in the foregoing conduct, Taro engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

a.    Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

b.    Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

c.    Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

d.    D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

e.    Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f.    Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

g.    Idaho Code §§ 48-601, et seq., with respect to the purchases in Idaho.

h.    815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

i.    5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j.    Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k.    Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l.    Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m.    Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n.    Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o.    Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p.    N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New Hampshire.

q.    N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r.   N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s.   N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t.   Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u.   73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v.   R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w.  S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x.   Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y.   Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z.   Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa. West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West Virginia.

## COUNT LXXXIV

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Taro and All Other Defendants Under Joint and Several Liability)

1692.   Humana incorporates by reference the preceding allegations.

1693.   Taro has benefitted from artificial prices in the sale of the Taro Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

1694.   Taro's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Taro Drugs by Humana.

1695.   Humana has conferred upon Taro an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

1696.   It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Taro Drugs.

REDACTED – PUBLIC VERSION

1697. It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Taro Drugs, as it is not liable and would not compensate Humana for the impact of Taro's unlawful conduct.

1698. The economic benefit of overcharges derived by Taro through charging supracompetitive and artificially inflated prices for the Taro Drugs is a direct and proximate result of Taro's unlawful conduct.

1699. The economic benefits derived by Taro rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Taro.

1700. It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Taro to be permitted to retain any of the overcharges for the Taro Drugs derived from Taro's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

1701. Taro is aware of and appreciates the benefits bestowed upon it by Humana.

1702. Taro should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds it received.

1703. A constructive trust should be imposed upon all unlawful or inequitable sums received by Taro traceable to Humana.

## COUNT LXXXV

### DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

### (As to Taro and All Other Defendants Under Joint and Several Liability)

1704. Humana incorporates by reference the preceding allegations.

REDACTED – PUBLIC VERSION

1705.    Taro knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Taro Drugs. Taro injured Humana through this conduct.

1706.    But for Taro's scheme to inflate the price of the Taro Drugs, Humana would have purchased lower-priced Taro Drugs.

1707.    Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Taro Drugs than it would have paid absent Taro's continuing anticompetitive conduct.

1708.    Humana has purchased substantial amounts of the Taro Drugs during the relevant period.

1709.    Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Taro's conduct violates Sections 1 and 2 of the Sherman Act.

1710.    Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Taro's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT LXXXVI

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT

### (As to Teva and All Other Defendants Under Joint and Several Liability)

1711.    Humana incorporates by reference the preceding allegations.

1712.    Teva knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States, in violation of Section 1 of the Sherman Act (the "Teva Drugs"). This conspiracy was *per se* unlawful price-fixing.

Carbidopa/Levodopa
Danazol
Ethambutol HCL
Hydrocodone Acetaminophen
Methyldopa
Ondansetron
Trazodone HCL

1713. Teva has committed at least one overt act to further the conspiracy alleged in this Complaint. Teva's anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing prices of the Teva Drugs throughout the United States.

1714. The conspiracy realized its intended effect; Teva has benefited, and continues to benefit, from its anticompetitive agreements which have artificially inflated the prices of the Teva Drugs.

1715. The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

    a. Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Teva Drugs;

    b. Humana was deprived of the benefits of free and open competition in the sale of the Teva Drugs in the United States market; and

    c. Competition in establishing the prices paid for the Teva Drugs was unlawfully restrained, suppressed, or eliminated.

1716. Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Teva Drugs until the market achieves a steady state.

1717. As a direct and proximate result of Teva's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Teva Drugs than it would have paid in the absence of Teva's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

REDACTED – PUBLIC VERSION

1718.    Teva is *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by its contract, combination, and conspiracy in restraint of trade as alleged herein.

1719.    There is no legitimate, non-pretextual, pro-competitive business justification for Teva's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1720.    Teva's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1721.    Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of the Teva Drugs, or by assignment from its other subsidiaries that directly purchased the Teva Drugs during the relevant period.

## COUNT LXXXVII

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAWS

#### (As to Teva and All Other Defendants Under Joint and Several Liability)

1722.    Humana incorporates by reference the preceding allegations.

1723.    Teva knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of the Teva Drugs in the United States. This conspiracy was *per se* unlawful price-fixing.

1724.    Teva has committed at least one overt act to further the conspiracy alleged in this Complaint. Teva's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Teva Drugs throughout the United States.

1725.    The conspiracy realized its intended effect; Teva has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Teva Drugs.

1726.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

      a.    Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Teva Drugs;

      b.    Humana was deprived of the benefits of free and open competition in the sale of the Teva Drugs in the United States market; and

      c.    Competition in establishing the prices paid for the Teva Drugs was unlawfully restrained, suppressed, or eliminated.

1727.    Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Teva Drugs until the market achieves a steady state.

1728.    As a direct and proximate result of Teva's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Teva Drugs than it would have paid in the absence of Teva's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

1729.    There is no legitimate, non-pretextual, pro-competitive business justification for Teva's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1730.    Teva's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1731.    Teva's conduct violated the following state antitrust or competition practices laws:

      a.    Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

      b.    Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

      c.    Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut.

REDACTED – PUBLIC VERSION

d.  D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

e.  Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f.  Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

g.  740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

h.  Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

i.  Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

j.  Md. Comm. L. §§ 11-201, et seq., with respect to purchases in Maryland.

k.  Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

l.  Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

m.  Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

n.  Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

o.  Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

p.  Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

q.  Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

r.  Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

s.  N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

t.  N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

u.  N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

v.  N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

w.  Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

    x.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

    y.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

    z.   S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

    aa.  Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

    bb.  Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

    cc.  Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

    dd.  W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

    ee.  Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

## COUNT LXXXVIII

### UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Teva and All Other Defendants Under Joint and Several Liability)

1732.   Humana incorporates by reference the preceding allegations.

1733.   Teva engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Teva's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase the Teva Drugs at prices restrained by competition and forced to pay artificially inflated prices.

1734.   There was and is a gross disparity between the price that Humana paid and continues to pay for the Teva Drugs, including by assignment from its subsidiaries, and the value received, given that more cheaply priced Teva Drugs should have been available, and would have been available, absent Teva's illegal conduct.

1735.   By engaging in the foregoing conduct, Teva engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

a.  Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

b.  Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

c.  Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

d.  D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of
    Columbia.

e.  Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f.  Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

g.  Idaho Code §§ 48-601, et seq., with respect to the purchases in Idaho.

h.  815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

i.  5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j.  Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k.  Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l.  Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to
    purchases in Minnesota.

m.  Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n.  Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o.  Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p.  N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New
    Hampshire.

q.  N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r.  N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s.  N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t.  Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u.  73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

REDACTED – PUBLIC VERSION

v.  R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w.  S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x.  Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y.  Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z.  Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa.  West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West Virginia.

## COUNT LXXXIX

## UNJUST ENRICHMENT UNDER STATE LAW

### (As to Teva and All Other Defendants Under Joint and Several Liability)

1736.  Humana incorporates by reference the preceding allegations.

1737.  Teva has benefitted from artificial prices in the sale of the Teva Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

1738.  Teva's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Teva Drugs by Humana.

1739.  Humana has conferred upon Teva an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

1740.  It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Teva Drugs.

1741.  It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Teva Drugs, as it is not liable and would not compensate Humana for the impact of Teva's unlawful conduct.

REDACTED – PUBLIC VERSION

1742.   The economic benefit of overcharges derived by Teva through charging supracompetitive and artificially inflated prices for the Teva Drugs is a direct and proximate result of Teva's unlawful conduct.

1743.   The economic benefits derived by Teva rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Teva.

1744.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Teva to be permitted to retain any of the overcharges for the Teva Drugs derived from Teva's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

1745.   Teva is aware of and appreciates the benefits bestowed upon it by Humana.

1746.   Teva should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds it received.

1747.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Teva traceable to Humana.

## COUNT XC

### DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

#### (As to Teva and All Other Defendants Under Joint and Several Liability)

1748.   Humana incorporates by reference the preceding allegations.

1749.   Teva knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Teva Drugs. Teva injured Humana through this conduct.

1750.   But for Teva's scheme to inflate the price of the Teva Drugs, Humana would have purchased lower-priced Teva Drugs.

REDACTED – PUBLIC VERSION

1751.   Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Teva Drugs than it would have paid absent Teva's continuing anticompetitive conduct.

1752.   Humana has purchased substantial amounts of the Teva Drugs during the relevant period.

1753.   Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Teva's conduct violates Sections 1 and 2 of the Sherman Act.

1754.   Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Teva's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT XCI

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT

### (As to Valeant and All Other Defendants Under Joint and Several Liability)

1755.   Humana incorporates by reference the preceding allegations.

1756.   Valeant knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States, in violation of Section 1 of the Sherman Act (the "Valeant Drugs"). This conspiracy was *per se* unlawful price-fixing.

> Atropine Sulfate
> Latanoprost
> Neomycin/Polymixin/Hydrocortisone
> Tobramycin Dexamethasone

1757.   Valeant has committed at least one overt act to further the conspiracy alleged in this Complaint. Valeant's anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing prices of the Valeant Drugs throughout the United States.

1758.   The conspiracy realized its intended effect; Valeant has benefited, and continues to benefit, from its anticompetitive agreements which have artificially inflated the prices of the Valeant Drugs.

1759.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

     a.   Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Valeant Drugs;

     b.   Humana was deprived of the benefits of free and open competition in the sale of the Valeant Drugs in the United States market; and

     c.   Competition in establishing the prices paid for the Valeant Drugs was unlawfully restrained, suppressed, or eliminated.

1760.   Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Valeant Drugs until the market achieves a steady state.

1761.   As a direct and proximate result of Valeant's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Valeant Drugs than it would have paid in the absence of Valeant's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

1762.   Valeant is *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by its contract, combination, and conspiracy in restraint of trade as alleged herein.

1763.   There is no legitimate, non-pretextual, pro-competitive business justification for Valeant's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

REDACTED – PUBLIC VERSION

1764.    Valeant's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1765.    Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of the Valeant Drugs, or by assignment from its other subsidiaries that directly purchased the Valeant Drugs during the relevant period.

## COUNT XCII

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT
### OF TRADE UNDER STATE LAWS

**(As to Valeant and All Other Defendants Under Joint and Several Liability)**

1766.    Humana incorporates by reference the preceding allegations.

1767.    Valeant knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of the Valeant Drugs in the United States. This conspiracy was *per se* unlawful price-fixing.

1768.    Valeant has committed at least one overt act to further the conspiracy alleged in this Complaint. Valeant's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Valeant Drugs throughout the United States.

1769.    The conspiracy realized its intended effect; Valeant has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Valeant Drugs.

1770.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

> a.    Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Valeant Drugs;

> b.    Humana was deprived of the benefits of free and open competition in the sale of the Valeant Drugs in the United States market; and

c. Competition in establishing the prices paid for the Valeant Drugs was unlawfully restrained, suppressed, or eliminated.

1771.    Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Valeant Drugs until the market achieves a steady state.

1772.    As a direct and proximate result of Valeant's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Valeant Drugs than it would have paid in the absence of Valeant's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

1773.    There is no legitimate, non-pretextual, pro-competitive business justification for Valeant's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1774.    Valeant's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1775.    Valeant's conduct violated the following state antitrust or competition practices laws:

a. Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

b. Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

c. Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut.

d. D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

e. Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f. Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

g. 740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

h. Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

i. Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

j.  Md. Comm. L. §§ 11-201, et seq., with respect to purchases in Maryland.

k.  Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

l.  Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

m.  Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

n.  Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

o.  Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

p.  Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

q.  Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

r.  Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

s.  N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

t.  N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

u.  N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

v.  N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

w.  Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

x.  10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

y.  R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

z.  S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

aa.  Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

bb.  Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

cc.  Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

REDACTED – PUBLIC VERSION

dd. W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

ee. Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

## COUNT XCIII

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Valeant and All Other Defendants Under Joint and Several Liability)

1776.  Humana incorporates by reference the preceding allegations.

1777.  Valeant engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Valeant's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase the Valeant Drugs at prices restrained by competition and forced to pay artificially inflated prices.

1778.  There was and is a gross disparity between the price that Humana paid and continues to pay for the Valeant Drugs, including by assignment from its subsidiaries, and the value received, given that more cheaply priced Valeant Drugs should have been available, and would have been available, absent Valeant's illegal conduct.

1779.  By engaging in the foregoing conduct, Valeant engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

a. Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

b. Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

c. Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

d. D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

e. Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f. Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

REDACTED – PUBLIC VERSION

g.   Idaho Code §§ 48-601, et seq., with respect to the purchases in Idaho.

h.   815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

i.   5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j.   Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k.   Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

l.   Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to
     purchases in Minnesota.

m.   Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n.   Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o.   Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p.   N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New
     Hampshire.

q.   N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r.   N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s.   N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t.   Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u.   73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v.   R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w.   S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x.   Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y.   Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z.   Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa.  West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West
     Virginia.

COUNT XCIV

UNJUST ENRICHMENT UNDER STATE LAW

(As to Valeant and All Other Defendants Under Joint and Several Liability)

1780.   Humana incorporates by reference the preceding allegations.

1781.   Valeant has benefitted from artificial prices in the sale of the Valeant Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

1782.   Valeant's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Valeant Drugs by Humana.

1783.   Humana has conferred upon Valeant an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

1784.   It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Valeant Drugs.

1785.   It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Valeant Drugs, as it is not liable and would not compensate Humana for the impact of Valeant's unlawful conduct.

1786.   The economic benefit of overcharges derived by Valeant through charging supracompetitive and artificially inflated prices for the Valeant Drugs is a direct and proximate result of Valeant's unlawful conduct.

1787.   The economic benefits derived by Valeant rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Valeant.

1788.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Valeant to be permitted to retain any of the overcharges for the Valeant Drugs derived

REDACTED – PUBLIC VERSION

from Valeant's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

1789.    Valeant is aware of and appreciates the benefits bestowed upon it by Humana.

1790.    Valeant should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds it received.

1791.    A constructive trust should be imposed upon all unlawful or inequitable sums received by Valeant traceable to Humana.

## COUNT XCV

### DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

**(As to Valeant and All Other Defendants Under Joint and Several Liability)**

1792.    Humana incorporates by reference the preceding allegations.

1793.    Valeant knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Valeant Drugs. Valeant injured Humana through this conduct.

1794.    But for Valeant's scheme to inflate the price of the Valeant Drugs, Humana would have purchased lower-priced Valeant Drugs.

1795.    Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Valeant Drugs than it would have paid absent Valeant's continuing anticompetitive conduct.

1796.    Humana has purchased substantial amounts of the Valeant Drugs during the relevant period.

1797.    Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Valeant's conduct violates Sections 1 and 2 of the Sherman Act.

REDACTED – PUBLIC VERSION

1798.   Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Valeant's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT XCVI

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT

### (As to West-Ward and All Other Defendants Under Joint and Several Liability)

1799.   Humana incorporates by reference the preceding allegations.

1800.   West-Ward knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States, in violation of Section 1 of the Sherman Act (the "West-Ward Drugs"). This conspiracy was *per se* unlawful price-fixing.

> Exemestane
> Fluticasone Propionate Nasal Spray

1801.   West-Ward has committed at least one overt act to further the conspiracy alleged in this Complaint. West-Ward's anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing prices of the West-Ward Drugs throughout the United States.

1802.   The conspiracy realized its intended effect; West-Ward has benefited, and continues to benefit, from its anticompetitive agreements which have artificially inflated the prices of the West-Ward Drugs.

1803.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

> a.   Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the West-Ward Drugs;

413

    b.   Humana was deprived of the benefits of free and open competition in the sale of the West-Ward Drugs in the United States market; and

    c.   Competition in establishing the prices paid for the West-Ward Drugs was unlawfully restrained, suppressed, or eliminated.

1804.   Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the West-Ward Drugs until the market achieves a steady state.

1805.   As a direct and proximate result of West-Ward's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the West-Ward Drugs than it would have paid in the absence of West-Ward's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

1806.   West-Ward is *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by its contract, combination, and conspiracy in restraint of trade as alleged herein.

1807.   There is no legitimate, non-pretextual, pro-competitive business justification for West-Ward's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1808.   West-Ward's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1809.   Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of the West-Ward Drugs, or by assignment from its other subsidiaries that directly purchased the West-Ward Drugs during the relevant period.

## COUNT XCVII

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT
### OF TRADE UNDER STATE LAWS

**(As to West-Ward and All Other Defendants Under Joint and Several Liability)**

1810.   Humana incorporates by reference the preceding allegations.

1811.   West-Ward knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of the West-Ward Drugs in the United States. This conspiracy was *per se* unlawful price-fixing.

1812.   West-Ward has committed at least one overt act to further the conspiracy alleged in this Complaint. West-Ward's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the West-Ward Drugs throughout the United States.

1813.   The conspiracy realized its intended effect; West-Ward has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the West-Ward Drugs.

1814.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

     a.   Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the West-Ward Drugs;

     b.   Humana was deprived of the benefits of free and open competition in the sale of the West-Ward Drugs in the United States market; and

     c.   Competition in establishing the prices paid for the West-Ward Drugs was unlawfully restrained, suppressed, or eliminated.

1815.   Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the West-Ward Drugs until the market achieves a steady state.

1816.    As a direct and proximate result of West-Ward's unlawful conduct, Humana has

been injured in its business and property in that it has paid more for the West-Ward Drugs than it

would have paid in the absence of West-Ward's unlawful conduct. The full amount of such damages

is presently unknown and will be determined after discovery and upon proof at trial.

1817.    There is no legitimate, non-pretextual, pro-competitive business justification for

West-Ward's conspiracy that outweighs its harmful effect. Even if there were some conceivable

justification, the conspiracy is broader than necessary to achieve such purpose.

1818.    West-Ward's unlawful conduct as alleged herein poses a significant and continuing

threat of antitrust injury.

1819.    West-Ward's conduct violated the following state antitrust or competition practices

laws:

      a.   Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

      b.   Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

      c.   Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut.

      d.   D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of

         Columbia.

      e.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

      f.   Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

      g.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

      h.   Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

      i.   Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

      j.   Md. Comm. L. §§ 11-201, et seq., with respect to purchases in Maryland.

      k.   Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

      l.   Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

REDACTED – PUBLIC VERSION

m.  Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

n.  Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

o.  Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

p.  Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

q.  Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

r.  Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

s.  N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

t.  N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

u.  N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

v.  N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

w.  Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

x.  10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

y.  R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

z.  S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

aa.  Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

bb.  Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

cc.  Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

dd.  W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

ee.  Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

**COUNT XCVIII**

REDACTED – PUBLIC VERSION

**UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW**

**(As to West-Ward and All Other Defendants Under Joint and Several Liability)**

1820.   Humana incorporates by reference the preceding allegations.

1821.   West-Ward engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of West-Ward's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase the West-Ward Drugs at prices restrained by competition and forced to pay artificially inflated prices.

1822.   There was and is a gross disparity between the price that Humana paid and continues to pay for the West-Ward Drugs, including by assignment from its subsidiaries, and the value received, given that more cheaply priced West-Ward Drugs should have been available, and would have been available, absent West-Ward's illegal conduct.

1823.   By engaging in the foregoing conduct, West-Ward engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

  a.   Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

  b.   Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

  c.   Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

  d.   D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

  e.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

  f.   Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

  g.   Idaho Code §§ 48-601, et seq., with respect to the purchases in Idaho.

  h.   815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

  i.   5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

REDACTED – PUBLIC VERSION

    j.   Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

    k.   Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

    l.   Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

    m.  Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

    n.   Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

    o.   Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

    p.   N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New Hampshire.

    q.   N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

    r.   N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

    s.   N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

    t.   Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

    u.   73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

    v.   R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

    w.  S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

    x.   Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

    y.   Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

    z.   Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

   aa.  West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West Virginia.

## COUNT XCIX

## UNJUST ENRICHMENT UNDER STATE LAW

**(As to West-Ward and All Other Defendants Under Joint and Several Liability)**

1824.    Humana incorporates by reference the preceding allegations.

1825.    West-Ward has benefitted from artificial prices in the sale of the West-Ward Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

1826.    West-Ward's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the West-Ward Drugs by Humana.

1827.    Humana has conferred upon West-Ward an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

1828.    It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the West-Ward Drugs.

1829.    It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the West-Ward Drugs, as it is not liable and would not compensate Humana for the impact of West-Ward's unlawful conduct.

1830.    The economic benefit of overcharges derived by West-Ward through charging supracompetitive and artificially inflated prices for the West-Ward Drugs is a direct and proximate result of West-Ward's unlawful conduct.

1831.    The economic benefits derived by West-Ward rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting West-Ward.

1832.    It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for West-Ward to be permitted to retain any of the overcharges for the West-Ward Drugs derived from West-Ward's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

1833.    West-Ward is aware of and appreciates the benefits bestowed upon it by Humana.

REDACTED – PUBLIC VERSION

1834.   West-Ward should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds it received.

1835.   A constructive trust should be imposed upon all unlawful or inequitable sums received by West-Ward traceable to Humana.

## COUNT C

## DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

### (As to West-Ward and All Other Defendants Under Joint and Several Liability)

1836.   Humana incorporates by reference the preceding allegations.

1837.   West-Ward knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the West-Ward Drugs. West-Ward injured Humana through this conduct.

1838.   But for West-Ward's scheme to inflate the price of the West-Ward Drugs, Humana would have purchased lower-priced West-Ward Drugs.

1839.   Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the West-Ward Drugs than it would have paid absent West-Ward's continuing anticompetitive conduct.

1840.   Humana has purchased substantial amounts of the West-Ward Drugs during the relevant period.

1841.   Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that West-Ward's conduct violates Sections 1 and 2 of the Sherman Act.

1842.   Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects

caused by West-Ward's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT CI

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT

### (As to Wockhardt and All Other Defendants Under Joint and Several Liability)

1843.   Humana incorporates by reference the preceding allegations.

1844.   Wockhardt knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of at least the drugs listed below in the United States, in violation of Section 1 of the Sherman Act (the "Wockhardt Drugs"). This conspiracy was *per se* unlawful price-fixing.

> Erythromycin Solution
> Fluticasone Propionate Nasal Spray

1845.   Wockhardt has committed at least one overt act to further the conspiracy alleged in this Complaint. Wockhardt's anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing prices of the Wockhardt Drugs throughout the United States.

1846.   The conspiracy realized its intended effect; Wockhardt has benefited, and continues to benefit, from its anticompetitive agreements which have artificially inflated the prices of the Wockhardt Drugs.

1847.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

> a.   Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Wockhardt Drugs;
>
> b.   Humana was deprived of the benefits of free and open competition in the sale of the Wockhardt Drugs in the United States market; and

REDACTED – PUBLIC VERSION

      c.   Competition in establishing the prices paid for the Wockhardt Drugs was

          unlawfully restrained, suppressed, or eliminated.

1848.   Even after free and open competition begins, Humana will continue to pay

supracompetitive prices for the Wockhardt Drugs until the market achieves a steady state.

1849.   As a direct and proximate result of Wockhardt's unlawful conduct, Humana has

been injured in its business and property in that it has paid more for the Wockhardt Drugs than it

would have paid in the absence of Wockhardt's unlawful conduct. The full amount of such damages

is presently unknown and will be determined after discovery and upon proof at trial.

1850.   Wockhardt is *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the

injuries and damages caused by its contract, combination, and conspiracy in restraint of trade as

alleged herein.

1851.   There is no legitimate, non-pretextual, pro-competitive business justification for

Wockhardt's conspiracy that outweighs its harmful effect. Even if there were some conceivable

justification, the conspiracy is broader than necessary to achieve such purpose.

1852.   Wockhardt's unlawful conduct as alleged herein poses a significant and continuing

threat of antitrust injury.

1853.   Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15,

for HPI's direct purchases of the Wockhardt Drugs, or by assignment from its other subsidiaries

that directly purchased the Wockhardt Drugs during the relevant period.

### COUNT CII

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT
### OF TRADE UNDER STATE LAWS

**(As to Wockhardt and All Other Defendants Under Joint and Several Liability)**

1854.   Humana incorporates by reference the preceding allegations.

1855.    Wockhardt knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of the Wockhardt Drugs in the United States. This conspiracy was *per se* unlawful price-fixing.

1856.    Wockhardt has committed at least one overt act to further the conspiracy alleged in this Complaint. Wockhardt's anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing prices of the Wockhardt Drugs throughout the United States.

1857.    The conspiracy realized its intended effect; Wockhardt has benefited, and continues to benefit, from its anticompetitive agreements which has artificially inflated the prices of the Wockhardt Drugs.

1858.    The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

      a.    Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Wockhardt Drugs;

      b.    Humana was deprived of the benefits of free and open competition in the sale of the Wockhardt Drugs in the United States market; and

      c.    Competition in establishing the prices paid for the Wockhardt Drugs was unlawfully restrained, suppressed, or eliminated.

1859.    Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Wockhardt Drugs until the market achieves a steady state.

1860.    As a direct and proximate result of Wockhardt's unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Wockhardt Drugs than it would have paid in the absence of Wockhardt's unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

REDACTED – PUBLIC VERSION

1861.    There is no legitimate, non-pretextual, pro-competitive business justification for Wockhardt's conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1862.    Wockhardt's unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1863.    Wockhardt's conduct violated the following state antitrust or competition practices laws:

       a.  Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

       b.  Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

       c.  Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut.

       d.  D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

       e.  Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

       f.  Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

       g.  740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

       h.  Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

       i.  Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

       j.  Md. Comm. L. §§ 11-201, et seq., with respect to purchases in Maryland.

       k.  Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

       l.  Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

       m.  Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

       n.  Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

REDACTED – PUBLIC VERSION

o.  Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

p.  Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

q.  Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

r.  Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

s.  N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

t.  N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

u.  N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

v.  N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

w.  Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

x.  10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

y.  R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

z.  S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

aa.  Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

bb.  Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

cc.  Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

dd.  W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

ee.  Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

## COUNT CIII

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW

### (As to Wockhardt and All Other Defendants Under Joint and Several Liability)

1864.  Humana incorporates by reference the preceding allegations.

1865.    Wockhardt engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Wockhardt's anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase the Wockhardt Drugs at prices restrained by competition and forced to pay artificially inflated prices.

1866.    There was and is a gross disparity between the price that Humana paid and continues to pay for the Wockhardt Drugs, including by assignment from its subsidiaries, and the value received, given that more cheaply priced Wockhardt Drugs should have been available, and would have been available, absent Wockhardt's illegal conduct.

1867.    By engaging in the foregoing conduct, Wockhardt engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

a.    Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

b.    Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

c.    Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

d.    D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

e.    Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

f.    Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

g.    Idaho Code §§ 48-601, et seq., with respect to purchases in Idaho.

h.    815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

i.    5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

j.    Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

k.    Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

REDACTED – PUBLIC VERSION

l.   Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

m.   Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

n.   Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

o.   Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

p.   N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New Hampshire.

q.   N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

r.   N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

s.   N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

t.   Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u.   73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v.   R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w.   S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x.   Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y.   Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z.   Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa.   West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West Virginia.

## COUNT CIV

## UNJUST ENRICHMENT UNDER STATE LAW

**(As to Wockhardt and All Other Defendants Under Joint and Several Liability)**

1868.   Humana incorporates by reference the preceding allegations.

REDACTED – PUBLIC VERSION

1869.   Wockhardt has benefitted from artificial prices in the sale of the Wockhardt Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

1870.   Wockhardt's financial benefit resulting from its unlawful and inequitable acts are traceable to overpayments for the Wockhardt Drugs by Humana.

1871.   Humana has conferred upon Wockhardt an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

1872.   It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Wockhardt Drugs.

1873.   It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Wockhardt Drugs, as it is not liable and would not compensate Humana for the impact of Wockhardt's unlawful conduct.

1874.   The economic benefit of overcharges derived by Wockhardt through charging supracompetitive and artificially inflated prices for the Wockhardt Drugs is a direct and proximate result of Wockhardt's unlawful conduct.

1875.   The economic benefits derived by Wockhardt rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the relevant period, benefiting Wockhardt.

1876.   It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Wockhardt to be permitted to retain any of the overcharges for the Wockhardt Drugs derived from Wockhardt's unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

1877.   Wockhardt is aware of and appreciates the benefits bestowed upon it by Humana.

1878.   Wockhardt should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds it received.

REDACTED – PUBLIC VERSION

1879.   A constructive trust should be imposed upon all unlawful or inequitable sums received by Wockhardt traceable to Humana.

## COUNT CV

## DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT

### (As to Wockhardt and All Other Defendants Under Joint and Several Liability)

1880.   Humana incorporates by reference the preceding allegations.

1881.   Wockhardt knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Wockhardt Drugs. Wockhardt injured Humana through this conduct.

1882.   But for Wockhardt's scheme to inflate the price of the Wockhardt Drugs, Humana would have purchased lower-priced Wockhardt Drugs.

1883.   Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Wockhardt Drugs than it would have paid absent Wockhardt's continuing anticompetitive conduct.

1884.   Humana has purchased substantial amounts of the Wockhardt Drugs during the relevant period.

1885.   Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Wockhardt's conduct violates Sections 1 and 2 of the Sherman Act.

1886.   Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Wockhardt's unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## COUNT CVI

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT (ALL SUBJECT DRUGS)

### (As to All Defendants)

1887.   Humana incorporates by reference the preceding allegations.

1888.   Defendants knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of the Subject Drugs in the United States, in violation of Section 1 of the Sherman Act. This conspiracy was *per se* unlawful price-fixing.

1889.   Each of the Defendants has committed at least one overt act to further the conspiracy alleged in this Complaint. Defendants' anticompetitive acts had a substantial and foreseeable effect on interstate commerce by raising and fixing the Subject Drugs prices throughout the United States.

1890.   The conspiracy realized its intended effect; Defendants have benefited, and continue to benefit, from their anticompetitive agreements which have artificially inflated the prices of the Subject Drugs.

1891.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

    a.   Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Subject Drugs;

    b.   Humana was deprived of the benefits of free and open competition in the sale of the Subject Drugs in the United States market; and

    c.   Competition in establishing the prices paid for the Subject Drugs was unlawfully restrained, suppressed, or eliminated.

1892.   Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Subject Drugs until the market achieves a steady state.

1893.   As a direct and proximate result of Defendants' unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Subject Drugs than it would have

REDACTED – PUBLIC VERSION

paid in the absence of Defendants' unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

1894.    Defendants are *per se* liable under Section 1 of the Sherman Act, 15 U.S.C. § 1, for the injuries and damages caused by their contract, combination, and conspiracy in restraint of trade as alleged herein.

1895.    There is no legitimate, non-pretextual, pro-competitive business justification for Defendants' conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1896.    Defendants' unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1897.    Humana seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for HPI's direct purchases of generic the Subject Drugs, or by assignment from its other subsidiaries that directly purchased generic the Subject Drugs during the relevant periods.

## COUNT CVII

### FOR CONSPIRACY AND COMBINATION IN RESTRAINT OF TRADE UNDER STATE LAWS (ALL SUBJECT DRUGS)

#### (As to All Defendants)

1898.    Humana incorporates by reference the preceding allegations.

1899.    Defendants knowingly, intentionally, and conspiratorially engaged in anticompetitive agreements designed to drive up the cost of the Subject Drugs in the United States. This conspiracy was *per se* unlawful price-fixing.

1900.    Each of the Defendants has committed at least one overt act to further the conspiracy alleged in this Complaint. Defendants' anticompetitive acts had a substantial and foreseeable effect on commerce by raising and fixing Subject Drug prices throughout the United States.

REDACTED – PUBLIC VERSION

1901.   The conspiracy realized its intended effect; Defendants have benefited, and continue to benefit, from their anticompetitive agreements which have artificially inflated the prices of the Subject Drugs.

1902.   The contract, combination, or conspiracy had the following direct, substantial, and reasonably foreseeable effects on United States commerce:

      a.   Humana has paid, and continues to pay, artificially inflated, fixed, maintained, or stabilized prices at supracompetitive levels for the Subject Drugs;

      b.   Humana was deprived of the benefits of free and open competition in the sale of the Subject Drugs in the United States market; and

      c.   Competition in establishing the prices paid for the Subject Drugs was unlawfully restrained, suppressed, or eliminated.

1903.   Even after free and open competition begins, Humana will continue to pay supracompetitive prices for the Subject Drugs until the market achieves a steady state.

1904.   As a direct and proximate result of Defendants' unlawful conduct, Humana has been injured in its business and property in that it has paid more for the Subject Drugs than it would have paid in the absence of Defendants' unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

1905.   There is no legitimate, non-pretextual, pro-competitive business justification for Defendants' conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such purpose.

1906.   Defendants' unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

1907.   Defendants' conduct violated the following state antitrust or competition practices laws:

1908.

    a.   Arizona Rev. Stat. §§ 44-1402, et seq., with respect to purchases in Arizona.

    b.   Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

    c.   Conn. Gen. Stat. §§ 35-24, et seq., with respect to purchases in Connecticut.

    d.   D.C. Code §§ 28-4503, et seq., with respect to purchases in the District of Columbia.

    e.   Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

    f.   Hawaii Code §§ 480, et seq., with respect to purchases in Hawaii.

    g.   740 Ill. Comp. Stat. 10/3, et seq., with respect to purchases in Illinois.

    h.   Iowa Code §§ 553.5 et seq., with respect to purchases in Iowa.

    i.   Kansas Stat. Ann. §§ 50-101, et seq., with respect to purchases in Kansas.

    j.   Md. Comm. L. §§ 11-201, et seq., with respect to purchases in Maryland.

    k.   Mass. Gen. L. Ch. 93A, et seq., with respect to purchases in Massachusetts.

    l.   Me. Rev. Stat. Ann. 10, §§ 1102, et seq., with respect to purchases in Maine.

    m.   Mich. Comp. Laws Ann. §§ 445.773, et seq., with respect to purchases in Michigan.

    n.   Minn. Stat. §§ 325D.52, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

    o.   Miss. Code Ann. §§ 75-21-3, et seq., with respect to purchases in Mississippi.

    p.   Mo. Rev. Stat. §§ 416.011, et seq., with respect to purchases in Missouri.

    q.   Neb. Code Ann. §§ 59-802, et seq., with respect to purchases in Nebraska.

    r.   Nev. Rev. Stat. Ann. §§ 598A.060, et seq., with respect to purchases in Nevada.

    s.   N.H. Rev. Stat. Ann. §§ 356.11, with respect to purchases in New Hampshire.

    t.   N.M. Stat. Ann. §§ 57-1-2, et seq., with respect to purchases in New Mexico.

    u.   N.C. Gen. Stat. §§ 75-2.1, et seq., with respect to purchases in North Carolina.

REDACTED – PUBLIC VERSION

v.   N.D. Cent. Code §§ 51-08.1-03, et seq., with respect to purchases in North Dakota.

w.   Or. Rev. Stat. §§ 646.705, et seq., with respect to purchases in Oregon.

x.   10 L.P.R.A. §§ 260, et seq., with respect to purchases in Puerto Rico.

y.   R.I. Gen. Laws §§ 6-36-1 et seq., with respect to purchases in Rhode Island.

z.   S.D. Codified Laws §§ 37-1-3.2, et seq., with respect to purchases in South Dakota.

aa.   Tenn. Code Ann. §§ 47-25-101, et seq., with respect to purchases in Tennessee.

bb.   Utah Code Ann. §§ 76-10-911, et seq., with respect to purchases in Utah.

cc.   Vt. Stat. Ann. 9, §§ 2453, et seq., with respect to purchases in Vermont.

dd.   W.Va. Code §§ 47-18-4, et seq., with respect to purchases in West Virginia.

ee.   Wis. Stat. §§ 133.03, et seq., with respect to purchases in Wisconsin.

## COUNT CVIII

## UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER STATE LAW (ALL SUBJECT DRUGS)

### (As to All Defendants)

1909.   Humana incorporates by reference the preceding allegations.

1910.   Defendants engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the state consumer protection statutes listed below. As a direct and proximate result of Defendants' anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, Humana was deprived of the opportunity to purchase the Subject Drugs at prices restrained by competition and forced to pay artificially inflated prices.

1911.   There was and is a gross disparity between the price that Humana paid and continues to pay for the Subject Drugs, including by assignment from its subsidiaries, and the value received, given that more cheaply priced generic drugs should have been available, and would have been available, absent Defendants' illegal conduct.

435

REDACTED – PUBLIC VERSION

1912. By engaging in the foregoing conduct, Defendants engaged in unfair competition or deceptive acts and practices in violation of the following state laws:

    a.  Ark. Code §§ 4-88-101, et seq., with respect to purchases in Arkansas.

    b.  Ariz. Code §§ 44-1255, et seq., with respect to purchases in Arizona.

    c.  Cal. Bus. & Prof. Code §§ 17200, et seq., with respect to purchases in California.

    d.  D.C. Code §§ 28-3901, et seq., with respect to the purchases in the District of Columbia.

    e.  Fla. Stat. §§ 501.201, et seq., with respect to purchases in Florida.

    f.  Kan. Stat. §§ 50-623, et seq., with respect to the purchases in Kansas.

    g.  Idaho Code §§ 48-601, et seq., with respect to the purchases in Idaho.

    h.  815 ILCS §§ 505/1, et seq., with respect to the purchases in Illinois.

    i.  5 Me. Rev. Stat. §§ 207, et seq., with respect to the purchases in Maine.

    j.  Mass. Ann. Laws ch. 93A, et seq., with respect to purchases in Massachusetts.

    k.  Mich. Stat. §§ 445.901, et seq., with respect to purchases in Michigan.

    l.  Minn. Stat. §§ 325F.68, et seq., and Minn. Stat. § 8.31, et seq., with respect to purchases in Minnesota.

    m.  Missouri Stat. §§ 407.010, et seq., with respect to purchases in Missouri.

    n.  Neb. Rev. Stat. §§ 59-1601, et seq., with respect to purchases in Nebraska.

    o.  Nev. Rev. Stat. §§ 598.0903, et seq., with respect to purchases in Nevada.

    p.  N.H. Rev. Stat. §§ 358-A: 1, et seq., with respect to purchases in New Hampshire.

    q.  N.M. Stat. §§ 57-12-1, et seq., with respect to purchases in New Mexico.

    r.  N.Y. Gen. Bus. Law §§ 349, et seq., with respect to purchases in New York.

    s.  N.C. Gen. Stat. §§ 75-1.2, et seq., with respect to purchases in North Carolina.

    t.  Or. Rev. Stat. §§ 646.605, et seq., with respect to purchases in Oregon.

u.  73 Pa. Stat. Ann. §§ 201-1, et seq., with respect to purchases in Pennsylvania.

v.  R.I. Gen. Laws §§ 6-13.1-1, et seq., with respect to purchases in Rhode Island.

w.  S.D. Code Laws §§ 37-24-1, et seq., with respect to purchases in South Dakota.

x.  Tenn. Code §§ 47-18-101, et seq., with respect to purchases in Tennessee.

y.  Utah Code §§ 13-11-1, et seq., with respect to purchases in Utah.

z.  Va. Code Ann. §§ 59.1-196, et seq., with respect to purchases in Virginia.

aa.  West Virginia Code §§ 46A-6-101, et seq., with respect to purchases in West Virginia.

## COUNT CIX

## UNJUST ENRICHMENT UNDER STATE LAW (ALL SUBJECT DRUGS)

### (As to All Defendants)

1913.  Humana incorporates by reference the preceding allegations.

1914.  Defendants have benefitted from artificial prices in the sale of the Subject Drugs resulting from the unlawful and inequitable acts alleged in this Complaint.

1915.  Defendants' financial benefit resulting from their unlawful and inequitable acts are traceable to overpayments for the Subject Drugs by Humana.

1916.  Humana has conferred upon Defendants an economic benefit, profits from unlawful overcharges, to the economic detriment of Humana.

1917.  It would be futile for Humana to seek a remedy from any party with whom it has privity of contract for its indirect purchases of the Subject Drugs.

1918.  It would be futile for Humana to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which it purchased the Subject Drugs, as it is not liable and would not compensate Humana for the impact of Defendants' unlawful conduct.

1919.    The economic benefit of overcharges derived by Defendants through charging supracompetitive and artificially inflated prices for the Subject Drugs is a direct and proximate result of Defendants' unlawful conduct.

1920.    The economic benefits derived by Defendants rightfully belong to Humana, as it paid anticompetitive and monopolistic prices during the relevant periods, benefiting Defendants.

1921.    It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories in the United States, except Ohio and Indiana, for Defendants to be permitted to retain any of the overcharges for the Subject Drugs derived from Defendants' unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

1922.    Defendants are aware of and appreciate the benefits bestowed upon them by Humana.

1923.    Defendants should be compelled to disgorge in a common fund for the benefit of Humana all unlawful or inequitable proceeds they received.

1924.    A constructive trust should be imposed upon all unlawful or inequitable sums received by Defendants traceable to Humana.

## COUNT CX

### DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 16 OF THE CLAYTON ACT FOR VIOLATIONS OF SECTIONS 1 AND 2 OF THE SHERMAN ACT (ALL SUBJECT DRUGS)

#### (As to All Defendants)

1925.    Humana incorporates by reference the preceding allegations.

1926.    Defendants knowingly, intentionally, and cooperatively engaged in an anticompetitive scheme designed to artificially inflate prices of the Subject Drugs. Defendants injured Humana through this conduct.

REDACTED – PUBLIC VERSION

1927.   But for Defendants' scheme to inflate the price of the Subject Drugs, Humana would have purchased lower-priced Subject Drugs.

1928.   Humana has suffered harm, and will continue to suffer harm in the future, as a result of paying higher prices for the Subject Drugs than it would have paid absent Defendants' continuing anticompetitive conduct.

1929.   Humana has purchased substantial amounts of the Subject Drugs during the relevant periods.

1930.   Humana seeks a declaratory judgment under Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201(a) ruling that Defendants' conduct violates Sections 1 and 2 of the Sherman Act.

1931.   Humana seeks equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct for the anticompetitive market effects caused by Defendants' unlawful conduct, and other relief to assure that similar anticompetitive conduct does not recur.

## XIV.   DEMAND FOR JUDGMENT

WHEREFORE, Humana demands judgment against Defendants, as follows:

A.   Declaring the acts alleged herein to constitute unlawful restraints of trade in violation of the Sherman Act, 15 U.S.C. §§ 1-2;

B.   Entering judgment against Defendants, jointly and severally, for the damages sustained by Humana, and awarding Humana actual, consequential, compensatory, treble, punitive, and/or other damages, in an amount to be proven at trial, including pre-judgment and post-judgment interest at the statutory rates;

C.   Awarding Humana its reasonable costs and expenses, including attorneys' fees; and

D.   Awarding all other legal or equitable relief as the Court deems just and proper.

REDACTED – PUBLIC VERSION

## XV.    JURY DEMAND

Humana demands a jury trial on all claims so triable under Federal Rule of Civil Procedure

Rule 38(b).

Dated:February 1, 2024                          Respectfully submitted:

**LOWEY DANNENBERG, P.C.**


By: _ Laura K. Mummert_
Laura K. Mummert, PA ID # 85964
One Tower Bridge
100 Front Street, Suite 520
West Conshohocken, Pennsylvania 19428
Tel: 215-399-4770
LMummert@lowey.com

**LOWEY DANNENBERG, P.C.**
Peter D. St. Phillip, PA ID # 70027
Thomas Skelton (admitted pro hac vice)
44 South Broadway, Suite 1100
White Plains, New York 10601
Tel. 914-997-0500
PStPhillip@lowey.com
JRisener@lowey.com

**SCHNEIDER WALLACE COTTRELL
KONECKY LLP**

Todd Schneider
Jason Kim
2000 Powell Street, Suite 1400
Emeryville, California 94608
Tel.: 415-421-7100
tschneider@schneiderwallace.com
jkim@schneiderwallace.com

_Counsel for Humana Inc._